## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID W. NATCHER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:16-cv-219 ERIE |
| | ) | |
| v. | ) | |
| | ) | |
| ACCURIDE CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | Electronically Filed |

## PLAINTIFF'S RESPONSE AND COUNTER-STATEMENT TO DEFENDANT'S CONCISE STATEMENT OF MATERIAL FACTS

Plaintiff, David W. Natcher, by his attorneys, Ainsman Levine, LLC., files the following

Concise Statement of Material Facts in Opposition of Motion for Summary Judgment, pursuant

to LCvR 56.B.1 of the Local Rules of the United States District Court for the Western District of

Pennsylvania:

## RESPONSE TO DEFENDANT'S CONCISE STATEMENT OF MATERIAL FACTS

Plaintiff generally objects to Defendant's Concise Statement of Material Facts to the extent

that the "facts" set forth contain legal argument, interpretation of and inferences from the testimony,

and/or set forth one version of a fact as testified to while omitting another witness' observation or

testimony as to the same item or event. Many of Defendant's material facts are disputed in the

testimony, and the disputes are both significant and germane to the Court's consideration of

Defendant's legal argument (e.g., one witness testified that events occurred on the north side of the

relevant conveyor and another witness testified that the same events occurred on the south side of the

conveyor). The evidence in this case is largely testimonial in nature, particularly as to how the

{AL545213.1}                                         1

incident itself occurred, and it will be necessary for the jury to hear the testimony and judge the witnesses' credibility in reconciling these differences.

1.      DENIED as stated. It is ADMITTED that on April 15, 2016, Plaintiff, David W. Natcher, an employee of Birkmire Trucking LLC, was injured while Accuride employee, Donald Herrmann, and Plaintiff loaded a conveyor onto a flatbed trailer at the Accuride manufacturing facility in Erie, Pennsylvania. (Complaint, ¶¶ 5-17).

2.      ADMITTED.

3.      DENIED as stated. It is ADMITTED that Plaintiff was standing on the flatbed trailer on which the conveyor had been placed with an overhead crane operated by Accuride employee, Donald Herrmann. However, after Plaintiff had unhooked the conveyor and Mr. Herrmann began raising the crane, the conveyor chains started hitting the side of the conveyor as the crane was lifting them causing the conveyor to first start to shake and then to tip over. As a result, Plaintiff fell off or jumped from the flatbed trailer onto the shop floor approximately four (4) feet below. (Complaint, ¶ 11, 16-17) (Natcher Depo., pp. 157-160, 163).

4.      ADMITTED except for the clarification that Plaintiff is unsure whether he fell from the trailer or jumped from the trailer in an effort to escape the conveyor. (Natcher Depo., pp. 59-60, 165-166.)

5.      DENIED. The individuals present at the time testified as to what they saw and heard happening at the time the conveyor tipped over. Plaintiff knows that either the chains or a hook, which were connected to the chains, being raised with the crane caused the conveyor to tip. (Natcher Depo., pp. 164-165, 181, 203). This is also Mr. Herrmann's belief, and while he denies observing this happen, his credibility is a question of fact for a jury to determine. (Herrmann Depo., pp. 100-101).

{AL545213.1}                                        2

6.      ADMITTED.

7.      ADMITTED.

8.      DENIED as stated. Accuride employees described the conveyor as "large, heavy, and awkward," but this description was not adopted by Plaintiff, who testified that the machine was not heavy and was "pretty much straightforward" as far as the characteristics of the load. (Natcher Depo. pp. 47-48.)

9.      ADMITTED as to the representation of the testimony. Aside from Mr. Herrmann's testimony, there has been no evidence of the configuration of the conveyor when installed.

10.     ADMITTED as to the representation of the testimony. The configuration of the conveyor can be viewed and assessed through the photographs.

11.     ADMITTED.

12.     ADMITTED.

13.     ADMITTED.

14.     ADMITTED.

15.     ADMITTED.

16.     ADMITTED.

17.     It is ADMITTED that Natcher has a recollection of safety meetings at which securement of cargo was addressed, however, there is no indication that securement of cargo was the topic of every annual safety meeting. Natcher has worked a truck driver for the length of time described, but to the extent the entirety of his driving career is described as "on the job training," this does not reflect his testimony.

18.     ADMITTED.

{AL545213.1}                              3

19.     DENIED as stated.  Although Plaintiff did some work for Hoffman Riggers and Hoffman Riggers moves machinery, Plaintiff was not an employee, he was just an over-the-road trucker that hauled items for them.  (Natcher Depo., p. 68).

20.     DENIED as stated.  Plaintiff has received on-the-job training over the years on loading all different types, shapes, and sizes of cargo, including oversized loads. (Natcher Depo., p. 69).

21.     It is ADMITTED that Plaintiff loaded or unloaded using overhead cranes before, interacted with crane operators who were up in the booth on the overhead crane, and interacted with crane operators who operated the crane using a pendant and remote.  (Natcher Depo., pp. 85-86).  It is DENIED that Plaintiff never loaded at Accuride using an overhead crane.  Plaintiff testified that he never loaded at Accuride previously using the particular crane in use on the day of the incident, but Plaintiff had loaded at Accuride before when cranes were in use.  Plaintiff loaded in the bay next to the bay where the incident occurred and testified that in the adjacent bay on the prior load there was "a crane operator and two or three guys with him."  (Natcher Depo., p. 145.)

22.     ADMITTED.

23.     It is ADMITTED that Plaintiff did not see anybody do anything or see anything that made him think that Accuride was not safe during his prior pickups or deliveries at Accuride. (Natcher Depo., p. 85).  However, Plaintiff also testified that on the day of the incident, he wondered about the safe practices at Accuride based on his observations of the crane operator.  (Natcher Depo., pp. 84-85.)

24.     DENIED as stated.  Defendant provides no citation for this assertion.

25.     ADMITTED as to the representation of the testimony.

26.     ADMITTED as to the representation of the testimony.

{AL545213.1}                                      4

27.     ADMITTED as to the representation of the testimony.

28.     ADMITTED as to the representation of the testimony.

29.     It is ADMITTED that Mr. Herrmann testified he worked for Metro Machine for almost ten years where he operated an overhead crane and served as a crane inspector. (Herrmann Depo., p. 14.)   Mr. Herrmann stated that he operated cranes "all the time," which was his characterization of his own usage.

30.     DENIED as stated.  Mr. Herrmann testified that Metro Machine had four different overhead cranes and that he had to do "something" with one of the cranes on a near daily basis. (Herrmann Depo., pp. 16-17.)

31.     ADMITTED as to the representation of the testimony.

32.     DENIED as stated.  Mr. Herrmann testified that he loaded and unloaded flatbeds.  As to the use of spotters he testified:

> Q:     During the time period you were at Metro Machine when you would be loading and unloading flatbeds, would you be the only employee from Metro Machine involved in that process?
> **A:     It depends.  Usually it would be me and the driver.**
> Q:     At any point in time at Metro Machine, did they provide spotters or any individuals from Metro Machine to assist in the loading or unloading process?
> **A:     Only if the truckdriver did a lot of the spotting.**
> Q:     Who would decide if somebody from Metro Machine needed to come and assist?  Would that be you as the crane operator or someone else?
> **A:     I would call my lead man and ask him for another guy because I needed, you know, two people depending on the size of a load.**

(Herrmann Depo. p. 18.)

33.     It is ADMITTED as to the representation of the testimony that Herrmann did not do as much crane operating because Erie Shipbuilding had a specific crane operator. (Herrmann Depo., p. 145).

34.     ADMITTED as to the representation of the testimony.

35.     ADMITTED as to the representation of the testimony.

36.     It is ADMITTED that Mr. Herrmann testified to attending crane training in 2008 while at Accuride. Mr. Herrmann did not recall any crane safety meeting in October 2011, but testified that he is required to attend each safety meeting. (Herrmann Depo., pp. 25-29.)

37.     DENIED as stated. Mr. Herrmann testified that he attended monthly safety meetings. Each monthly safety meeting did not cover crane-specific functions. Plaintiff requested all documents evidence crane training during the time period Mr. Herrmann was employed with Accuride. Accuride produced a log of the monthly safety meetings for the year of 2011, with the October meeting reflecting training regarding the crane. This was the only monthly safety meeting identified by Accuride as pertaining to crane training. Mr. Herrmann testified that there were weekly toolbox talks, run by the foreman, that may have touched upon "a crane, a forklift, rigging, cribbing" and other various matters brought up by the foreman. (Herrmann Depo., p. 29.) No record of the toolbox talks or the topics covered has been produced by Accuride in response to Plaintiff's Request for Production of Documents. (See Defendant's Responses to Request for Production of Documents & Accuride Documents 161-163, produced as Exhibits 3-4 of Plaintiff's Appendix.)

38.     ADMITTED as to the representation of the testimony.

39.     ADMITTED as to the representation of the testimony.

40.     ADMITTED as to the representation of the testimony.

41.     ADMITTED as to the representation of the testimony.

42.     ADMITTED as to the representation of the testimony.

43.     ADMITTED as to the representation of the testimony.

44.     ADMITTED as to the representation of the testimony.

45.    ADMITTED.

46.    ADMITTED.

47.    ADMITTED.

48.    DENIED. Under the "Special Instructions" section on the Bill of Lading prepared by Accuride, it provides, "Looking for an accordion sided flatbed." (Bill of Lading – Ex. M of Defendant's Appendix). Birkmire followed the instructions specifically provided by Accuride in sending an accordion sided flatbed.

49.    DENIED as stated. The accordion sided flatbed trailer involved in the incident had an aluminum deck. (Natcher Depo., p. 89.) Plaintiff testified that Birkmire had wood deck trailers, but specifically identified two wood deck trailers – those being a "double-drop trailer and a drop deck." (Natcher Depo., p. 89.) There was no testimony in this matter from any individual that Birkmire had an accordion sided flatbed trailer, as specifically requested by Accuride, that had a wood deck. The two trailers identified by Plaintiff as having a wood deck are not accordion sided flatbeds. Furthermore, there was no testimony that Accuride requested a wood deck trailer, and no such specification is set forth in the bill of lading.

50.    DENIED. Plaintiff's testimony as to why the particular trailer was selected was equivocal and he ultimately testified that he "doesn't know for sure" why the particular trailer was selected or what, if any, cargo would be coming back from Wisconsin. (Natcher Depo., pp. 88-89.) Under the "Special Instructions" section on the Bill of Lading prepared by Accuride, it provides, "Looking for an accordion sided flatbed." (Bill of Lading – Ex. M of Defendant's Appendix). Birkmire followed the instructions specifically provided by Accuride in sending an accordion sided flatbed.

51.    ADMITTED.

{AL545213.1}                                    7

52.    ADMITTED.

53.    ADMITTED.

54.    ADMITTED as to the representation of the testimony. It is DENIED to the extent this allegation suggests that when the act of rigging ends or begins or the specific definition of "rigging" is defined solely by Plaintiff's opinion and description.

55.    It is ADMITTED that Plaintiff responded "no" when he was asked if he was "critical of the fact that there wasn't a separate person there designated as the rigger." However, Plaintiff stated that it would have been helpful to have a spotter there. (Natcher Depo., p. 118, 145). Furthermore, Plaintiff's counsel objected on the record to this line of questioning, stating that Plaintiff's expert will address Defendant's conduct. (Natcher Depo., p. 145.)

56.    It is ADMITTED that Plaintiff testified that he and Herrmann were able to hear each other and that Plaintiff did not have to shout when the two were 10 or 15 feet apart. (Natcher Depo., pp. 104-106, 120-121).

57.    DENIED. Herrmann testified that they were communicating with hand signals because a big ventilation system in the building was very noisy. Herrmann also stated, that "I'm sure [Plaintiff] tried to say something to me like over more or up a little more or something. But in that building, you're not going to hear unless you scream, so you use both. You're verbal, but you always use your hand signals. It's just an automatic, you know." (Herrmann Depo., p. 78). Mr. Herrmann confirmed that he was *not* able to hear Plaintiff if he was saying anything during the process of loading the equipment. (Herrmann Depo., pp. 78-79.)

58.    ADMITTED.

59.    ADMITTED.

{AL545213.1}                          8

60.    DENIED.  The responsibility of each person involved is the subject of extensive expert opinion and testimony in this matter. (Gualardo Depo., pp. 91-100; Guarlardo Expert Report, filed of record at Document No. 25.)  Plaintiff's expert testified that the crane operator has total control of the crane and the work area until the load is successfully placed on the flatbed trailer and the crane operator had removed the crane from the area.  (Gualardo Depo., p. 98.)  Mr. Herrmann's personal opinion of when his responsibility ended is not controlling and is a matter to be determined by a jury after assessing all of the testimony in this matter.

61.    DENIED.  The responsibility of each person involved is the subject of extensive expert opinion and testimony in this matter. (Gualardo Depo., pp. 91-100; Gualardo Expert Report, filed of record at Document No. 25.)  Plaintiff's expert testified that the crane operator has total control of the crane and the work area until the load is successfully placed on the flatbed trailer and the crane operator has removed the crane from the area.  (Gualardo Depo., p. 98, 141.)  Mr. Herrmann's personal opinion of when his responsibility ended is not controlling and is a matter to be determined by a jury after assessing all of the testimony in this matter.

62.    It is ADMITTED that Plaintiff's responsibility was to secure the load for transport.  In securing the load, Plaintiff is referring to what is necessary to ensure it is safe to be transported over the road.  Plaintiff considered weight distribution, what straps to use, and the area the load is transported through.  Plaintiff stated that "Chicago is kind of a rough area to run through – with loose chains." (Natcher Depo., p. 62, 111, 113, 133).  It is DENIED that positioning the conveyor is part of securing the load.  Plaintiff, by de facto, directed the crane operator where to place the conveyor because Accuride did not have riggers, spotters, or anyone present aside from Mr. Herrmann, who could not perform all of the necessary tasks to position the conveyor alone. (Gualardo Depo., pp. 91-100.)

{AL545213.1}                              9

63.     DENIED.  Plaintiff determined where he wanted the conveyor positioned on the trailer, however, Mr. Herrmann was responsible for placing the load on the truck to the driver's satisfaction.  (Natcher Depo., p. 119; Herrmann Depo., p. 71; Gualardo Depo., pp. 91-100.)

64.     ADMITTED.

65.     DENIED as stated.  Plaintiff stated that it would not be unusual for different drivers to secure a load differently.  (Natcher Depo., pp. 69-70.)  However, there is a difference between the loading process and securing a load after it has been loaded.  Plaintiff's expert testified extensively about the general safety procedures that are to be used to loading *any* item using a crane.  (Gualardo Depo., pp. 91-100, 124-125, 131-132, 138-142, 233-236.)

66.     DENIED.  The crane operator is responsible for placing the load on the trailer and all aspects of the crane operations.  (Natcher Depo., p. 142; Herrmann Depo., pp. 71, 74, 95).  The responsibility of each person involved is the subject of extensive expert opinion and testimony in this matter.  (Gualardo Depo., pp. 91-100; Gualardo Expert Report, filed of record at Document No. 25.) Plaintiff's expert testified that the crane operator has total control of the crane and the work area until the load is successfully placed on the flatbed trailer and the crane operator has removed the crane from the area.  (Gualardo Depo., p. 98, 141.)  Mr. Herrmann's personal opinion of when his responsibility ended is not controlling and is a matter to be determined by a jury after assessing all of the testimony in this matter.

67.     ADMITTED.

68.     ADMITTED.

69.     It is ADMITTED that Plaintiff testified he personally was not critical of Accuride that he was allowed to climb onto the trailer; however, there are plants that do not allow the driver on the trailer during the loading process.  (Natcher Depo., p. 137-139).  Plaintiff's opinion as to this is

{AL545213.1}                                      10

reflective of Plaintiff's expert's testimony as to the conduct of employees in the workplace and Plaintiff's expert testified extensively as to the fact that it was improper for Accuride to place Plaintiff in this situation and that Plaintiff never should have been allowed on the trailer or in the vicinity of the crane during any portion of the lift or crane operations. (Gualardo Depo., pp. 91-100, 124-125, 131-132, 138-142, 233-236.)

70.    Plaintiff testified in this manner; however Plaintiff's opinion as to this is reflective of Plaintiff's expert's testimony as to the conduct of employees in the workplace and Plaintiff's expert testified extensively that it was improper for Accuride to place Plaintiff in this situation and that Plaintiff never should have been allowed on the trailer or in the vicinity of the crane during any portion of the lift or crane operations. (Gualardo Depo., pp. 91-100, 124-125, 131-132, 138-142, 233-236.) Plaintiff further testified that "it's a crapshoot" whether he is permitted on a trailer, required to be on a trailer, or prohibited from being on a trailer in any particular facility or site. (Natcher Depo., pp. 137-138.)

71.    ADMITTED.

72.    ADMITTED.

73.    DENIED. Plaintiff did not testify that he knew, on the day of the accident, how each foot plate would be in contact with the trailer bed or the wooden cribbing. When Plaintiff was presented with a picture of a conveyor that was "[m]aybe not the exact same unit" and asked if the feet were sitting flat on the cribbing, Plaintiff stated, "I don't recall – I don't recall – you tell me this is the same conveyor." (Natcher Depo., p. 117).

74.    DENIED. Plaintiff did not testify that he knew, on the day of the accident, how each foot plate would be in contact with the trailer bed or the wooden cribbing. When Plaintiff was presented with a picture of a conveyor that was "[m]aybe not the exact same unit" and asked if the

{AL545213.1}                               11

feet were sitting flat on the cribbing, Plaintiff stated, "I don't recall – I don't recall – you tell me this is the same conveyor." (Natcher Depo., p. 117). Plaintiff intended to use cribbing for the unit because of the risk of damage to the aluminum decking, which could cause the load to become unsecure during transport. (Natcher Depo., pp. 132-133.)

75.    ADMITTED.

76.    ADMITTED.

77.    ADMITTED.

78.    DENIED as stated. Plaintiff stated that he did not believe that placing the conveyor on cribbing made it less stable and observed that the conveyor was stable on the cribbing until the crane operator started dragging the crane slings up the side of the conveyor. (Natcher Depo., pp. 127, 134, 192.)

79.    ADMITTED.

80.    DENIED. It is impossible to know if Herrmann had concerns that he did not express. It is ADMITTED that Herrmann did not discuss cribbing with Plaintiff. (Herrmann Depo., 71-72). Herrmann only testified that he disagreed with the use of cribbing, not that he had "concerns."

81.    DENIED as stated. As set forth previously, the equipment was only described as heavy and awkward by Defendant's representatives and was not characterized as such by Plaintiff or any other individual. Mr. Herrmann testified as to his thoughts on the cribbing, but admitted he did not express those concerns to anyone during the process of loading nor did he call a supervisor or any other individual, which he knew he could do. (Herrmann Depo., pp. 71-74.) Furthermore, Herrmann never testified that the cribbing actually made the load unstable in any way from his observations. He instead testified that the conveyor sat on the cribbing during the entire process of Plaintiff walking around the conveyor and detaching the crane slings and that the conveyor only moved when

{AL545213.1}                    12

he started to operate the crane.  (Herrmann Depo., pp. 80-82.)  The veracity of Mr. Herrmann's testimony as to his internal thoughts, only stated during his deposition and not expressed during the course of operations, are for the jury to determine.

82.    DENIED as stated.  Mr. Herrmann testified as to his thoughts on the cribbing, but admitted he did not express those concerns to anyone during the process of loading nor did he call a supervisor or any other individual, which he knew he could do.  (Herrmann Depo., pp. 71-74.) Furthermore, Mr. Herrmann never testified that the cribbing actually made the load unstable in any way from his observations, that the conveyor sat on the cribbing during the entire process of Plaintiff walking around the conveyor and detaching the crane slings, and that the conveyor only moved when he started to operate the crane.  (Herrmann Depo., pp. 80-82.)  The veracity of Mr. Herrmann's testimony as to his internal thoughts, only stated during his deposition and not expressed during the course of operations, are for the jury to determine.

83.    ADMITTED.

84.    DENIED as stated.  It is ADMITTED that Herrmann operated the crane and heeded Plaintiff's directions to move north, south, east, west, up and/or down, because Plaintiff was the one "walking around looking at everything to make sure it's going to sit the way he's satisfied with." (Natcher Depo., p. 140; Herrmann Depo., pp. 91-93).  The crane operator is responsible for placing the load on the trailer and all aspects of the crane operations.  (Natcher Depo., p. 142; Herrmann Depo., pp. 71, 74, 95).  The responsibility of each person involved is the subject of extensive expert opinion and testimony in this matter.  (Gualardo Depo., pp. 91-100; Gualardo Expert Report, filed of record at Document No. 25.)  Plaintiff's expert testified that the crane operator has total control of the crane and the work area until the load is successfully placed on the flatbed trailer and the crane operator had removed the crane from the area.  (Gualardo Depo., p. 98, 141.)  Mr. Herrmann was in

{AL545213.1}                                13

control of the crane and did not have to follow Plaintiff's directions or permit Plaintiff to be involved in the loading process at all.

85.    ADMITTED as to the representation of Mr. Herrmann's testimony.  Plaintiff did not recall whether this occurred or not, but testified it was possible.  (Natcher Depo., pp. 141-142.)

86.    ADMITTED.

87.    DENIED as stated. It is ADMITTED that Plaintiff did not use temporary bracing or securement before unhooking the chains.  Plaintiff did, however, ensure that the conveyor was stable before he started unhooking the chains and testified that temporary bracing was not required for this load.  (Natcher Depo., pp. 127, 166).

88.    DENIED as stated. It is ADMITTED that Plaintiff did not strap down the conveyor before unhooking the chains because he "did not consider it as being a threat" after he ensured the conveyor was stable.  (Natcher Depo., pp. 127, 167, 184).  Plaintiff further testified that securing the load prior to unhooking it from the crane would not be standard practice and that he intended to use the eye hooks where the crane was attached as the points to secure the conveyor to the flatbed, which he could not do until the crane was unhooked.  (Natcher Depo., pp. 112-113, 184-185,.)

89.    ADMITTED.

90.    DENIED.  Herrmann testified that they communicated using hand signals because "[y]ou can't hear."  Herrmann also testified that, "I'm sure [plaintiff] tried to say something to me like over more or up a little more or something.  But in that building, you're not going to hear unless you scream."  (Herrmann Depo., pp. 77-78.)

91.    DENIED as stated. It is ADMITTED that Herrmann testified he positioned himself in a location where he could see Plaintiff as Plaintiff walked around the conveyor unhooking the chains.

{AL545213.1}                                14

(Herrmann Depo., pp. 79-80).  There is conflict between the testimony of Plaintiff and Mr. Herrmann as to whether they remained in eye contact at all times or whether they maintained visual sight lines at all times during the loading process, particularly at the moment Mr. Herrmann began lifting the crane after Plaintiff had unhooked the crane slings.

92.    ADMITTED.

93.    ADMITTED.  For purposes of clarification, Plaintiff's testimony indicates that he ended with the hook closest to the front driver side of the flatbed, then placed the last chain sling with the others on the conveyor, as described.

94.    ADMITTED.

95.    ADMITTED.

96.    DENIED.  Plaintiff unhooked the chains and piled them on top of what he described as a flat spot on the deck of the conveyor.  It is ADMITTED that Herrmann did not instruct Plaintiff on where to place the chains. (Natcher Depo., pp. 153, 173).  Furthermore, from where Mr. Herrmann was standing, he could not see exactly where Plaintiff placed the chains as he removed them. (Herrmann Depo., pp. 83-85.)  Mr. Herrmann believed all of the chains were on the north side of the conveyor. (Herrmann Depo., pp. 83-84.)  He testified that he never asked Plaintiff to do anything specific with the chains and "assumed he knowed" even though he had never met Plaintiff before that day. (Herrmann Depo., p. 85.)

97.    ADMITTED.

98.    DENIED as stated.  Plaintiff told Herrmann "okay, take them up." (Natcher Depo., pp. 153, 156).

99.    DENIED as stated.  At the time Plaintiff told Herrmann to raise the chains, Plaintiff was beside the conveyor at the location marked "N-4" on Natcher Depo. Ex.4.  The chains and hooks

{AL545213.1}                                          15

were piled on the conveyor deck labeled "pile chain" on Natcher Depo. Ex. 4. (Natcher Depo., pp. 156-157; Natcher Depo. Ex. 4).

100.    DENIED as stated. After telling Herrmann to raise the chains, Plaintiff walked to the front of the trailer by the curtain (marked as "N-3" on Natcher Depo. Ex. 4) because it was a safe spot to stand in his opinion. Plaintiff never testified that he "retreated." Furthermore, despite Plaintiff describing position as N-3 as a "safe spot" in response to counsel's suggestion, Plaintiff only stated he was out of the way of the hoist and off to the side at N-3. (Natcher Depo., p. 157.) Plaintiff's expert testified that there is no safe spot on that trailer to stand while the crane is in operation and Mr. Herrmann should have refused to allow Plaintiff to remain anywhere on or near the trailer during crane operations. (Gualardo Depo., pp. 91-100, 124-125, 131-132, 138-142, 233-236.)

101.    ADMITTED.

102.    DENIED. At that location ("N-3"), Plaintiff said that he was "out of the way of the hoist and stuff," but he did not admit that he would have been out of the way had the conveyor tipped over to the north. (Natcher Depo., p. 157; Natcher Depo. Ex. 4).

103.    DENIED as stated. After Plaintiff told Herrmann to take up the chains, Herrmann started raising the chains. (Natcher Depo., p. 157).

104.    DENIED as stated. Herrmann did not begin to lift the chains before Plaintiff was ready or before Plaintiff told him to. (Natcher Depo., pp. 171-172.)

105.    ADMITTED.

106.    DENIED as stated. Plaintiff was standing at the front on the trailer by the curtain (N-3) when the chains slid off the conveyor deck. (Natcher Depo., pp. 157,158; Natcher Depo. Ex. 4). The characterization of this area as a safe spot is denied. Plaintiff's expert testified that there is no

{AL545213.1}    16

safe spot on that trailer to stand while the crane is in operation and Mr. Herrmann should have refused to allow Plaintiff to remain anywhere on or near the trailer during crane operations. (Gualardo Depo., pp. 91-100, 124-125, 131-132, 138-142, 233-236.)

107.    DENIED as stated.  Plaintiff heard the chains hit the deck of the aluminum trailer, saying "[i]t's just loud."  Although he did not actually observe all the chains and hooks on the south side, he knows they were on the south side because they fell off the conveyor, they were all off the side of the conveyor, and were not on the north side.  (Natcher Depo., pp. 157-158).

108.    DENIED as stated.  Plaintiff does not know if Herrmann was aware that the chains slid off, but he "figured he would have known enough to stop the chains [b]ecause they were dragging up the side of the conveyor."  (Natcher Depo., p. 159).

109.    ADMITTED.

110.    DENIED as stated.  Plaintiff never testified that he "knew" that one of the things that could happen if the chains dragged up the side of the conveyor was that the chains or hooks might catch on the conveyor causing the conveyor to tip over.  It was only after Accuride's counsel suggested that a chain or hook might catch and flip the machine three times that Plaintiff testified that he was worried about that occurring.  Accuride then chose to omit its leading question in the middle of this exchange in its Concise Statement of Material Fact.

> Q: Why did you know it was not a good thing for them to be dragging up the side of the machine?
>
> A: Just it shouldn't be – they shouldn't be dragging up the side of the machine.
>
> Q: Well, were you concerned that if they dragged up the side of the machine, they could tip the machine over?
>
> A: It was – that was in the back of my mind, but that's – I was just trying to get them away from the machine.

{AL545213.1}                                    17

> Q: But one of the things that would make it improper or not
> desirable for the chains to be dragging up the side of the machine,
> they might scratch the machine. They might get caught on
> something. Right?
>
> A: Yes.
>
> Q: Okay.
>
> A: I don't think I was so worried about them scratching the
> machine, but –
>
> Q: You were more worried about them maybe getting caught or –
>
> A: Getting caught and flipping the machine –
>
> Q: Sure.
>
> A: -- off the trailer.

(Natcher Depo., pp. 161-162.) Plaintiff also testified that before he walked over toward the conveyor

to push the chains out of the way, he had no thought that the conveyor was going to tip over:

> Q: When you were asked earlier about the fact that you walked over
> to the piece of equipment when you the – or hear the chains dragging
> up the side of it –
>
> A: Um-hum.
>
> Q: -- when you walked over into that area, did you have any thought
> that this thing was going to tip over and hit you?
>
> A: No.

(Natcher Depo., p. 241.)

111.    DENIED as stated. After the chains slipped off the side of the conveyor, "the chains

were still going up, dragging along the side of the conveyor." At this point, Plaintiff went to the side

of the conveyor opposite the chains to try get the chains away from the machine. (Natcher Depo., pp.

158-159). The characterization of this area as a safe spot is denied. Plaintiff's expert testified that

{AL545213.1}                                          18

there is no safe spot on that trailer to stand while the crane is in operation and Mr. Herrmann should have refused to allow Plaintiff to remain anywhere on or near the trailer during crane operations. (Gualardo Depo., pp. 91-100, 124-125, 131-132, 138-142, 233-236.)

112.    DENIED as stated. It is ADMITTED that plaintiff did not communicate or direct Herrmann to stop raising the chains before he left the front of the trailer by the curtain (N-3) and went to the side of the conveyor (N-4), but Plaintiff testified that he believed Herrmann would know to do that because of the chains dragging up the side of the conveyor. (Natcher Depo., p. 159; Natcher Depo. Ex. 4). The characterization of this area as a safe spot is denied. Plaintiff's expert testified that there is no safe spot on that trailer to stand while the crane is in operation and Mr. Herrmann should have refused to allow Plaintiff to remain anywhere on or near the trailer during crane operations. (Gualardo Depo., pp. 91-100, 124-125, 131-132, 138-142, 233-236.)

113.    DENIED as stated. It is ADMITTED that Plaintiff does not know whether Herrmann knew the chains had slipped off and were dragging up the side of the conveyor when Plaintiff left the front of the trailer by the curtain (N-3). (Natcher Depo., p. 159; Natcher Depo. Ex. 4). However, Plaintiff believed that Mr. Herrmann, as the crane operator, was observing the operations and was on the south side of the flatbed, which is the side where the chains were dragging. Plaintiff could never testify as to what was in Mr. Herrmann's mind, but his observations included hearing the chains hit the deck of the trailer, not on the north side, and having seen Mr. Herrmann previously on the south side of the flatbed.

114.    DENIED. Plaintiff answered "yes" when he was asked, "If the chains were being lifted and caught on something, wouldn't it stand to reason that the unit would tip to the north?" Plaintiff did not testify that he knew the conveyor would flip toward him if a chain or hook caught

and later testified that the possibility of the conveyor tipping over was not in his mind as he walked toward where the chains were dragging up the side of the machinery. (Natcher Depo., pp. 162, 241.)

115.    DENIED as stated. As soon as Plaintiff arrived at the side of the conveyor opposite the chains, the conveyor started shaking. Plaintiff never described the motion as a wobble. (Natcher Depo., p. 163). Defense counsel attempted to lead Plaintiff into testifying that the conveyor wobbled, but Plaintiff never adopted this description and in fact contradicted the assertion that the unit "wobbled:"

> Q: Okay. You don't know. So when the unit began to tip, did it wobble and then tip?
>
> A: It – it was shaking.

(Natcher Depo., p. 164.) The word "wobble" appears only three times in Plaintiff's deposition transcript, on pages 154, 164, and 169, each time used by defense counsel.

116.    DENIED as stated. Plaintiff was not able to reach the chains because the conveyor started shaking. Instead, Plaintiff held his hands out and said "whoa, whoa, whoa," in an attempt to "take the shakes" out of the machine. (Natcher Depo., p. 163).

117.    DENIED as stated. Plaintiff said, "whoa, whoa, whoa," but there is no testimony in the record as to what Plaintiff intended by the statement. Plaintiff was never asked this question. (Natcher Depo., pp. 160-163.)

118.    DENIED as stated. Plaintiff said, "whoa, whoa, whoa," but there is no testimony in the record as to what Plaintiff intended by the statement. Plaintiff was never asked this question. (Natcher Depo., pp. 160-163.) The characterization of any area of the trailer as "safe" or "dangerous" is denied. Plaintiff's expert testified that there is no safe spot on that trailer to stand while the crane is in operation and Mr. Herrmann should have refused to allow Plaintiff to remain

anywhere on or near the trailer during crane operations. (Gualardo Depo., pp. 91-100, 124-125, 131-132, 138-142, 233-236.)

119.    DENIED.  Plaintiff's criticisms were that Herrmann did not react quickly enough either to stop raising the chains or to trolley the chains to the south away from the conveyor.  Plaintiff also stated that Herrmann should have known that the chains slid off the side off the conveyor. (Natcher Depo., pp. 159, 173-174, 192-193).  Plaintiff's personal opinion is amplified by Plaintiff's expert's testimony as to the conduct of employees in the workplace and the fact that it was improper for Accuride to place Plaintiff in this situation and that Plaintiff never should have been allowed on the trailer or in the vicinity of the crane during any portion of the lift or crane operations.  (Gualardo Depo., pp. 91-100, 124-125, 131-132, 138-142, 233-236.)

120.    ADMITTED.

121.    ADMITTED as to the representation of the testimony; however, this statement is confusing as stated.

122.    DENIED.  Plaintiff testified that the machine was shaking because the chains were dragging up the side of the conveyor (Natcher Depo., p. 164).  Again, Plaintiff never described the motion as a wobble.  (Natcher Depo., p. 163).  Defense counsel attempted to lead Plaintiff into testifying that the conveyor wobbled, but Plaintiff never adopted this description and in fact contradicted the assertion that the unit "wobbled:"

> Q: Okay.  You don't know.  So when the unit began to tip, did it wobble and then tip?
>
> A: It – it was shaking.

(Natcher Depo., p. 164.)  The word "wobble" appears only three times in Plaintiff's deposition transcript, on pages 154, 164, and 169, each time used by defense counsel.

123.    ADMITTED.

124.    ADMITTED.

125.    DENIED. Plaintiff testified specifically as to the actions of the crane operator during the loading process that contradicted Plaintiff's experience and training, including the fact that the crane operator did not move the crane away from the conveyor to clear the slings before raising the crane and the fact that the crane operator did not stop raising the crane when the slings began dragging up the side of the equipment.  Plaintiff's criticisms were that Herrmann did not react quickly enough either to stop raising the chains or to trolley the chains to the south away from the conveyor.  Plaintiff also stated that Herrmann should have known that the chains slid off the side off the conveyor. (Natcher Depo., pp. 159, 173-174, 192-193).  Plaintiff's personal opinion is amplified by Plaintiff's expert's testimony as to the conduct of employees in the workplace and the fact that it was improper for Accuride to place Plaintiff in this situation and that Plaintiff never should have been allowed on the trailer or in the vicinity of the crane during any portion of the lift or crane operations. (Gualardo Depo., pp. 91-100, 124-125, 131-132, 138-142, 233-236.)

126.    DENIED. Mr. Hermann never testified that Plaintiff "draped the chains over the north side of the conveyor." Mr. Hermann said it "looked like he [Plaintiff] had thrown them to the north side of the conveyor. Now, mind you, he's standing on the – on the north side of the truck. It looked like as he went through, he threw all the hooks over to the other side of the conveyor. And then when he unhooked the last hook, let it go. To me it looked like they were all free of the conveyor from what – my ground level." (Herrmann Depo., pp. 83-84.)  Mr. Herrmann actually testified that it appeared to him that all of the chains and hooks were clear of the conveyor, not "draped" on the conveyor in any manner.  (Herrmann Depo., p. 84.)

127.    ADMITTED.

128.    DENIED. Herrmann testified that he could not see the full length of the chains or the hooks before he began to raise the chains. (Herrmann Depo., p. 82). He also did not testify that they were clear of the trailer, but rather that he believed they were free of the conveyor from his vantage point. (Herrmann Depo., pp. 83-84.) He initially testified that the chains were all on the north side of the conveyor, but then alternatively testified that one of the chains remained in Plaintiff's hand. (Herrmann Depo., pp. 83-84, 99.)

129.    DENIED as stated. Herrmann testified that Plaintiff had one hook in his hand when Plaintiff told him to raise the hooks, but Herrmann also testified that he could not see the hooks before he began raising the chains. (Herrmann Depo., pp. 82, 90, 100).

130.    DENIED as stated. Mr. Herrmann testified that he raised the chains very slowly, actually toggling the switch on and off, causing the crane to start and stop. (Herrmann Depo., p. 99.) Plaintiff did not testify as to the speed of the crane, but testified that the crane was in motion, the chains fells onto the trailer deck, the crane remained in motion, and the chains were dragging up the side of the conveyor. (Natcher Depo., pp. 156-162.)

131.    DENIED as stated. Mr. Herrmann testified that Plaintiff was still standing near the conveyor, near the chains, on the north side with a hook in his hand. (Herrmann Depo., p. 99). Plaintiff, alternatively, testified that when he said, "okay, take them up" all of the chains were on the conveyor. (Natcher Depo., pp. 156-162.)

132.    DENIED as stated. Mr. Herrmann testified that he raised the chains very slowly, actually toggling the switch on and off, causing the crane to start and stop. (Herrmann Depo., p. 99.) Plaintiff did not testify as to the speed of the crane, but testified that the crane was in motion, the chains fells onto the trailer deck, the crane remained in motion, and the chains were dragging up the side of the conveyor. (Natcher Depo., pp. 156-162.)

{AL545213.1}                                    23

133.    DENIED as stated.  Mr. Herrmann specifically testified that he observed the conveyor start to "shimmy" at the moment he started to lift the crane.  (Herrmann Depo., pp. 81-82, 86, 103.)

134.    DENIED.  When Herrmann was talking about the general operation of the crane, he stated that the crane stops immediately when the toggle switch is released.  Herrmann let his finger off the button after he realized the conveyor was going to fall but did not testify that the crane stopped rising immediately as he did so.  (Herrmann Depo., p. 89, 103).

135.    DENIED.  Mr. Herrmann testified that this occurred, but Plaintiff did not testify that he was provided any type of verbal warning or direction from Mr. Herrmann during this process.

136.    DENIED.  Herrmann testified:

> Q:  Okay.  **So the question that I was asking was what was it about what you observed that thought you to believe the hook may have gotten caught up?**  And I understand it could have been a hook, it could have been a link in the chain.  What was it about what you observed that caused you to come to that conclusion?
>
> A:  **Because I've seen it before.**  Never seen anything of this catastrophe, because there's always a guy watching it, but I have seen a hook – I've seen a hook on a come along.  I've seen chain – a link on a chain get caught up.  **I've, again, seen it before in my 20-plus years of doing this.**
>
> Q:  **Was there anything specifically about the movement that you saw, the shimmy of the conveyor, that led you to believe that a hook or some point of a chain may have gotten caught up?**
>
> A:  A shimmy was a shimmy; that leads me to believe something went wrong.  **Why did I say the hook or the chain?  Because that's what I seen.  I moved it.  Whether I moved it a half inch or a quarter or an inch, when I moved that – when I went up with that – the device, the rigging and all that, the chains, okay, I went up as I was told.  I seen the shake.**  I can only think of two or three things that would do that, which is what I said, the hooks, the chains, maybe a forklift.  I don't know about the forklift.

{AL545213.1}                            24

> I don't know about any of that. There could be a lot of things that happened. The only thing I can think that caused that was that. Is that what happened? I really don't know.

(Herrmann Depo., pp. 102-103, emphasis added.)   Mr. Herrmann's testimony did not address Plaintiff's conduct in allowing the chains to drag up the side of the equipment. Plaintiff's testimony is essentially the opposite of Mr. Herrmann's, in that Plaintiff testified that the chains and hooks were on the south side of the equipment, on Mr. Herrmann's side, and that Mr. Herrmann continued to operate the crane while being in a position to observe the chains contacting the conveyor.

137.    DENIED. Herrmann testified that he believes that a hook or chain link began to make the conveyor shimmy, as cited in ¶ 136.  It is ADMITTED that the conveyor quickly tipped in the direction of Plaintiff after it began to shake and/or shimmy.  (Herrmann Depo., 100-101).

138.    ADMITTED.

139.    DENIED as stated.  OSHA initially issued a citation to Birkmire Trucking but the citation was later deleted and Birkmire paid no penalty.  (Gualardo Depo., pp. 83-85.)  Plaintiff's expert, who is the Director of OSHA Compliance for the Commonwealth of Pennsylvania, opined in his report and in his deposition that Birkmire was cited incorrectly by OSHA.  (Gualardo Depo., pp. 80-81, 83-85.)

140.    DENIED as stated.  OSHA initially issued a citation to Birkmire Trucking but the citation was later deleted and Birkmire paid no penalty.  (Gualardo Depo., pp. 83-85.)  Plaintiff's expert, who is the head of OSHA Compliance for the Commonwealth of Pennsylvania, opined in his report and in his deposition that Birkmire was cited incorrectly by OSHA.  (Gualardo Depo., pp. 80-81, 83-85.)

141.    ADMITTED. However, Plaintiff's expert, who is the Director of OSHA Compliance for the Commonwealth of Pennsylvania, also testified that OSHA dropped the ball "horribly" by not

{AL545213.1}                                   25

citing Accuride, and that this is probably one of the worst cases he has seen as far as incompetence or lack of skill within OSHA. (Gualardo Depo., p. 80.)

142.    ADMITTED.

143.    DENIED as stated. Crispin first testified, without equivocation, that he saw the crane moving and the chains raising out of his peripheral vision for 30 seconds. (Crispin Depo., pp. 35, 37). He also testified that the crane is old, and that he could hear the contacts come on and hear clicking of the movements from the crane running up. (Crispin Depo., p. 35.) On cross-examination, Mr. Crispin confirmed that he said it was 30 seconds that the crane was in motion, but then changed his testimony after being prompted by Accuride's counsel to state that it was "far less than 30 seconds." (Crispin Depo., pp. 62-63.)

144.    ADMITTED as to the representation of the testimony.

145.    ADMITTED. Mr. Crispin further testified, however, that he was not watching the process, did not look up immediately, and saw the conveyor tipping as he was looking up. (Crispin Depo., pp. 36-37.) By the time Mr. Crispin's attention was directed to the conveyor, it was already tipping.

146.    DENIED as stated. Crispin did not *observe* anything to indicate why the conveyor tipped. (Crispin Depo., p. 39).

147.    DENIED. It is ADMITTED that Plaintiff testified he left the front of the trailer by the curtain because he saw the chains being dragged up the side of the conveyor, but the conveyor had not begun to shake at that point. (Natcher Depo., pp. 159-161, 163). Furthermore, both of Accuride's witnesses – Mr. Herrmann and Mr. Crispin –testified that they observed Plaintiff at different places on the flatbed during the critical time periods, Mr. Herrmann testifying that Plaintiff was at all times near where the chains were located and Mr. Crispin describing Plaintiff's position as

{AL545213.1}                                    26

a third way down the driver's side of the flatbed. Neither Mr. Crispin nor Mr. Herrmann ever observed Plaintiff in the area Plaintiff described. (Herrmann Depo., pp. 82-84, 99; Crispin Depo., p. 36.) Plaintiff knows that either the chains or a hook, which were connected to the chains, being raised with the crane caused the conveyor to tip. (Natcher Depo., pp. 164-165, 181, 203). The characterization of any area of the trailer as "safe" or "dangerous" is denied. Plaintiff's expert testified that there is no safe spot on that trailer to stand while the crane is in operation and Mr. Herrmann should have refused to allow Plaintiff to remain anywhere on or near the trailer during crane operations. (Gualardo Depo., pp. 91-100, 124-125, 131-132, 138-142, 233-236.)

148.    DENIED. Plaintiff believes the chains dragging up the side of the conveyor caused it to shake and tip. (Natcher Depo., p. 164).

149.    DENIED. Plaintiff knows that either the chains or a hook, which were connected to the chains, being raised with the crane caused the conveyor to tip. (Natcher Depo., pp. 164-165, 181, 203).

150.    DENIED. Mr. Herrmann testified:

> Q:  Okay. **So the question that I was asking was what was it about what you observed that thought you to believe the hook may have gotten caught up?** And I understand it could have been a hook, it could have been a link in the chain. What was it about what you observed that caused you to come to that conclusion?
>
> A:  **Because I've seen it before.** Never seen anything of this catastrophe, because there's always a guy watching it, but I have seen a hook – I've seen a hook on a come along. I've seen chain – a link on a chain get caught up. **I've, again, seen it before in my 20-plus years of doing this.**
>
> Q:  **Was there anything specifically about the movement that you saw, the shimmy of the conveyor, that led you to believe that a hook or some point of a chain may have gotten caught up?**

{AL545213.1}                           27

A: A shimmy was a shimmy; that leads me to believe something went wrong. **Why did I say the hook or the chain? Because that's what I seen. I moved it. Whether I moved it a half inch or a quarter or an inch, when I moved that – when I went up with that – the device, the rigging and all that, the chains, okay, I went up as I was told. I seen the shake.** I can only think of two or three things that would do that, which is what I said, the hooks, the chains, maybe a forklift. I don't know about the forklift. I don't know about any of that. There could be a lot of things that happened. The only thing I can think that caused that was that. Is that what happened? I really don't know.

(Herrmann Depo., pp. 102-103, emphasis added.)

151.    DENIED as stated. Mr. Herrmann speculated as to other things that may have caused the conveyor to tip, but never testified that a forklift was in the area and testified that he "doesn't know about the forklift." His testimony, as cited in ¶ 150, demonstrates that he said the hook or chain caused the conveyor to tip "because that's what I [Herrmann] seen."

## COUNTER-STATEMENT OF CONCISE MATERIAL FACTS

152.    When Mr. Herrmann was hired by Accuride, he was asked if he had "experience" in using an overhead crane but he was not asked for specifics of how he had used a crane in the past. They just discussed his "previous job." (Herrmann Depo., p. 22.)

153.    Mr. Herrmann did not receive any training from Accuride when he first started relative to the use of the overhead crane. He was told the weight limits, showed where the chains were located, and told to "make sure the safety latch always works." (Herrmann Depo., pp. 23-24.)

154.    Mr. Herrmann was relying on his "original training" prior to working at Accuride because he had nine or ten years of prior experience, the specifics of which had not been inquired into by Accuride at the time of his hire. (Herrmann Depo., pp. 22-24).

155.    Mr. Herrmann did not believe that he received any training the he would classify as "safety training" from Accuride regarding the use of the crane. (Herrmann Depo., pp. 24.)

156.    Mr. Herrmann was never given any type of safety manual for the crane, including the safety manual from the manufacturer of the crane. (Herrmann Depo., pp. 24-25.)

157.    Mr. Herrmann was never given a copy of the instruction manual for the crane and is not sure if one even exists. (Herrmann Depo., p. 25.)

158.    The training Mr. Herrmann received through Accuride in July 2008 regarding the overhead crane did not include any information regarding procedures for loading or unloading flatbed trailers. (Herrmann Depo., p. 28.)

159.    Accuride is in possession of only three documents evidencing any training as to crane usage provided to Donald Herrmann prior to the date of the incident in question. (Accuride's Response to Plaintiff's Request for Production No. 1, produced as Exhibit 3.)

160.    Accuride is in possession of only three documents evidencing any training as to crane operations provided to Donald Herrmann prior to the date of the incident in question. (Accuride's Response to Plaintiff's Request for Production No. 3, produced as Exhibit 3.)

161.    Accuride is in possession of only three documents evidencing any training of Donald Herrmann as a crane rigger, spotter, or signaler, prior to the date of the incident in question. (Accuride's Response to Plaintiff's Request for Production No. 5, produced as Exhibit 3.)

162.    Accuride is in possession of only three documents evidencing any training provided to any crane rigger, spotter, or signal person prior to the date of the incident in question. (Accuride's Response to Plaintiff's Request for Production Nos. 6-8, produced as Exhibit 3.)

163.    The three documents referenced in ¶¶ 159-162 are sign in sheets and contain no substance as to the training provided. (Documents 161-163, Exhibit 4.)

164.   At the time of the incident, Accuride did not have any rules, policies, or procedures in effect regarding crane use, rigging, spotting, or signaling.  (Accuride's Response to Plaintiff's Request for Production No. 10, produced as Exhibit 3.)

165.   At the time of the incident, Accuride did not have any rules, policies, or procedures in effect regarding driver access to trailers while crane operations were occurring.  (Accuride's Response to Plaintiff's Request for Production No. 10, produced as Exhibit 3.)

166.   At the time of the incident, Accuride did not have any rules, policies, or procedures in effect regarding a truck driver removing loading hooks.  (Accuride's Response to Plaintiff's Request for Production No. 10, produced as Exhibit 3.)

167.   Mr. Herrmann arrived at work on the morning of the incident without any knowledge that he would be tasked to load the puck conveyor onto a flatbed trailer.  (Herrmann Depo., pp. 47-48.)

168.   Mr. Herrmann testified that the truck arrived "unexpectedly" and he was the only person available at the moment to deal with the conveyor.  (Herrmann Depo., p. 48.)

169.   Mr. Herrmann and his co-workers were surprised that the truck was there, and Mr. Herrmann was instructed by his foreman over the radio to go up and load the conveyor onto the truck.  (Herrmann Depo., pp. 50-51.)

170.   At the time Plaintiff arrived at Accuride, the conveyor was perpendicular to the bed of the trailer and located in an area called the "wash bay."  It was on a low trailer that was used to transport the conveyor within the facility to wash bay.  (Herrmann Depo., pp. 46-47.)

171.   Accuride did not have a designated "rigger" or "spotter" or anyone else present to assist Mr. Herrmann with this operation – Mr. Herrmann was on his own.  (Natcher Depo., pp. 105-106; Herrmann Depo., p. 69.)

{AL545213.1}                                            30

172.   According to Mr. Herrmann, "[n]o one was assisting with the actual loading of the – of the trailer . . . there was nobody but met and the driver to place that load." (Herrmann Depo., pp. 94-95.)

173.   Mr. Herrmann's initial lift of the conveyor – off of the low transport trailer – was only high enough to move the conveyor off of the low trailer and toward Plaintiff's flatbed trailer. (Herrmann Depo., pp. 68-69.)

174.   The first lift revealed that the conveyor was off balance and tipping in such a manner that it could not be lifted on the trailer in that position. (Herrmann Depo., pp. 66-67.)

175.   Mr. Herrmann testified that he had forgotten which set of eyes on the conveyor were supposed to be used because "it had been a while since I [Herrmann] had loaded a trailer." (Herrmann Depo., p. 61.)

176.   The only thing Plaintiff did to assist Mr. Herrmann with rigging the conveyor was to change the positioning of one of the three crane slings from its original location to the location designated by Mr. Herrmann. (Herrmann Depo., pp. 60; 68.)

177.   When both men were satisfied with the "rigging," Mr. Herrmann asked Plaintiff where on the trailer he wanted the conveyor to be placed. (Herrmann Depo., p. 54.)

178.   This was Mr. Herrmann's custom – to always ask the driver where to place the load. (Herrmann Depo., p. 54.)

179.   When the conveyor was set down on the cribbing on the trailer, Plaintiff walked the entire way around the conveyor, which was on the cribbing on the trailer, and was satisfied with its positioning. (Natcher Depo., pp. 127-128, 142-143).

180.    During this time while Plaintiff was walking around the conveyor, there was slack in the crane slings and the full weight of the conveyor was resting on the cribbing on the trailer. (Herrmann Depo., pp. 80-82, 120-121).

181.    While Plaintiff walked around the conveyor to unhook all four hooks from the lifting eyes, the crane was not supporting any portion of the weight of the conveyor. (Herrmann Depo., p. 120.)

182.    The conveyor did not shift, wiggle, shimmy, or move in any manner while Plaintiff was walking about the conveyor to unhook all four of the chains from the lifting eyes. (Herrmann Depo., p. 121.)

183.    The conveyor did not move in any manner until Mr. Herrmann started to operate the crane. (Herrmann Depo., pp. 81-82.)

184.    Mr. Herrmann never testified that he observed Plaintiff leave the area adjacent to the conveyor and return to the front of the trailer, and then approach the conveyor again before it tipped. Mr. Herrmann's observation was that Plaintiff was near the chains of the crane, alternatively holding one hook in his hand, and that the conveyor tipped in the "blink of an eye" when he started to operate the crane. (Herrmann Depo., pp. 81-82.)

185.    Mr. Herrmann testified repeatedly that he was critical of the use of cribbing for the load (which will be the subject of a credibility determination by the jury), but admitted that at no time did he communicate any concern to Plaintiff regarding the cribbing and continued with the loading process. (Herrmann Depo., pp. 73-74, 120-121.)

186.    Mr. Herrmann stated that he "would have left the hooks hanging there until, you know, 5:30 if he didn't want them raised up." (Herrmann Depo., p. 82.)

187.    When Mr. Herrmann started to lift the crane, Mr. Herrmann testified that he was unable to see the full length of chain comprising the four slings of the crane and specifically could not see the four hooks at the end of the slings from where he was standing. (Herrmann Depo., p. 82, 100). He estimated he could not see the bottom "10 inches or so." (Herrmann Depo., p. 82.)

188.    Mr. Herrmann did not see Plaintiff do what he himself does with the crane slings after they are unhooked from a load – which is gather them in his arms loosely to control the chains as they raise. (Herrmann Depo., pp. 83-84.) It is Mr. Herrmann's practice to actually remain in contact with the crane slings while the crane is in operation. (Herrmann Depo., pp. 83-85.)

189.    Mr. Herrmann had never met Plaintiff prior to the incident and never asked him to do anything particular with the chains, but rather "assumed he knowed." (Herrmann Depo., p. 85.)

190.    Mr. Herrmann admitted that he could not seek the hooks before lifting the crane and "should have ran around to the other side of the trailer instead of taking trust in the driver." (Herrmann Depo., p. 100.)

191.    Mr. Herrmann testified that Ron Celeski, the Union representative, told the OSHA investigator that Accuride used to use two employees for flatbed loading. (Herrmann Depo., p. 97.)

192.    At the time of the incident, Accuride only used two employees to load trucks "if we [Accuride] needed it." In Mr. Herrmann's time at Accuride, "the driver has always been the one to do the spotting and help loading, unless, of course, it's too big of an object to where you need an extra person." (Herrmann Depo., p. 97.)

193.    In relationship to placing and positioning the load properly on the flatbed, Mr. Herrmann testified that he "can't do nothing because I'm on the ground." (Herrmann Depo., p. 80.)

194.    Mr. Herrmann had a radio at all times during the loading process in order to be able to contact his foreman, Scott Biggie, who was "authority." (Herrmann Depo., pp. 107-108.)

{AL545213.1}                    33

195.    Mr. Herrmann's supervisor was "clear on the other side of the building" when the incident occurred.  (Herrmann Depo., p. 116.)

196.    Mr. Herrmann believes that the "shimmy" he observed contemporaneously with the start of the crane operation "caused like a tumble."  (Herrmann Depo., p. 104.)

197.    When the conveyor fell, Mr. Herrmann was standing in the area where the conveyor would have landed had it fallen to the passenger side rather than the driver's side of the flatbed. (Herrmann Depo, p. 117-118.) Mr. Herrmann is unsure whether he would have been able to get out of the way of the conveyor had it tipped south.  (Herrmann Depo., p. 118.)

198.    After this incident, Accuride implemented a rule that the crane is not to be unhooked from the load until the load is completely fastened down and secured to the truck, whether the truck is an Accuride truck or an outside truck.  (Herrmann Depo., pp. 118-119.)

199.    According to Mr. Herrmann, Accuride "decided to take full control from the driver because it's our facility, it's our crane. The driver now has to kind of do things the way that we want because . . . ." (Herrmann Depo., pp. 124-125.)

200.    After the incident, Mr. Herrmann learned that a truck driver tried to tell an Accuride crane operator to unhook the crane prior to the load being secure, and the Accuride crane operator refused because of the new rule.  (Herrmann Depo., p. 119.)

201.    Mr. Herrmann did not interact with Plaintiff after the incident other than observe his condition and call for help and has had no contact with Plaintiff since the day of the incident. (Herrmann Depo., pp. 108-110, 123.)

202.    Plaintiff testified that the cribbing he used on the trailer deck did not roll or become displaced during the incident and that it was in "fairly the same place" in the post-incident photos as to where he placed it on the trailer.  (Natcher Depo., pp. 193-194.)

{AL545213.1}                                      34

Respectfully submitted,

AINSMAN LEVINE, LLC


By: /s/ Erin K. Rudert
      Erin K. Rudert, Esquire
      PA ID No. 200432
      Ainsman Levine, LLC
      310 Grant Street, Suite 1500
      Pittsburgh, PA 15219
      (412) 338-9030
      er@ainsmanlevine.com

      Attorney for Plaintiff, David W. Natcher

Dated:  July 9, 2018

**AINSMAN LEVINE, LLC**
By:    Erin K. Rudert, Esquire
PA Bar Identification No: 200432
310 Grant Street, Suite 1500
Pittsburgh, PA  15219
(412) 338-9030
er@ainsmanlevine.com
*Attorney for Plaintiff, David W. Natcher*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID W. NATCHER,                                      Civ. A. No. 1:16-cv-000219

        Plaintiff,

vs.

ACCURIDE CORPORATION,

        Defendant.

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2018, Plaintiff's Response and Counter -Statement to

Defendant's Concise Statement of Material Facts were served to counsel of record via United

States first class mail, postage prepaid, and electronic mail addressed as follows:

Matthew W. McCullough, Esquire
MacDonald Illig Jones & Britton, LLP
100 State Street, Suite 700
Erie, PA  16507-1459
*Attorney for Defendant*

                                   */s/   Erin K. Rudert, Esquire*
                                   Erin K. Rudert, Esquire

{AL545213.1}                                    36