1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

- - - - -

DAVID NATCHER,

    Plaintiff,

    vs.

ACCURIDE CORPORATION,

    Defendant.

) Civil Action
) No. 1:16-cv-219-BJR

- - - - -

DEPOSITION OF PLAINTIFF'S EXPERT
SAMUEL J. GUALARDO, CSP

- - - - -

Wednesday, May 30, 2018

REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
WITHOUT AUTHORIZATION FROM THE CERTIFYING AGENCY

- - - - -

PLAINTIFF'S
EXHIBIT

1

DEPOSITION OF SAMUEL J. GUALARDO, CSP a witness herein, called by the Defendant for examination, taken pursuant to the Federal Rules of Civil Procedure, by and before Constance Lee, a Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania, at the law offices of Ainsman Levine, LLC, 310 Grant Street, Suite 1500, Pittsburgh, Pennsylvania, on Wednesday, May 30, 2018, at 12:49 p.m.

-----

COUNSEL PRESENT:

For the Plaintiff:

AINSMAN LEVINE, LLC
by Erin K. Rudert, Esq.
310 Grant Street, Suite 1500
Pittsburgh, PA 15219

For the Defendant:

MacDONALD, ILLIG, JONES & BRITTON, LLP
by Matthew W. McCullough, Esq.
100 State Street, Suite 700
Erie, PA 16507-1459

INDEX

| EXAMINATION | PAGE |
|---|---|
| BY MR. McCULOUGH | 4 |
| BY MS. RUDERT | 238 |
| BY MR. McCULLOUGH | 248 |

| EXHIBITS | PAGE |
|---|---|
| 1 - Notice of Deposition | 5 |
| 2 - Curriculum Vitae | 7 |
| 3 - 2018 Fee Schedule | 50 |
| 4 - Deposition History | 54 |
| 5 - Copy of Report | 88 |
| 6 - Incident Interviews | 213 |
| 7 - Citation and Notification of Penalty | 216 |
| 8 - Notice of Deposition | 216 |

S. Gualardo - by Mr. McCullough

PROCEEDINGS

-----

SAMUEL J. GUALARDO, CSP a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. McCULLOUGH:

Q.    Mr. Gualardo?

A.    Gualardo.

Q.    Gualardo. Okay, Mr. Gualardo. My name is Matt McCullough. We introduced ourselves in the lobby. I'm here today representing Accuride Corporation, which is a defendant in a lawsuit brought by David Natcher. It's pending in federal court here in the Western District of Pennsylvania. And I am here today for the purpose of taking your deposition -- discovery deposition, and I understand that you've been retained by the Plaintiff or on behalf of the Plaintiff to testify as an expert witness in this matter; is that correct?

A.    Correct.

Q.    And I'm going to make an assumption that you've had your deposition taken before.

A.    Yes.

Q.    All right. Then I am not going to

S. Gualardo - by Mr. McCullough

belabor the rules, the dos and don'ts. I'm just going to ask you, please, if you don't hear me or don't understand me, let me know. I'll repeat the question or attempt to repeat the question or have Connie read it back.

The other thing, aside from taking a break whenever you need it and so forth, because we're talking about, perhaps, a technical area or at least an area that is not common parlance, equipment and terminology related to equipment, I'm going to try to make sure that we get some agreement up front on what certain terms mean, like a "hoist" or a "crane" and that sort of thing. But if you feel that I'm using a technical term incorrectly, let me know so that -- I want to make sure that we're talking about the same thing when I question you and you give your answers. Okay?

A.    Okay.

(Gualardo Deposition Exhibit No. 1 was marked for identification.)

Q.    All right. I'm just going to hand you what I've marked as Exhibit 1. And it's just a copy of the Notice of Deposition I sent out, and I appreciate the fact that you're here. We're starting early.

S. Gualardo - by Mr. McCullough

6

And Attorney Rudert did provide some information that I had requested prior to your deposition. I've had a chance to look at it. But did you bring with you what I'll call your working file in regard to this matter?

A. I brought some documents with me. Not my working file.

Q. Okay. Did you bring any documents or all documents that reflect the facts upon which you based your testimony?

A. I -- my report contains all the facts that I base my testimony on.

Q. Okay. But in terms of you -- you would have obtained those facts from somewhere.

A. Yes.

Q. Did you bring the underlying sources of those facts?

A. No. I just cite them in my report.

Q. Did you -- at this point in time do you anticipate using any exhibits if there's a trial in this matter?

A. At this point in time, probably not, but I reserve the right to do so if, in fact, I feel they're necessary.

Q. So just for the sake of clarity, today

S. Gualardo - by Mr. McCullough

7

you didn't bring any exhibits that you would anticipate using at trial?

A. I did not.

Q. Just some background information. Your full name, please.

A. Samuel J. Gualardo.

Q. And your residence address?

A. My permanent residence at this point is 1237 Harwick Lane, Ormond Beach, Florida. I also have a secondary residence in Pennsylvania.

Q. Where in Pennsylvania?

A. 1616 Oakridge Drive, Salix, Pennsylvania.

Q. Is that anywhere near IUP?

A. It's about 45 minutes.

Q. Okay.

A. It's near Johnstown, actually.

Q. And I might as well mark the second exhibit.

(Gualardo Deposition Exhibit No. 2 was marked for identification.)

Q. I've marked and handed you Exhibit 2, which I understand is a copy of your curriculum vitae or résumé.

A. Correct.

Q. And that was provided to me within the

S. Gualardo - by Mr. McCullough

8

last week, roughly, by Attorney Rudert, and I assume she got it from you?

A. Yes.

Q. And is it current at least through the end of April?

A. I would say it's current through the end of 2017. There may be some things that I did not add in 2018 so far, but it's, I would say, fairly current.

Q. All right. You've been retained to provide opinion testimony on behalf of Mr. Natcher. Who actually retained you? In other words, how did you initially get involved?

A. Attorney. An attorney.

Q. Ms. Rudert?

A. Yes.

Q. And do you recall when you were retained; a month, year?

A. No, I don't recall.

Q. A year?

A. I would say last year, but I just don't recall the exact date.

Q. It may have been 2016, and I'll tell you why I think that.

A. Do I have it listed?

S. Gualardo - by Mr. McCullough

9

Q. It's listed under the year 2016.

A. Maybe then, yeah.

Q. My overall question was: Any time there's an expert witness retention or service listed under a particular year, would that be the year that you were retained?

A. Yes. Assuming I documented it accurately, that's correct.

Q. And have you provided any invoices to Ms. Rudert regarding your services in this matter?

A. I have.

Q. Can you give me an idea of, to date, how much you have invoiced Ms. Rudert for your services?

A. I didn't bring that information with me.

Q. Do you have any idea what is it?

A. Don't recall.

Q. When was the last time that you sent her an invoice?

A. I don't recall that either.

Q. Who does your invoicing for you?

A. My -- my wife is on my payroll who does that.

Q. Do you review and approve all invoices before they go out the door?

A. Yes.

S. Gualardo - by Mr. McCullough

**10**

Q. Have you been paid for any of your services in this matter?

A. I would presume that I have.

Q. Do you know from whom the check comes?

A. It would be coming from Ms. Rudert's firm.

Q. So your testimony is that the check would have Ainsman Levine on it?

A. Yes, it would either come from that firm or an insurance company. I'm not really sure. I just can't -- I don't recall in this case. Typically, it's the law firm or it's an insurance company.

Q. Would it jog your memory if I mentioned that a check may have come -- I don't know -- from Lackawanna Insurance Company in this matter?

A. It may have. I don't know. My wife handles that side of the business.

Q. Have you had any discussion with -- regarding this case, not with Attorney Rudert or with her being present, but with any representative of Lackawanna Insurance Company?

A. No.

Q. Have you had any discussion about this case with anybody who is not one of the attorneys

S. Gualardo - by Mr. McCullough

**11**

representing Mr. Natcher?

A. I, at times, would use people on my staff. 1099 employees to do some research. I don't recall if I did have any discussions with anybody with respect to this case though.

Q. Have you had any conversations with Mr. Natcher?

A. No.

Q. So to the extent that you -- your report reflects any information regarding Mr. Natcher's recollection or version of what happened on the day of the accident, that came from reading his deposition testimony?

A. Reading the deposition testimony as well as the OSHA information and the other discovery information.

Q. Were you provided any summaries of his testimony by Attorney Rudert?

A. No.

Q. In reading Mr. Natcher's deposition testimony, were there any issues or -- issues or topics of his testimony that you wanted further clarification about?

A. No.

Q. So you are -- you're obviously here today

S. Gualardo - by Mr. McCullough

**12**

at my request. Did you prepare in order to sit down here and have your deposition taken?

A. I just reviewed my file. That's all.

Q. Did you do that back at your office?

A. Yes.

Q. Did you review anything that you have with you in front of you?

A. Yes.

Q. How long did you spend reviewing your file in order to prepare for today's deposition?

A. Hour and a half, two hours.

Q. Did any part of your preparation up to the moment we entered this room include a conversation with Ms. Rudert?

A. No, just --

Q. Pleasantries?

A. Yes.

Q. I'm looking at your résumé, and I'm certainly not going to cover all of the notes. I think it's about 18 pages long.

A. If you do, I have a lot of stamina.

Q. I'm not sure anybody has that much stamina today. My voice sounds like it's going to give out on me after a while. You are presently identified as the president of National Safety

S. Gualardo - by Mr. McCullough

**13**

Consultants Inc.?

A. That's correct.

Q. And that's listed as from 1987 to the present.

A. Correct.

Q. And although I can read what it says, what is the business of National Safety Consultants?

A. There's two facets of National Safety Consultants. Actually, there are three facets. One is to provide education in the area of safety management. I do that primarily through the American Society of Safety Engineers as well as independently.

Second is to utilize a safety management system that I developed by -- organizations will contract with me to install that safety management system in their firm. It's called the management-based safety process.

And the third is expert testimony for plaintiff and defendant cases.

Q. The management-based safety program -- you say installed.

A. Yes.

Q. That makes me think of a program.

A. Yes.

S. Gualardo - by Mr. McCullough

14

Q.    Software.

A.    System. It's actually a system.

Q.    Is it's a software system?

A.    No.

Q.    It may include software?

A.    It's a process. It's a safety management process. The industry calls them a system, though. It sometimes gets confused with information systems.

Q.    All right. And from 50,000 feet --

A.    Yes.

Q.    -- what aspects of safety does the process cover?

A.    Occupational safety, all aspects of occupational safety.

Q.    Okay. All aspects ranging from what?

A.    From senior management ownership to line management ownership through employee participation, all aspects of creating an outstanding safety culture within the organization.

Q.    Meaning you have to get buy-in from both upper management and the employees themselves --

A.    That's correct.

Q.    -- in order to achieve the goals?

A.    That's correct. It's a tool-based process, essentially, for organizations. There's

S Gualardo - by Mr. McCullough

15

several steps in the process. The first step of the process involves assessing an organization's safety culture. The second step involves realigning or aligning senior management in terms of gaining their understanding and ownership in terms of managing safety effectively. The third step involves doing the same for first line supervisors. The fourth step involves employee engagement throughout the organization. And the fifth step is a recreation of step one when there is a reassessment done of the organization.

Q.    Do you actually go in and look at the manner in which a particular operation or a procedure is done in a plant and say this is how you can do it more safely, or is yours more of an overview education, teaching -- changing, as you say, changing the culture to recognize the importance of those individual how can I make this particular task safer?

A.    I don't evaluate their tasks, per se. I give them the tools to do that. I teach them on how to do that with the tools that I provide them that are part of the process.

Q.    So just for an example, if a particular client, say, a manufacturing client, had a task that

S Gualardo - by Mr. McCullough

16

needed to be accomplished moving a heavy object from point A to point B --

A.    Yes.

Q.    -- from one operation to another operation.

A.    Yes.

Q.    You wouldn't get down on the plant floor and say, you should be doing these ergonomic movements or adopt these ergonomic practices in order to make it more safe. That would be something somebody else would do?

A.    Yeah, they would actually do that themselves, but they would use the tools that I provide them to do that. In other words, they would -- there's two primary tools, ultimately, that end up in the laps of employees. One is what's called a preflight checklist. So there would be a risk assessment done of that particular task by both supervision and employees, and they will develop the preflight checklist for that particular task. So every aspect of safety would be contained in that preflight checklist for a routine task kind of a function.

For a nonroutine task type of function, I have another tool called risk finder, and the risk

S Gualardo - by Mr. McCullough

17

finder is essentially a tool whereby they go through the -- they have no knowledge of what could occur, but they analyze the task prior to performing the task, analyzing every potential aspect of where a hazard could occur or where they could be exposed to risk and then they define the protection measures that they would use in that process.

Q.    Okay. And --

A.    In this case, if Accuride had either of those tools in place, we would not be sitting here today.

Q.    Okay. And when I -- I appreciate the information, but I'll ask the question. When you're done answering it, let me know.

A.    I wasn't done.

Q.    Okay. How many of these assessments -- strike that.

How many of these systems have you installed in the last ten years?

A.    Probably 15. I would say 15 installations of that process. Now, some of these are -- you have to understand, some of these are worldwide installations. In other words, I did a process for a multinational manufacturer, and there were 58 plant locations. So it's not, you know,

S. Gualardo - by Mr. McCullough

It's not your typical 40-employee plant. It's a huge installation, huge process installation.

Q.    And each one of those installations would involve an assessment of the safety culture?

A.    Yes.

Q.    Do you assess the safety culture at each of the 58 locations in your example or just the big brass?

A.    Well, no. Actually, there's -- part of that current state assessment is step one, which is actually a safety climate survey that's done for each individual site. So that's part of the assessment process. The safety climate survey is followed up by interviews, random sample interviews, where I interview senior management, midlevel management, first-line supervisors and employees; evaluate each safety climate survey results, and collectively, that is the current state assessment. The result of that is the current state assessment.

Q.    Have you ever done a safety culture assessment where you found that no change at all was needed?

A.    It's pretty rare. I mean, you're always going to find some issues of deficiencies. But I have done some assessments whereby I have seen

S. Gualardo - by Mr. McCullough

outstanding safety cultures, if that's your question, that where there would be less of a need to make any changes in the organization.

Q.    But you've never -- you can't recall a situation where you've had to make no changes or had no recommendations to make?

A.    I do not recall any, no.

Q.    And some of your clients required more attention and improvement than others?

A.    Yes. All depending on where their safety culture was at on the continuum.

Q.    In your experience, you're brought into a variety of safety cultures?

A.    Yes.

Q.    Have you had some Fortune 100 companies where you have found that they lacked in safety culture?

A.    I think that it runs the gamut. I find Fortune 100 companies, in some cases, have outstanding safety cultures, and some may have some things lacking in their culture. It really all depends. By the same token, I have found, you know, 30-employee shops that have outstanding safety cultures. We see those every day in the state of Pennsylvania, where my organization, under OSHA,

S. Gualardo - by Mr. McCullough

awards what's called the SHARP recognition.

Q.    So I'm going to come back to National Safety Consultants. But since you mentioned it, what is the PA OSHA Consultation Program?

A.    If you think of OSHA, there are two sides of OSHA. The one side is the enforcement side, and the other side is the consultation side. We do not cross paths. We're prohibited by law from crossing paths. We must work independently of each other. The consultation side of OSHA provides consultation services to small businesses in the state of Pennsylvania. We will provide services for large businesses as well, but they have to go to the bottom of the list. It's primarily focused on assuring small businesses understand the regulations and how to comply with those regulations.

Q.    When you say *small business*, can you give me an idea of how you define small businesses?

A.    Up to 250 employees.

Q.    In one location?

A.    Yes. 500 corporate-wide.

Q.    Do these small businesses come to you voluntarily, or does the organization solicit them or at least contact them and offer their services?

A.    You mean the OSHA consultation? Do we

S. Gualardo - by Mr. McCullough

solicit?

Q.    The consultation arm of the OSHA, yeah.

A.    Yes. Well, we don't typically solicit, we do what we call targeted marketing.

Q.    Okay.

A.    For instance, we just did some targeted marketing for the construction industry where we want to make sure that they are understanding their compliance requirements with silicon. So we have a backlog of, typically, 400-plus requests, always. We don't have to solicit anybody.

Q.    So these small businesses respond to the organization's marketing?

A.    No. They actually respond all by themselves.

Q.    Or word of mouth or website?

A.    Yeah. Sometimes they'll respond in response to an OSHA investigation, an OSHA enforcement investigation at their site.

Q.    That may be part of a settlement?

A.    It could be. In some cases, it's not.

Q.    Now, in terms of the consultation, what is your particular involvement? I see you're identified as a director and assistant professor?

A.    Yes. I actually oversee the OSHA

S. Gualardo - by Mr. McCullough

22

consultation program for the state of Pennsylvania.

Q.   So similar to what I asked you about the management-based safety, are you actually on the -- you, yourself, on the floor at these small businesses doing an audit of safe or unsafe or potential hazards, or is that done by other team members?

A.   That's done by my staff at this point.

Q.   Was there a time when you did that?

A.   Yes.

Q.   When was the last time you were in that kind of a position?

A.   In that kind of a position doing the consultation visits would have been in 19 -- I'm sorry, 2009, I believe. 2010. 2010.

Let me just clarify. I must review and approve everything that they do. My signature goes on every report that they issue. So I'm engaged very deeply from that perspective, analyzing what they did, what they identified, what they cited, what they didn't cite. Those kinds of things.

Q.   You rely on the information they bring to you to review and approve?

A.   I do.

Q.   Have you ever been involved in the

S. Gualardo - by Mr. McCullough

23

enforcement side of OSHA?

A.   No. Let me just clarify that, though, Mark, so you're clear. What consultation does and enforcement does is identical. We do the exact same thing. The only thing consultation does not do is issue penalties for violations. So we use the same system; we issue the same reports; we do the exact same thing as the enforcement side does. We just don't issue penalties to the employers.

Q.   If there's a -- an accident or reportable incident at a facility, which arm of OSHA responds?

A.   Well, it could -- it could be both.

Q.   If there's an injury involved?

A.   Well, it could be both. It all depends on the injury. Typically, OSHA does not respond to -- the enforcement side does not respond to a workplace unless there's a fatality or catastrophic event or a hospitalization of an employee, multiple hospitalizations.

Q.   I know the standard changed recently --

A.   Yes.

Q.   -- in terms of what's reportable.

A.   Yes.

Q.   And how long you have to report it.

A.   Right. But typically in a situation, the

S. Gualardo - by Mr. McCullough

24

enforcement side is only going to respond to the very serious events. That's the dividing line. Sometimes there will be an event whereby an accident will occur, OSHA, the enforcement side, will get wind of it. They'll realize that they don't want to apply any resources to it, and they'll refer the client to the consultation side of OSHA. The client will then call us post-accident.

Q.   Is that referral and the client's -- or the client's contacting the consultation arm, is that done as a condition to not being investigated by the enforcement arm?

A.   No.

Q.   In other words, if you don't call consultation, we're going to come in and --

A.   No. No, they -- the enforcement side would make a suggestion at that point.

Q.   A strong suggestion?

A.   Yes. Now, sometimes that also occurs with what's called an employee complaint, where OSHA won't do a full-blown investigation. They'll refer the client, we'll call it, to the consultation arm of OSHA.

Q.   As part of your investigation and work on the Natcher case, did you do any kind of an OSHA

S. Gualardo - by Mr. McCullough

25

search or history search, and I don't know to what extent you can do this, but to try to determine Accuride's record with OSHA?

A.   I may have looked at it. I don't recall doing it, though. I just -- sometimes it's relevant, sometimes it's not.

Q.   If you looked at it, is there nothing that -- if you did, there's nothing that you would have determined from that or learned from that research that made its way into your report; is that correct?

A.   I did not identify anything, I believe, in my report.

Q.   And there's nothing that you -- if you did conduct any research on Accuride's history, nothing that you may have found is influencing your opinion as to Accuride's safety or safety culture?

A.   No. My opinion was influenced based on all the testimony and the OSHA investigation and everything that I read. It was clearly evident what their culture was. Or what it wasn't, I should say.

Q.   And you spoke to nobody at Accuride; is that correct?

A.   That's correct.

Q.   And you only reviewed documents that were

S. Gualardo - by Mr. McCullough

26

provided to you by your -- by Ms. Rudert that she obtained from Accuride in terms of manuals and training sessions and so forth; is that correct?

A. That's correct.

Q. And you did not review any deposition testimony of anybody holding a safety position at Accuride, or risk management or safety position?

A. There was some -- there were several references that I recall in the information I reviewed with respect to a safety person who did an investigation. So there was a safety person that was involved in the investigation of what occurred, and transposed some information --

Q. You never spoke to that individual?

A. No.

Q. And I'm going to tell you that no such individual was ever deposed. So therefore, you never read a deposition transcript of that individual?

A. No.

Q. Do you know whether there are others -- strike that.

Do you know where Accuride is headquartered?

A. I believe Erie.

S. Gualardo - by Mr. McCullough

27

Q. Do you know whether Accuride has any other facilities anywhere else in the nation?

A. Don't know.

Q. Do you know what Accuride makes or does?

A. Don't know. It's not relevant.

Q. Do you know whether the top management for Accuride Corporation's physically located in Erie, Pennsylvania?

A. Don't know, and it's not relevant to my analysis.

Q. In trying to ascertain the safety culture of an organization, do you generally attempt to speak to the highest-level individuals? It all starts at the top and --

A. I can also see evidence of a safety culture. I can see clear evidence of a safety culture, a failed safety culture --

Q. I asked whether you seek to speak with the upper-level management.

A. At times, I do, yeah.

Q. Because in often cases, it's the most senior-level management that drives the decision-making or the implementation down the line; correct?

A. In many cases that is true, yes.

S. Gualardo - by Mr. McCullough

28

Q. In terms of seeing evidence of corporate safety culture, you did not visit the Accuride facility?

A. I did not.

Q. You didn't -- obviously, you have not seen, then, the particular cargo, the conveyor -- we'll talk more about that later -- but the conveyor that was being loaded at the time this accident occurred?

A. I saw multiple photos, post-incident photos.

Q. Right, okay. But you've not physically seen it, measured it, inspected it --

A. No.

Q. -- kicked it, whatever? Okay. And you've not inspected the crane that was involved?

A. Had not. It would be a moot point at this point.

Q. Why do you say it would be a moot point?

A. Because there was no evidence that the crane was inspected prior to the event. There was no documentation to prove that. I couldn't prove anything at this point, several years later.

Q. And maybe I can save some time, and correct me -- I believe in your report, you also

S. Gualardo - by Mr. McCullough

29

indicated that there is no evidence, and you have no knowledge that any failure or defect or malfunction of the crane or the hoist or the chains or the hooks caused or contributed to this accident; is that correct?

A. I can't prove it one way or the other. I can only determine that the crane was not properly inspected and that the crane was not properly maintained. The crane was not properly utilized. That's what I identified in my report.

Q. Okay. And you based that exclusively on the records that you saw that were provided to you by your counsel?

A. Well, at this point I'm also basing it on the testimony of your expert who also confirmed that, that the records and information was not available.

Q. Okay. So you read his report?

A. I did.

Q. And from that, you conclude that there may have been a lack of appropriate maintenance or inspection and so forth?

A. Well, I --

Q. From all of what we just talked, about all the sources.

S. Gualardo - by Mr. McCullough

30

A.    Yeah, okay. I concluded that they did not comply with any OSHA regulation with respect to maintaining, inspecting, utilizing, operating that crane. I mean, it's clearly illustrated in my report. They did not comply with any OSHA regulation with respect to those issues.

Q.    Apart from the operation, let's talk about maintaining, inspecting, repairing, servicing.

A.    Yes.

Q.    Installing.

A.    Yes.

Q.    In any of those regulations that may address those aspects of owning a crane, am I correct that you cannot state under oath that any of those failures, if they, in fact, occurred -- let's assume for the sake of this question they did occur -- they were complete failures in all those areas, that none of those failures caused or contributed to this accident?

A.    I can't state that. I can't state one way or the other.

Q.    So you can't state that they did?

A.    I can't state that they were not contributing factors, is what I'm saying. They could have been contributing factors. There's no

S. Gualardo - by Mr. McCullough

31

way that that can be proven at this point. And there is no way that it can be proven one way or the other at this point either, because we don't have the documentation to prove that it was maintained, properly inspected, properly utilized and the list goes on.

Q.    Based upon the collection of testimony that you've read from -- I guess it would be from Crispin, Herrmann and Mr. Natcher?

A.    Yes.

Q.    Did you see any evidence or testimony that a hook broke or bent or malfunctioned?

A.    No.

Q.    Or that the clasp, whatever you call the clasp on the hook, was not utilized or did not work properly?

A.    Yeah, I don't know that.

Q.    Or the chain was -- that a chain failed under a load?

A.    A chain did not fail under a load.

Q.    Or that a hoist somehow failed because it wasn't maintained?

A.    Hoist could have failed.

Q.    And how could it have contributed to this accident?

S. Gualardo - by Mr. McCullough

32

A.    Well, if they were lifting the actual slings at the point in time which I believe they were, there could have been a failure. There could have been something that occurred to that hoist that caused the slings to pull over under the conveyor as it was being lifted.

Q.    But that would be pure speculation on your part right now?

A.    It would be speculation. There's no question about that. It is speculation, but it can't be proven one way or the other, because we don't have the documentation. That's the problem in this case.

Q.    Well, you do have -- you were never denied the opportunity to come and look at the hoist; correct?

A.    It was after -- way after the fact. It would have been -- have absolutely no relevance at that point.

Q.    Okay. I guess the answer is you were not denied that opportunity.

A.    Well, again --

Q.    You never requested it nor were you denied the opportunity?

A.    I looked at the case record, and the case

S. Gualardo - by Mr. McCullough

33

record was clear that the inspections were not done, the maintenance was not done, nothing was done according to OSHA's regulations. So me going to the facility at some point later, a year later, two years later, would have been absolutely irrelevant to my analysis.

Q.    Well, if you were retained in 2016, it would have been the same year of the accident?

A.    That's true, yes. But I didn't have any discovery at that point to make that determination. It was just in the beginning stages when I was retained.

Q.    There is no evidence, and there's been no deposition testimony that you've read that the brake on the hoist malfunctioned or did not work properly?

A.    Again, it can't be proven one way or the other whether it did or whether it didn't, but there is a strong association between a crane not being maintained and whether, in fact, the brakes were working. We have no documentation to prove whether they worked, whether they were tested. No documentation on the part of Accuride. They failed in every aspect of complying with OSHA's regulations.

Q.    And if they did, again, you cannot cite a

S. Gualardo - by Mr. McCullough

34

specific instance where their failure to maintain, inspect, service, repair, caused or contributed to this accident?

A.    They're all contributing factors.

Q.    You can only speculate that they contribute?

A.    They are all contributing factors.

Q.    How are they contributing?

A.    All of those are contributing until they're ruled out. They're all contributing factors until they are ruled out. We have nothing to rule them out.

Q.    Well, maybe you -- and I don't mean this disrespectfully, but maybe in your mind, you can't rule them out. You're going to testify -- if you do testify in trial, are you going to be able to testify under oath to a reasonable degree of professional safety certainty, whatever the proper term is going to end up being, that a failure to maintain or service any aspect of a crane, including the chains and the hooks, caused or was a substantial factor contributing to this accident?

A.    I'm going to testify that those factors cannot be ruled out, and they could have contributed to this accident.

S. Gualardo - by Mr. McCullough

35

Q.    But to say that they did would be a guess on your part?

A.    I'm not going to guess. What I'm going to say is, I can't -- I'm going to testify that they were contributing factors until they can be ruled out. The fact that there is no evidence that the crane was not inspected, maintained, operated properly, gives me no -- I have no evidence to prove that that crane -- that they were not contributing factors. I have no evidence. I need evidence to be able to prove that.

Q.    One of the -- and again, I don't mean this in any disrespect, but one of the regulations that I read indicated that the operator should not be impaired, which I assume is under the influence of alcohol or drugs, at the time he's operating the crane. Would you agree that there is such a standard in the OSHA and/or ASME?

A.    I would have to look at ASME. I'm not sure that I cited that, to be honest with you.

Q.    You didn't cite it?

A.    Yeah.

Q.    But it's right along with all the ones you did cite.

A.    Okay.

S. Gualardo - by Mr. McCullough

36

Q.    Okay?

A.    Yeah. I saw no evidence.

Q.    But unless you could confirm that the operator was not impaired or under the influence, are you telling me that it's still a possibility? You can't rule it out?

A.    I saw no evidence that would even suggest that. So I didn't analyze that at all.

Q.    Okay. So what evidence did you see that a failure to service the crane caused this accident?

A.    Because a failure to service a crane causes crane accidents every single day in my line of work. A failure to maintain a crane causes crane accidents every single day in my line of work. A failure to maintain a braking system causes accidents every single day in my line of work. A failure to operate a crane safely causes accidents in my line of work every single day. So I see evidence of that every single day. That's why the regulations exist. So all of those regulations exist to prevent those things from occurring. And in this case we have no evidence that any of those regulations were complied with. If I had evidence that any of those regulation were complied with, I could rule those factors out. I cannot rule any of

S. Gualardo - by Mr. McCullough

37

those factors out because I have no evidence.

Q.    How would evidence that a crane was inspected within a 12-month period rule out a failure in that particular crane 11 months later?

A.    Because it met the regulations, and it met the requirements of the inspection, and it would be evaluating the braking systems, the operating systems, the hoisting systems, the --

Q.    It still wouldn't mean that it didn't fall 11 months later.

MS. RUDERT:  Did you finish your answer?

A.    We would be evaluating every aspect of the crane within that -- within that inspection period. That's part of the inspection. Now in addition to that, there are also more frequent inspections beyond the 12-month inspection. There are both frequent and periodic inspections. So those frequent inspections following up the periodic inspections would get to the point you're making. It would actually verify that the crane is operating prior to use. Periodic inspections were not done, frequent inspections were not done, maintenance was not done, nothing was done according to OSHA's regulations. I cannot rule out whether, in fact, these were not contributing factors at that point.

S. Gualardo - by Mr. McCullough

38

Q. Okay. Can't rule them out?

A. Cannot rule them out.

Q. If I get my car inspected today, and it passes, does that mean that my tire is not going to fail tomorrow?

MS. RUDERT: Don't answer that.

MR. McCULLOUGH: Are you directing --

MS. RUDERT: Is he a tire expert, a car expert?

MR. McCULLOUGH: I mean, I'm asking him --

MS. RUDERT: That's not what he's here for.

MR. McCULLOUGH: He's testified that he can determine that something --

MS. RUDERT: Within his area of expertise.

MR. McCULLOUGH: All right.

Q. So you're telling me that if the appropriate service was done -- and some of these inspections only have to be done every 12 months; correct?

A. Correct.

Q. All right. If it's done on -- 11 months ago, does that mean that there couldn't be a failure

S. Gualardo - by Mr. McCullough

39

or something that was inspected 11 months earlier?

A. Well, the regulations are written --

Q. It's not --

A. Can I answer?

Q. No, I --

A. Can I answer the question?

Q. No. I should -- it doesn't have anything to do with the regulations.

A. I'm talking about --

MS. RUDERT: If that's how he wants to answer, that's how he's going to answer the question.

MR. McCULLOUGH: Well, he's not answering the question.

MS. RUDERT: You don't know if he's going to answer the question. He's going to give you an explanation in response to the question.

Q. I'll hear your explanation and then I want you to tell me why, though, an inspection 11 months earlier that was clean rules out or eliminates the possibility of a failure 11 months later.

A. It's one factor that would be evaluated in the analysis of that particular incident. They would be evaluating whether, in fact, an inspection

S. Gualardo - by Mr. McCullough

40

occurred, and what was analyzed during that inspection. If, in fact, it met the requirements during that inspection, then the inspection requirements are such that it is saying that -- it's like when you get a car inspected, and they give you a green light with respect to the tires or the brake lines, they're saying this car is inspected currently, and it's expected to make it through the next inspection period, the next 12-month inspection period. They give you that capability. They give you that green light to make it through the next inspection period with that set of tires or those set of brakes.

Q. But it doesn't mean that it will?

A. Well, anything can happen. The reality is, you know, there could be an external cause that causes that tire to fail.

Q. And you saw no physical evidence in all the photographs that you saw -- you realized you conducted no in-person inspections for physical evidence of a failure of any aspect of the crane?

A. Again --

Q. Physical components of the crane?

A. I can't rule it -- I cannot --

Q. I didn't ask you that. Did you see any

S. Gualardo - by Mr. McCullough

41

physical evidence?

A. I did not see any physical evidence with my eyes.

Q. Did you read any deposition testimony from either Mr. Natcher or Mr. Herrmann where they said a component of the crane system failed?

A. No.

Q. Is the PA OSHA Consultation Program, is that a state-run agency?

A. It's actually funded by federal OSHA, but it's also run by the state of Pennsylvania. Each state has a consultation program.

Q. Are you compensated for that service?

A. I am.

Q. Salary?

A. Yes.

Q. From 1999 to 2010, you were a safety consultant instructor at Indiana University of Pennsylvania, which I referred to as IUP before.

A. Yes.

Q. And I know that they've got a highly regarded occupational safety program.

A. Thanks for recognizing that.

Q. And you can't practice in the area of law in this part of the country without knowing that.

S. Gualardo - by Mr. McCullough

42

A. You can't practice anywhere in the world without knowing that.

Q. When we go off the record, I'll have a conversation with you about IUP.

A. Okay.

Q. Are you presently affiliated -- well, we'll go back.

How is the PA OSHA Consultation Program affiliated with IUP?

A. It's part of the Safety Sciences Department.

Q. Does the university contract with the state and/or federal OSHA to run the program?

A. Yes.

Q. Who pays you to -- your salary in conjunction with what you do? Is it the university? Is it the state? Is it the --

A. It's the university.

Q. Are you -- you also are listed as an assistant professor --

A. Yes.

Q. -- next to the OSHA Consultation Program. Do you actually teach a course or courses?

A. I don't teach anymore at IUP because I have to be dedicated 100 percent on the grant.

S. Gualardo - by Mr. McCullough

43

Q. From 1999 to 2010, about 11 years, 10 or 11 years, you were a safety consultant instructor at IUP?

A. Yes.

Q. I believe Mr. Taylor went to IUP, the expert we retained.

A. He did.

Q. Did you ever have him in any of your courses?

A. I may have. He obviously didn't show up for class if he did, if I had him.

Q. Okay. Well, that's the good thing about experts. They often tend to disagree on things.

A. I don't recall having him, to be honest with you.

Q. So you -- do you have any recollection of who this Matthew Taylor would have been as a student at IUP?

A. No. No, I taught hundreds of students over the years. He doesn't stick out.

Q. Now, under the next one down on your CV, 2010 president and CEO of Board of Certified Safety Professionals. What is that organization in a nutshell?

A. The Board of Certified Safety

S. Gualardo - by Mr. McCullough

44

Professionals is the highest-ranking certification board in the world with respect to safety and health professionals.

Q. If somebody has CSP after their name, is that what they are? They've been certified by this board?

A. That's correct.

Q. Is it sort of like taking a CPA exam?

A. It is.

Q. How many times do you have to sit? Is it different parts?

A. It is. There are two. There -- well, it's all changed recently. But when I took it, there were actually two parts. The first was called associate safety professional. The second part was called the certified safety professional.

Q. Okay. What is your role as president and CEO of that organization?

A. I oversaw the entire organization.

Q. What was -- I'm sorry.

A. Yes.

Q. Did you administer exams?

A. Personally?

Q. Yes.

A. No.

S. Gualardo - by Mr. McCullough

45

Q. Did you review exam results?

A. Results, yes.

Q. Did you grade exams?

A. No.

Q. Did you write the exams?

A. No.

Q. Were you paid for that position?

A. No.

Q. Were you elected or appointed? How did that come to be?

A. Elected.

Q. And you've been affiliated with the certified -- what is the organization called?

A. Board of Certified Safety Professionals.

Q. Oh, that's what it's called. Okay. Were you involved with the Board of Certified Safety Professionals in any capacity prior to you becoming president and CEO?

A. Yes, for several years.

Q. Is it a -- is the board a nonprofit organization?

A. Yes. Not for profit.

Q. Not-for-profit organization.

A. Yeah.

Q. You were president and chairman of the

S. Gualardo - by Mr. McCullough

46

Board of American Society of Safety Engineers in 2000-2001?

A. Correct.

Q. Is that an elected or appointed position?

A. Elected.

Q. Is it paid?

A. No.

Q. What were your duties?

A. Oversaw the entire organization.

Q. Was it full-time?

A. It was -- yeah. It was like three jobs. It was -- it was not full-time, but it was very significant. Both of those were very significant tasks.

Q. Because during that time period, you were also affiliated with IUP as a safety consultant instructor?

A. I was.

Q. You were also involved with National Safety Consultants?

A. Yes.

Q. And I guess you would be -- also have been a consultant for DuPont Safety Resources?

A. Around that time, yes.

Q. 2000-2006?

S. Gualardo - by Mr. McCullough

47

A. Uh-huh.

Q. Yes?

A. Yes.

Q. So you had a lot of things going on?

A. Always have a lot of irons in the fire.

Q. When you were with DuPont Safety Resources -- when I think of DuPont, I think of chemicals. Probably other things, fabrics, sprays --

A. Yes.

Q. -- I don't know what they're into these days. Is DuPont Safety Resources a particular branch or arm of the organization?

A. Yes.

Q. What do they do?

A. They provided safety culture work for organizations, very much like what I do as part of the National Safety Consultants. They help analyze safety cultures and organizations and take them to a level of sustained excellence.

Q. All right. So an organization or a company, a manufacturer might retain DuPont Safety Resources --

A. Yes.

Q. -- to come in and do a safety audit much

S. Gualardo - by Mr. McCullough

48

like you're doing now with your current company?

A. Yes. DuPont is recognized around the world for its outstanding safety cultures.

Q. It would have to be.

A. Yes. They slipped a little recently though.

Q. Now, as a consultant in the 2000-2006 time frame, what were your specific tasks? Were you more a boots-on-the-ground person at that time, or were you much like your role is with National Safety Consultants?

A. My -- it was more boots on the ground. I was providing training to businesses that they contracted with.

Q. Were you doing risk or hazard analysis?

A. No, just training.

Q. When you train somebody, are you training them how to comply with various regulations and standards?

A. No. We were training them on safety management concepts to take their organization to a level of sustained excellence.

Q. So this is more intended -- your target audience was more the management than it was the individual --

S. Gualardo - by Mr. McCullough

49

A. Yes.

Q. -- on the --

A. Yes.

Q. -- on the shop floor?

A. Yes, senior management and upper management, predominantly.

Q. Director of corporate safety and health from 1992 to 1999 for Niagara Mohawk of Syracuse. Again, obviously as a director, you were in charge of that particular department?

A. Yes.

Q. Of the function?

A. Yes.

Q. And you had people reporting to you --

A. I had staff of roughly 30, if I recall.

Q. Were you doing the risk analysis and the risk or hazard identification, or were you doing more on compliance and managing those who were doing all the safety-related --

A. I would say 95 percent of it was probably managing at that point. But there were -- you know, there were circumstances where I was deeply involved in the analysis of various risks.

Q. And I don't want to go all the way back, but you worked at General Public Utilities for a

S. Gualardo - by Mr. McCullough

50

period of time?

A.    Correct.

Q.    Same thing, in a management capacity more so than an investigative, boots-on-the-ground capacity?

A.    Well, I don't want you to mischaracterize that. No, I was deeply involved in investigations. I was deeply involved in risk analysis. I managed the function, but I was also -- I wasn't detached from the whole safety. I mean, I don't want you to think that I sat in some ivory tower. I was very much attached to every aspect of safety management within all of those organizations.

Q.    I have some questions concerning National Safety Consultants.

A.    Sure. Go ahead and fire away while I get some water.

(Discussion held off the record.)

Q.    I've marked Exhibit 3.

(Gualardo Deposition Exhibit No. 3 was marked for identification.)

Q.    This was provided to me by Ms. Rudert, and I assume she got this from you?

A.    Yes.

Q.    And would these be the rates in effect by

S. Gualardo - by Mr. McCullough

51

your business today?

A.    Correct.

Q.    So you are the president and, I assume, the founder of National Safety Consultants?

A.    Correct.

Q.    How many employees -- you mentioned your wife.

A.    Uh-huh.

Q.    How many -- besides yourself and your wife, how many employees do you have?

A.    Just 1099 employees occasionally.

Q.    Are these students?

A.    No. No, they're certified safety professionals or they have some certification.

Q.    Well, how many -- let's -- just so I can get some idea.

A.    Yes.

Q.    For 2017, have you filed your business taxes yet?

A.    Yes.

Q.    Okay. How many 1099s, roughly, did you issue?

A.    I think two. And -- yeah.

Q.    For the year 2017?

A.    Yes.

S. Gualardo - by Mr. McCullough

52

Q.    Is that about usual that you might have two different people, maybe three?

A.    That's rare. I don't hire a lot of employees. I don't need to.

Q.    Was there a particular need that you had in 2017 that caused you to hire two 1099 employees?

A.    I don't recall a specific need, but probably it had something to do with a case that I was working on, and I needed some research for.

Q.    Can you give me an idea of how many hours these individuals put in during 2017?

A.    I can't tell you.

Q.    Fifty or less?

A.    Yes. Oh, yes.

Q.    Per individual?

A.    Yes.

Q.    Has -- I might just call them NSC.

A.    Okay.

Q.    Because I don't want to offend anybody.

A.    Okay.

Q.    Would NSC -- has NSC ever had more than you and your wife as W-2, I assume, as employees?

A.    I had my kids on my payroll at one time. My kids are both safety professionals. So there had been times over the years where I've used them to do

S. Gualardo - by Mr. McCullough

53

some work. So I may have had them. I've also used them as 1099 employees at times as well.

Q.    Did you consult with either one of your kids regarding the David Natcher case?

A.    No.

Q.    Where are they located geographically?

A.    Ohio.

Q.    As between the three components of the National Safety Consultants business that you identified very early on today -- well, you know what they are. My handwriting. Education, safety management systems and expert testimony?

A.    Yes.

Q.    Three arms. Which arm produces the most revenue for the business?

A.    Safety management systems by far.

Q.    How much revenue, ballpark, annually for 2017?

A.    I can't tell you. I just don't know.

Q.    What was the -- what was NSC's gross receipts or gross revenue?

A.    I don't recall that --

Q.    Again, ballpark.

A.    Yeah, I don't recall. I just don't recall.

S. Gualardo - by Mr. McCullough

54

Q. Less than a million; more than a million?

A. Less than a million.

Q. Less than 500,000; more than 500,000?

A. Yes, less, but I don't know where it fell below that.

Q. More than 100,000?

A. Yes.

Q. Was 2017 a typical year revenue-wise?

A. No year is typical. They are up and down all over the place.

Q. Was 2017 a good year, bad year or average year?

A. Average, you know, decent year.

Q. What percentage of the company's revenues are derived from expert witness service?

A. It varies from year to year. It all depends on how much of the safety management functions I'm performing. It depends on -- it varied from year to year. But I would say probably, on average, about a third.

Q. What was the highest percentage you can recall the expert witness component responsible for?

A. I would say probably a third.

(Gualardo Deposition Exhibit No. 4 was marked for identification.)

S. Gualardo - by Mr. McCullough

55

Q. Exhibit 4 is a document that was provided at my request by your counsel. Did you type this document for her? Or -- if you -- do you have any recollection? Did your office type it for you?

A. It was on my computer. I'm assuming I did.

Q. Okay. And so the questions to which this is responsive are court cases where you have either provided testimony by way of a deposition, like we're having here today, or actually live testimony in court, or perhaps a videotaped deposition that was shown later in a courtroom?

A. Yes.

Q. Do you understand that?

A. Yes.

Q. Okay. And is this accurate, to your knowledge?

A. There was another one -- there was another one in 2017 that I do not have on this list either, I believe.

Q. Do you have a recollection of what is it?

A. Yeah. It was a case -- it was a Columbia Gas case in Kentucky. It was a deposition.

Q. That may show up on your CV, I assume.

A. Yes. It was a Columbia Gas case in

S. Gualardo - by Mr. McCullough

56

Kentucky.

Q. Okay. So let's turn on your CV, which I believe is Exhibit 2, turn to page -- they're not numbered. Turn to the page that starts listing speaking, consulting, expert testimony.

A. Okay.

Q. Again, just so I can interpret this correctly, are -- you were not retained to serve, or you have not yet been retained to serve as an expert witness in 2018; is that correct?

A. I may have. I just may not have it updated. I just don't know.

Q. Is this the first deposition or trial testimony that you've given this year?

A. Well, I have listed -- yeah, I'm just confused. The deposition for Gary versus Ft. Meyer was actually -- I think that was 2018.

Q. Okay. I'm not going to hold you to that.

A. Yeah. There may have been a mistake there. And the other one that I identified was the Columbia Gas case, and that was 2018.

Q. Okay. Retained and/or testified?

A. Yes.

Q. That was a yes. Retained or testified or both?

S. Gualardo - by Mr. McCullough

57

A. Well, I was retained at some point prior to that, but testified in 2018.

Q. Okay. So what did Colombia Gas -- who were you retained by? And what I really want to know is plaintiff or defendant.

A. Plaintiff.

Q. The Meza case, plaintiff or defendant?

A. That was plaintiff.

Q. The Gary versus Ft. Myer case?

A. That was plaintiff.

Q. Pinzino?

A. Plaintiff.

Q. What was -- again, I want to try to make this as succinct as possible. But were all these cases that I just mentioned -- the 2017 or '18 cases, as the case may be --

A. Yes.

Q. -- do they all involve an injury?

A. Yes.

Q. Okay. And what was the -- what was the mechanism? How did the injury happen? Was it a forklift? Was it an exposure to toxic gas? Was it a crane? What happened?

A. The Meza case was an electrocution.

Q. All right.

S. Gualardo - by Mr. McCullough

58

A.   The Gary case was a crush injury.  The Pinzino was an injury involving works on a traffic control.

Q.   And Columbia Gas?

A.   Columbia Gas was an explosion, a gas explosion.

Q.   In each of those cases, did you -- well, would you have submitted a report?

A.   If a report was required in that state.

Q.   Did your testimony in each of those cases involve compliance or lack of compliance with OSHA regulations?

A.   Yes, every one of those cases.

Q.   And I presume that in each of those cases, your opinion, without getting into the details, was that there was a failure by the defendant to comply with one or more OSHA regulations.

A.   Or other regulations.

Q.   Or ASME?

A.   Right.

Q.   Now, we don't call ASME regulations, do we?

A.   Consensus standards.

Q.   Yeah.

S. Gualardo - by Mr. McCullough

59

A.   But there could have been other DOT regulations or federal motor carrier regulations.  It all depends on the particular case.

Q.   Okay.  Let me -- let's go to your CV.
     I realize now that my math could be a little inaccurate based upon some of these possibly occurring in 2018 and not '17, as listed, but the -- actually, the first thing under 2017, keynote speaker, ASSE Student Chapter, "From IUP to Safety Stardom... What It Takes"?

A.   Uh-huh.

Q.   That was a talk that you gave?

A.   Yes, to the student chapter of ASSE.

Q.   What's the reference to safety stardom?

A.   Being successful in the field.

Q.   Do you consider yourself safety stardom?

A.   Others do.  They gave me the title of the speech.

Q.   The Viggiano case, plaintiff or defendant?

A.   That's plaintiff.

Q.   Let's -- how about mechanism?  That's my question for what happened.

A.   That was a motor vehicle incident involving distracted driving.

S. Gualardo - by Mr. McCullough

60

Q.   Was OSHA involved?  Were OSHA regulations involved?

A.   To some degree they were, yes.

Q.   Was it an employment setting?

A.   Yes.

Q.   Newsuan, plaintiff or defendant?

A.   That is defendant.  I don't have the specifics on that case yet.  That's just a new case.

Q.   Freshly retained?

A.   Yes.

Q.   Oates?

A.   That's defendant.

Q.   Mechanism?

A.   Fall.

Q.   Have you issued a report yet?

A.   I don't know that I issued a report for that yet.  I just don't recall.

Q.   Fall from --

A.   Height.

Q.   From height?

A.   Yes, construction fall.

Q.   Scaffolding?

A.   Elevated work area.

Q.   I think Gary we talked about already.  Demnicki.

S. Gualardo - by Mr. McCullough

61

A.   That's a plaintiff case.  That's a fall at a workplace; fall on same level.

Q.   What does that mean; fell off an object or a ladder onto the same floor?

A.   No, actually fall on the floor surface, slippery floor surface.

Q.   OSHA?

A.   Yes.

Q.   Cerritelli?

A.   An explosion.

Q.   Plaintiff?

A.   Plaintiff.

Q.   Poissinger?

A.   Fall to a different level from a platform.  That was plaintiff.

Q.   We talked about Meza.  Kletcho?

A.   Fall on a same surface.

Q.   Plaintiff?

A.   Plaintiff.

Q.   Has the Edgar Snyder firm ever retained you to defend an employer?  I can skip over them quickly.

A.   Yeah, I don't think Edgar does many employer cases.

Q.   Okay.  Kalownski?

S. Gualardo - by Mr. McCullough

62

A.    That is -- that is defendant.  That's a fall from a roof, skylight.

Q.    Have you issued a report yet?

A.    Not yet.

Q.    Do you anticipate that you will?

A.    Yes.

Q.    OSHA regulations involved?

A.    Yes, many.

Q.    Do you anticipate that you will issue a report that there were no violations of OSHA regulations?

A.    No.  There were multiple violations of OSHA regulations.

Q.    Do you anticipate that you will opine that there -- that any of the multiple violations caused or contributed to the fall?

A.    Yes.  I said that was a defense case; right?

Q.    Yes.  It is a defense case?

A.    Yes.

Q.    Sounds like a mitigation case.

A.    It's a sad case.

Q.    Duke.

A.    That's a defense case.  Multiple OSHA regulations involving an aerial lift device.

S. Gualardo - by Mr. McCullough

63

Q.    Aerial lift device?

A.    Bucket truck.

Q.    OSHA regulations involved?

A.    Yes.

Q.    ASME?

A.    I would think, yeah, some consensus standards, but I just don't recall what's involved in that case.

Q.    Violations or no violations, in your opinion?

A.    Multiple.

Q.    And then Callaghan.

A.    I just don't recall the case for whatever reason.  I'm drawing a blank on that one.

Q.    Burkett?

A.    Same on that.  Both of those, I believe, were construction cases, but I just don't recall the specifics.  I'm just mixing them up.

Q.    Do you know whether they were --

A.    I think both.

Q.    Plaintiff or defendant?

A.    I think both were defendant.

Q.    And the last one for 2017 is Belcher?

A.    Yeah, that was a Columbia Gas case.  That was plaintiff and an explosion.

S. Gualardo - by Mr. McCullough

64

Q.    Just to get a feel for this, I'm going to ask you to endure one more year.  Okay?

A.    You're testing my memory.

Q.    Well, that's why I don't know that I'm going to go back that much further.  Turning to 2016.  Rettew?

A.    That's a defense case.  That was a -- "impalement" is the wrong word -- struck by case.

Q.    OSHA involved?

A.    Yes.

Q.    Violations, in your opinion?

A.    Yes.  Consensus standards violations involved as well.

Q.    Kulovic; defense?

A.    Defense.  OSHA violations involved. Consensus standards involved.  Fall from a scaffold.

Q.    Burkett's back.

A.    Yeah, I don't recall that one.

Q.    Okay.  I would have double counted them in my count, though.  If it's the same Burkett as --

A.    Yeah, I'm not sure why I have it listed for both years.  It's a carryover, I guess.

Q.    Blanch.

A.    That was defense.

Q.    Is this Marks, O'Neill, O'Brien, Doherty

S. Gualardo - by Mr. McCullough

65

& Kelly a defense firm?

A.    I think they primarily do all defense work.  I don't know if they do any plaintiff work. I just don't know.

Q.    Domanque or Dom -- the next one down.

A.    Yes.

Q.    MiJack Promotions.

A.    Yes.  That was plaintiff.  That was an auto racing.

Q.    Here's our case.  Pauloski?

A.    That was a plaintiff, fall from a ladder.

Q.    OSHA?

A.    Yes.

Q.    LaGamba?  Plaintiff?

A.    Yes.  Fall from a floor hole.

Q.    Goodwin versus NYSEG.

A.    Just don't recall that one.

Q.    Abraham?

A.    Electrocution, plaintiff.

Q.    Montilla, Daub?

A.    Fire, defense.

Q.    Julia and Edward Smith?

A.    Plaintiff, explosion.

Q.    Halilovic?

A.    Just don't recall that one.  I'm sorry.

S Gualardo - by Mr. McCullough

66

Q. All right. Sunoco v TRICO?

A. Yeah. That was a -- well -- I'm not sure how to categorize that. That started as a plaintiff case, and then the law firm retained me again. It was -- someone versus Sunoco, I believe, originally.

Q. Do you remember the nature of the case?

A. It was a crush case involving a vehicle.

Q. And OSHA and perhaps other regulations involved?

A. Yes, yes.

Q. Nelson versus Lowe's?

A. Yes. It was a plaintiff case. Although not -- not pertinent to the plaintiff, there were multiple OSHA violations that would have prevented it.

Q. You said it was an OSHA case. What kind of a mechanism was it?

A. It was a -- the employee (sic) was struck by a falling display.

Q. Was the plaintiff an employee of Lowe's?

A. No, a customer.

Q. A customer. And Pinzino? Seems to me we talked about that.

A. We talked about that. That's the water company, yeah.

S Gualardo - by Mr. McCullough

67

Q. And Losada.

A. That was defense case. That involved a chemical substance that was ingested.

Q. I recognize that on this list of cases that we started to go over, by no means covered --

A. Right.

Q. -- that although the -- some of the more recent cases that you've been retained in, the time may not have come for you to prepare a report and/or it may be involved in a state where a report isn't required now or maybe some later time or at all. But in the majority of your cases that you've been retained in, do you typically issue a report much like you did today or in this case?

A. I would say the majority, yes.

Q. In your career -- strike that. Let me rephrase that.

In all of the -- or over the years in all of the instances where you have been retained as an expert witness, for either plaintiff or defendant, have you ever not been qualified by a judge as an expert witness in the particular field that you were seeking to give testimony?

A. I've never been disqualified.

Q. To your knowledge, has the scope of the

S Gualardo - by Mr. McCullough

68

areas in which you had hoped to testify been limited by the judge based upon your expertise, your qualifications?

A. Never, to my knowledge, no.

Q. Have you ever been retained -- and I'm going back, not just the cases we've talked about but going back as far as your memory will allow you with the help of the list you created. Other than the present case, have you been retained in a case involving an overhead crane like that subject in the Accuride case?

A. I'm sure I have over the years been involved in crane cases. I just don't recall.

Q. Many cases?

A. No, I've been involved in crane cases. I just don't recall when.

Q. I'm sure there are different standards or regulations depending upon the nature of the crane --

A. Right.

Q. -- and the lifting device.

A. Right.

Q. The crane involved in this case -- my word "crane." Is there a more appropriate term to designate this particular crane?

S Gualardo - by Mr. McCullough

69

A. "Crane" is fine.

Q. Okay. How about the type? Is it a bridge crane? Is it an overhead crane? Is it both a bridge and an overhead crane?

A. I would just refer to it as an overhead crane.

Q. Is it a gantry?

A. It's not a gantry.

Q. Because determining what type of crane is involved does have some relevance to what standards apply.

A. It can.

Q. It can.

A. But generally, the inspection, the maintenance, the things that I cited in my report are all generic with respect to all cranes.

Q. Okay.

A. There can be certain nuances for certain things with respect to the different types of cranes but not --

Q. Sure. So specifically -- let's call this an overhead crane.

A. Yes.

Q. Have you testified in a case involving an overhead crane or testified or issued a report?

S. Gualardo - by Mr. McCullough

70

A.    I want to think I did, but I just can't pull it out of my brain at this point.

Q.    Can you think of when it might have been or anything about it, whether it was in Pennsylvania even or maybe it was in Florida?

A.    I just don't recall. I just don't recall at this point. Certainly investigated incidents involving overhead cranes over the years and certainly investigated compliance with respect to overhead cranes over the years.

Q.    In what capacity?

A.    In my OSHA capacity. That's a normal occurrence at just about every manufacturing facility; they have some sort of crane or hoist.

Q.    Sure.

(Witness reviews document.)

A.    I just have to go back and look at every one of my cases. I just can't recollect at this point.

Q.    We'll leave that for now.

A.    Okay.

Q.    Have you ever done or performed any of the following? And I'm going to have a list.

A.    Let me clarify that. I do recall a crane case that I was involved in here in the Pittsburgh

S. Gualardo - by Mr. McCullough

71

area. It was an electric contact case.

Q.    A what?

A.    An electric contact case where the crane contacted the electric wires. I was involved in another case, I believe, in the Greensburg area involving electric contact by crane.

Q.    Would those cranes be mounted inside a manufacturing facility?

A.    No. They were construction cranes, track devices.

Q.    And did they involved OSHA regulations?

A.    Always. Same exact regulations I cited with respect to maintenance, with respect to operation, all the things that I cited would have been similar regulations that I cited in this case.

Q.    And in terms of the -- so somebody was operating the crane?

A.    Yes.

Q.    Moving -- causing it to move in some fashion?

A.    Yes.

Q.    And came in contact with electrical wires?

A.    Yes.

Q.    And you -- and I'm being very general

S. Gualardo - by Mr. McCullough

72

here, but you attributed that, i.e., coming in contact with electrical wires, to things like failing to maintain the crane, failing to inspect the crane?

A.    Well, it all depends on the case.

Q.    As opposed to a failure to be aware of your surroundings?

A.    It depends on the case. It depends on the case that I was involved in. So could it have; it could have. It all depends on the case.

There were two cases that I gave you. There was an additional crane contact case that I recall. There's another crane case that I'm working on right now on a construction case. So it could have involved those. It all depends on the particular case.

Q.    What's the one you're working on right now?

A.    There's a crane case in Florida involving a failure of a lifting device.

Q.    Did we talk about that one when we were going over all those cases?

A.    No. That's one of the ones I don't have listed in 2018 yet. I indicated there were probably some I don't have listed yet.

S. Gualardo - by Mr. McCullough

73

Q.    Do you know any of the names or anybody --

A.    No details yet; it just started.

Q.    What part of Florida?

A.    I don't know the answer to that. I don't know. Miami area, I'm thinking, but I just don't know.

Q.    The other two cases, one in Pittsburgh, one in Greensburg or in that area --

A.    Yes.

Q.    -- any specifics you can recall there; name of the case, name of the plaintiff, name of the defendant?

A.    No. I would have to go back and look at all of my files.

Q.    Name of the attorney?

A.    No.

Q.    Are those cases over?

A.    Yes.

Q.    How long ago? How long have they been over?

A.    The one electric contact case in the Pittsburgh area was over probably about two or three years ago. The one in the Greensburg area was probably eight, ten, maybe even more than that.

S. Gualardo - by Mr. McCullough

74

There was one involving a U.S. Steel plant involving rigging. That was probably eight, ten years ago.

Q. Would that be or should that be on the list of your CV?

A. They're all in there, yeah.

Q. Were all of those plaintiffs?

A. I don't recall.

Q. How about the Pittsburgh -- the one that just closed two or three years ago, was that plaintiff or defendant?

A. I believe that was plaintiff.

Q. Do you remember what law firm retained you?

A. No.

Q. Wasn't it Edgar Snyder, was it?

A. No.

Q. Was it a Pittsburgh firm?

A. I want to think they were, but again, I'd have to go back and research it.

Q. How about Greensburg; defense case?

A. I don't recall specifically on that.

Q. And nothing about the attorneys who retained you?

A. No.

Q. U.S. Steel, the rigging case?

S. Gualardo - by Mr. McCullough

75

A. Same.

Q. Do you know whether you were representing or -- strike that -- testifying on behalf or retained on behalf of U.S. Steel?

A. I don't think it was U.S. Steel, but it might have been a contractor that was on their property. I just don't recall.

Q. Have you ever operated an overhead crane?

A. No. Well, operating -- operated for what purpose? For work purposes, are you saying? For production purposes?

Q. I have a note to self to ask you, in your capacity as a consultant, have you ever operated an overhead crane?

A. Yes.

Q. How about actually performed production work?

A. No, no.

Q. And as a consultant, how often or how much time would you have logged operating an overhead crane and for what purpose?

A. Well, just to evaluate various mechanisms, pending controls, things of that nature at the worksite.

Q. To see how they work, if they work?

S. Gualardo - by Mr. McCullough

76

A. To see if they work, to see how they work, to see if they were marked appropriately in terms of what their directions were; up, down, left, right, whatever.

Q. How often would you have had occasion to do that?

A. Typically that's something that we would do at an OSHA inspection. We would actually physically grab a pending control and look at it, evaluate it and potentially operate it. It all depends on -- it all depends on the organization itself in terms of what you have found up to that point in terms of their crane training, their crane inspection protocols and so on.

Q. This is part of the PA OSHA consultation arm?

A. That's correct.

Q. It was back in the time when you were actually physically doing some of that work as opposed to managing?

A. Yes.

Q. You've never -- have you operated an overhead crane with a load on it?

A. Not that I recall.

Q. Have you ever attached or rigged a load

S. Gualardo - by Mr. McCullough

77

to an overhead crane, actually grabbed the chains and whatever device, whether it was a sling or a rope?

A. I'm sure I did with respect to some work that we've done in power plants and my work at Niagara Mohawk Power over the years have been involved in training and doing some things of that nature, but I just don't recall the specifics.

Q. Specifically as demonstrative --

A. Correct.

Q. -- as opposed to production work?

A. Correct.

Q. Have you ever had occasion to operate a crane in conjunction with working with somebody else, whether it be a truck driver or a signaller or a spotter or a rigger?

A. No. I've witnessed the operations quite often.

Q. Are you a -- well, have you ever received crane operator training?

A. I have gone through it over the years, years and years ago.

Q. I take it you have never loaded a two- or three-ton object onto a flatbed trailer?

A. Yes, I take it I did.

S. Gualardo - by Mr. McCullough

78

Q. Okay.

A. I worked for the United States Post Office over the years, and I loaded trucks.

Q. With forklifts?

A. With forklifts, yeah.

Q. I should have been more specific.

A. Yes.

Q. Have you ever secured a load --

A. Let me clarify that. They were box trailers. They were not flatbed trailers.

Q. You had to drive a forklift with a big box pallet or --

A. Well, no, I'm talking there was a closure around the trailer. It wasn't your typical flatbed without sides.

Q. I get it.

A. Yeah.

Q. Yeah. You ever secured a load to a flatbed trailer?

A. Secured loads in trailers but not flatbed trailers.

Q. That would be, again, working for the postal service?

A. Yes. I drove a truck and also loaded trucks for the United States Postal Service, two

S. Gualardo - by Mr. McCullough

79

different capacities. I drove trucks as a contractor and loaded trucks working for the United States post office direct.

Q. And I wasn't keeping count and I know that some of your recollection was understandably not precise, but would it be fair to say that you are retained more often on behalf of a plaintiff than it would be a defendant?

A. I think it varies from year to year. I think it probably swings back and forth depending on the year that you look at if you go back in history. It could be 60/40 one way and 60/40 the other way the next year. It all depends.

Q. Can you think of a case in which you've been retained, let's say in the last four or five years, where you've rendered an opinion that an employer was wrongfully cited by OSHA?

A. Yeah. I can think of cases where OSHA makes mistakes all the time.

Q. Okay.

A. I've seen cases like that, yes.

Q. Can you give me an example of a case where you can recall where you've testified or at least written a report?

A. Yeah; this case.

S. Gualardo - by Mr. McCullough

80

Q. This case today?

A. Yes. Yeah.

Q. That somebody was wrongfully cited by OSHA?

A. Yes.

Q. Did you write an opinion to that effect?

A. In this case, I didn't have to write an opinion. It was already rendered by the time we got to that point in the case.

Q. In other words, your opinion, although it's not in the report, was that Berkmire Trucking was wrongfully cited by OSHA in this case?

A. That's correct.

Q. I assume that you would also testify that OSHA dropped the ball by not citing Accuride?

A. Horribly. It's probably one of the worst cases I've seen. They obviously had a very incompetent compliance officer or a very unskilled compliance officer assigned to this case.

Q. Did you ever dig into that further --

A. No.

Q. -- to try to talk to anybody involved?

A. No. I need to maintain my separation between OSHA consultation and OSHA enforcement.

Q. Do you know a particular -- do you happen

S. Gualardo - by Mr. McCullough

81

to know any individual who is involved in the investigation of this accident by name?

A. From OSHA?

Q. Yes.

A. No, no. Although I can tell you, anecdotally, we have very significant problems in the Erie area with respect to the area office of Erie with the compliance officers. My folks follow them into worksites all the time, and there is an absolute failure to identify known violations of OSHA regulations at those worksites that we follow them into.

Q. When you say we -- I know you've testified you do not work for OSHA.

A. Well, I do work for OSHA. The funding comes from OSHA. That's the program. It's OSHA's program. Without OSHA, there's no program.

Q. Well, sure. But it's operated and run by IUP?

A. Yes, but it's a federal program.

Q. Pursuant to a grant.

A. It's a federal program pursuant to a grant, right.

Q. Yeah. IUP was awarded the grant?

A. That's correct.

S. Gualardo - by Mr. McCullough

82

Q. And you get paid by IUP?

A. That's correct.

Q. Out of the grant funds?

A. That's the way it is in every state.

Q. Would you consider yourself an OSHA employee when you say we?

A. Well, we're part of the Department of Labor. What we do every day is part of the Department of Labor. We're recognized by the Department of Labor.

Q. Do you consider yourself to be an OSHA employee or an employee of OSHA?

A. I think you're mincing words. We're paid by OSHA for what we do. We do exactly what OSHA does. We are paid by the State of Pennsylvania, though, as employees. The way that the system is set up, the program, the consultation program as written into the law has to be administered by one of two entities within the state, either a state university or state Department of Labor. It just so happens in the state of Pennsylvania it's part of the state university system.

Q. Okay. Your check -- and maybe I should be more specific. I indicated you're paid by -- I asked you whether you were paid by the university --

S. Gualardo - by Mr. McCullough

83

A. Yes.

Q. -- which is a member of PASSHE?

A. Let me cut to the case. When there was a sequester at OSHA, we were furloughed. So you clearly understand the connection between OSHA paying us.

Q. Okay.

A. When the federal government went -- was sequestered, we were furloughed immediately. Regardless of whether we are paid by IUP or not, we were furloughed immediately.

Q. In some respects then you consider yourself to be OSHA?

A. We are OSHA. Everything we do is OSHA.

Q. So what you're telling me is that some of your brethren in Erie are incompetent?

A. I am telling you that.

Q. And their incompetence is illustrated by the fact that they cited Berkmire and didn't cite Accuride?

A. They not only cited Berkmire; they cited them incorrectly.

Q. When a citation is issued by OSHA, does it get reviewed?

A. Yes.

S. Gualardo - by Mr. McCullough

84

Q. By higher levels?

A. Typically.

Q. How far up the ladder would this OSHA citation in this case that was issued to Berkmire have gone?

A. It might have gotten reviewed by a supervisor on the staff.

Q. In Erie?

A. Yes.

Q. Does it go to Harrisburg or Pittsburgh?

A. No, no, only to Erie.

Q. So you know that in this case, or that's just the way it's ordinarily done?

A. That's normally the way it is. Only significant cases would be referred to higher level in the regional office, which is Philadelphia. It's not Harrisburg.

Q. What's a significant case?

A. A catastrophic event, fatality, things of that nature. Things of that nature that would -- that would potentially result in bad publicity, negative publicity, multimillion-dollar fine being issued. Again, fatality, catastrophic event, those kinds things would typically be evaluated at a higher level.

S. Gualardo - by Mr. McCullough

85

That doesn't -- let me just further add, that doesn't always make it right just because it's evaluated at a higher level.

Q. There could be successive layers of failure?

A. Well, one in particular that I was involved in over the years involved OSHA issuing a multimillion-dollar fine -- I'm sorry -- a $463,000 fine to a manufacturer that was issued and based on the wrong set of regulations, that was eventually dropped.

Q. Okay. Now, in -- I'm going to come back to it, but just as long as we're on this aspect of it. The OSHA citation that was issued to Berkmire was actually compromised or settled. Are you aware of that?

A. The citation was deleted as part of the settlement.

Q. So there was a settlement.

A. There was a settlement, but the citation was deleted, though, which is fairly significant in terms what OSHA's actions were in this case.

Q. And was that done at the local level --

A. Yes.

Q. -- in Erie?

S. Gualardo - by Mr. McCullough

86

A.   Yes.

Q.   Other than this case, have you testified or rendered an opinion or did you hold an opinion that an employer had been wrongfully cited by OSHA?

A.   Yes. I just gave you an example.

Q.   The 450 --

A.   463,000, if I recall correctly. OSHA cited them under the entire set of wrong regulations.

Q.   And that was litigation that you were involved in?

A.   Yes.

Q.   And do you remember any specifics about it?

A.   Yeah. It was a double fatality. It was in New Hampshire involving a bridge manufacturer that was cambering bridge beams.

Q.   Okay.

A.   And there was a crush -- a jack slipped, bridge beams came together and crushed two individuals, and OSHA came in and did a wall-to-wall inspection of the facility.

Q.   And you testified on behalf of the employer or -- strike that.

You were retained on behalf of the

S. Gualardo - by Mr. McCullough

87

employer?

A.   Actually, I was retained by the employer to fight OSHA on that case.

Q.   Would that show up on your list on your CV?

A.   Yeah, it probably does.

Q.   It would be Department of Labor versus?

A.   I don't know how it would show up. I think the law firm was called Kleeman. No, that wasn't it. Hold on, I'll find it.

(Witness reviews document.)

A.   I'd have to spend some time and go back and find it.

Q.   I'd like to know that; so we can either do it now or you can agree to do it on your time and just let me know what it was.

A.   We'll use your time.

Q.   I'll sit here.

MR. McCULLOUGH: Let's take five minutes.

(A brief recess was taken.)

BY MR. McCULLOUGH:

Q.   Did you find the reference?

A.   Secretary of Labor versus Claremont Steel.

Q.   And you're going to make me find it.

S. Gualardo - by Mr. McCullough

88

What year was it?

A.   I should have wrote that down. Sorry.

(Witness reviews document.)

A.   '98.

Q.   I didn't go back that far. Okay. Claremont, New Hampshire, Secretary of Labor. All right.

Let's shift gears. Exhibit 5 is a copy of your report.

(Gualardo Deposition Exhibit No. 5 was marked for identification.)

Q.   Let me -- so for the record, is Exhibit 5 a copy of the report that you prepared in this case?

A.   Yes.

Q.   And on page 2 of the report -- and when I say 2 of the report, I'm referring to the page in the lower right-hand corner, not the filing page up on top.

A.   Okay.

Q.   -- is a section called "Documents Reviewed."

A.   Yes.

Q.   And is this a complete list of all the documents that you have reviewed in connection with this case?

S. Gualardo - by Mr. McCullough

89

A.   The only addition would be the defense -- the defense expert report.

Q.   Okay. In the introduction -- it's page 2, first paragraph of the introduction -- you state that "In developing an opinion, this expert evaluated," then you started listing a number of things.

A.   Right.

Q.   You say, "workplace customs, practices, and procedures." What specific workplace customs, practices and procedures did you evaluate in this case?

A.   Well --

Q.   What are you referring to there?

A.   I'm referring to the standard of practice that would occur in a typical situation involving a truck driver coming into a facility where a crane is being loaded by a manufacturing facility.

Q.   Is there some source that you can look up what's typical when a truck driver comes into a facility and about to be loaded by a crane?

A.   Well, what's typical, again, is I worked as a truck driver over the years.

Q.   When was that? I didn't go back that far in your résumé.

S. Gualardo - by Mr. McCullough

90

A. The '70s.

Q. Okay.

A. So I worked as a truck driver, and I'm familiar with the loading requirements.

Q. Of that particular truck, that particular time, and the environments that you were being loaded in?

A. That's correct.

Q. All right.

A. I worked for Bethlehem Steel Corporation in my internship, which was involving very significant loading of steel and whatnot in their operation.

Q. Were you doing -- actually involved in the loading of that work?

A. When you say *involved*?

Q. Were you doing the loading or participating in the loading?

A. No. We discussed that earlier.

Q. You were doing the --

A. I was a safety engineer --

Q. -- safety engineering?

A. -- intern, yes.

Q. Right.

A. The same holds true throughout my entire

S. Gualardo - by Mr. McCullough

91

career with respect to all the operations that I worked, all the organizations where I worked, whether it be on Hershey or Metropolitan Edison or Niagara Mohawk Power or all of the OSHA inspections that I've conducted over the years, this is a typical activity and it's performed at worksites that I've seen all the time.

Q. Okay. And so can you tell me what are the customs and practices?

A. Yes. The custom would be for a truck driver to be nowhere near the crane operation.

Q. Now, you've -- so he would be sitting in the cab or in the break room, whatever?

A. Yeah. Many organizations have policies that restrict the driver from being anywhere near his truck or her truck when it's being loaded by the firm. So many cases they're asked to go to the break room, go to a waiting facility of some sort, somewhere away from the truck.

Q. Now, you've read Mr. Natcher's testimony --

A. I did.

Q. -- deposition testimony?

A. I did.

Q. And you'll recall that he testified that

S. Gualardo - by Mr. McCullough

92

he was involved and that he testified that, as a truck driver, he was responsible for securing the load. Do you agree with that?

A. Yes.

Q. A, that he testified to such; and B, you agree with what he said?

A. Yes, but I would -- we need to clarify the words "securing the load."

Q. All right.

A. When he's talking about securing the load, he's talking about securing it from a Federal Motor Carrier safety perspective. He's not talking about securing the load as its being craned onto the truck.

Q. I think what he's talking about, frankly, is he's talking about attaching it to the flatbed so it doesn't fall off when I'm driving down the road.

A. When he's driving down the road, right.

Q. Or moving it from the Accuride facility back to the Berkmire facility.

A. Correct.

Q. Which is what he was doing.

A. That's his role. That's his job under the DOT regulations. It's called load securement.

Q. I think that -- and that involves not

S. Gualardo - by Mr. McCullough

93

only how you "strap it down", so to speak, and I'm using that term very roughly because there's many ways to secure a load. Strapping it down would be one; chaining it down, using webbing, putting it in a rocker that's -- that's affixed. He also testified that he felt part of his responsibility was to make sure that it was positioned properly on the flatbed.

A. They're responsible for that load when they're traveling over the road. So they have a responsibility to ensure that it's positioned on the trailer correctly.

Q. And this -- this particular load, as I'm sure is the case in many customary situations, the load is not going to be repositioned again. Wherever it's positioned from the place it's being -- the location it's being put on the truck is where it's positioned for the journey.

A. Well, unless he doesn't accept that. He could say to the shipper that I don't accept where it's placed; I need it to be relocated.

Q. So he -- what you're saying, for practical -- it would be appropriate and customary for Mr. Natcher to have been nowhere around -- perhaps outside having a cigarette or in a break

S. Gualardo - by Mr. McCullough

94

room or wherever -- perhaps give the crane operator and others involved a rough idea of how he wanted it positioned on the flatbed --

A.    Correct.

Q.    -- leave, come back and say, you got it wrong, it needs to be over here a little bit; leave again, while they did that. That's, in effect, what you're saying.

A.    Well, if they followed his instructions that would not have to occur.

Q.    Well, I'm sure that happens every time, doesn't it?

A.    I'm sure it happens a lot of the time. If you have an experienced crane operator that is experienced at loading trucks, they're going to know where to position the load on the truck.

Q.    Okay. But it's the truck driver, ultimately, who is responsible and dictates where that load goes on his truck?

A.    They're responsible to secure the load after it's placed on the truck. They're going to tell the truck driver where to generally place the load on the truck, whether, in fact, there's a cribbing that's needed or some kind of a device that's going to hold it in place or do something at

S. Gualardo - by Mr. McCullough

95

that particular juncture. That's going to be directed by the truck driver, but it's going to be the crane operator's responsibility to safely place that load on the flatbed trailer.

Q.    And is it your testimony that it's also the crane operator's responsibility to appropriately place the cribbing so that the load can be placed on the cribbing on the trailer?

A.    The riggers do that.

Q.    The riggers?

A.    I've seen riggers do that.

Q.    As opposed to truck drivers?

A.    I've seen them both do that.

Q.    The truck driver shouldn't do that?

A.    They shouldn't be anywhere near the crane operation, is what I'm saying. They can place the cribbing as long as they're out of that area when the crane operation is occurring. So they can place the cribbing in advance of a crane operation and then leave the area.

Q.    In this particular case, you're aware of the cribbing being essentially three-by-three or four-by-four lengths.

A.    Yes.

Q.    Okay. And there were precise contact

S. Gualardo - by Mr. McCullough

96

points where this conveyor was to be placed on the cribbing?

A.    Yes.

Q.    Okay. And so what you're suggesting is that Mr. Natcher should have said he should have perhaps put the cribbing on the flatbed before the crane was in operation and then gone away?

A.    That's correct.

Q.    And he should have just estimated or guesstimated where exactly those contact points were going to be?

A.    Well, again, if you had qualified riggers there, they would have adjusted those cribbing points as they loaded that onto the trailer. There were no qualified riggers. There were no qualified spotters to do that.

So if Mr. Natcher said, here is the cribbing that I want to be used, it would be the rigger that would make those adjustments as that load is being placed on the trailer.

Q.    So you read Mr. Natcher's testimony -- and I'm not going to go over it all -- but you read everything he said about what he typically does when he is loading a flatbed --

A.    I think --

S. Gualardo - by Mr. McCullough

97

Q.    -- using cribbing and his participation in the loading activity and so forth?

A.    I think he said that it was -- that it wasn't always typical. I think what he said was that there were occasions where he went to worksites where they did the loading, they had spotters, and they had riggers at that facility -- at their facility.

Q.    Sure. So --

A.    I don't want to categorize that every situation he was involved in cribbing a load that was being loaded onto a flatbed or a trailer.

Q.    So are you suggesting that Mr. Natcher shouldn't have been allowed to be in the area?

A.    Absolutely not, he should not have been.

Q.    And he should have known better that he shouldn't have been in the area?

A.    No. He was there by default. He was there because Accuride did not provide a qualified spotter or rigger. He jumped in to do that because there was nobody to perform that task. That's why he did it.

Q.    And he did it without any objection?

A.    I don't know whether he objected or not. There was no testimony to that effect.

S. Gualardo - by Mr. McCullough

98

Q.    He testified that he did not object. He did not ask for a rigger or a spotter?

A.    Well, the reality is he shouldn't have been the one that should have been objecting. It should have been Accuride who should have been objecting that he was in that location. That's the reality.

The crane operator has total control of that crane. If, in fact, there's anybody in that crane area where he's operating that crane, he should have objected and told Mr. Natcher to get out of his area. It was his operation.

Q.    At what point in this scenario leading up to the accident itself would it have been appropriate for Mr. Natcher to have returned?

A.    After the crane -- after the load was successfully placed onto the flatbed trailer at the point where the crane operator had removed the crane from that work area.

Q.    So you disagree with Mr. Natcher's actions in this particular case in terms of not leaving the area?

A.    I disagree that he was placed -- what I have a concern with is he was placed in that position by default. He did that --

S. Gualardo - by Mr. McCullough

99

Q.    Mr. Natcher is a grown man.

A.    Can I finish with my answer?

I believe Mr. Natcher did exactly as anybody would do in that situation when there was nobody present to give any assistance to that crane operator; he would jump in and assist. I think anybody would do something exactly as Mr. Natcher did.

Q.    How long had Mr. Natcher been a truck driver?

A.    I can't recall the number of years. It was several.

Q.    He had several stints. He's a grown man.

A.    Yes.

Q.    And fully capable of saying, I shouldn't be doing this; therefore, I'm not going to do this.

A.    Yeah, but you're also not including the fact that employees rarely, if ever, stop work. It's one of the concepts I teach in my management-based safety process continually. Employees are very reluctant to ever stop work, for a myriad of reasons. One is their continued employment, the recognition by the customer, of a good employer, of a contractor. They just absolutely will do anything it takes to get the job done to put them in good

S. Gualardo - by Mr. McCullough

100

light as opposed to put them in a negative light.

Q.    So that's why Mr. Natcher participated even though he should have known better?

MS. RUDERT:  Don't answer that.

He can't say what was in his mind.

THE WITNESS:  No.

Q.    Well, you just made a very general statement about why employees do certain things. Is that your understanding or is that your theory as to why Mr. Natcher participated in an activity that you're testifying he shouldn't have been?

A.    I'm testifying that Mr. Natcher did something very normally that an employee would do in that given circumstance. That's what I'm saying. That a contractor employee, a truck driver, would normally assist given the fact that there was nobody there to provide any assist.

Q.    Now, is there any -- in your experience from all your sources from which you draw your experience -- any responsibility on Berkmire Trucking to be teaching its employee, Mr. Natcher, what he should and should not be getting involved in when he goes to a customer's site?

A.    I think that organizations do have policies and procedures to that effect.

S. Gualardo - by Mr. McCullough

101

Q.    Does Berkmire?

A.    I did not see any policies and procedures to that effect. I can't speak to what he was trained or not trained on verbally, absent policies and procedures.

Q.    Throughout your report --

A.    I need to just clarify my most recent testimony. What we're dealing with here is a multi-employer worksite. A multi-employer worksite you have a controlling employer in this particular case, and that was Accuride. Accuride is a controlling employer. Accuride in this case was also a creating employer. They created the particular hazard that caused this event.

Although Berkmire was an exposing employer, so was Accuride in this particular case. And the correcting employer was obviously Accuride when they decided that they needed to come up with a policy to preclude this from ever reoccurring.

MR. McCULLOUGH:  And obviously I'm reserving all the objections because that's a subsequent measurement, at least that's what I will argue.

Q.    I understand what you're saying. I understand the concept of multi-employer. I'm not

S. Gualardo - by Mr. McCullough

102

agreeing that it applies or does not apply in this situation because there's a number of factors that go into it, and I'm not sure that it's -- it's probably a question of law as to whether a multi-employer work doctrine actually applies in this case or not.

But it is a fact that OSHA did not cite Accuride for any reason, including the multi-employer worksite?

A. We already opined --

Q. We covered that, but it's a fact.

A. Yeah. We already opined on their negligence.

Q. So your opinion is that OSHA was negligent in their investigation.

A. Absolutely negligent. It was evident.

Q. Throughout your report, you have made references to facts and you make citations to various deposition testimony --

A. Correct.

Q. -- either of Mr. Herrmann or Mr. Crispin or Mr. Natcher, sometimes more than one of them.

A. Yes.

Q. Do you believe that you have fairly and accurately characterized the references to testimony

S. Gualardo - by Mr. McCullough

103

as you've written it in your report?

A. I believe I did. There could be one exception to that, and there was some misinformation that was transcribed by a safety director with respect to what he heard from others with reference to what occurred in the workplace. So that testimony is -- or that, maybe, reference to that is debatable. I don't know what to believe. The guy appeared to be bending the truth or bending what he was trying to represent occurred in the particular case.

Q. Who are you saying --

A. The safety director. The safety director.

Q. You wrote -- you read something that he wrote?

A. Yes. Yeah.

Q. Matt Brady; is that --

A. I can't recall the person's name. I have to go back and look at my report.

Q. So you think he was bending the truth?

A. I don't think he was telling the truth, the whole truth and nothing but the truth; we'll say it that way.

Q. But you're referring to his writing down

S. Gualardo - by Mr. McCullough

104

a statement or --

A. Yes, taking statements or coming up with statements that folks didn't -- they testified that they didn't say or they didn't agree that they said. There was definitely a mis --

Q. Is it possible he just got it wrong?

A. Pardon me?

Q. Would you allow any room for thinking that maybe he just got it wrong?

A. When you're investigating an incident, you don't get it wrong.

Q. You either get it right or you're lying?

A. You take the statements verbatim. You don't take statements and then paraphrase those in your own words.

Q. You did read the testimony from Mr. Herrmann and Mr. Crispin that they were never shown those statements?

A. Yeah. That's part of the problem here.

Q. Okay.

A. Therein lies the problem.

Q. They should have been shown the statement.

A. Well, therein lies the problem. That's exactly what I'm talking about. They were never

S. Gualardo - by Mr. McCullough

105

shown the statements. They never attested to the statements. They didn't agree or disagree with the statements. Therein lies the problem. You have a difference of opinion of what occurred here with respect to what one said versus what others said. And that's what I'm saying is a little --

Q. What's the impact of that difference of opinion on this case?

A. Well, I think it's just a flat-out fabrication. Not only was that a fabrication on the part of that safety director, but it was also -- there was also some discovery information that was misreported by Accuride. There was information that I saw that was clearly wrong in terms of what they reported in discovery as opposed to what was in the evidence.

Q. Such as?

A. I'd have to go back and find it. I mentioned it in my report. I'd have to go back and find it.

Q. Would it have been the weight of the conveyor?

A. I don't recall. I'd have to go back and look at it.

(Witness reviews document.)

S. Gualardo - by Mr. McCullough

106

Q.    Because they may well have gotten the weight of the conveyor wrong.

A.    Here we go; "They admitted that Mr. Herrmann began raising the chains after Mr. Natcher had unhooked them. Accuride believed the hooks and the chains were adequately cleared from the equipment when Mr. Herrmann began raising the chains, and neither the chains nor the hooks became entangled in or with any part of the equipment."

Q.    And you just read from where?

A.    I just read from my report on page 29.

Q.    And it is, again, relating to these statements?

A.    Yes.

Q.    And so there's -- you're talking about a disagreement between what Mr. Herrmann testified to and what was written down by whoever took -- who wrote up the statement?

A.    I'm talking about the answers in a legal proceeding. The Accuride answers were inaccurate.

Q.    What answers?

A.    "They admitted that Mr. Herrmann began raising the chains after Mr. Natcher had unhooked them. Accuride believed that the hooks and the

S. Gualardo - by Mr. McCullough

107

chains were adequately cleared from the equipment when Mr. Herrmann began raising the chains, and neither the chains nor the hooks became entangled in or with any part of the equipment. As the testimony and evidence revealed the position was not true."

Q.    I'm not at the right spot.

A.    On page 29.

Q.    I'm there.

A.    Second paragraph.

Q.    The answers. Are you talking about the answer to the complaint?

A.    Yes.

Q.    Okay.

A.    It continues with respect to the statements and so on between Maleski and Herrmann and Crispin so on.

Q.    Sure, okay. But Mr. Herrmann has testified that -- and I don't think that Mr. Natcher disagrees -- that the chains, in fact, weren't clear of the conveyor.

A.    Say that again, please.

Q.    They were not clear hanging above --

A.    Mr. Herrmann testified to that.

Q.    Yes.

A.    Yes.

S. Gualardo - by Mr. McCullough

108

Q.    Yeah. And Mr. Natcher would agree with that.

A.    Yes.

Q.    And I don't know that that's in dispute right now.

A.    No.

Q.    And, again, it's quite possible that a mistake was made in an answer, is it not?

A.    I think when you're -- when you're answering a legal opinion like this, you shouldn't be making a mistake with respect to your answer.

Q.    All right. Well, I certainly hope that Erin or I never make a mistake.

A.    Well, you shouldn't.

Q.    Well, we shouldn't, you're right, but mistakes happen. Have you ever made a mistake, sir?

A.    I make lots of mistakes.

Q.    All right. Thank you.

A.    Yes. I don't think it was a mistake. I think that's exactly how they felt. That's what they believed.

Q.    That's what the written statement said; right?

A.    Yeah.

Q.    And that's maybe what somebody at

S. Gualardo - by Mr. McCullough

109

Accuride believed.

A.    That's why they wrote the statement. That's what they believed.

Q.    But then something that you believe today -- and I'm sure that you've experienced this -- turns out not to be quite as you believed it to have been when you dig into it further?

A.    Right.

Q.    Is that culpable- or malicious- or punitive-type conduct, or is that a mistake that gets corrected?

A.    No, I don't think it was a mistake. I think it was slanted. I think it was slanted from the beginning with respect to Accuride as well as Mr. Maleski in terms of what he thought occurred or did not occur. I think it was -- it was -- it was slanted from the beginning on their part.

Q.    Have you talked to Mr. Maleski?

A.    No. I can only read the testimony.

Q.    So you have no idea what Mr. Maleski -- or how he would explain that statement was taken or under what circumstances?

A.    I would be interested in how he would explain it.

Q.    Same with Mr. Brady; you have never

S. Gualardo - by Mr. McCullough

110

spoken with Mr. Brady.

A. No.

Q. He's not been deposed in this case.

A. No.

Q. And you have no idea one way or the other how he might explain why the statement that he wrote down, and was not reviewed by the person interviewed, says what it says?

A. I think it's a failure of the safety management system when you take a statement of an individual and don't have it reviewed and signed off by the individual.

Q. If that was a failure --

A. Can I finish?

Q. I'll concede that. For the sake of this --

A. Let me finish. I think that is -- that is critical to the prevention of incidents in the future.

Q. Okay.

A. And if Mr. Maleski didn't conduct a thorough and unbiased investigation, as he did not do this case, I think he was setting Accuride up for another failure down the road; and I think the position that Accuride took in this particular case

S. Gualardo - by Mr. McCullough

111

was also part of Mr. Maleski's guidance to the leadership of that organization that responded to this complaint.

Q. Now, let's assume for the sake of this question that you're right. He shouldn't have made that mistake, and it was a failure of him doing his job.

A. It wasn't a mistake. Please don't --

Q. It was a failure of him to properly do an investigation?

A. Yes.

Q. All right. Let's assume that.

A. Yes.

Q. His investigation, of course, occurred after this accident.

A. Yes.

Q. So that failure, however egregious you may think it is, had nothing to do whatsoever with that conveyor tipping over, did it?

A. The --

Q. Answer the question. The investigation that took place after the conveyor had tipped obviously had no causal effect on the conveyor tipping, did it?

A. The investigation did not reveal what the

S. Gualardo - by Mr. McCullough

112

contributing factors were for why the conveyor tipped.

Q. And that's --

A. There was not a thorough investigation conducted in this particular case.

Q. And so Accuride has deprived itself, based on Mr. Maleski's investigation that you're critical of, of perhaps preventing these incidents of happening in the future, but that failure did not impact, one way or the other, that conveyor tipping over on the day of this incident?

A. Well, it's just one more factor that reflected a failed safety management system, from my perspective.

Q. Understood.

A. That was just one more factor.

Q. Understood. Okay. I think we got off on that track when I asked you if you fairly -- do you believe you fairly characterized the deposition testimony as you've repeated in your report.

A. Yes.

Q. And do you feel that you've taken it in context --

A. I do.

Q. -- as you put it in?

S. Gualardo - by Mr. McCullough

113

A. Yes, I did.

Q. You mentioned Mr. Crispin a couple times.

A. Yes.

Q. He was at some function in shipping or receiving?

A. Yes, some supervisory function.

Q. Yeah. And he may or may not have been the person who told Mr. Natcher which bay to back his truck into. He testified that he was on the scene a couple times. One time he came, they were still doing it. He turned around and went back to his office.

A. Right.

Q. Again, I'm way up high on all this.

A. Yeah, go ahead.

Q. In terms of the actual hands-on of this loading operation, it's fair to say that he did not -- he was not a participant. He was a bystander who may or may not have seen the physical component?

A. Physical touching it, participant?

Q. Right.

A. Yes.

Q. He was maybe responsible for the paperwork.

A. Yes.

S. Gualardo - by Mr. McCullough

114

Q.    But not the actual getting the conveyor from the ground up onto the trailer?

A.    Yes, but that's a participant from my perspective. The one that completes the bill of lading information or whatever. I mean, that's all part of the shipping process.

Q.    He did not do anything that, in your judgment, was negligent --

A.    Yes.

Q.    -- in causing this to tip over?

A.    Yes, absolutely he did. He failed to supervise that operation. He was in a supervisory capacity.

Q.    What makes you think he had any responsibility for that aspect of the operation?

A.    Based on the evidence that I reviewed, that was his function, he supervised that function.

Q.    He supervised the operation of the crane?

A.    Yes. No, he supervised -- he was a supervisor in the shipping and receiving department, I'll call it. He acted in a supervisory capacity.

Q.    What was the scope of his function, scope of his supervision? Did he designate who was going to be doing this?

A.    Well, I don't know who designated who was

S. Gualardo - by Mr. McCullough

115

actually going to do the crane lift.

Q.    So you don't know whether it was Mr. Crispin --

A.    I don't know. I don't know. But he was the one responsible for the shipment. So when we talk about supervision, I look at it as the supervision of the shipment in terms when it was going -- you know, the paperwork with respect to the shipment and where it was going and so on and so forth.

Q.    That's your view, but it's not based on any job descriptions or internal policies or procedures that would pertain to Accuride?

A.    Well, it was based on the evidence that I reviewed; that was his role.

Q.    The evidence was what, his testimony?

A.    His testimony.

Q.    Anything else?

A.    The OSHA evidence.

Q.    What OSHA evidence --

A.    OSHA case file, there was some references in the OSHA case file. There was some references in the investigation that Berkmire did. There were definite references to Crispin and what function he was performing.

S. Gualardo - by Mr. McCullough

116

Q.    Okay. From that, you conclude that he had a supervisory function, i.e., a supervisory responsibility for the manner in which this conveyor was being loaded on the truck?

A.    I'm not saying he was totally responsible. I'm saying he performed in a supervisory function.

Q.    So it's possible that his only function from Accuride's perspective was that he needed to get the right signatures on the paper?

A.    It could have been that, it could have been beyond that. He was in a supervisory function. He physically watched this occur. He was actually watching some aspects of this operation occur as well. In that capacity, had he not been the direct supervisor of this operation, he should have made contact with the direct supervision to oversee this function.

Q.    So there should have been a supervisor overseeing the entire function?

A.    Well, somebody assigned a nontrained crane operator to perform this function.

Q.    So Mr. Herrmann is not trained?

A.    He was not trained.

Q.    He's not qualified?

S. Gualardo - by Mr. McCullough

117

A.    He was not qualified.

Q.    You've reviewed his testimony?

A.    I have reviewed his testimony.

Q.    His work experience?

A.    I have.

Q.    And his testimony about what training he did receive --

A.    Yes.

Q.    -- at the other locations?

A.    Yes. He did not meet the requirements.

Q.    In what respect did he not meet the requirements?

A.    I have it all listed in my report if you want me to read the section.

Q.    I do. Direct me to it, at least. We may not have to read it.

A.    Okay.

(Witness reviews document.)

A.    Let's start with the fact that he failed to operate the crane in a safe manner, which was reflective of his training.

Q.    His training?

A.    Or lack thereof.

Q.    Let's go to the training. Let's digress a second and go back to "Failure of Accuride to

S. Gualardo - by Mr. McCullough

118

properly supervise the crane operations." According to the testimony of Mr. Crispin, he shipped --

A.    Where are you?

Q.    On page 12. "According to the testimony of Mr. Crispin, he shipped these conveyors for repairs two times in the past 1.5 years prior to the day of the incident; thus, he was in a position at Accuride to supervise these activities or to assure supervision was effectively provided?"

A.    That last sentence, starting with the "thus" was your words. That's not from his transcript.

Q.    No, that was my position.

A.    Yeah.

Q.    Yeah. He failed to supervise or he failed to make sure that somebody was in a position to supervise?

A.    So he shipped it.

Q.    He shipped it? He shipped it. Yep.

And, again, the scope of shipping could only be as limited as making sure the signatures were obtained on the paperwork?

A.    I would love to have that job if that's all that a shipper does.

Q.    I guess my point is you don't know the

S. Gualardo - by Mr. McCullough

119

scope of his responsibilities.

A.    A typical shipper is --

Q.    No. You don't know the scope of his responsibilities. I don't know the typical shipper. I want to know what Mr. Crispin's responsibilities were.

A.    Mr. Crispin said that he shipped conveyors for repairs on two occasions in the past 1.5 years.

Q.    Okay.

A.    So he performed -- he oversaw the shipping of conveyors at Accuride over the last 2.5 (sic) years.

Q.    Okay.

A.    That's my point.

Q.    And so your testimony is that includes every step that's involved in the shipping of that conveyor, including moving it from where it might have been located to the area where it was going to be put on the -- loaded onto the truck, including assigning the personnel to -- to be involved in the load --

A.    Can I further add, as a shipping coordinator and former Accuride supervisor, Mr. Crispin should have stopped the operation at

S. Gualardo - by Mr. McCullough

120

that time.

Q.    That's your testimony, or that's your opinion. That's not his testimony. I'm asking you for facts, sir.

A.    He was a shipping coordinator. He was in a supervisory function. He was coordinating the shipping function. That is the facts.

Q.    All right. You don't know what the shipping function at Accuride is; correct?

A.    I don't have the job description for the shipping coordinator.

Q.    Thank you.

A.    I know what a shipping coordinator does, though.

Q.    All right. So you were going to direct me to or take me to --

A.    Let's just --

Q.    -- the training.

A.    -- go to the training. Failure of Accuride to train Mr. Herrmann on -- let's back up.

"Failure of Accuride to properly train Mr. Herrmann on crane operation, load rigging and load spotting activities."

Q.    What page are you on?

A.    On page 14.

S. Gualardo - by Mr. McCullough

121

Q.    Okay.

A.    "After being hired by Accuride" --

(Court reporter interrupted.)

Q.    I don't need you to read it to me.

So the reasons and the basis for which you believe that Accuride failed to properly train Mr. Herrmann is in this particular section?

A.    It is.

Q.    What would have -- strike that.

Is there an OSHA or ASME standard that tells us how Mr. Herrmann should have been trained?

A.    Yes.

Q.    Okay. Is that cited in your report?

A.    Yes.

Q.    Which one is that?

(Witness reviews document.)

A.    Well, number one, Mr. Herrmann would have been required to be trained on every one of these regulations that I cited on page 21. First and foremost, that "All employees should be kept clear of loads about to be lifted and of suspended loads."

Q.    Okay. Where do we start? What section says this is what you must train him on?

A.    Employees need to be trained on the regulations and the hazards.

S. Gualardo - by Mr. McCullough

122

Q. Okay.

A. Number one. They have to be trained on the specific regulations applicable to crane operations.

Q. Is there a regulation that says they have to be trained on the specific regulations?

A. Yes. Just bear with me.

(Witness reviews document.)

A. "Only designated personnel should be permitted to operate a crane covered by this section. 1910.179(a)(35) 'Designated' means selected or assigned by the employer or the employer's representative as being qualified to perform specific duties. According to OSHA letter of interpretation" -- and we go to the following link. It discusses what a designated employee is and what a qualified employee is. He did not meet those requirements.

Q. He was designated?

A. He was designated; he was not qualified.

Q. And where -- where is the laundry list of what it takes to be qualified? Where am I going to find that?

A. I'm not sure that I included the laundry list in my report, but if I need to I will.

S. Gualardo - by Mr. McCullough

123

Q. Where is the reference -- the regulatory reference that directs me to the laundry list?

A. That employees have to be trained, are you saying?

Q. The laundry list of what makes one qualified.

A. OSHA defines a designated person -- defines a 1910.179 --

Q. You're on page 23?

A. Yes. It gets into the operator qualifications. There were no qualifications that Accuride had with respect to training Mr. Herrmann. There were no qualifications. There was no training that was provided. There was no formal training. There was only very informal training at a safety meeting that he attended; that was it. He has to be qualified by them to be able to operate a crane. He was not.

Q. So there's a -- in your opinion, there's a failure to require Mr. Herrmann to go through the appropriate coursework-type training/education component?

A. That's correct. Now --

Q. Wait a minute.

A. No, I need to finish. I need to finish.

S. Gualardo - by Mr. McCullough

124

On top of that, OSHA references ANSI with respect to their regulation, and ANSI calls out the specifics with respect to training.

Q. Okay. What does ANSI tell us specifically that he has to be trained on or how he specifically has to be trained?

A. Section 2.3.1. "Training shall include those items that apply to the crane and the particular application of the crane. Training programs and their contents shall be based upon but not limited to the physical characteristics of the workplace, performance characteristics and complexity of the crane, type of load to be handled, such as but not limited to the following, multiple piece loads, raw materials" and so on.

Q. So that's ASME?

A. That's ASME, correct.

Q. And --

A. In addition, they have to be trained on the operations section of the crane.

Q. Is there any evidence in this -- forget about whether he was trained. Let's assume he walked into the shop the first day and had not done any of this training. Is there any evidence that he failed to operate the crane properly?

S. Gualardo - by Mr. McCullough

125

A. Absolutely.

Q. What is it?

A. He operated that crane while Mr. Natcher was in that particular area, number one.

Q. So that doesn't -- all right. So that -- is that not knowing how to use the crane or not knowing under what circumstances to use it?

A. He did not operate it safely.

Q. Okay.

A. You don't operate a crane when somebody that is not a qualified rigger or qualified spotter, you don't operate it when somebody is in that particular area, number one. Number two, he lifted that crane and the -- the lifting slings were not secured away from the load, and that's actually what caused the load to tip.

Q. You know that?

A. That's the evidence. There's nothing else that would cause an 8,000-pound load to just arbitrarily fall off a trailer.

Q. Well, you told me how you accurately characterized the testimony.

A. Yes.

Q. You do realize that both Mr. Natcher and Mr. Herrmann testified that they don't know what

S. Gualardo - by Mr. McCullough

126

caused it to tip?

A.    They speculated.

Q.    They speculated --

A.    Yes.

Q.    -- that it could have been something got caught on?

A.    Yes.

Q.    But they don't know?

A.    I would absolutely agree with their speculation. Eight-thousand-pound loads just simply don't fall off of trailers. They're caused to fall off of trailers.

Q.    This one fell off because it tipped over.

A.    It didn't tip over. It was caused to tip over. An 8,000-pound load doesn't just tip over.

Q.    Whether it was caused to tip over or not, it tipped over.

A.    An 8,000-pound load doesn't tip over after it's stable for 30 or more seconds. It was caused to tip over by the crane operation by Mr. Herrmann raising the crane and the sling catching underneath or on the side of the crane.

Q.    That's your speculation as to how that happened.

A.    That is not only mine. That's

S. Gualardo - by Mr. McCullough

127

Mr. Herrmann's. That's also Mr. Natcher's.

Q.    It's a theory, I think Mr. Herrmann said.

A.    That's their belief that's how it occurred. Mr. Herrmann said he operated cranes. He heard what occurred. That was his theory.

Q.    What did he say he heard?

A.    He heard the cranes clanging on the side of the conveyor. And he did not stop. At that point he should have stopped.

Q.    He testified that he stopped it immediately when the conveyor began to shimmy, that he saw?

A.    When it began to shimmy.

Q.    Yeah. And Mr. Natcher testified that he doesn't know one way or the other whether Mr. Herrmann stopped the chain immediately upon Mr. Natcher saying "whoa." Do you remember reading that?

A.    I'm sure I read it, but I'm not sure of the question. What's the question?

Q.    So the question is, you don't know one way or another whether Mr. Herrmann did or did not immediately stop the chain at the point where it was noticed that the conveyor was shimmying?

A.    The evidence that I read indicated that

S. Gualardo - by Mr. McCullough

128

there was clanging prior to the conveyor tipping. That's the evidence. That was the majority evidence. They heard the clanging of the slings against the conveyor prior to the tipping occurring.

Q.    How long were they clanging?

A.    There was no -- to the best of my knowledge, I can't recall the exact time frame. There was no time frame defined.

Q.    Let me try it this way. You have a section of your report where you get into violations or alleged violations, in your mind, of OSHA regulations --

A.    Yes.

Q.    -- and ASME.

A.    Yes.

Q.    Prior to that section, you -- you've also -- you go through a number of discussions -- I guess I would begin on page 7 -- where you state your opinion that Accuride or Mr. Herrmann failed in some regard, a whole series of them.

A.    Yes.

Q.    Are they all -- are all those -- is that series of sections where you say Accuride failed to do this or that appropriately, is it all based upon your discussion of the regulations that appears

S. Gualardo - by Mr. McCullough

129

later in the report?

A.    It could be. I mean, there might be a section that doesn't deal with regulations.

Q.    Are the majority of the failures that you believe occurred on Accuride's or Mr. Herrmann's part, are they attributable to a failure to abide by regulations?

A.    Some are and some aren't. We can go through them if you want to.

Q.    All right.

A.    Failure to remove the sling; I mean, that was operational, but that was an operational requirement. It's part of OSHA as well, that you would remove the sling before you actually do the lift after the lift occurs.

Q.    Which -- what page are you on now?

A.    On page 11.

Q.    Okay.

A.    They failed to remove the sling. That was an operational issue. He failed to operate the crane in a safe manner. That was an operational issue. Could have had some OSHA references. Failed to properly supervise; that was not necessarily an OSHA reference. Failed to -- a failure of Accuride, Mr. Crispin, and Mr. Herrmann to properly warn; that

S Gualardo - by Mr McCullough

130

was not an OSHA reference with the exception of the actual warning of a warning device or some warning mechanism to warn of that lift occurring.

Q. Right.

A. Failure of Accuride to train; again, that was OSHA and also the consensus standard.

Q. Okay.

A. Failure of Accuride to train Mr. Herrmann on the crane safety manual; that was a requirement of the crane safety manual. The crane manufacturer --

Q. The crane safety manual required --

A. Training on the manual itself.

Q. On the manual itself, okay.

A. Yes. Failure of Accuride to train Mr. Natcher on rigging and load spotting activities.

Q. Okay.

A. That was multi-employer worksite.

Q. All right.

A. Failure of Accuride to develop and enforce rules, regulations with respect to safe crane operation. OSHA doesn't say you must develop rules and procedures, but you must train people according to the operational requirements of the crane.

S Gualardo - by Mr McCullough

131

Failure of Accuride and Mr. Herrmann to properly inspect; that was OSHA. Failure -- and ASME.

Failure of Accuride to properly maintain; that was OSHA and ASME. Some of these may also have jumped into the area of crane manufacturer requirements. Failure of Accuride and Mr. Herrmann to properly inspect the work area; that could or could not be OSHA.

Q. Let me stop you there.

A. Sure.

Q. What would be the inspection of the work area have revealed that you believe is pertinent here?

A. Well, in a situation like this, you're going to inspect the work area to ensure that the area is safe for the crane operation. One of the things that you're going to be inspecting for is, is there any personnel in that particular area that could be harmed by the crane operation.

Q. Such as -- but they would be bystanders or stray people walking through.

A. It could be anybody.

Q. But there would be other people involved perhaps, in your opinion, serving as spotters or

S Gualardo - by Mr. McCullough

132

riggers?

A. In a -- in a normal world you would have an Accuride spotter or rigger in addition to the crane operator.

Q. Right. I guess you said inspecting the work area to make sure it's safe would mean so there's not other personnel around. Obviously that means excluding those who are participating in the activity.

A. Yes.

Q. In this case, that person happened to be Mr. Natcher. You say he shouldn't have been there, but in this case it was Mr. Natcher who was participating. Correct?

A. Yes.

Q. What other hazard would an inspection of the work area have revealed that would have prevented this accident from happening?

A. Well, I didn't opine on that. All I talked about was Mr. Natcher in this particular case to ensure that he was in a safe area before commencing a lift. I didn't opine on anything else that would have attributed to an unsafe lift.

Q. All right. Have you gone through the whole list?

S Gualardo - by Mr McCullough

133

A. Failure of Accuride to develop and implement effective crane signaling protocols or safety warning systems.

Q. Let's stop there. Signaling, what aspect of failure to develop signaling or warning caused this accident to happen?

A. They didn't have a recognized signaling or warning -- first of all, there's no warning.

Q. Warning of what?

A. Audible warning that when the crane was lifted -- when the sling was lifted, there was no audible warning that would occur.

Q. Let me stop you there.

A. Go ahead.

Q. You do realize that Mr. Natcher testified that he told -- directed Mr. Herrmann to raise the chain?

A. Yes.

Q. And he further testified that he didn't -- Mr. Herrmann did not begin raising the chain prematurely or unexpectedly?

A. I don't know that.

Q. Well, he testified to that. You want to look at that?

A. No. I don't need to. The point is

S Gualardo - by Mr. McCullough

134

simply --

Q.    Why don't you need to? Are you going to take my word for it?

A.    No, I'm not going to take your word for it.

Q.    All right. Well then let's look at.

A.    Certainly, we'll look at it.

Q.    Well, let me ask you this: If he had testified that there was no unexpected movement of that chain in terms of it being lifted --

A.    Who are we talking about?

Q.    If Mr. Natcher testified that he wasn't taken by surprise at all, Mr. Herrmann raised it when he told him to raise it, he didn't do it prematurely, would that change your opinions about warnings or signaling?

A.    I think you to have to signal or warn regardless. You have to signal. You to have use an approved signaling method, a known signaling method or you have to have some warning before you raise a crane.

Q.    If I know the crane is lifting --

A.    You're just not warning Mr. Natcher. You're warning everybody.

Q.    But nobody else got hurt.

S Gualardo - by Mr. McCullough

135

A.    That's irrelevant. The requirement says you must warn.

Q.    It may be irrelevant to whether there was a violation of the regulation, but I'm talking about whether the violation, in your mind, of the regulation caused this accident to happen or was a contributing factor.

And my question is: If Mr. Natcher knew precisely when the crane chain -- the hoist chain was being lifted and it didn't surprise him and it wasn't lifted until he told Mr. Herrmann to lift it, then what in the world good is a warning beeper going off going to do? What is it going to add to the situation?

A.    What it adds to the situation is that they totally ignored all of OSHA's regulations in this case collectively.

Q.    Stop. Stop, please.

A.    Sit --

Q.    No.

A.    Let me --

Q.    No. You're not answering my question.

A.    I can finish my answer, sir.

Q.    You are not answering my question.

THE WITNESS: Can I finish my answer?

S. Gualardo - by Mr. McCullough

136

MS. RUDERT: Let him answer it.

MR. McCULLOUGH: He's been not answering it for -- my question was precise. I would like you to stop and read it if you can find it. Either read it back or I'll start over.

THE WITNESS: Start over.

Q.    I'll start over. I understand that you believe there are a number of things -- failures, failure to abide by regulations, failure to conduct inspections on an annual or a periodic and daily basis, a lot of things, training, this that and another thing. We're talking about warning right now.

A.    Yes.

Q.    I know in your mind that's all part of the big picture.

A.    Yes.

Q.    I'm talking about, Mr. Natcher would not have been hurt -- or what caused him to get hurt was that unit tipping over; right?

A.    Yes.

Q.    And however it happened, whether he got knocked off or whether he jumped off, he ended up on the shop floor.

A.    Yes.

S. Gualardo - by Mr. McCullough

137

Q.    And thank goodness the thing missed him.

A.    Yes.

Q.    Okay. I'm talking about what caused that thing to tip over. All right. That's what my question is going after.

A.    Go ahead.

Q.    So with that background in mind, if Mr. Natcher signaled Mr. Herrmann it's okay to raise the chain --

A.    Yes.

Q.    -- and if Mr. Natcher testified that Mr. Herrmann did not start raising the chain prematurely, in other words, he did not start raising the chain before Mr. Natcher signaled him, then what additional safety would have been provided by a beeper warning going off? Mr. Natcher already knew what that warning beeper was intended to do from his perspective.

A.    You're mischaracterizing the purpose of a warning. A warning is to alert somebody to get out of that particular hazard area.

Q.    Okay.

A.    Okay. Had a warning been issued, had some warning been issued to Mr. Natcher to get out that area, he would not have been in that area.

S. Gualardo - by Mr. McCullough

138

There was no warning issued to Mr. Natcher to get out of that area.

Q. What type of warning?

A. It doesn't matter. There was zero warning on the part of Accuride.

Q. Would it matter to you that Mr. Natcher did get out to that area?

A. He did not get out of that area.

Q. Well, he testified that he retreated to the front of the trailer under the canvas to an area where if that conveyor tipped over, he would have been free and clear; it wouldn't have touched him?

A. By the mere fact that he was harmed in this case, he was not in an area that was safe.

Q. Did you read that portion? Did you realize -- understand that he testified that he went back to a safe zone?

A. I did read that. That was not a safe zone anywhere on that truck. He was not qualified to be on that truck.

Q. Will you agree with me -- do you dispute Mr. Natcher's testimony that if the unit had tipped over while he was standing by the curtain, in the area he called safe, that his injury would not have happened?

S. Gualardo - by Mr. McCullough

139

A. I don't know. I don't know exactly where he would have not been injured. The reality is this: When you are warned to get out of an area, you can't be in that hazard zone. He was in that hazard zone obviously in this particular case, or he would have never been injured.

Q. Do you know why he was in that hazard zone?

A. Because he attempted to stabilize the conveyor after it began to tip.

Q. Because he went from a zone of safety to a zone of danger.

A. He went there by default. He should have never been there to begin with. As I spoke earlier, Mr. Herrmann should have directed him out of that area totally.

Q. And in your --

A. Can I finish my testimony. He should have never been in that area to begin with. Mr. Herrmann should have directed him out of that area.

Q. And in your opinion, Mr. Natcher bears no responsibility whatsoever for his decision to go from a safe place to a dangerous place?

A. I think Mr. Herrmann was --

S. Gualardo - by Mr. McCullough

140

Q. Yes or no?

A. Are you going to allow me to answer my (sic) question?

Q. No, not that way. The question was: Is it --

THE WITNESS: He's not going to allow me to answer the question.

MS. RUDERT: He can't opine as to, you know, does he bear any responsibility without explaining the whole circumstance, which he did earlier. He talked about the conduct.

MR. McCULLOUGH: He talked about a lot of things. And I'm focusing on one decision, and that was Mr. Natcher's decision to go from a safe spot -- his words or he agreed with my words that it was a "safe spot" -- to a dangerous spot at which time or shortly thereafter the conveyor tipped over.

A. Counsel, there was not a safe spot on that truck. You put words in his mouth. There was not a safe spot on that truck. That's the reality. He's not allowed to be in that zone when there's a crane operation going on.

Q. How about if we call it a spot where he wouldn't have been knocked off the trailer or had to jump out of the way?

S. Gualardo - by Mr. McCullough

141

A. He's not allowed on that truck --

Q. I understand that.

A. -- while a crane operation was going on.

Q. I understand that; but he was there.

A. He's not allowed to be. That's the whole crux of this case. He was not directed to get off the load -- I'm sorry -- off the truck.

Q. Okay.

A. He was not directed. And while he was not directed, the crane operation commenced with Mr. Herrmann. Mr. Herrmann had full responsibility for the operation of that crane. He represented Accuride in that case. He had 100 percent responsibility for the operation of the crane. He had 100 percent responsibility to tell Mr. Natcher to get off the flatbed truck; I'm going to do a crane operation to lift the load onto the truck. He had 100 percent responsibility to do that.

Now, had Mr. Natcher refused at that point, we would be talking about a different circumstance. That wasn't what we're talking about here. What we're talking about is Mr. Herrmann directing -- not directing Mr. Natcher away from that vehicle.

Q. Now, why would we be talking about an

S. Gualardo - by Mr. McCullough

142

entirely different circumstance?

A. Because then in that particular case that would be a contribution on the part of Mr. Natcher. That's not what we're talking about here. Mr. Natcher performed in a normal, natural occurrence as we discussed earlier, because he knew that he had to get that thing loaded, he knew that there was nobody there to assist and he jumped in to help. That's what a normal individual would do in a situation like that.

Q. And we should be protecting that normal individual from doing those things?

A. That's why you have the regulations that you have, to protect individuals. Had they applied those regulations that were in place, we would not be talking about this case. Had Accuride complied with the regulations that were in place with respect to a safe crane operation, we wouldn't be sitting here today.

Q. So the regulation that tells us that Mr. Natcher should not have been anywhere near there, that's something that's cited in your report?

A. Yes.

Q. Do you have the regulations with you?

A. I have them all listed out in my report.

S. Gualardo - by Mr. McCullough

143

Q. Do you have the actual regulations?

A. No. They're all written out verbatim.

Q. Before I get into that, just a couple quick questions on it. You say initially in the report that the conveyor was stable.

A. Yes.

Q. In your verbiage, is -- is stable the same as stationary or vice versa?

A. As in not moving? I'm missing your question.

Q. Was the conveyor stationary?

A. Yes.

Q. Before it tipped over, before it started to shimmy?

A. Yes.

Q. Once it had been planted?

A. Yes.

Q. As it was resting on the cribbing --

A. Yes.

Q. -- in your opinion, it was not only stationary for a period of time, but it was also stable; correct?

MS. RUDERT: You just asked him if those words with are the same. I'm going to object to the form because you asked him do they mean the same

S. Gualardo - by Mr. McCullough

144

thing. Now you're asking him are they -- it's kind of implying that they have a different meaning.

MR. McCULLOUGH: All right. We'll take them one at a time. I tried to get around.

Q. Do they mean the same thing to you?

A. How do you define stationary?

Q. I asked you how to define stationary. I asked you whether your definition of stationary is the same as your definition of stable.

A. My definition was the load was on the trailer and it was not moving.

Q. Does that mean it's stable?

A. Yes, it was stable.

Q. Are there varying degrees of stability?

A. If we're talking about an elderly person walking down the street, yes, sometimes they can be stable and sometimes they can be unstable, and there's varying degrees in that. In this case, the conveyor was sitting on the load and it was not moving, period.

Q. If I -- I think Mr. Natcher said that it was "stable" -- that might have been his word, too -- as long as nothing touched it was, I think, his characteristics?

A. Yes, there was something --

S. Gualardo - by Mr. McCullough

145

Q. "Disturbed" I think is the word he used, "disturbed."

A. Yeah, it could have become unstable if something hit it, and that's exactly what happened in this case.

Q. If I balance a nickel on its edge -- have you ever done that?

A. I'm sure I have.

Q. If you can prevent it from rolling someplace, would you call that nickel stable?

A. If you can prevent it from rolling?

Q. If it's on a perfectly level surface and it's not rolling --

A. Yes.

Q. -- but you're able to balance it so it's stationary on the table --

A. I would call it stationary.

Q. Would you call it stable?

A. It could be stable. It would be stable in that configuration if it's standing there, and it's not moving, it's stable and it's stationary. I'm really missing your definitions, sorry.

Q. I'm just trying to figure out exactly what you mean by this load was stable. Do you understand how the feet were placed on the cribbing?

S. Gualardo - by Mr. McCullough

146

A.    I saw the -- I saw some references to that in the report.

Q.    Describe for me how you believe the feet were placed on --

A.    There were a couple of feet on the actual conveyor itself, and those were in contact at various points, if I recall correctly.

Q.    How big are the feet themselves?

A.    I can't recall. I didn't measure them. I can't give you a measurement. I wasn't there.

Q.    Do you know whether the feet are flat when they're sitting on the cribbing?

A.    No.

Q.    You don't know or they're not?

A.    No, I don't know.

Q.    I believe there was testimony, and this is not a very good example, but assume this is a square, this a Post-it pad and it represents the feet.

A.    Yes.

Q.    I would consider that to be the foot sitting flat on the ground.

A.    Yes.

Q.    Do you understand from reading the testimony that when the conveyor was placed on the

S. Gualardo - by Mr. McCullough

147

cribbing, just the leading edge of the feet was touching the cribbing?

A.    I remember some testimony to that effect.

Q.    Do you know why that is or was?

A.    No.

Q.    Do you know what the conveyor was used for?

A.    No.

Q.    The conveyor was S-shaped to transport materials from one floor level up to a second floor level.

A.    Okay.

Q.    So when it's in its working position, the feet would sit flat.

A.    Okay.

Q.    But when it's all down on one level --

A.    They're not flat. But a portion of the conveyor was touching the cribbing or the trailer.

Q.    Just the leading edge of the plate.

A.    Yes.

Q.    In your mind, does that make it any less stable?

A.    No.

Q.    Any less susceptible for the slightest jostling to knock it over?

S. Gualardo - by Mr. McCullough

148

A.    No. I think you have an 8,000-pound weight sitting on a trailer. I don't think you're going to jostle that too easily.

Q.    Do you know whether that conveyor is top heavy?

A.    I don't know. Again, I think you have an 8,000-pound weight sitting on a trailer. I think it's going to take a substantial force to move that trailer -- I'm sorry -- to move that load.

Q.    Does the -- does the distribution of weight of that -- what did you say 2,000 or 3,000 pound?

A.    Eight thousand.

Q.    Eight-thousand-pound conveyor. Does the distribution of where that weight is located cause it to be more or less stable?

A.    I didn't do an accident reconstruction. I can't tell you that.

Q.    As a general proposition, would it?

A.    I can't tell you that. I can't tell you where the weight was distributed on there. All the weight could have been on that front leg that you're talking about.

Q.    Would that have made it more or less stable?

S. Gualardo - by Mr. McCullough

149

A.    It could have made it more.

Q.    You don't know at this point?

A.    Nobody knows. There was no accident reconstruction.

Q.    Mr. Natcher has testified that he went over to the conveyor to try to keep the -- reach over the conveyor to push the chains away from the conveyor. Do you recall that?

A.    I do.

Q.    I'm sorry, you do?

A.    I do.

Q.    Okay. Do you know whether Mr. Natcher might have bumped the conveyor as he was attempting to reach over to grab the chains?

A.    No.

Q.    You don't know?

A.    But I find it inconceivable that bumping an 8,000-pound conveyor would cause it to topple off of a flatbed trailer.

Q.    It may have caused it to wobble.

A.    I don't think it would cause it to wobble either.

Q.    You don't know one way or the other because you haven't reconstructed the accident.

A.    I don't think an 8,000-pound conveyor is

S. Gualardo - by Mr. McCullough

150

easily wobbled.

Q. Okay.

A. Again, whether he did or did not, he shouldn't have ever been there. That's the whole point.

Q. I know that.

A. He should have never been there.

Q. I know that's what you will say. That's why I'm not going to ask this next question because I know what you're going to say.

A. He should have never been there.

Q. You are aware -- again, for all these questions I understand that it's your opinion that he never should have been there.

A. That's correct.

Q. So I take it that it doesn't matter to you that Mr. Natcher testified that at all times he was able to communicate verbally with Mr. Herrmann without having to shout?

A. I think there was some testimony that there was some noise in the area, if I recall.

Q. That came from somebody else. I'm talking about -- not your client, but the person that you're representing here testified that at no time did he have the inability to verbally

S. Gualardo - by Mr. McCullough

151

communicate with Mr. Herrmann without -- without having to shout. In other words, he never had to shout in order to verbally communicate.

A. Okay.

Q. You recall --

A. I recall reading something to that effect.

Q. He also testified that he could visually see over, under and around the conveyor given its configuration.

A. Yeah. That wasn't the problem. The problem wasn't him seeing; it was the crane operator seeing him. It was the crane operator communicating to him. That was the issue here.

Q. Okay. We've already talked for some period of time about the warning.

A. Yes.

Q. Is that what you're speaking of?

A. Well, no, I'm talking about all of it. The crane operator operated the crane without being able to see the rigging. He lifted that rigging, those slings, without being in visual sight of those slings. He had no idea where they were at.

Q. Does it -- there seems to be an inconsistency of two versions of Mr. Natcher and

S. Gualardo - by Mr. McCullough

152

Mr. Herrmann at kind of the critical time when this was about to happen. Okay? Tell me if you recall differently. But my recollection -- I have it all written down -- is that Mr. Herrmann testified the chains were on Mr. Natcher's side of the conveyor.

A. Right.

Q. Okay. But Mr. Natcher testified that the crane -- the chains were on Mr. Herrmann's side of the conveyor; right?

A. I'd have to go back and verify that.

Q. Okay. Take my word for it. He said that's where they slipped off, onto that side, on the south side?

A. My understanding is that the chains were on the far side of the conveyor.

Q. Far side from Mr. Natcher?

A. From Mr. Herrmann. He could not see the chains. I think there was a question asked with respect to that.

Q. He said he couldn't see the hooks.

A. Well, he could clearly see the hooks if they were on his side. How could he not see the hooks if they're on his side.

Q. See, that's the problem. We have two different recollections of where the chains were.

S. Gualardo - by Mr. McCullough

153

A. The chains, I believe, were on Mr. Natcher's side of the conveyor, and when they were clanging -- when he lifted, Mr. Herrmann could never see the chains. He could never see the hooks; he testified to that.

Q. Do you want to know what your client said?

A. Go ahead.

Q. I'll have to dig it out. Are you looking at the factual section of your report?

A. I'm looking at the incident description where it discussions what Mr. Herrmann stated.

Q. Erin and I are probably so familiar with this that we could probably recite, but Mr. Herrmann did testify that he was on the opposite side of the conveyor from Mr. Natcher.

A. Right.

Q. And that, from his perspective, he thought that Mr. Natcher had the chains on the op -- on his side, on Natcher's side of the conveyor.

A. He had on Natcher's side?

Q. And he had them in his hand.

A. That Natcher had the chains on his side.

Q. Yes. That's what Mr. Herrmann thinks he saw.

S. Gualardo - by Mr. McCullough

154

A. Yeah, I agree.

Q. Okay. Now, what Mr. Natcher says is that he took off the four chains, corner by corner, and set them down. In the report I think he said he set them on the trailer.

(Witness reviews document.)

A. Go ahead.

Q. You good? I thought you were refreshing.

A. No. Everything I'm reading so far is that Mr. Herrmann was not in eyesight of those slings. They were on the other side. They were on the decking or whatever. He couldn't see the hooks. He couldn't see the chains.

Q. Does it matter whether they were on the decking or elsewhere?

A. Yeah.

Q. When you talk about slings, you're talking about -- the sling is the entire chain; right?

A. The chain and the hook.

Q. And the hook.

A. Right.

Q. Okay. So he could see part of the sling.

A. He couldn't see the hooks.

Q. So was it necessary that he see the hook?

S. Gualardo - by Mr. McCullough

155

A. Absolutely.

Q. Okay.

A. Yes.

Q. He did say that he -- he did say that Mr. Natcher had one of the hooks in his hand, though.

A. He said that at one point that he had them in his hand.

Q. Right.

A. Yeah.

Q. So I -- presumably, he would have had to see the hook in order to know that.

A. Well, I don't know what he saw. Let's look at that testimony, exactly what he said with respect -- when he said he saw him with the hook. Was he talking about when he unhooked it, or was he talking about when they were laying on the deck?

Q. They were not laying on the deck.

A. Mr. Natcher unhooked the sling hooks and piled them on the trailer decking. That's on page 150 through 152.

Q. Who said that?

A. Mr. Natcher.

Q. Mr. Natcher says that?

A. Yeah, Natcher said he unhooked the slings

S. Gualardo - by Mr. McCullough

156

and piled them on the trailer decking.

Q. You mean the aluminum decking?

A. Yes.

Q. 152?

A. Right, 150 to 152.

Q. You sure he didn't put them on the conveyor itself?

A. I'm only reading what I excerpted from the testimony.

Q. Right, which you've testified was accurate to the best of your ability?

A. Right.

Q. I'm reading the testimony. "What did you do with it after you got it unhooked? Did you set it down? Did they -- did they just drape?"

Answer: "It was unhook -- hook a chain and set it up here, unhook a chain, set it up here, unhook a chain, set it up here. And they were all piled up on top of the deck here (indicating)."

And I'll represent to you I had the photo. He's talking about putting it on the deck of the conveyor, and he drew a little circle on the conveyor itself.

A. I thought that he was referring to the trailer decking at that point in the testimony.

S. Gualardo - by Mr. McCullough

157

Q. So at that point, everything was up -- according to Mr. Natcher, it was up on top of the conveyor.

A. Okay.

Q. All right?

A. Yeah.

Q. Okay. Then -- now, again, Mr. Natcher -- Mr. Herrmann has it a little different. He said that they were -- one by one as he took them off, he draped them over the far side, the north side of the conveyor.

A. Right.

Q. So we have some disagreement. It's not unusual for people to disagree, though, is it?

A. Right.

Q. Or see the same thing or recall the same thing differently. You would agree with that? It's not unusual for two people who saw the same event to recall it somewhat differently?

A. That happens, yes.

Q. Now, Mr. Natcher goes on to testify, though, that when the chains started lifting after he signaled Mr. Herrmann to start raising the chains and clearing them and at which point Mr. Natcher went up to the front area of the trailer -- I know

S. Gualardo - by Mr. McCullough

158

he shouldn't have been there at all, but he was at least where he would say if the thing tipped over, it wasn't going to hit me?

A.    Right.

Q.    He then says the chains fall off the side of the trailer.

A.    Right.

Q.    The south side of the trailer.

Q.    Mr. Herrmann's side of the trailer.

A.    Okay.

Q.    Okay. Two different -- two different aspects. Two different events. In which case Mr. Herrmann would have been able to see the slings. He's a tall man. He's taller than the four-foot-high trailer.

A.    Okay.

Q.    So my point is -- really my point was, you took a position in your report based upon one version of the deposition testimony when there clearly was a different version of the testimony.

A.    I think the accurate version of the testimony was he did not see the slings.

Q.    You think -- so you think that Mr. Herrmann's version of the testimony was more accurate than Mr. Natcher's?

S. Gualardo - by Mr. McCullough

159

A.    No. What I'm saying is, if in fact you're a crane operator and you see slings rubbing against the side of a conveyor and you're physically looking at this occurring, you're not going to continue to raise that load. You're going to stop at that point.

Q.    Uh-huh.

A.    He's on that side, you're saying, looking at those slings as they're rubbing against the side of the conveyor as he's lifting the hoist.

Q.    But he's not saying that.

A.    Yeah, but my point is, he would have to be on that side. He would have to be looking at them. You're saying they're on his side.

Q.    No, I'm saying that Mr. Natcher said they're on his side. Mr. Herrmann has them on the other side.

A.    I believe that they were on the other side. I think you had Mr. Natcher confused in the testimony. I think you did a very good job of confusing him north, south, east and west. I don't think he was very clear with respect to that testimony. I firmly believe they were on the other side. Mr. Herrmann did not have eye contact with those slings.

S. Gualardo - by Mr. McCullough

160

Q.    So I put words in his mouth and I confused him.

A.    No, I didn't say you put words in his mouth.

Q.    Yes, you did. I put the safe zone words in his mouth.

A.    You did put the safe zone.

Q.    Yeah, that's what you told me I did.

A.    You did. That was not a safe zone. I'm sorry.

Q.    And when Mr. Natcher drew on the exhibit that showed exactly where he was each time at various points in this operation, I had him confused there too.

A.    No. All I'm saying is, I believe Mr. Herrmann -- I believe that the sling chains were on Natcher's side of the conveyor when the lift occurred. Otherwise, they would have been on his side, and he would have clearly seen them hitting the conveyor as he was lifting the sling.

Q.    Maybe they were actually on top piled up as Mr. Natcher said.

A.    No. How could they hit the side of the conveyor when, in fact, they're on top?

Q.    Mr. Natcher said they slid off.

S. Gualardo - by Mr. McCullough

161

A.    Well, then they were off. Okay? Then they were off. Okay? They were off at some point. So it was being lifted while he was not in eye contact with those things and/or the hooks. So if they fell off or if they were actually off prior to the lift, either way he was not in eye contact with those slings.

Q.    Okay.

A.    You can pick whichever poison you want in that situation; the reality was he was not in eye contact.

Q.    Okay. So we were going to look at some regulations. Just one more question on that.

A.    Sure.

Q.    If, as Mr. Natcher testified, the slings, including the hooks, were all piled up on top of the conveyor at the time Mr. Natcher was directed, whether it was verbal or signal or both, Mr. Herrmann to start lifting the chains --

A.    Yes.

Q.    So that's where they started?

A.    Yes.

Q.    Assume Mr. Natcher is correct, if the jury were to believe him in this case that they slid

S. Gualardo - by Mr. McCullough

162

off to Mr. Herrmann's side of the conveyor sometime after they started going up --

A.    Yes.

Q.    -- then Mr. Herrmann would have been able to see, from the south side, the slings? Because they would have been on his side of the conveyor.

MS. RUDERT: You're assuming that he was looking.

A.    Yeah, and you're -- but they weren't. He testified they weren't.

Q.    But Mr. Natcher testified they were.

MS. RUDERT: I think -- we're going to fight all day about who testified to what. The testimony is what it is. The point is and what he's testified based on is the fact that Mr. Herrmann clearly said he couldn't see the slings.

MR. McCULLOUGH: I asked him to assume that the jury believed Mr. Natcher. Okay? That's all.

Q.    Because I assume you want the jury to believe Mr. Natcher.

A.    I'm going to have the jury believe the facts in this case. I don't want them to believe one way or another. I want them to believe the facts in this case. That's my whole purpose of

S. Gualardo - by Mr. McCullough

163

being here.

Q.    Mr. Natcher's version of the facts, okay, as he sees them is that the chain slid off to the south side of the trailer. He also -- that's where Mr. Herrmann would have been standing when he was doing this. As counsel said, assuming he was looking and not distracted or daydreaming, okay, if that is true, then he would or should have been able to see the slings because they were now on his side of the conveyor.

A.    Well, if they were on his side of the conveyor, he would clearly see the slings. And if he would clearly see the slings -- it goes back to the point that I made earlier -- why would you continue to lift the slings when they're in contact with the conveyor?

Q.    But there's no testimony that I'm aware of as to how quickly or how long they were -- continued to be raised.

A.    They were clanging. They were clanging. There was testimony that the chains were in contact with the conveyor as it was being raised. Crispin said that. Herrmann said that.

Q.    Did Crispin say that he heard chains on the conveyor, or did Crispin say he heard the crane?

S. Gualardo - by Mr. McCullough

164

A.    I thought he said he actually heard the clanging. I thought he said clanging. That was the verbiage that the others used.

Q.    But is it possible that he was referring to the crane?

MS. RUDERT: Don't answer that.

I mean, you're going to ask him is it possible that somebody else misheard something?

MR. McCULLOUGH: I'll rephrase it.

Q.    Your recollection is that Crispin heard and attributed the noise he heard to the chain on the conveyor?

A.    Yes.

Q.    Okay. Not something else?

A.    No.

Q.    All right. And you would have gotten that obviously only from reading the Crispin deposition?

A.    Yeah. My recollection was that he heard a noise as the lift was occurring.

MS. RUDERT: If you want to be clear what the deposition said, you can look at it. There have been a ton of questions about what's your recollection of this and what's your recollection of that.

S. Gualardo - by Mr. McCullough

165

You can show him the testimony and have him read it. We're talking about his report, his opinions, not do you specifically recall this one line of testimony.

MR. McCULLOUGH: I understand. But he's already told me that what's in his report is accurate in terms of the testimony that he cites. And so --

MS. RUDERT: Yeah, based on his reading of it.

THE WITNESS: Yes.

MS. RUDERT: That's -- that's the point that I'm trying to make. You're talking about somebody who is reading testimony from somebody else. You know, he wasn't there when this incident occurred. He didn't talk to these individuals on his own.

MR. McCULLOUGH: That's correct.

MS. RUDERT: So --

MR. McCULLOUGH: That is correct.

MS. RUDERT: Yeah.

A.    He actually used the word "clicking." He heard the word "clicking." Cranes don't typically click.

Q.    You haven't heard this crane, though,

S. Gualardo - by Mr. McCullough

166

have you?

A.    No. I've heard lots of cranes. They don't typically click unless there's some malfunction occurring.

Q.    We've covered the OSHA investigation, I think, fairly, so we know where you stand on that. But given that you think that the folks who conducted the investigation were so "negligent" -- I think you used that term -- and dropped the ball so egregiously, if that's a fair characterization, did you like report that anywhere, or did you use -- is there any recourse that you might exercise?

A.    I told you I can't.

Q.    You just can't?

A.    No. There's a clear separation between OSHA compliance and OSHA consultation. I can't discuss anything with them. They can't discuss anything with me. There's requirements under the law to preclude that.

Q.    But again, for the record -- and again, I understand that you agree this is egregious -- but no citation on Accuride under multi-employer worksite or general duty?

A.    Just because there's no citation does not mean that violations were not there. I mean, the

S. Gualardo - by Mr. McCullough

167

best example that I can give you is you can drive your car and exceed the speed limit. Just because you didn't get pulled over by the police doesn't mean you weren't violating the law. The violations were clear in this particular case.

Q.    See, I really only needed a yes or no.

A.    Well, I had to --

Q.    But you've explained without answering.

A.    I explained.

Q.    The answer to the question is there was no citation issued under either of those sections or theories; correct?

A.    There were no citations issued, no.

Q.    Yes. And did you read the section called -- the portion where somebody -- one of the investigators did a walk-around investigation?

A.    As in OSHA?

Q.    Yes.

A.    Yes.

Q.    And the notes read, "rigging and cranes in good repair, up-to-date crane inspections, lifting devices in good repair, Konecranes performs annual inspect, daily and monthly inspects crane performed"?

A.    That was all based on information that

S. Gualardo - by Mr. McCullough

168

was given to them, not physical evidence that I reviewed.

Q.    You knew that?

A.    I didn't review any physical evidence that proved that is my point.

Q.    How do you know what the OSHA person that wrote this based it on, whether she talked to somebody or whether she looked at something?

A.    Because when they do an investigation, typically they will have that in their report. They will actually have the crane inspections, they will have all of that evidence as part of their report. There was no evidence to that effect.

Q.    That you saw?

A.    No.

Q.    Okay. Again, you weren't there with her. You haven't talked to her. You don't know what she based it on.

A.    No, I know what she based it on. I know what she based it on.

Q.    Her incompetence?

A.    No. She based it on an interview; that's what she based it on. Your expert could not produce any documentation, either, to prove any of that.

Q.    If you turn to page -- I guess it would

S. Gualardo - by Mr. McCullough

169

be 21 of your report. Are you there?

A.    Yes.

Q.    You start talking about regulations.

A.    Yes.

Q.    And as soon as I find my copy of the report, the first cite you give is 1910.184?

A.    Yes.

Q.    (C)(9)?

A.    Uh-huh.

Q.    And I believe that says -- you quoted it here, "All employees shall be kept clear of loads about to be lifted and of suspended loads." Correct?

A.    Yes.

Q.    At the time that the conveyor tipped, which the tipping and falling is what brought about Mr. Natcher's injuries. Would you agree with that?

A.    Yes.

Q.    The load was not about to be lifted; correct? It had been lifted; right?

A.    The crane was about to be lifted.

Q.    What does the regulation say?

A.    It says loads; however, the load was being lifted by the crane at that particular point in time when this tipping occurred. That's my

S. Gualardo - by Mr. McCullough

170

contention.

Q. So by virtue of your theory or speculation that what must have caused this to tip was a hook getting caught?

A. Absolutely.

Q. Your testimony would be that that falls within the purview of this regulation?

A. It does.

Q. And not that the load was being lifted --

A. No.

Q. -- purposefully, not by accident?

A. The load was being lifted. It says, "All employees shall be kept clear of loads about to be lifted and" -- "and of suspended loads."

This load was about to be lifted. It was being lifted in the particular instance where the incident occurred.

Q. Well, wait a minute, just so we're clear. In my vernacular, in my reading of this, I would agree that the load -- the conveyor; right?

A. Yes.

Q. Conveyor had been lifted?

A. Yes.

Q. Got lifted from the ground and up and placed down on the conveyor.

S. Gualardo - by Mr. McCullough

171

A. Yes.

Q. And at the time that it tipped, it was not attached to the crane; correct?

A. It was not attached but it was lifted.

Q. And so -- and --

A. It doesn't have to be attached to be lifted.

Q. Lifted by virtue of the possibility that a hook caught on something on the conveyor, thus you consider that a lift?

A. It lifted. That is lift. It lifted.

Q. And it's your testimony that that is the intent and the scope of this OSHA regulation?

A. Yes. It's to keep employees out of any area where there's a crane operation. That's the intent of the regulation.

Q. Just to be clear about something, any of the regulations or OSHA regulations or ASME standards that you cite in here --

A. Yes.

Q. -- did you author any of them?

A. No.

Q. Okay. Did you review any of them as part of their approval or revision or update or in any of your capacities, any of your official -- agency

S. Gualardo - by Mr. McCullough

172

capacity? I'm not asking you did you review them as an expert witness. In terms of passing the regulations or reviewing them periodically?

A. I may have in my years in OSHA. I don't recall whether I did or didn't.

Q. Okay.

The next thing you site is 1910.184(c)(12)?

A. Right.

Q. The sling, which is the chain and hook, in your vernacular?

A. Right.

Q. Don't pull -- I'm paraphrasing -- don't pull the sling from under the load when load is resting on the sling?

A. Yes.

Q. Was the load resting on this sling?

A. It could have been.

Q. What do you mean it could have been?

A. It could have been. It could have been under the load in this particular case. It could have swung under the load.

Q. And being rested on it?

A. Well, it all depends on exactly when this tipping occurred, whether, in fact, that was resting

S. Gualardo - by Mr. McCullough

173

on it at that particular point.

Q. Resting like bearing some weight?

A. Yes. There were four slings here, remember. There wasn't just one sling. There were four slings in this particular case. And a sling could have been resting under the load as it was being lifted.

Q. No, the sling wouldn't be resting on the load. The load would be resting on the sling.

A. I'm sorry. The sling would be under the load, yes.

Q. And would actually be bearing some weight of the load?

A. It could be.

Q. But you don't know.

A. Nobody knows. There was no reconstruction of this particular case.

Q. It would be pure speculation for you to say the particular evil that this regulation is intended to address actually occurred?

A. I'm saying that this was in play. This was definitely in play in this case. It could not be ruled out.

Q. Can't be ruled out?

A. Cannot be ruled out.

S. Gualardo - by Mr. McCullough

174

Q.    You can't say with reasonable certainty that it did play a role?

A.    It cannot be ruled out. I can say that with reasonable certainty.

Q.    Yeah, but a judge is going to want me to say it this way. Can you say with a reasonable degree of certainty that the sling was resting under -- or the load was resting on the sling?

A.    I'm saying that the load -- the sling came under the load at that -- at the particular point in time when the load became unstable, the sling came under that particular load.

Q.    It might have. It could have?

A.    I'm saying it did.

Q.    You're saying it did.

A.    I'm saying it did.

Q.    That's what happened?

A.    I'm saying the sling came under the load at some point to be able to catch on that load. I mean, it had to come under and catch on something. It caught on something.

Q.    Okay. There's nothing on the side that it could have possibly caught?

A.    It could have possibly. But there were four slings, remember, in this particular case.

S. Gualardo - by Mr. McCullough

175

Q.    Right.

A.    I'm saying that that is conceivable that that occurred.

Q.    It's conceivable?

A.    Yes.

Q.    Conceivable.

A.    Yes. I'm saying it cannot be disproven.

Q.    It can't be proven?

A.    It cannot be disproven.

Q.    What's the converse of that? It can't be disproven.

A.    There's no evidence to preclude citing that at this point.

Q.    And there's no evidence that says that's what happened?

A.    There's no evidence that says that's exactly what happened. What I'm saying is there are four slings, and there's a strong probability in this case that when you're lifting four slings from a decking, those slings are going to slide under that load.

The lift was occurring above the -- the crane was positioned, based on the pictures, above the load. If the slings were to the side of the load, we'll call it, and when that lift occurred,

S. Gualardo - by Mr. McCullough

176

those slings are going to slide under that load. That's normal physics. That's basic physics.

Q.    You have no idea whether that happened.

A.    We cannot prove or disprove that. I'm saying that that regulation is in play as a result of that.

Q.    Thank you; you said it. You can't prove it or disprove it.

A.    Nobody can.

Q.    All right. Thank you. 1910.184(d). That concerns sling inspections in this particular -- we're looking for damaged or defective slings or fastenings or attachments; right?

A.    Right.

Q.    And again, there is no evidence that you can point me to that there is a damaged or defective sling or fastening or attachment that had a bearing on this accident that an inspection would have or should have revealed?

A.    As I indicated earlier, I have to rely on the evidence. There was no evidence that a sling inspection occurred to indicate whether, in fact, there were any defects of that sling or that sling was sound to use prior to its operation. Your expert agreed with that.

S. Gualardo - by Mr. McCullough

177

Q.    Okay. Fine. So there's no evidence of any inspections, so it means there's no evidence that there was a defective or damaged sling, fastening or attachment?

A.    There was no evidence that the sling was safe to use. There was no evidence to say that that sling was safe to use. That's the whole purpose of doing an inspection.

Q.    Did the sling break?

A.    No. No.

Q.    Did the hook bend?

A.    I didn't examine the hook. I can't tell you whether it bent.

Q.    You were given photographs of the hook.

A.    I didn't -- we're talking about prior to, what could have contributed to this case. We're talking about whether, in fact, an inspection was done to verify that the sling was safe to use. There was no inspection done.

Q.    You have no evidence that you can point me to that the sling was unsafe to use?

A.    I have evidence to say that there was nothing to prove that the sling was safe. That's my evidence.

Q.    You had nothing to prove that it was

S Gualardo - by Mr McCullough

178

unsafe?

A.    No, not at this point, because the information was not provided to me.

Q.    Because it didn't exist, apparently?

A.    No. The information -- there was no analysis that was done in any of the evidence that I reviewed as to whether the sling was safe or not safe.

Q.    184(e)(1), it talks about there must be some kind of an identification tag on the sling.

A.    Yes. There wasn't.

Q.    There was none?

A.    There was none.

Q.    Okay. And that had bearing on this accident how?

A.    It's -- again, it's a compilation of the -- it's an absolute failure of the safety management system. The end result of the failure of the safety management system was they allowed a person that was not trained or experienced to operate a crane, and it caused an injury to Mr. Natcher. This is one other element where they totally ignored OSHA's regulations outright.

Q.    What is supposed to be on the tag?

A.    A sling indicating its weight.

S Gualardo - by Mr McCullough

179

Q.    Okay. And again --

A.    Sometimes an inspection date is stamped on there.

Q.    Right, right. And the chain didn't break?

A.    The chain did not break.

Q.    And the chain was not overloaded?

A.    The chain was not overloaded.

Q.    All right.

A.    That I know of. It could have been overloaded prior to that.

Q.    The tree could have fallen in the woods and nobody heard it.

A.    I have no evidence that the sling was safe, it was inspected, and it was the right capacity for the load.

Q.    In terms of contributing to this accident, this discrete event?

A.    I have no evidence that says that the sling was safe to lift that load. There was no tag on the sling to indicate its lifting capacity. I have no evidence. There is no evidence.

Q.    And why would you want to know lifting capacity?

A.    Because you're going to be lifting a load

S Gualardo - by Mr McCullough

180

and you want to know the capacity of the sling and whenever, in fact, the sling, in the configuration that it's going to be used, is going to be able to sustain the load lift safely.

Q.    Without breaking?

A.    Without breaking.

Q.    And it didn't break.

A.    Without stretching, without breaking, without elongating. There could be a lot of different factors in play.

Q.    And all those evils that the inspection would be designed to detect or the tag would be designed to detect, we don't know whether they caused or contributed to this accident at all, other than your overall safety culture?

A.    Once again, this is just one more example of where Accuride totally failed to abide by basic OSHA minimum regulations, many of which have been in place since 1970.

Q.    Okay. 184(e)(3), focus on inspection of chains by competent person. Again, we're in the same discussion.

A.    Same exact thing.

Q.    Same thing?

A.    Absolutely no evidence. Accuride ignored

S Gualardo - by Mr McCullough

181

all of OSHA's regulations with respect to crane operations.

Cranes are very dangerous pieces of equipment.

Q.    No question.

A.    When you operate a crane, you have to be absolutely perfect. You can't be just close in terms of operating that crane. You have to maintain it. You have to inspect it. It is a very dangerous piece of equipment, as we saw in this particular case.

Q.    You have no evidence that a failure or defect in the chain or hook caused this conveyor to shimmy and tip over?

A.    We have no evidence because there was no reconstruction.

Q.    1910.179(j), initial inspection of all new and altered cranes prior to initial use?

A.    Same deal, totally ignorant of OSHA's regulations with respect to installing a new crane hoist.

Q.    Same thing, you can't tell me how this caused this crane to tip over?

A.    We don't know that it didn't. We don't know that the crane did not malfunction in this

S. Gualardo - by Mr. McCullough

182

case. We have no knowledge of that. There wasn't a thorough investigation done subsequent to the event occurring. There wasn't a reanalysis that was done with respect to the crane subsequent to the event occurring. There was nothing done on the part of Accuride to prove that the crane functioned properly after the event. They didn't do it prior to the event. They didn't do it after the event.

Q.    This regulation applies to initial inspection of all new and altered cranes.

A.    Yes.

Q.    Is this a new or an altered crane on the day of the accident?

A.    It was altered prior to the incident. There was a new hoist installed at some point, if I recall correctly.

Q.    When?

A.    I don't recall the exact date. I don't think I have it in my report.

Q.    This doesn't talk about why this was or when it was altered. I'm just curious.

A.    It was altered at some point, or I would not have it in my report. There was a new crane hoist installed about 10 years or 15 years prior to this, if I recall.

S. Gualardo - by Mr. McCullough

183

Q.    And you're suggesting that the initial and new inspection, as it was dictated here, wasn't done in ten years?

A.    It was never done. There was no evidence that it was ever done. Again, they totally ignored OSHA's regulations.

Q.    This is something that should have happened ten years earlier.

A.    Whenever they installed that new piece of equipment is when that should have occurred.

Q.    Okay. Frequent inspections for defects is kind of what 179(j)(2) talks about.

A.    Yep, same thing, absolute ignorance of the regulations.

Q.    Right. And one way or the other, absolutely no way to prove or disprove that anything that would have been detected in an inspection would have caused the accident on the day of the accident?

A.    The whole purpose of doing an inspection is to determine whether, in fact, the crane is going to operate safely.

Q.    Mr. Gualardo, I have heard the same --

A.    Can I finish?

Q.    -- answer. No.

A.    Can I please finish? The whole

S. Gualardo - by Mr. McCullough

184

purpose --

Q.    You're burdening the record with this answer. Just say "same answer."

A.    The whole purpose of doing an inspection is to inspect the crane to assure that it operates safely. That is the purpose of an inspection. There was no inspection. We don't know whether the crane operated safely. We have no inspection to validate that it was safe to operate prior to being operated.

Q.    You don't know whether it was or was not safe on the day of the accident.

A.    At this point we cannot tell.

Q.    Answer my question --

A.    No, we cannot tell.

Q.    -- you do not know whether it was or was not safe on the day of the accident; yes or no?

A.    At this point I can tell you it was never inspected to determine whether it was safe. That's what I can tell you based on the evidence.

Q.    (J)(2)(i) for inspection of functional operating mechanisms?

A.    Same thing. Same for all of these.

Q.    Same answer?

A.    Same for all of these.

S. Gualardo - by Mr. McCullough

185

Q.    Daily inspection?

A.    They ignored the daily inspection requirement as well.

Q.    That's correct, and you have no indication or evidence that it did or did not contribute to the accident?

A.    Once again, the whole purpose of conducting a daily inspection or an initial inspection, frequent periodic inspection, the whole purpose of conducting an inspection is to determine whether, in fact, the equipment is safe to operate. There was no evidence that inspections were conducted, thus there is no way for me to determine that the crane was safe to operate.

Q.    Or unsafe?

A.    Or unsafe. There's no inspection.

Q.    (J)(2)(iii), daily inspection of hooks. Same thing?

A.    Same thing.

Q.    No evidence that it was safe or unsafe?

A.    No evidence that it was safe.

Q.    Or unsafe?

A.    If it was unsafe, they wouldn't have operated it. That's the whole purpose of doing an inspection. When you identify something that is

S. Gualardo - by Mr. McCullough

186

unsafe, you don't operate it. You get it repaired. That's the whole purpose of the inspection.

Q.  What would make a hook unsafe?

A.  It could be bent. It could be elongated. It could be fractured. It could be chipped. There's a lot of things. It could be burnt. There's a lot of things that could happen to crane hooks.

Q.  Was this hook or these hooks any of those conditions?

A.  Again, I can't opine on that because I did not evaluate the hooks.

Q.  Okay. Hoist chain and connections, daily inspections?

A.  Same.

Q.  Daily inspection of all functional operating mechanisms for excessive wear of components.

A.  Same.

Q.  179(j)(2)(vii), inspection of rope reeving for noncompliance of recommendations?

A.  Same.

Q.  What is rope reeving?

A.  That's how the rope is actually around the drum.

S. Gualardo - by Mr. McCullough

187

Q.  Up on the --

A.  The hoist.

Q.  Where it winds it?

A.  Yeah, where it winds it.

Q.  What is the definition of rope reeving. The term "rope" refers to wire rope?

A.  Yes.

Q.  Okay. That's like a braided rope?

A.  Yes. It's on a hoist, hoist mechanism.

Q.  And the answer is the same?

A.  Same.

Q.  Operational test, 179(k) -- is that L or (1)(l)?

A.  Same.

Q.  Again, initial use, all new/altered cranes. The alteration that you would think renders this --

A.  It does.

Q.  -- operable was the alteration that may have been ten years earlier?

A.  They put a new hoist in. They have to determine that it's safe. That's what the regulation says. They ignored that one, too.

Q.  Preventative maintenance?

A.  Yes.

S. Gualardo - by Mr. McCullough

188

Q.  Under 179(l)(1).

A.  Yes.

Q.  So you cite that basically says there should be a preventive maintenance program established.

A.  That's correct, yes.

Q.  And that caused this accident how?

A.  We don't know whether it caused this accident. We don't know -- they had no preventive maintenance program. We don't know whether the crane malfunctioned.

Q.  179(b)(8), general requirements. Only designated personnel are permitted to operate a crane.

A.  Yes. We discussed that.

Q.  Same discussion as before; right?

A.  Yes.

Q.  And you take the position that he does not -- Mr. Herrmann did not meet that requirement?

A.  Absolutely not.

Q.  And 179(n)(2), (n)(2)(iii), I guess.

A.  Yes.

Q.  What does that say?

A.  Cranes. "Care shall be taken to make certain that the sling clears all obstacles."

S. Gualardo - by Mr. McCullough

189

Obviously it did not in this case.

Q.  At what point in time is it supposed to clear all obstacles?

A.  Anytime, always.

Q.  179(n) deals with handling the load.

A.  Yes.

Q.  Again, the load wasn't being handled here.

A.  The load was handled until the point the crane was moved away.

Q.  You mean the load is still being handled when the hooks are detached?

A.  The crane operation is still occurring until that crane is totally moved away from that load.

Q.  Is handling the load and crane operation synonymous?

A.  The crane operation involves everything from when it starts until when that crane is totally away from that load and back to its rest position.

Q.  This regulation only covers handling the load. That's what it's titled --

A.  Yes.

Q.  -- Section A.

A.  It was handling the load.

S. Gualardo - by Mr. McCullough

190

Q. How was it handling the load?

A. Well, in that case, it just dropped off the load. And when you -- when you finish dropping off that load, you're still handling the load. You're still dealing with the load. It's load handling.

Q. So handling the load doesn't mean that it's hooked up or rigged to --

A. No.

Q. -- pick and drop or --

A. No.

Q. -- pick and set the load?

A. No. It doesn't say that in the regulation anywhere.

Q. Well, (n)(2) talks about attaching the load.

A. Yes.

Q. Were they in the process of attaching the load at this time?

A. No.

Q. And it was not attached at this time?

A. It was detached at that point, according to the testimony.

Q. So does (n)(2) apply?

A. Which (n)(2) are we talking about?

S. Gualardo - by Mr. McCullough

191

(N)(2)(ii)?

Q. (N)(2) falls -- (n)(2)(ii) falls under (n)(2); correct?

A. Yes.

Q. It's a subcategory of --

A. I'm saying (n)(2)(ii) appears -- applies.

Q. How does it apply if they weren't attaching the load?

A. I'm saying (n)(2)(ii), "Care shall be taken to make certain that the sling clears all obstacles." That's what I'm saying applied.

What are you referring to?

Q. I'm referring to the regulations. When you set these up, you have a, you know, subpart (n) --

A. Yes.

Q. -- right? And then below that you might have a subpart (n)(1)?

A. Yes. Handling the load deals with everything from stem to stern. It deals with everything from when that load is initiated, all the way until when that crane is clear.

Q. Yeah, but (n)(2) covers attaching the load only.

A. Okay.

S. Gualardo - by Mr. McCullough

192

Q. So you would agree that they weren't attaching the load at the time?

A. Well --

Q. What falls under (n)(2)(i), (ii) or (iii) doesn't apply if they weren't attaching the load.

A. I think you're mincing the regulations here.

Q. I'm just reading the regulations the way that they're normally set up.

A. As I said, I think "Care shall be taken to make sure that the sling clears all obstacles" regardless of when you're doing that. I think that regulation applies when you're operating that crane.

Q. My copy of the regs, if you want to see them. 179 --

A. Handling the load. Handling.

Q. Handling the load.

A. Yes.

Q. Handling.

A. Handling means everything from beginning to end.

Q. Right. And then (n)(2) falls under (n) --

A. Can I see that?

Q. Yeah. It's attaching the load.

S. Gualardo - by Mr. McCullough

193

A. Okay, all right.

Q. It's a subpart of handling the load.

A. Okay.

Q. All right? So would you agree that (n)(2)(i), (ii) and (iii) apply when you're attaching the load? Even though it may be part of handling the load.

A. I'm not sure if I understand your question.

Q. I'm just reading the way you normally -- an outline gets written.

A. Yeah.

Q. And one things flows to an another. The smaller you get, they all fall under the greater.

A. Yes. Yeah.

Q. So when you're attaching -- as I read that, when you're attaching the load, then your regulation applies.

A. Yes.

Q. But they weren't attaching the load at this point in time.

A. The load was detached at that point in time, yes.

Q. That's what I meant.

A. Yes.

S. Gualardo - by Mr. McCullough

194

Q.    The next one that you cite is 179(n)(3)(iii)(a). I'm on page 23.

A.    Okay.

Q.    Okay? "No sudden acceleration or deceleration of the moving load." Right?

A.    Yes.

Q.    How does that apply here?

A.    Again, the load was being moved at the time that the incident occurred.

Q.    Okay. And we talked about that before. So your interpretation of this is that moving the load includes the -- I'll call it the accidental or incidental or unattended catching of a hook, potentially, on the conveyor?

A.    The answer is yes. The load was being moved. It was being moved by that crane, sling and hoist.

Q.    But even though it was not attached?

A.    I don't know that it wasn't attached.

Q.    You just told me a minute ago it wasn't attached. The load was detached.

A.    No, the load was detached -- you're taking my testimony out of context. The load was detached at one point. The load then was attached at some point to cause that conveyor to tip. It was

S. Gualardo - by Mr. McCullough

195

attached in some sway, some fashion to that chain sling.

Q.    You don't think that's a stretch?

A.    No, I don't think that's a stretch at all. I don't think an 8,000-pound load automatically falls off a trailer without being pulled.

Q.    No, I didn't mean that. I mean, in your interpretation and definition of "attached" as these regulations use it, you don't think that's a stretch?

A.    I think attached is attached. Was it attached or detached? It had to be attached to be able to pull that load.

Q.    Attached within the meaning of these regs?

A.    Attached meaning affixed. It's in some way pulling on that load.

Q.    179(n)(3) we just got talking about, there's no sudden acceleration or deceleration of the load. (N)(3) actually talks about during hoisting care shall be taken.

A.    Yes.

Q.    They weren't hoisting at this point.

A.    Well, they were hoisting. That's the

S. Gualardo - by Mr. McCullough

196

point. The load was being hoisted because the sling was in contact with the load. They were hoisting. Technically they were hoisting the load. It was not flat on the conveyor. It was being hoisted off the truck as it tipped.

Q.    Okay. Again, same line, you don't think that your use and interpretation of the word "hoist" or what is hoisting --

A.    Hoist means to lift.

Q.    -- as used in these regulations is a stretch, as applied to the hook or whatever might have caught, if anything did catch, on the conveyor on the way up?

A.    My interpretation of the word "hoist" means to lift. I believe clearly that the load was being lifted by the chain sling as it contacted the conveyor. That's what I believe.

Q.    Do you believe that your definition is the same as the interpretation that the regulations --

A.    I don't know of any other definition other than what hoist means. Hoist means to lift. Lift means to pull that conveyor off the deck. That's what was occurring here. It was an unintentional lift that was occurring. It was

S. Gualardo - by Mr. McCullough

197

unintentional. I don't think it was intentional that they were lifting it, but it was being hoisted, it was being lifted.

Q.    So they re-engaged, unintentionally, the act of hoisting as covered by these regulations?

A.    Say that again.

Q.    They re-engaged, unintentionally, in the act of hoisting the load as defined in these regulations?

A.    Well, it was being hoisted. It was coming off the deck. I can't say -- I mean, it was coming off the deck. There was no evidence that suggested otherwise.

Q.    All right. 179(n)(3)(iii)(b), during hoisting "care shall be taken that the load does not contact obstructions." Under your understanding that -- in your interpretation, hoisting was going on if something accidentally caught?

A.    Well, we know that there was -- that there was more than -- there was at least one sling that it contacted to pull -- to make that pull.

Q.    We don't know that. Remember, that's your theory.

A.    Yes. That's Mr. Herrmann's theory as well, the crane operator.

S. Gualardo - by Mr. McCullough

198

Q.    He had other theories, too.

A.    I didn't see any other theory.

Q.    You don't think so?

A.    I didn't see any other theories that he had. He had a theory that the chain sling contacted the conveyor, and that's what caused this to occur.

Q.    Or it fell off the unstable cribbing?

A.    That theory was not substantiated.

Q.    But you just told me he didn't have a theory, and I can tell you, if you read his deposition --

A.    I did read his deposition.

Q.    -- he thinks that was in play too.

A.    His theory was that the crane sling contacted the conveyor. That came out loud and clear in his deposition.

Q.    Okay. That was one of his theories, I got you. I mean, I agree with you on that.

During hoisting care taken that load does not contact obstructions. Let's just assume that you're correct that they were engaged in hoisting at this point in time.

A.    Yes.

Q.    What did the load come in contact with?

A.    Well, it came into contact with the

S. Gualardo - by Mr. McCullough

199

sling, we know that. We know that for sure. It came in contact with the sling. We don't know exactly which clanging was occurring.

Q.    The only reason it, under your interpretation, turned into a hoist is because it did come in contact; okay? Doesn't the regulation envision that when you're hoisting the load that you better not hit anything else?

A.    Yes.

Q.    Isn't that what it says?

A.    It does but --

Q.    So how did that happen here?

A.    It did hit something else.

Q.    What?

A.    It hit the other chain slings. That's what I'm telling you. It hit not only one, it hit all the chain slings. All the chain slings were on the one side.

Q.    Okay. So again, that's your -- your understanding or your testimony as to how this regulation applies?

A.    This regulation applies in this particular case based on what occurred in this case.

Q.    And what you just described to me is how it applies?

S. Gualardo - by Mr. McCullough

200

A.    Yes. It applies in this case because they hit other obstructions. The other obstructions were the chain slings.

Q.    So one of the chain slings was unintentionally --

A.    At least one I would think.

Q.    -- reattached?

A.    Yes.

Q.    And thus, they're now hoisting.

A.    Yes.

Q.    And the obstruction that it hit were the other three -- one of the three, maybe two of the three or three of the three remaining chains --

A.    That's right.

Q.    And that, in your mind, is a violation of this regulation?

A.    It says when you make a lift, you can't hit an obstruction. That's what the regulation says. It's pretty clear.

Q.    Operator must avoid -- this is (n)(3)(vi), operator must "avoid carrying loads over people." How does this apply?

A.    Obviously, the load fell as Mr. Natcher was trying to position himself underneath the truck. It was still being lifted at that point, I believe,

S. Gualardo - by Mr. McCullough

201

as it was being tipped.

Q.    Huh? Wait a minute. So you're saying that the load was being carried over Mr. Natcher?

A.    I believe it was being carried at some point over Mr. Natcher as he was trying to get his way underneath the truck.

Q.    How do you know he was trying to get his way underneath the truck?

A.    Because that's what the testimony said.

Q.    Whose testimony?

A.    I believe it was Natcher who said that he jumped from the truck -- came off the truck in some way and got under the truck.

Q.    Mr. Natcher doesn't know how he got off the truck, whether he jumped, fell or got knocked off?

A.    Well, he came off the truck at some point is my point.

Q.    Right. Then he went on to say he doesn't know how he got under the truck.

A.    Yes, yeah.

Q.    Okay.

A.    The crane fell over the -- the conveyor fell over him.

Q.    It fell over him?

S. Gualardo - by Mr. McCullough

202

A. Yes.

Q. Okay. But by that point, as it was falling over him, it was no longer attached; right?

A. I don't know that. It could have detached at a point where it was falling off the trailer. We don't know where it was at.

Q. In other words, you don't know whether this regulation applies?

A. No. What I'm saying is there's no evidence to prove one way or the other. Just like I said earlier, there's no way to prove this because there was no reconstruction done and there was no investigation done. We don't know. We don't know exactly where it detached, at what point it detached.

Q. (N)(3)(vii), "Operator shall test the brakes each time load approaching the rig load is handled."

A. He didn't know what the rated load was. He didn't even know what he was lifting.

Q. Mr. Herrmann?

A. Herrmann.

Q. Herrmann?

A. Yes.

Q. He knew he had 20-ton capacity.

S. Gualardo - by Mr. McCullough

203

A. He had no knowledge of what he was lifting. When you're a crane operator, you have to have absolute knowledge that you have the capacity to lift a conveyor. It could have been 23 tons. He had no knowledge of what that conveyor was.

Q. So if I had a 10-ton or 20-ton load capacity, okay, crane, slings, hoists, the weakest link is 20 tons.

A. Yes.

Q. Okay? And I pick an object, this table, are you telling me that I have to ascertain the weight of this table before I pick it?

A. You as a crane operator have to know exactly what you're lifting. You are required to know the weight that you're lifting before you lift anything.

Q. So in other words, your answer is yes?

A. Yes.

Q. Under your interpretation, he would have to know how much this table weighed?

A. Absolutely, he would have to know. That's his responsibility to know what he's lifting.

Q. How did the -- let's assume that -- what is the problem that could arise if you overload?

A. You could -- you could cause a crane to

S. Gualardo - by Mr. McCullough

204

fail.

Q. Okay. And how did the crane fail here?

A. We don't know that it did or didn't. Because he did not understand what he was lifting. Again, I might add, although it was a 20-ton crane, the crane was not maintained and inspected. We don't know that it was capable of lifting 20 tons. You're making an assumption that it was. We don't know that it was.

Q. It didn't drop the conveyor, did it?

A. We don't know that.

Q. We don't know that it didn't drop --

A. We don't know exactly what it was capable of lifting, is my point.

Q. My question was: It didn't drop the conveyor?

A. I don't know. I didn't watch the lift occur. It could have dropped the conveyor.

Q. Did anybody testify --

A. We saw no evidence of that. We don't know how the lift occurred, though.

Q. Okay.

A. We do know that there were two attempts to lift and that rigging was changed and so on. We do know that. At least two.

S. Gualardo - by Mr. McCullough

205

Q. (n)(3) -- I guess this would be (xi). "When starting the bridge and when the load or hook approaches near or over personnel, the warning signals should be" -- we kind of talked about this before; didn't we?

A. Anytime you're operating a crane near personnel you have to give them a warning. The purpose of the warning is to make sure they're clear.

Q. But the bridge wasn't being moved here?

A. No. Well, we don't know whether it was being moved. We have no knowledge.

Q. Because you weren't there?

A. There was no evidence to say it was or was not being moved.

MR. McCULLOUGH: Let's take another break.

(A brief recess was taken.)

BY MR. McCULLOUGH:

Q. I know you believe and have testified that Mr. Natcher shouldn't have been in the vicinity, shouldn't have been on the flatbed. He should have been somewhere else. And he should have -- I think you said that it would have been okay for him to return to the site, to the trailer,

S. Gualardo - by Mr. McCullough

206

once the hooks had been removed and once it had been hoisted up and the crane had cleared the area.

A.    That's typically what occurs. A trailer is loaded. The truck driver returns to assure that he's happy or she's happy with how the load is positioned. Then they will secure their load prior to transport.

Q.    At that point in time if he had returned, as you say, and the conveyor would have been sitting there resting on the cribbing and there may or may not have been anybody else there, would you have expected an Accuride employee to be sticking around while Mr. Natcher secured the load?

A.    No.

Q.    So he would have been on his own to secure the load?

A.    Yes, at that point. I mean, there are some organizations that don't allow any employees to be unattended. But you know, I think in most organizations, a truck driver will secure that load without direct supervision of anybody in a particular area.

Q.    Right. Keep in mind Mr. Natcher wasn't an Accuride employee.

A.    I'm sorry, a truck -- a trucking company

S. Gualardo - by Mr. McCullough

207

employee would typically not be supervised when they're securing the load. There are organizations, though, that will not let anybody on their property without being supervised, is what I'm saying.

Q.    That's kind of what I thought you meant.

A.    Yes.

Q.    All right. You know, at that point in time, Mr. Natcher would have set about, presumably, securing the load with chains or straps or whatever he was going to do?

A.    Right, right.

Q.    And would it have been wise for him, at that point in time, had he returned only for the securement part of it, to somehow brace that conveyor before he actually started --

A.    No.

Q.    -- manhandling it or doing what he needed to strap it down?

A.    No. I think an 8,000-pound load isn't going to go anywhere on a flatbed trailer. I think you have sufficient mass to hold that in place. I think his next move was to secure it with whatever securing devices he was going to use.

There are some regulation -- some Federal Motor Carrier regulations that do talk about

S. Gualardo - by Mr. McCullough

208

additional blocking, bracing and so on, but that's really up to the driver to make that determination at that point in time.

Again, that's all -- that's all done in anticipation of over-the-road travel. That has nothing to do with the loading operation.

Q.    I'm just trying to follow the line of thinking here --

A.    Right.

Q.    -- to what would have occurred had -- what you would have liked to have seen occur actually occurred?

A.    No, I don't know what he would have done. I'm not in his brain. But, you know, based on the testimony, I believe he thought the load was -- had sufficient mass, and his next move would have been to strap it down.

Q.    You don't think he, under those circumstances, from what you know, needed to temporarily secure it or brace it before he went about to rig the permanent strapping?

A.    No, no. Based on what I know, no.

Q.    So you did write in your report, though, that Accuride, after the accident, began requiring that, I guess, certain loads, particularly loads

S. Gualardo - by Mr. McCullough

209

like this that might tip more easily than a crate --

A.    Right.

Q.    -- be braced in some fashion --

A.    Right.

Q.    -- or secured in some fashion before the chains are unhooked?

A.    Right. That would be Accuride's responsibility to do that, not -- not the truck driver's responsibility. If they're going to unhook those chains and they feel that that load is unstable, it could fall, could tip, could move, whatever, at that point in time, it's their responsibility before they remove those chains.

Q.    So it would have been prudent, according to your report, at least, for Accuride to have required that the conveyor be braced?

A.    No, it would have been prudent that they braced the conveyor if it was, in fact, their policy at that point.

I have to clarify something; when they -- you know, they came up with that methodology that, you know, we're going to make sure that the load is braced before we remove the slings, well, again, that presumes the fact that that person is not in the vicinity of any of those crane

S. Gualardo - by Mr. McCullough

210

operations. So if they're going to ask the truck driver to do that, they have to totally lock that crane out if, in fact, he's going to be anywhere near that crane while he's bracing that load. They didn't say that in their policy. So if I looked at the policy, I would say that's a flawed policy all in itself.

Q. So are you critical of Accuride in the process as it did occur, okay, as it did occur that, in addition to all the other things you said they did wrong, they should have braced the load, the conveyor before the chains were unhooked?

A. No. I'm not saying that the load was unstable and needed braced. I'm saying that this incident occurred because you had a crane operator that lifted a hoist with slings that were not secured that contacted the conveyor. They could have braced it, and this still would have occurred.

Q. Or it may not have.

A. It could have occurred.

Q. Sure. So at the very end of your report, the last page, you say, "Accuride implemented a rule requiring loads to be secured by the driver before sling hooks were removed from the load. Had Accuride implemented this rule prior to the

S. Gualardo - by Mr. McCullough

211

incident, the load would not have tipped by the unsafe actions of Mr. Herrmann."

The fact that they didn't have that policy or rule, I guess, in place at the time of the accident or prior to the accident isn't negligence on their part.

A. I think the negligence on their part is clearly illustrated.

Q. But this isn't one of them. This isn't one of the examples.

A. Well, if they -- if they had a process whereby they were requiring the load to be secured for over-the-road purposes we're talking about, okay, in this instance, by the driver prior to them releasing the slings, and the driver was not in harm's way when they released those slings, I think that would be a good process. I'm not saying that's a bad process at all. I'm saying that's a bad process if, in fact, that driver is in any vicinity of those slings and that crane when that crane was being lifted off of that load.

Q. Lifted in the capacity that you're -- that we talked about before.

A. Yes.

Q. The snag.

S. Gualardo - by Mr. McCullough

212

A. Lifted, snagged, moved. He can't be in the vicinity of that crane when it's moved, period; anywhere in the vicinity where it could harm him.

Cranes -- crane slings hurt people as well. Let me just clarify.

Q. I didn't answer (sic) the question. I didn't ask you a question. You're not answering a question that I asked.

A. All right.

Q. Just to be clear, you're not saying that, in addition to everything else, Accuride should have -- should have braced or not removed the conveyor from the hooks before it was secured? That's not -- you're not saying that that's something they shouldn't have done. You're saying it's good that they do it now.

A. Well, I'm saying by the mere fact that they do it now is an enhancement of their safety management system.

Q. The fact that they didn't do it before, isn't a basis that you're holding them responsible for.

A. No, they didn't have to do that then.

Q. All right. That's all I wanted to find out.

S. Gualardo - by Mr. McCullough

213

A. Yeah.

Q. In your report, you're talking about -- toward the end -- on page 29 when we were talking about the statements that were written up purporting to summarize what was communicated by Herrmann and Crispin, you refer to -- in the paragraph that starts off "additionally" --

A. Right.

Q. -- you refer to Accuride 009-0011. (Sic). I guess I'm going to mark this as 7 now.

MS. RUDERT: We're at 6.

(Gualardo Deposition Exhibit No. 6 was marked for identification.)

Q. These are the three pages you're referring to; right?

A. Yes.

Q. Do you understand that -- as I understand it -- that was terrible.

As I understand it, you tell me if I -- if you disagree or have a different understanding, page 1, the first page of this three-page exhibit, Accuride 9, was done by Maleski?

A. Right.

Q. But the pages 10 and 11 or the second two pages of the exhibit were not done by Maleski?

S. Gualardo - by Mr. McCullough

214

A.    They were done by somebody other than the individuals.

Q.    Right. Right. I think they all -- both Herrmann and Crispin both said they didn't review either one of them.

A.    That's correct.

Q.    Okay.

A.    I'm not sure who these next two were done by, 10 and 11.

Q.    We went over it. You talk about an inconsistency here appearing on the -- on page 1 of the exhibit where it says, "Don raised the crane and after the hooks had cleared the conveyor began to tip to the north."

A.    Right.

Q.    You say that's not consistent with his testimony, which it's not; okay?

A.    Right.

Q.    And then you -- if you look at the second page, though, this is somebody else. I can tell you, represent to you this is somebody else taking this statement down or whose notes these are. I wouldn't even call this a statement, even though the document says it's a statement.

A.    Yeah, it's not a statement.

S. Gualardo - by Mr. McCullough

215

Q.    It's not a statement as the rules would call it. But if you look about halfway down -- one, two, three, four -- seventh bullet point, in fact, you should go to the sixth one. "Once all the chains were unlatched, the driver instructed Don to raise the chains and move them out of the way." Then the next bulletpoint, "Don stated that as he had the chains suspended above the trailer and the puck conveyor began to tip."

First of all, it's a terrible sentence, not written very well. But whoever wrote this one up or typed this one based upon what he heard says trailer. You agree that the trailer is different than the conveyor?

A.    Yes.

Q.    And the chains may have been suspended over the trailer even if they weren't suspended over the conveyor?

A.    Not based on the pictures that I saw. They were dead center on the trailer.

Q.    When I read suspended -- maybe that's another reason why this is completely ambiguous. When I read "suspended above the trailer," I mean, they weren't sitting on the trailer. The slings, the bottom portion of the sling in the hook, wasn't

S. Gualardo - by Mr. McCullough

216

touching the trailer?

A.    I guess you could read it that way, right.

Q.    Okay.

A.    Well, I mean, you're saying -- the chains were suspended above. It doesn't say the chain hooks were suspended above. It says the chains. The hooks could have been laying on the trailer while the chain was suspended above the trailer.

Q.    Right. To me, it's a pretty muddy area.

A.    It's very muddy, yeah.

Q.    Hooks, chains, slings. You're telling me a sling is both the hook and the sling.

A.    The hook is part of the sling.

Q.    Okay.

(Gualardo Deposition Exhibit No. 7 was marked for identification.)

Q.    All right. Here's 7.

(Gualardo Deposition Exhibit No. 8 was marked for identification.)

Q.    And this is 8. Okay. 7, I understand to be the citation and notification of penalty and then the informal settlement agreement.

(Witness reviews document.)

Q.    Is that --

S. Gualardo - by Mr. McCullough

217

A.    Yes.

Q.    Okay. And you've discussed this in your report. It's among those documents that you reviewed in forming your opinions.

A.    I did.

Q.    And then 8 -- take a look at 8, first two pages. It's what Erin provided me as initial disclosures and then the attachments, as I understand it, are the OSHA notes.

A.    Okay.

Q.    Are these the OSHA notes that you reviewed as part of your investigation?

A.    Yes.

Q.    When you say you reviewed the OSHA file, is this what you're talking about?

A.    Yes.

Q.    And you relied on these documents in forming your opinion?

A.    I did.

Q.    Would you conclude from looking at the handwriting that at least there were two different people involved in this investigation?

(Witness reviews document.)

A.    It appears that way.

Q.    Okay.

S. Gualardo - by Mr. McCullough

218

A.    Yeah.

Q.    I'm not trying to make you into a handwriting expert, but I think it's fairly obvious.

A.    Yep.

MS. RUDERT:  I also think that there are other indications that there was more than one person involved in the rest of the file.

MR. McCULLOUGH:  Was there more files?

MS. RUDERT:  You have this here which is the --

MR. McCULLOUGH:  Nothing other than these two things.

MS. RUDERT:  Not as far as I know.  I think there was like the violation stuff.  This is actually the report that OSHA put out and then this is what they gave us in response to the FOIA request, which is why it's all redacted.

MR. McCULLOUGH:  All right.

Q.    And if you look at the -- let's go with the third page from the back.  The Bates number on the bottom is -2480.

A.    -2480?

Q.    Yes.

A.    Okay.

Q.    Do you conclude as I conclude, that these

S. Gualardo - by Mr. McCullough

219

are notes regarding a discussion by an investigator with Mr. Natcher?

A.    Yeah.  This is the untrained investigator that I felt was incompetent.

Q.    Right.

A.    Yes.

Q.    The untrained investigator.  Halfway down, maybe a little more than halfway down, you see where this says, "This was just an accident.  No way I know of it could have been prevented"?

A.    Yes.  She's just repeating words that somebody is giving her at this point.

Q.    But the somebody who she's speaking with at this point, based upon the context, would be Mr. Natcher; right?

A.    I don't know exactly.  Was this the Natcher -- no, this was during.

Q.    No, no, go to the top of the page you were just at.  "The conveyor started moving and knocked me off the trailer."

A.    Okay.

Q.    -- who got knocked off the trailer?

A.    Yes.

Q.    So you would attribute this competent, incompetent, negligent, not negligent to notes that

S. Gualardo - by Mr. McCullough

220

this person wrote down relating to a discussion that she was having with Mr. Natcher?

A.    Yes.

Q.    At least by the context.

A.    Right.

Q.    And as I read, among the words she wrote was, "This was just an accident.  No way I know of it could have been prevented"; right?

A.    Yes.  This is very typical of what an employee would say that's untrained in safety and health management.  They are not experts in safety.

Q.    Now, have you ever seen an incident or been involved in an incident in the course of your professional life, any aspect of your professional life, where somebody was hurt in a working environment where you just said, "This was an accident; I can't attribute responsibility or fault to anybody"?

A.    Never.

Q.    It's an accident.

A.    Never.

Q.    So there's no such --

A.    Accidents don't occur; they're caused.

Q.    Accidents do not happen?

A.    No.  They're caused by factors that come

S. Gualardo - by Mr. McCullough

221

together to produce that event.  They just don't happen.

Q.    Have you ever said or concluded that an accident that was caused by a series of events, nevertheless, was not caused by a series of events for which somebody was culpable?

A.    There's always culpability in every accident.  I've never been involved in a workplace accident where there isn't culpability of the individuals involved, the organization.  There's somebody always culpable in that particular case.

Q.    Is there any context in which you would say accidents just happen?

A.    Never.

Q.    So you're walking down the hall at home, and a glass of water slips out of your hands?

A.    It was caused, obviously.  There was a cause.

Q.    And you were culpable because you didn't grasp the glass tight enough or --

A.    There could have been lots of facts.

Q.    There could have been condensation on it or --

A.    Perhaps my wife did not maintain the glassware properly or something.  I'm going to blame

S. Gualardo - by Mr. McCullough

222

it on her in this case.

Q. So there's no such thing as a pure unadulterated, nobody at fault accident?

A. My wife, if she would hear that, she would clobber me like right now. No, accidents don't just happen. They're caused. There's causes for accidents. There are contributing causes, and ultimately there are -- there are primary causes and secondary causes. There's not an accident that just falls out of the sky.

Q. I'm not suggesting something falls out the sky.

A. Okay.

Q. I'm suggesting that sometimes bad things happen, as unfortunate as they might be, and you really can't -- you can't assign blame to anybody?

A. I've been involved in this profession including my time at IUP since 1978. I have investigated hundreds, maybe thousands, of accidents in that time frame. I've investigated -- I've been involved in these cases. I have lectured extensively internationally. There is never a situation ever that I can think of where an accident just happened and there's no culpability, there's no cause, there's nobody to blame, there's nothing to

S. Gualardo - by Mr. McCullough

223

blame. That's just unrealistic to think that that could occur. That would be totally -- that would be totally out of sync with my training and my education and my experience.

Q. You've reviewed the report of Matthew Taylor --

A. Yes.

Q. -- the expert?

A. Yes.

Q. And I asked before, you know, a little bit about him. You don't know him?

A. No.

Q. You have no recollection of him as a student?

A. No, I do not recall --

Q. Particular recollection.

A. No.

Q. You may recall that he did go there, but --

A. I don't even recall that other than just what it says in the report.

Q. So you have no -- prior to his involvement in this case, you have no impression of him one way or the other?

A. No.

S. Gualardo - by Mr. McCullough

224

Q. Are you familiar with the Amerisafe Group?

A. I am.

Q. How are you familiar with them?

A. They do consulting work.

Q. Are they a competitor of yours?

A. No.

Q. Why do you not consider them a competitor? They consult, they consult with safety --

A. I don't consult on their level. My consulting is safety culture change. They consult on anything that will, essentially, turn a dollar bill, to the best of my knowledge. They will provide, with all due respect to my profession, rental safety professionals. They'll do an inspection of a worksite. They will, you know -- they will do just about anything under the sun with respect to safety consulting. I'm very specialized in what I do. They don't do what I do.

Q. Are you suggesting that they're not qualified to do a much broader array of safety consulting than you do?

A. I haven't seen any evidence that they do what I do.

S. Gualardo - by Mr. McCullough

225

Q. No, no, no, that's not what I asked you. Are you suggesting that they're -- you're suggesting that they do a -- they consult in a lot more areas than you do, not geographical but topics and situations and maybe industries. You're very focused on your consultation.

A. I'm focused on two things. I'm focused on safety management systems and safety culture change under National Safety Consultants. But I'm also focused on providing services to hundreds of clients throughout the state of Pennsylvania as part of lecture and consultation. So I see a broader array as well.

We don't do consulting like they do. If they want somebody to write a procedure -- if one of their clients wants them to write a procedure, that's what they do. If one of their clients wants them to inspect -- be a construction safety professional, that's what they do. So they -- they do whatever they do.

Q. Yeah. They have the personnel -- they have more resources at their disposal to perhaps do these different things than you do?

A. They have a revolving door of resources at Amerisafe.

S. Gualardo - by Mr. McCullough

226

Q. Again, I'm just trying to detect whether you're being critical or snarky about it or simply distinguishing them from you.

A. No, I'm not being critical. I think the type of safety consulting that they do is very basic safety consulting. The type of safety consulting that I do requires a much higher level of expertise and experience and knowledge in the field of safety management.

They do entry level -- most of what they do is entry-level safety work, based on my knowledge of them.

Q. And your knowledge is based upon what?

A. I know -- I've known people that have worked for them over the years. As a matter of fact, I believe I have somebody on my staff that has worked for them.

Q. The OSHA staff?

A. Yes.

Q. So have you looked at Mr. Taylor's résumé?

A. I did.

Q. Do you have any reason to challenge his qualifications or credentials as an expert in the field of occupational health and safety?

S. Gualardo - by Mr. McCullough

227

A. I think --

Q. Let me clarify this. Apart from the fact that I know you disagree with him.

A. I think he has limited experience.

Q. Was there a time when you had limited experience?

A. There was and I was not serving as an expert witness when I had limited experience, I can assure you.

Q. You first served as an expert witness within 18 years after graduating with your undergraduate degree?

A. That's correct.

Q. I think it was 12 years after your graduate degree.

A. That's correct.

Q. So you're going to -- look, the numbers don't vie, you have more experience than this gentleman.

A. Yes.

Q. But does that -- at the time you were 12 years out or 18 years out, other experts who you went toe-to-toe with probably had more experience at that time than you do?

A. Perhaps.

S. Gualardo - by Mr. McCullough

228

Q. Did you regard yourself as being inferior to them?

A. No. And I'm not saying that he's inferior to me or I'm superior to him. I just noted that he had limited experience --

Q. Right.

A. -- and some of the positions that he took were totally inaccurate.

Q. I'll tell you that he's never been an expert witness before.

A. He has never been an expert.

Q. That's why you're not going to get a long list of testimony.

A. That is very evident.

Q. What are some of the things that you are critical or disagree with in his report?

A. Well, I think one of the first things -- you know what, I don't want to give a full opinion on his report at this point because I did not do a full analysis of his report. I did a cursory overview prior to this deposition. So I did not do a full analysis.

One of the things that stuck out to me was his lack of understanding of the multi-employer worksite provision under OSHA. The other thing that

S. Gualardo - by Mr. McCullough

229

stuck out to me was his repeated reference to the fact that just because OSHA did not cite an organization, that means the violations did not occur or were not occurring at the point in time of a particular incident.

I was -- I was pleasantly surprised that he agreed with me on many of the OSHA regulations that I cited in the case. In the beginning of his analysis, he said, well, this didn't really apply; however -- I'm going to paraphrase here -- however, Mr. Gualardo is correct, there is no evidence, there is no documentation, there is nothing to support that an inspection was done or maintenance was done or preoperational tests were done or whatever. So I was -- I admire him for his honesty.

Q. You know, he -- I don't want to get into discussion with you over it, but he said that, but isn't it true he also says that the lack of the these inspections, lack of the testing, whatever, didn't cause the discrete incident that caused injury to Mr. Natcher? That's what his position is; right?

A. That's what his position was, but that's what you asked me as well.

S. Gualardo - by Mr. McCullough

230

Q.    And you disagreed with it.

A.    I totally disagree for the same reason you disagree with me, because he cannot prove that.

Q.    Okay. We're going to get back into the same --

A.    Yes, we're going — he cannot prove that.

Q.    And you're going to be suggesting to him at some point that you can't prove that the chain inspection that didn't occur didn't contribute?

A.    Right. We cannot prove that.

Q.    You're right. All we have to go on is the testimony of the witnesses that were there --

A.    That's it, unfortunately.

Q.    -- and the physical evidence of what we see from inspecting the chains and the hooks. So you're right.

A.    We didn't inspect the chains. You may have inspected the chains. We did not inspect the chains.

Q.    I'm talking about postincident.

A.    Yes. You may have inspected the chains. I did not inspect the chains, so I cannot opine on that.

Q.    Right. Okay. So there are a couple of areas of agreement, but in terms of -- obviously

S. Gualardo - by Mr. McCullough

231

there are areas of disagreement. But in terms of your evaluation of Mr. Taylor, although you disagree with his opinions, maybe all of them, most of them, you would not challenge his qualifications to render those opinions; is that correct?

A.    Again, I think to serve as an expert, you have to have extensive experience and education in the field of safety management. I'm not sure that he has that. I think he has somewhat limited. That would be my only criticism of him.

Q.    Perhaps that might go to how much weight you put on his testimony as opposed to whether he can give it; right?

A.    What's that?

Q.    How much weight you would assign to it as opposed to whether he should be allowed to say it.

A.    I'm not saying he shouldn't be allowed to say it. That's for the Court to decide in terms of deciding whether he's an expert.

Q.    You're not going to tell the Court at some point down the road, Judge, you shouldn't let this guy talk because he's not qualified?

MS. RUDERT:  I don't think that's his place in any case.

MR. McCULLOUGH:  Whether it is or it

S. Gualardo - by Mr. McCullough

232

isn't his place, if it was his place, he's not going to say that.

MS. RUDERT:  I think he's already testified to what he would say, that he would question his experience.

THE WITNESS:  Yeah, that's really it.

Q.    Okay.

A.    The other criticism -- well, I guess we talked about this -- that is this whole issue of whether Mr. Natcher was acting as an employee. He was assigned to perform a task. He was performing that task at the direction of the crane operator at that particular point in time when this occurred.

Q.    What task was he assigned to do at the direction of the crane operator?

A.    He was on the -- he was on the -- on the --

Q.    Trailer.

A.    -- the trailer, sorry. He was on the trailer, and he was unhooking the chains at the point -- prior to the incident occurring.

Q.    And, of course, you know that Mr. Natcher has testified that that's what he customarily would do and it was understood that he would be doing it?

A.    As I recall, there was other testimony

S. Gualardo - by Mr. McCullough

233

that said at previous lifts when he came to that facility a spotter or rigger was provided, and at other facilities that was also the case. It wasn't always customary. I don't want you to mischaracterize it.

Q.    I don't think I said it was always customary.

A.    Well, you said it was customary, but that inferred that it was always customary.

Q.    Not 100 percent customary and that he was directing -- what he would tell you, I told Mr. Herrmann to do this; I told Mr. Herrmann to give me slack so I could unhook the chains. You read that, didn't you?

A.    I did. Remember, though, Mr. Herrmann is the crane operator. He is directing that lift. It is his responsibility to direct that lift. It is not Mr. Natcher's responsibility to direct anything. As I indicated before, crane operations are inherently unsafe. That's why you have an experienced crane operator directing the lift. That's why you have a qualified rigger as part of the lifting operation. That's why you have a qualified spotter. Mr. Natcher was none of those.

S. Gualardo - by Mr. McCullough

234

Mr. Herrmann was the only person there that was directing that, and he was unqualified to do so as well.

Q. What would a qualified rigger have done differently?

A. He would have unhooked that load and took himself out of position of harm's way.

Q. Which Mr. Natcher did.

A. He did not. He was still on the truck.

Q. Did you consider all points of that truck in harm's way?

A. I'm considering anywhere near that crane or that load was in harm's way, anywhere near that crane or that load.

Q. Harm's way, in your mind, is beyond the area that would be within the path of the toppling conveyor?

A. Within the path of the conveyor or the path of the crane.

Q. But the crane didn't hit him.

A. But you're asking me a question and I'm trying to answer your question. Harm's way would be anywhere where the path of the crane, a sling swinging, anything that could harm him and harm him in the context of that crane operation or that

S. Gualardo - by Mr. McCullough

235

unlatching or anything that occurred. That's harm's way.

Q. All right. Anything else that the rigger would have done?

A. Pardon me?

Q. Anything else that that qualified rigger would have done?

A. Well, the qualified rigger would have unhooked the load and removed himself from the area so he was not in harm's way, period.

Q. That's what a prudent person would do.

A. That's what a qualified rigger would do because a qualified rigger knows to do that. Mr. Natcher was not qualified. He was not trained on those techniques.

Q. And training is the only way one would know or think that he should move out of way?

A. Well, people can gain experience without training. Just because they gain experience doesn't mean it's safe experience or good experience. The mere fact that Mr. Natcher was around those operations, I can't conclude as a safety expert that he was trained to do that safely. He observed it being done at various locations. I don't know that he ever observed it being done safely. He obviously

S. Gualardo - by Mr. McCullough

236

didn't observe it being done safely at Accuride. That's clear.

Q. All right.

A. There was one other thing that I was critical of, if I could just add that. He said the cribbing caused the incident. There was no evidence that the cribbing caused the incident, from my expert opinion.

Q. I'll borrow one from you then, there's no evidence that it didn't.

A. Well, we'll play that game all day, I guess, then. There's no evidence that the cribbing caused the incident, and it was reiterated by Mr. Herrmann that he knows what caused the incident. He's clear on what caused the incident.

Q. So your testimony is that Mr. Herrmann testified that he's clear?

A. I'm saying Mr. Herrmann testified that the chains were in contact with the conveyor as it was being lifted. He knows exactly what caused this incident. He may not tell you. He may change his story. He knows exactly what caused this incident.

Q. Okay. All right. This is your conclusion as opposed to what the words in his transcript actually say?

S. Gualardo - by Mr. McCullough

237

A. I have to draw conclusions from the words, and there were many words in his testimony, but one of the strong words in his testimony was the fact that he raised the crane and he heard the clanging of the slings. It was clear. He said he did not see the chains over the hoist -- or the chains over the hooks.

Q. We've been around this one.

A. That was clear. He did not see them. Had he seen them, any normal person would have not continued to operate that crane and lift it. If he, as in your world, thinks that he was in visual contact with those chain slings, he would not continue to operate those slings as they're clanging, as he's watching them clang as he's lifting the hoist. You would stop immediately as a crane operator.

The evidence doesn't support that. The evidence supports exactly what he said, that they were on the other side of the load while he was raising it. They weren't clanging.

Q. If they were on the other side of the load, how did the load tip north?

A. The load can tip depending on how it's hooked or how it's jolted with respect to that

S. Gualardo - by Mr. McCullough

238

particular -- with respect to that particular sling.

Q. Would you agree that if the chains were on the north side, the Natcher side of the conveyor, that it would be more likely that it would tip to the south?

A. I can't agree one way or the other because I didn't do an accident reconstruction, and an accident investigation never occurred.

Q. And intuitively, it doesn't seem like it would make sense?

A. I can't conclude one way or the other. I don't know whether, in fact, there was any movement of that crane occurring at that point in time. I know that it was going up. We know that based on the testimony. We don't know if it was moving at all. We just don't know that. We can't conclude that.

MR. McCULLOUGH: All right. I have no further questions. Do you have any questions?

MS. RUDERT: Let's just take a quick break. Let me collect my thoughts.

-----

EXAMINATION

BY MS. RUDERT:

Q. In authoring your opinion in any case,

S. Gualardo - by Ms. Rudert

239

does it matter to you who retains you?

A. No.

Q. In your capacity with the OSHA consultants, do you consider yourself to be a neutral advisor?

A. With my consultants themselves?

Q. When you are working through IUP with OSHA --

A. Yes.

Q. -- are you going into businesses and providing information in a neutral --

A. Oh, yes, oh, yes.

Q. -- capacity?

Do you bring that same attitude towards your expert work?

A. I have to. My job is to inform the jury as to the facts as I know them based on your evidence.

Q. If you would slant your opinion in a legal matter, would that affect your credibility in the OSHA world?

A. Absolutely.

Q. You were asked earlier if there were situations in your career where you saw an employer being wrongfully cited --

S. Gualardo - by Ms. Rudert

240

A. Yes.

Q. -- and you mentioned two. Were there more than two situations where you saw an employer wrongfully cited?

A. It happens quite often.

Q. I just want to be clear for the record that your testimony about that was not limited to the two specific examples you gave.

A. No. That happens on a regular basis. Cases are adjudicated continually based on the fact that OSHA did not do an adequate inspection or they messed up during the inspection with respect to the findings or the evidence.

Q. When something like that occurs, can a citation be deleted or removed from an employer's history?

A. Yes, as it was in this case, it was deleted.

Q. On the converse of that, are there situations in your career where you've seen an OSHA investigation that resulted in no citations where you believe citations should have been issued?

A. Often. As my OSHA consultancy going to workplaces, we've seen that often. That's what I was illustrating with respect to Erie. I oversee

S. Gualardo - by Ms. Rudert

241

OSHA consultation for the state of Pennsylvania, so we deal with all the area offices throughout the state of Pennsylvania. Erie is notorious for what I will refer to as negligent inspections. So my consults will go in after them at a workplace and find all kinds of violations, and the employer is baffled by that. They're baffled.

Now, I must add that OSHA has, you know -- in some of their citations, they have some other evidentiary requirements that we do not have, but normally it's not the case.

Q. And we've referenced throughout the course of your deposition a "multi-employer worksite." What does that term mean to you?

A. A multi-employer worksite is when you're bringing a contractor on your property, such as Berkmire in this case was a contracted trucking company. When you have a contractor on your property or it could be a temporary employee as well that comes from a temporary agency, you now have what's called a multi-employer worksite. You have more than one employer.

When there is more than one employer, OSHA has a policy for evaluating that case using what's called a multi-employer worksite policy.

S. Gualardo - by Ms. Rudert

242

They determine -- they're looking for who is the controlling employer. In other words, who controlled the workplace and the hazards created in the workplace. Who is the exposing employer; who actually exposed the employees to the hazards in the workplace. Who is the creating employer, who actually created the particular hazard in the workplace. And who is the correcting employer; the employer that was responsible for correcting the situation to prevent it from reoccurring in the future.

Q. In a multi-employer worksite situation, can -- we ordinarily use the term "employer/employee" in the legal context. In this situation, is it your opinion that Accuride was an "employer" of Mr. Natcher as that term is used by OSHA?

A. In this case -- in this case, in the multi-employer context, we have two things in play. One, Berkmire was his employer from an exposing employer perspective, but Accuride was his employer from my perspective in that they asked him to perform a task, a rigging task, a spotting task or whatever he was doing on the truck.

Q. Once Accuride is in that multi-employer

S. Gualardo - by Ms. Rudert

243

role, what are their responsibilities to Mr. Natcher under OSHA?

A. They have the responsibility to train him, first and foremost, as to what hazards he may be exposed to in the workplace. In this particular context he would have been required to be trained as a spotter, trained as a rigger, trained in safe crane operations, if he was going to be exposed to those crane operations, and any other hazards that they would be encountering in that particular workplace.

Q. Did you see any evidence in this case that Accuride performed any of those functions?

A. Zero training, zero orientation, zero conveyance of knowledge to Mr. Natcher towards any of the hazards that he would be exposed to.

Q. Now, is a multi-employer worksite something that you, in your capacity with the OSHA consultants through IUP and the OSHA consultation program, is that something that you and your other consultants review and interpret in the context of your consultation?

A. All the time, yes. We typically -- most workplaces in today's world have what are referred to as multi-employer worksites. They're found in

S. Gualardo - by Ms. Rudert

244

general industry where you have situations like this and/or temporary employees. They're also found in the construction industry where you have general contractor and multiple subcontractors.

Q. Are the guidelines set by OSHA considered to be a minimum standard?

A. They're are the bare-bone minimum. So if you're not meeting the bare-bone minimum standard, you're at the bottom of the pile with respect to operating a safe environment. In this case, Accuride did not meet the bare-bone minimum regulations.

Q. Are companies permitted to do more than what OSHA required?

A. Great safety cultures will go well above what is required by OSHA. I refer to the SHARP companies in the state of Pennsylvania that I oversee under the OSHA consultation program. SHARP refers to the Safety and Health Achievement Recognition Program. Those are small employers. There's roughly 50 or 60 small employers in the state of Pennsylvania that I have authorized because they have gone above and beyond OSHA's minimum regulations. They are SHARP employers, and they're recognized as such and they're recognized and

S. Gualardo - by Ms. Rudert

245

referred from OSHA inspections. They have a great safety culture above and beyond what is required by the law.

Q. With your job with the OSHA consultation program --

A. Yes.

Q. -- is part of your job as the director and previously as a safety consultant to specifically interpret and apply OSHA regulations?

A. Every single day.

Q. Is that -- that role in interpreting and applying OSHA regulations information that you obtained from your education and also your years of work experience?

A. Through education, through work experience, as well as interpretations of the regulations.

Q. When you say interpretations of the regulations, do you mean things that are put out by OSHA?

A. Yes.

Q. Do you keep current with all of OSHA's interpretations of the regulations?

A. I do.

Q. Do you participate in any way with any of

S. Gualardo - by Ms. Rudert

246

the committees or any consulting organizations regarding the drafting or revising existing OSHA regulations?

A. I did at one point. I don't anymore, as I work for OSHA. But prior to working for OSHA, I did as part of -- as the National Electric Institute when I worked for the electric utility industry, when I worked with Hershey as part of the Chocolate Manufacturers Association. In those contexts in a previous life, the answer is yes. Now that I work for OSHA, I can't do that.

I do do that, however, with respect to the consensus standards. I serve on a consensus standard right now, an entity that oversees training with respect to safety in the workplace. It think it's Z590, I think it's titled.

(Witness reviews document.)

A. ANSI Z490, Criteria For Accepted Practices in Safety, Health & Environmental Training.

Q. You said you work for a certain committee that deals with training or with --

A. Yes.

Q. For that specific standard?

A. Yes.

S. Gualardo - by Ms. Rudert

247

Q. What's the name of that committee?

A. That's it, ANSI Z490. ANSI Z490, Criteria for Accepted Practices in Safety, Health & Environmental Training. That's the title of the committee.

Q. Okay. How long have you been a member of that committee?

A. I think four or five years maybe.

Q. How long have you been serving as an expert witness or in some type of an expert capacity for litigation? Has it been since 1987 as indicated on your résumé or was there some period after that when you started?

A. No. I didn't serve as an expert witness until whenever the first case I have listed here. 1999. No, a case before that. It wasn't 1987, though.

Q. Okay.

A. It was --

(Witness reviews document.)

A. -- prior to '98. Around '98, I believe it was.

Q. So at this point in time it's been about 20 years, give or take?

A. Yes.

S. Gualardo - by Ms. Rudert

248

Q. At any point in time in that 20-year period when you've been retained in a legal capacity, have you ever spoken with any employees or representatives of the other side on your own, just gone and done an investigation by contacting the other -- the opponent? If you're retained for the plaintiff, do you contact representatives of the defendant? If you're retained for the defendant, do you contact representatives of the plaintiff?

A. No.

Q. And as far as the language in your report, did I have any input into what you wrote in your report?

A. No.

MS. RUDERT: I think that's those are all the questions I have.

-----

EXAMINATION

BY MR. McCULLOUGH:

Q. OSHA does get it right sometimes; correct?

A. Yeah, they get it right every once in a while.

Q. Are you being factitious, or do you mean every once in a while?

S. Gualardo - by Mr. McCullough

249

A. No, they get it right.

Q. Okay. More often than not?

A. You know, I can't say that. I don't know that. I can't say that that is accurate. I would like to believe that that is the case, but I don't know that.

Q. Sure. This multi-employer doctrine or workplace doctrine --

A. Policy.

Q. Is it a statutory section or a regulatory section, or is it an interpretation of --

A. It's an administrative policy that OSHA administers.

Q. You know, it's an internal enforcement policy?

A. That's correct.

Q. Even though the reg may not specifically say this, this is going to be our interpretation of our authority?

A. That's correct, which has been sustained by the courts.

Q. And the determination of whether there is or is not a multi-employer situation, although initially it's a determination that has to be made by the OSHA people, it's a conclusion that an

S. Gualardo - by Mr. McCullough

250

administrative law Judge or judge decides. It's a legal question; correct? Mixed legal and --

A.    Yeah. It's a regulatory question. If I recall, that's one of the questions that was determined on the worksheets that the compliance officers use.

Q.    But not every situation where an employee -- a common-law employee of one company happens to be working on-site at another company where it's not an employer, every time that happens, you don't automatically have a multi-employer worksite situation, do you?

A.    I think if you have one employee on a worksite that can be there either controlled, corrected, exposed, or all the categories, the answer is, yes, that's a multi-employer worksite.

Q.    By definition. But is the policy going to be applied to issue a citation or find a violation or issue a citation in all such cases?

A.    It's all going to be based on the investigation and the evidence.

Q.    And the factors, multiple factors.

A.    It's going to be evaluated according to the evidence that would occur.

Q.    Understood. And who was exposing, who

S. Gualardo - by Mr. McCullough

251

was controlling, to what degree and so forth?

A.    Yes.

Q.    All right. I guess I just wanted to make sure it's not a strict situation where employee A working at site B is automatically going to result in an application of the policy.

A.    Well, the application of the policy is -- the policies only apply when there's a violation.

Q.    My question assumed that that there would be a violation.

A.    There has to be a violation, first and foremost, for the policy to apply. To say that if you have multi-employers working at a worksite, the multi-employer of the worksite doesn't apply would be inaccurate.

Q.    Now, the individuals about whom you are extremely critical had the ability to determine that this was a multi-employer worksite situation?

A.    That's one of the things I'm critical on.

Q.    But they did not?

A.    They did not, no.

Q.    One comment you made along the way which I think was related to multi-employer worksite was they asked him to be a rigger or a spotter.

A.    By default they asked him.

252

Q.    That's all, by default?

A.    Yes. Well, I don't know, there could have been words to that effect as well.

Q.    Right, but you haven't seen any testimony to that effect?

A.    No.

Q.    In fact, you haven't seen any testimony other than the fact that Mr. Natcher jumped right in and got on the truck, saw Mr. Herrmann was struggling a bit getting the conveyor hooked so it would lift evenly, and jumped in and assisted?

A.    I saw Mr. Natcher do a natural reaction to a situation that he saw.

Q.    Right. Okay.

A.    Yeah.

MR. McCULLOUGH: All right. Thank you.

MS. RUDERT: I don't have anything else. We'll read.

(Signature not waived.)

(Whereupon, the above-entitled matter was concluded at 6:00 p.m.)

-----

253

DEPOSITION ERRATA SHEET

Case Caption:

NATCHER

vs.

ACCURIDE CORPORATION

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the___ day of_____, 2018.

_____

SAMUEL J. GUALARDO

294

DEPOSITION ERRATA SHEET

Page No.____Line No._____ Change_____
to:_____
Reason for change _____

Page No.____Line No._____ Change_____
to:_____
Reason for change:_____

Page No.____Line No._____ Change_____
to:_____
Reason for change:_____

Page No.____Line No._____ Change_____
to:_____
Reason for change:_____

Page No.____Line No._____ Change_____
to:_____
Reason for change:_____

Page No.____Line No._____ Change_____
to:_____
Reason for change:_____

Page No.____Line No._____ Change_____
to:_____
Reason for change:_____

Page No.____Line No._____ Change_____
to:_____
Reason for change:_____

Page No.____Line No._____ Change_____
to:_____
Reason for change:_____

Page No.____Line No._____ Change_____
to:_____
Reason for change:_____

Page No.____Line No._____ Change_____
to:_____
Reason for change _____

SIGNATURE:_____DATE:
SAMUEL I. GUALARDO

---

255

COMMONWEALTH OF PENNSYLVANIA)
COUNTY OF ALLEGHENY        )

I, Constance Lee, Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that the witness was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth, that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was recorded stenographically by me and then reduced to typewriting under my direction, and constitutes a true record of the testimony given by said witness, all to the best of my skill and ability.

I further certify that the inspection, reading and signing of said deposition were not waived by counsel for the respective parties and by the witness and if after 30 days the transcript has not been signed by said witness that the witness received notification and has failed to respond and the deposition may then be used as though signed.

I further certify that I am not a relative, or employee of either counsel, and that I am in no way interested, directly or indirectly, in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this _____ day of _____, 2018.

.................................

Constance Lee

| $ | | | 1 |
|---|---|---|---|

**$**

$463,000 [1] - 85:8

**'**

'17 [1] - 59:7
'18 [1] - 57:15
'70s [1] - 90:1
'98 [3] - 88:4, 247:21
'Designated ' [1] - 122:11

**0**

009-0011 [1] - 213:9

**1**

1 [5] - 3:8, 5:19, 5:22, 213:21, 214:11
1)(I [1] - 187:13
1.5 [2] - 118:6, 119:9
10 [4] - 43:1, 182:24, 213:24, 214:9
10-ton [1] - 203:6
100 [8] - 2:18, 19:15, 19:19, 42:25, 141:13, 141:15, 141:18, 233:10
100,000 [1] - 54:6
1099 [4] - 11:3, 51:11, 52:6, 53:2
1099s [1] - 51:21
11 [11] - 37:4, 37:10, 38:24, 39:1, 39:19, 39:21, 43:1, 43:2, 129:17, 213:24, 214:9
12 [4] - 38:21, 118:4, 227:14, 227:21
12-month [3] - 37:3, 37:16, 40:9
1237 [1] - 7:9
12:49 [1] - 2:9
14 [1] - 120:25
15 [3] - 17:20, 182:24
150 [2] - 155:21, 156:5
1500 [2] - 2:8, 2:15
152 [3] - 155:21, 156:4, 156:5
15219 [1] - 2:15
1616 [1] - 7:12
16507-1459 [1] - 2:19
179 [1] - 192:15
179(b)(8 [1] - 188:12
179(j)(2 [1] - 183:12
179(j)(2)(vII [1] - 186:20
179(k [1] - 187:12
179(l)(1) [1] - 188:1

179(n [1] - 189:5
179(n)(2 [1] - 188:21
179(n)(3 [1] - 195:19
179(n)(3)(III)(a) [1] - 194:2
179(n)(3)(III)(b [1] - 197:14
18 [3] - 12:20, 227:11, 227:22
184(e)(1 [1] - 178:9
184(e)(3 [1] - 180:20
19 [1] - 22:14
1910.179 [1] - 123:8
1910.179(a)(35 [1] - 122:11
1910.179(j [1] - 181:17
1910.184 [1] - 169:6
1910.184(c)(12 [1] - 172:8
1910.184(d) [1] - 176:10
1970 [1] - 180:19
1978 [1] - 222:18
1987 [3] - 13:3, 247:11, 247:16
1992 [1] - 49:8
1999 [4] - 41:17, 43:1, 49:8, 247:16
1:16-cv-219-BJR [1] - 1:5

**2**

2 [7] - 3:9, 7:19, 7:21, 56:3, 88:15, 88:16, 89:4
2,000 [1] - 148:11
2.3.1 [1] - 124:7
2.5 [1] - 119:12
20 [3] - 203:8, 204:7, 247:24
20-ton [3] - 202:25, 203:6, 204:5
20-year [1] - 248:1
2000-2001 [1] - 46:2
2000-2006 [2] - 46:25, 48:7
2009 [1] - 22:15
2010 [5] - 22:15, 41:17, 43:1, 43:22
2016 [4] - 8:23, 9:1, 33:7, 64:6
2017 [12] - 8:7, 51:18, 51:24, 52:6, 52:11, 53:18, 54:8, 54:11, 55:19, 57:15, 59:8, 63:23
2018 [12] - 1:15, 2:9, 3:10, 8:8, 56:10, 56:17, 56:21, 57:2, 59:7, 72:24, 253:20, 255:17
21 [2] - 121:19, 169:1
213 [1] - 3:13
216 [2] - 3:14, 3:15
23 [3] - 123:9, 194:2, 203:4
238 [1] - 3:4
248 [1] - 3:5
2480 [2] - 218:21, 218:22
250 [1] - 20:19

29 [3] - 106:12, 107:7, 213:3

**3**

3 [3] - 3:10, 50:19, 50:20
3,000 [1] - 148:11
30 [5] - 1:15, 2:9, 49:15, 126:19, 255:11
30-employee [1] - 19:23
310 [2] - 2:7, 2:15

**4**

4 [4] - 3:3, 3:11, 54:24, 55:1
40-employee [1] - 18:1
400-plus [1] - 21:10
45 [1] - 7:14
450 [1] - 86:6
463,000 [1] - 86:7

**5**

5 [5] - 3:8, 3:12, 88:8, 88:10, 88:12
50 [2] - 3:10, 244:21
50,000 [1] - 14:9
500 [1] - 20:21
500,000 [2] - 54:3
54 [1] - 3:11
58 [2] - 17:25, 18:7

**6**

6 [3] - 3:13, 213:11, 213:12
60 [1] - 244:21
60/40 [2] - 79:12
6:00 [1] - 252:21

**7**

7 [7] - 3:9, 3:14, 128:16, 213:10, 216:16, 216:18, 216:21
700 [1] - 2:18

**8**

8 [5] - 3:15, 216:19, 216:21, 217:6
8,000-pound [9] - 125:19, 126:15, 126:18, 148:1, 148:7, 149:18, 149:25, 195:5, 207:19
88 [1] - 3:12

**9**

9 [1] - 213:22
95 [1] - 49:20

**A**

abide [3] - 129:6, 136:9, 180:17
ability [3] - 156:11, 251:17, 255:8
able [12] - 34:16, 35:11, 123:17, 145:15, 150:18, 151:21, 158:13, 162:4, 163:8, 174:19, 180:3, 195:14
above-captioned [1] - 253:12
above-entitled [1] - 252:20
Abraham [1] - 65:18
absent [1] - 101:4
absolute [4] - 81:10, 178:17, 183:13, 203:3
absolutely [16] - 32:18, 33:5, 97:15, 99:24, 102:16, 114:11, 125:1, 126:9, 155:1, 170:5, 180:25, 181:7, 183:16, 188:20, 203:21, 239:22
acceleration [2] - 194:4, 195:20
accept [2] - 93:19, 93:20
Accepted [2] - 246:18, 247:3
accident [50] - 11:12, 23:10, 24:3, 24:8, 28:8, 29:4, 30:19, 31:25, 33:8, 34:3, 34:22, 34:25, 36:10, 81:2, 98:14, 111:15, 132:13, 133:6, 135:6, 148:17, 149:3, 149:24, 170:11, 176:18, 178:15, 179:18, 180:14, 182:13, 183:18, 184:12, 184:17, 185:6, 188:7, 188:9, 208:24, 211:5, 219:9, 220:7, 220:17, 220:20, 221:4, 221:8, 221:9, 222:3, 222:9, 222:23, 238:7, 238:8
accidental [1] - 194:12
accidentally [1] - 197:18
accidents [10] - 36:12, 36:14, 36:16, 36:17, 220:23, 220:24, 221:13, 222:5, 222:7, 222:19
accomplished [1] - 16:1
according [10] - 33:3, 37:23, 118:1, 118:4, 122:14,

2

130:24, 157:2, 190:22, 209:14, 250:23
accurate [7] - 55:16, 156:11, 158:21, 158:25, 165:7, 249:4, 253:13
accurately [3] - 9:8, 102:25, 125:21
ACCURIDE [2] - 1:7, 253:6
Accuride [78] - 4:12, 17:9, 25:22, 26:2, 26:7, 26:23, 27:1, 27:4, 27:7, 28:2, 33:22, 68:11, 80:15, 83:20, 92:19, 97:19, 98:5, 101:11, 101:12, 101:16, 101:17, 102:8, 105:13, 106:5, 106:21, 106:25, 109:1, 109:14, 110:23, 110:25, 112:6, 115:13, 117:25, 118:8, 119:12, 119:24, 120:9, 120:20, 120:21, 121:2, 121:6, 123:12, 128:19, 128:23, 129:24, 130:5, 130:8, 130:15, 130:20, 131:1, 131:4, 131:7, 132:3, 133:1, 138:5, 141:13, 142:16, 166:22, 180:17, 180:25, 182:6, 206:12, 206:24, 208:24, 209:15, 210:8, 210:22, 210:25, 212:11, 213:9, 213:22, 236:1, 242:15, 242:21, 242:25, 243:13, 244:11
Accuride 's [6] - 25:3, 25:15, 25:17, 116:9, 129:5, 209:7
achieve [1] - 14:23
Achievement [1] - 244:19
act [2] - 197:5, 197:8
acted [1] - 114:21
acting [1] - 232:10
action [1] - 255:15
Action [1] - 1:5
actions [3] - 85:22, 98:21, 211:2
activities [3] - 118:8, 120:23, 130:16
activity [4] - 91:6, 97:2, 100:10, 132:9
actual [6] - 32:1, 113:16, 114:1, 130:2, 143:1, 146:5
add [7] - 8:8, 85:2, 119:23, 135:14, 204:5, 236:5, 241:8
addition [6] - 37:15, 89:1, 124:19, 132:3, 210:10, 212:11
additional [3] - 72:12, 137:15, 208:1
additionally [1] - 213:7

address [3] - 7:7, 30:13, 173:20
adds [1] - 135:15
adequate [1] - 240:11
adequately [2] - 106:6, 107:1
adjudicated [1] - 240:10
adjusted [1] - 96:13
adjustments [1] - 96:19
administer [1] - 44:22
administered [1] - 82:18
administers [1] - 249:13
administrative [2] - 249:12, 250:1
admire [1] - 229:15
admitted [2] - 106:3, 106:23
adopt [1] - 16:9
advance [1] - 95:19
advisor [1] - 239:5
aerial [2] - 62:25, 63:1
affect [1] - 239:20
affiliated [4] - 42:6, 42:9, 45:12, 46:16
affixed [3] - 93:5, 195:17, 255:16
agency [3] - 41:9, 171:25, 241:20
AGENCY [1] - 1:17
ago [7] - 38:25, 73:20, 73:24, 74:2, 74:9, 77:22, 194:20
agree [20] - 35:17, 87:15, 92:3, 92:6, 104:4, 105:2, 108:1, 126:9, 138:21, 154:1, 157:17, 166:21, 169:17, 170:20, 192:1, 193:4, 198:18, 215:13, 238:2, 238:6
agreed [3] - 140:15, 176:25, 229:7
agreeing [1] - 102:1
agreement [3] - 5:11, 216:23, 230:25
ahead [6] - 50:16, 113:15, 133:14, 137:6, 153:8, 154:7
AINSMAN [1] - 2:14
Ainsman [2] - 2:7, 10:8
alcohol [1] - 35:16
alert [1] - 137:20
aligning [1] - 15:4
alleged [1] - 128:11
ALLEGHENY [1] - 255:1
allow [5] - 68:7, 104:8, 140:2, 140:6, 206:18
allowed [7] - 97:14, 140:21, 141:1, 141:5, 178:19, 231:16, 231:17
alteration [2] - 187:16, 187:19

altered [6] - 181:18, 182:10, 182:12, 182:14, 182:21, 182:22
aluminum [1] - 156:2
ambiguous [1] - 215:22
American [2] - 13:12, 46:1
Amerisafe [2] - 224:1, 225:25
analysis [11] - 27:10, 33:6, 39:24, 48:15, 49:16, 49:23, 50:8, 178:6, 228:20, 228:22, 229:9
analyze [3] - 17:3, 36:8, 47:18
analyzed [1] - 40:1
analyzing [2] - 17:4, 22:19
anecdotally [1] - 81:6
annual [2] - 136:10, 167:23
annually [1] - 53:17
ANSI [6] - 124:1, 124:2, 124:4, 246:18, 247:2
answer [35] - 32:20, 37:11, 38:6, 39:4, 39:6, 39:11, 39:16, 73:5, 99:2, 100:4, 107:11, 108:8, 108:11, 111:21, 135:23, 135:25, 136:1, 140:2, 140:7, 156:16, 164:6, 167:10, 183:24, 184:3, 184:14, 184:24, 187:10, 194:15, 203:17, 212:6, 234:22, 246:10, 250:16
answering [8] - 17:14, 39:13, 108:10, 135:22, 135:24, 136:2, 167:8, 212:7
answers [5] - 5:17, 106:20, 106:21, 106:22, 107:10
anticipate [5] - 6:20, 7:2, 62:5, 62:9, 62:14
anticipation [1] - 208:5
anytime [2] - 189:4, 205:6
apart [2] - 30:7, 227:2
appeared [1] - 103:9
appearing [1] - 214:11
applicable [1] - 122:3
application [3] - 124:9, 251:6, 251:7
applied [4] - 142:14, 191:11, 196:11, 250:18
applies [11] - 102:1, 102:5, 182:9, 191:6, 192:13, 193:18, 199:21, 199:22, 199:25, 200:1, 202:8
apply [15] - 24:6, 69:11, 102:1, 124:8, 190:24, 191:7, 192:5, 193:5, 194:7, 200:22, 229:10, 245:9, 251:8, 251:12, 251:14
applying [1] - 245:12

appointed [2] - 45:9, 46:4
appreciate [2] - 5:24, 17:12
approaches [1] - 205:3
approaching [1] - 202:17
appropriate [6] - 29:21, 38:20, 68:24, 93:23, 98:15, 123:21
appropriately [3] - 76:2, 95:6, 128:24
approval [1] - 171:24
approve [3] - 9:23, 22:17, 22:23
approved [1] - 134:19
April [1] - 8:5
arbitrarily [1] - 125:20
area [56] - 5:8, 5:9, 13:10, 38:16, 41:24, 60:23, 71:1, 71:5, 73:6, 73:9, 73:23, 73:24, 81:7, 95:17, 95:20, 97:14, 97:17, 98:10, 98:12, 98:19, 98:22, 119:19, 125:4, 125:13, 131:6, 131:8, 131:13, 131:16, 131:17, 131:19, 132:6, 132:17, 132:21, 137:21, 137:25, 138:2, 138:7, 138:8, 138:10, 138:14, 138:24, 139:3, 139:16, 139:19, 139:21, 150:21, 157:25, 171:15, 206:2, 206:22, 216:10, 234:16, 235:9, 241:2
areas [5] - 30:18, 68:1, 225:3, 230:25, 231:1
argue [1] - 101:23
arise [1] - 203:24
arm [6] - 21:2, 23:11, 24:10, 24:12, 24:22, 47:13, 53:14, 76:16
arms [1] - 53:14
array [2] - 224:22, 225:13
ascertain [2] - 27:11, 203:11
aside [1] - 5:6
ASME [12] - 35:18, 35:19, 58:20, 58:22, 63:5, 121:10, 124:16, 124:17, 128:14, 131:3, 131:5, 171:18
aspect [11] - 16:21, 17:4, 33:23, 34:20, 37:12, 40:21, 50:12, 85:13, 114:15, 133:4, 220:14
aspects [7] - 14:11, 14:13, 14:15, 14:18, 30:13, 116:14, 158:12
ASSE [2] - 59:9, 59:13
assess [1] - 18:6
assessing [1] - 15:2
assessment [7] - 16:18, 18:4, 18:10, 18:13, 18:18,

18:19, 18:21
assessments [2] - 17:16, 18:25
assign [2] - 222:16, 231:15
assigned [5] - 80:19, 116:21, 122:12, 232:11, 232:14
assigning [1] - 119:21
assist [4] - 99:6, 100:16, 100:17, 142:8
assistance [1] - 99:5
assistant [2] - 21:24, 42:20
assisted [1] - 252:11
associate [1] - 44:15
association [1] - 33:18
Association [1] - 246:9
assume [17] - 8:1, 30:16, 35:15, 50:23, 51:3, 52:22, 55:24, 80:14, 111:4, 111:12, 124:22, 146:17, 161:24, 162:17, 162:20, 198:20, 203:23
assumed [1] - 251:9
assuming [4] - 9:7, 55:5, 162:7, 163:6
assumption [2] - 4:22, 204:8
assure [4] - 118:8, 184:5, 206:4, 227:9
assuring [1] - 20:15
attached [19] - 50:12, 76:25, 171:3, 171:4, 171:6, 190:21, 194:18, 194:19, 194:21, 194:24, 195:1, 195:9, 195:12, 195:13, 195:15, 195:17, 202:3
attaching [12] - 92:16, 190:15, 190:18, 191:8, 191:23, 192:2, 192:5, 192:25, 193:6, 193:16, 193:17, 193:20
attachment [2] - 176:17, 177:4
attachments [2] - 176:13, 217:8
attempt [2] - 5:4, 27:12
attempted [1] - 139:9
attempting [1] - 149:13
attempts [1] - 204:23
attended [1] - 123:16
attention [1] - 19:9
attested [1] - 105:1
attitude [1] - 239:14
Attorney [4] - 6:1, 8:1, 10:20, 11:18
attorney [3] - 8:14, 73:16
attorneys [2] - 10:25, 74:22
attributable [1] - 129:6
attribute [2] - 219:24, 220:17
attributed [3] - 72:1, 132:23,

164:11
audible [2] - 133:10, 133:12
audience [1] - 48:24
audit [2] - 22:5, 47:25
author [1] - 171:21
authoring [1] - 238:25
authority [1] - 249:19
AUTHORIZATION [1] - 1:17
authorized [1] - 244:22
auto [1] - 65:9
automatically [3] - 195:6, 250:11, 251:5
available [1] - 29:17
average [3] - 54:11, 54:13, 54:20
avoid [2] - 200:20, 200:21
awarded [1] - 81:24
awards [1] - 20:1
aware [5] - 72:6, 85:15, 95:21, 150:12, 163:17

## B

background [2] - 7:4, 137:7
backlog [1] - 21:10
bad [5] - 54:11, 84:21, 211:18, 222:14
baffled [2] - 241:7
balance [2] - 145:6, 145:15
ball [2] - 80:15, 166:9
ballpark [2] - 53:17, 53:23
bare [3] - 244:7, 244:8, 244:11
bare-bone [3] - 244:7, 244:8, 244:11
base [1] - 6:12
based [42] - 6:10, 13:18, 13:21, 14:24, 22:3, 25:18, 29:11, 31:7, 59:6, 68:2, 85:9, 99:20, 112:7, 114:16, 115:11, 115:14, 124:10, 128:24, 158:18, 162:15, 165:9, 167:25, 168:7, 168:18, 168:19, 168:20, 168:22, 168:23, 175:23, 184:20, 199:23, 208:14, 208:22, 215:12, 215:19, 219:14, 226:11, 226:13, 238:14, 239:17, 240:10, 250:20
basic [3] - 176:2, 180:17, 226:5
basing [1] - 29:14
basis [4] - 121:5, 136:11, 212:21, 240:9
Bates [1] - 218:20
bay [1] - 113:8
Beach [1] - 7:9

beams [2] - 86:17, 86:20
bear [2] - 122:7, 140:9
bearing [4] - 173:2, 173:12, 176:17, 178:14
bears [1] - 139:22
became [3] - 106:9, 107:3, 174:11
become [1] - 145:3
becoming [1] - 45:17
beeper [3] - 135:13, 137:16, 137:17
began [10] - 106:4, 106:7, 106:23, 107:2, 127:11, 127:13, 139:10, 208:24, 214:13, 215:9
begin [4] - 128:18, 133:20, 139:14, 139:19
beginning [5] - 33:11, 109:14, 109:17, 192:20, 229:9
behalf [7] - 4:19, 8:11, 75:3, 75:4, 79:7, 86:23, 86:25
belabor [1] - 5:1
Belcher [1] - 63:23
belief [1] - 127:3
below [2] - 54:5, 191:17
bend [1] - 177:11
bending [3] - 103:9, 103:21
bent [3] - 31:12, 177:13, 186:4
Berkmire [12] - 80:11, 83:19, 83:21, 84:4, 85:14, 92:20, 100:20, 101:1, 101:15, 115:23, 241:17, 242:20
best [5] - 128:6, 156:11, 167:1, 224:14, 255:8
Bethlehem [1] - 90:10
better [3] - 97:16, 100:3, 199:8
between [7] - 33:18, 53:8, 80:24, 83:5, 106:17, 107:15, 166:15
beyond [5] - 37:16, 116:12, 234:15, 244:23, 245:2
big [4] - 18:7, 78:11, 136:16, 146:8
bill [2] - 114:4, 224:14
bit [3] - 94:6, 223:11, 252:10
blame [4] - 221:25, 222:16, 222:25, 223:1
blanch [1] - 64:23
blank [1] - 63:14
blocking [1] - 208:1
blown [1] - 24:21
Board [5] - 43:22, 43:25, 45:14, 45:16, 46:1
board [3] - 44:2, 44:6, 45:20
bone [3] - 244:7, 244:8,

244:11
boots [3] - 48:9, 48:12, 50:4
boots-on-the-ground [2] - 48:9, 50:4
borrow [1] - 236:9
bottom [4] - 20:14, 215:25, 218:21, 244:9
box [2] - 78:9, 78:12
brace [2] - 207:14, 208:20
braced [8] - 209:3, 209:16, 209:18, 209:23, 210:11, 210:14, 210:18, 212:12
bracing [2] - 208:1, 210:4
Brady [3] - 103:18, 109:25, 110:1
braided [1] - 187:8
brain [2] - 70:2, 208:14
brake [2] - 33:14, 40:6
brakes [3] - 33:19, 40:13, 202:17
braking [2] - 36:15, 37:7
branch [1] - 47:13
brass [1] - 18:8
break [10] - 5:7, 91:13, 91:18, 93:25, 177:9, 179:5, 179:6, 180:7, 205:17, 238:21
breaking [3] - 180:5, 180:6, 180:8
brethren [1] - 83:16
bridge [7] - 69:3, 69:4, 86:16, 86:17, 86:20, 205:2, 205:10
brief [2] - 87:20, 205:18
bring [7] - 6:4, 6:8, 6:16, 7:1, 9:14, 22:22, 239:14
bringing [1] - 241:16
BRITTON [1] - 2:17
broader [2] - 224:22, 225:12
broke [1] - 31:12
brought [4] - 4:14, 6:6, 19:12, 169:16
bucket [1] - 63:2
bullet [1] - 215:3
bulletpoint [1] - 215:7
bumped [1] - 149:13
bumping [1] - 149:17
burdening [1] - 184:2
Burkett [2] - 63:15, 64:20
Burkett's [1] - 64:17
burnt [1] - 186:6
business [7] - 10:18, 13:7, 20:17, 51:1, 51:18, 53:9, 53:15
businesses [9] - 20:11, 20:13, 20:15, 20:18, 20:22, 21:12, 22:5, 48:13, 239:10
buy [1] - 14:20
buy-in [1] - 14:20

3

BY [8] - 3:3, 3:4, 3:5, 4:7, 87:21, 205:19, 238:24, 248:19

bystander [1] - 113:18

bystanders [1] - 131:21

---

### C

c)(9 [1] - 169:8

cab [1] - 91:13

Callaghan [1] - 63:12

cambering [1] - 86:17

cannot [18] - 30:14, 33:25, 34:24, 36:25, 37:24, 38:2, 40:24, 173:25, 174:3, 175:7, 175:9, 176:4, 184:13, 184:15, 230:3, 230:6, 230:10, 230:22

canvas [1] - 138:10

capability [1] - 40:10

capable [3] - 99:15, 204:7, 204:13

capacities [2] - 79:1, 171:25

capacity [23] - 45:17, 50:3, 50:5, 70:11, 70:12, 75:13, 114:13, 114:21, 116:15, 172:1, 179:16, 179:21, 179:24, 180:1, 202:25, 203:3, 203:7, 211:22, 239:3, 239:13, 243:18, 247:10, 248:3

Caption [1] - 253:3

captioned [1] - 253:12

car [5] - 38:3, 38:8, 40:5, 40:7, 167:2

care [4] - 188:24, 195:22, 197:15, 198:19

Care [2] - 191:9, 192:10

career [4] - 67:16, 91:1, 239:24, 240:20

cargo [1] - 28:6

carried [2] - 201:3, 201:4

carrier [1] - 59:2

Carrier [2] - 92:12, 207:25

carrying [1] - 200:21

carryover [1] - 64:22

Case [1] - 253:3

case [149] - 10:11, 10:20, 10:25, 11:5, 17:9, 24:25, 32:13, 32:25, 36:22, 52:8, 53:4, 55:22, 55:23, 55:25, 56:21, 57:7, 57:9, 57:16, 57:24, 58:1, 59:3, 59:19, 60:8, 61:1, 62:17, 62:19, 62:21, 62:22, 62:24, 63:8, 63:13, 63:24, 64:7, 64:8, 65:10, 66:4, 66:6, 66:7, 66:12, 66:16, 67:2, 67:14,

68:9, 68:11, 68:23, 69:24, 70:25, 71:1, 71:3, 71:5, 71:15, 72:5, 72:8, 72:9, 72:10, 72:12, 72:13, 72:14, 72:16, 72:19, 73:12, 73:22, 74:20, 74:25, 79:14, 79:22, 79:25, 80:1, 80:7, 80:9, 80:12, 80:19, 83:3, 84:4, 84:12, 84:18, 85:22, 86:2, 87:3, 88:13, 88:25, 89:12, 93:14, 95:21, 98:21, 101:11, 101:12, 101:16, 102:6, 103:11, 105:8, 110:3, 110:23, 110:25, 112:5, 115:21, 115:22, 132:11, 132:13, 132:20, 135:17, 138:14, 139:5, 141:6, 141:13, 142:2, 142:16, 144:18, 145:5, 158:12, 161:25, 162:23, 162:25, 167:5, 172:21, 173:5, 173:17, 173:22, 174:25, 175:19, 177:16, 181:11, 182:1, 189:1, 190:2, 199:23, 200:1, 221:11, 222:1, 223:23, 229:8, 231:24, 233:3, 238:25, 240:17, 241:11, 241:17, 241:24, 242:18, 243:12, 244:10, 247:15, 247:16, 249:5

cases [34] - 13:20, 19:19, 21:21, 27:21, 27:25, 55:8, 57:15, 57:16, 58:7, 58:10, 58:13, 58:15, 61:24, 63:17, 67:4, 67:8, 67:12, 68:6, 68:13, 68:14, 68:15, 70:18, 72:11, 72:22, 73:8, 73:18, 79:18, 79:21, 80:17, 84:15, 91:17, 222:21, 240:10, 250:19

catastrophic [3] - 23:17, 84:19, 84:23

catch [3] - 174:19, 174:20, 196:12

catching [2] - 126:22, 194:13

categories [1] - 250:15

categorize [2] - 66:3, 97:10

caught [7] - 126:6, 170:4, 171:9, 174:21, 174:23, 196:12, 197:18

causal [1] - 111:23

caused [43] - 29:4, 30:18, 32:5, 34:2, 34:21, 36:10, 52:6, 62:16, 101:14, 125:16, 126:1, 126:11, 126:14, 126:16, 126:20, 133:5, 135:6, 136:19, 137:3, 149:20, 170:3,

178:21, 180:14, 181:13, 181:23, 183:18, 188:7, 188:8, 198:6, 220:23, 220:25, 221:4, 221:5, 221:17, 222:6, 229:21, 236:6, 236:7, 236:13, 236:14, 236:15, 236:20, 236:22

causes [9] - 36:12, 36:13, 36:15, 36:17, 40:17, 222:6, 222:7, 222:8, 222:9

causing [2] - 71:19, 114:10

center [1] - 215:20

CEO [3] - 43:22, 44:18, 45:18

cerritelli [1] - 61:9

certain [8] - 5:12, 69:18, 100:8, 188:25, 191:10, 208:25, 246:21

certainly [5] - 12:19, 70:7, 70:9, 108:12, 134:7

certainty [4] - 34:18, 174:1, 174:4, 174:7

certification [2] - 44:1, 51:14

Certified [4] - 43:22, 43:25, 45:14, 45:16

certified [4] - 44:5, 44:16, 45:13, 51:13

certify [3] - 255:4, 255:9, 255:13

CERTIFYING [1] - 1:17

chain [39] - 31:18, 31:20, 127:16, 127:23, 133:17, 133:21, 134:10, 135:9, 135:10, 137:9, 137:12, 137:14, 154:18, 154:20, 156:16, 156:17, 156:18, 163:3, 164:11, 172:10, 179:4, 179:6, 179:7, 179:8, 181:13, 186:13, 195:1, 196:16, 198:5, 199:15, 199:17, 200:3, 200:4, 216:6, 216:9, 230:8, 237:13

chaining [1] - 93:4

chains [58] - 29:3, 34:21, 77:1, 106:4, 106:6, 106:8, 106:24, 107:1, 107:2, 107:3, 107:19, 149:7, 149:14, 152:5, 152:8, 152:14, 152:18, 152:25, 153:1, 153:4, 153:19, 153:23, 154:3, 154:13, 157:22, 157:23, 158:5, 160:16, 161:20, 163:21, 163:24, 180:21, 200:13, 207:9, 209:6, 209:10, 209:13, 210:12, 215:5, 215:6, 215:8, 215:16, 216:5, 216:7, 216:12,

230:15, 230:17, 230:18, 230:19, 230:21, 230:22, 232:20, 233:13, 236:19, 237:6, 237:7, 238:2

chairman [1] - 45:25

challenge [2] - 226:23, 231:4

chance [1] - 6:3

change [16] - 18:21, 134:15, 224:12, 225:9, 236:21, 254:3, 254:5, 254:7, 254:9, 254:11, 254:13, 254:15, 254:17, 254:19, 254:21, 254:23

Change [11] - 254:2, 254:4, 254:6, 254:8, 254:10, 254:12, 254:14, 254:16, 254:18, 254:20, 254:22

changed [3] - 23:20, 44:13, 204:24

changes [4] - 19:3, 19:5, 253:14, 253:17

changing [2] - 15:16, 15:17

Chapter [1] - 59:9

chapter [1] - 59:13

characteristics [3] - 124:11, 124:12, 144:24

characterization [1] - 166:10

characterized [3] - 102:25, 112:19, 125:22

charge [1] - 49:9

check [4] - 10:4, 10:7, 10:15, 82:23

checklist [3] - 16:17, 16:20, 16:22

chemical [1] - 67:3

chemicals [1] - 47:8

chipped [1] - 186:5

Chocolate [1] - 246:8

cigarette [1] - 93:25

circle [1] - 156:22

circumstance [4] - 100:14, 140:10, 141:21, 142:1

circumstances [4] - 49:22, 109:22, 125:7, 208:19

Citation [1] - 3:14

citation [12] - 83:23, 84:4, 85:14, 85:17, 85:20, 166:22, 166:24, 167:11, 216:22, 240:15, 250:18, 250:19

citations [5] - 102:18, 167:13, 240:21, 240:22, 241:9

cite [12] - 6:18, 22:21, 33:25, 35:21, 35:24, 83:19, 102:7, 169:6, 171:19, 188:3, 194:1, 229:2

cited [20] - 22:20, 35:20, 69:15, 71:12, 71:14, 71:15,

5

79:17, 80:3, 80:12, 83:19, 83:21, 86:4, 86:8, 121:13, 121:19, 142:22, 229:8, 239:25, 240:4

cites [1] - 165:7

citing [2] - 80:15, 175:12

Civil [2] - 1:5, 2.4

clang [1] - 237:15

clanging [13] - 127:7, 128:1, 128:3, 128:5, 153:3, 163:20, 164:2, 199:3, 237:5, 237:15, 237:21

Claremont [2] - 87:23, 88:6

clarification [1] - 11:23

clarify [9] - 22:16, 23:2, 70:24, 78:9, 92:7, 101:7, 209:20, 212:5, 227:2

clarity [1] - 6:25

clasp [2] - 31:14, 31:15

class [1] - 43:11

clean [1] - 39:20

clear [27] - 23:3, 27:16, 33:1, 107:19, 107:22, 121:20, 138:12, 159:22, 164:21, 166:15, 167:5, 169:11, 170:13, 170:18, 171:17, 189:3, 191:22, 198:16, 200:19, 205:9, 212:10, 236:2, 236:15, 236:17, 237:5, 237:9, 240:6

cleared [4] - 106:6, 107:1, 206:2, 214:13

clearing [1] - 157:24

clearly [12] - 25:20, 30:4, 83:5, 105:14, 152:21, 158:20, 160:19, 162:16, 163:12, 163:13, 196:15, 211:8

clears [3] - 188:25, 191:10, 192:11

click [2] - 165:24, 166:3

clicking [2] - 165:22, 165:23

client [7] - 15:25, 24:7, 24:22, 150:23, 153:6

client 's [2] - 24:9, 24:10

clients [4] - 19:8, 225:11, 225:16, 225:17

climate [3] - 18:11, 18:13, 18:17

clobber [1] - 222:5

close [1] - 181:7

closed [1] - 74:9

closure [1] - 78:13

collect [1] - 238:21

collection [1] - 31:7

collectively [2] - 18:18, 135:17

Colombia [1] - 57:3

Columbia [6] - 55:22, 55:25,

56:21, 58:4, 58:5, 63:24

coming [6] - 10:5, 72:1, 89:17, 104:2, 197:11, 197:12

commenced [1] - 141:10

commencing [1] - 132:22

comment [1] - 251:22

committee [4] - 246:21, 247:1, 247:5, 247:7

committees [1] - 246:1

common [2] - 5:9, 250:8

common -law [1] - 250:8

Commonwealth [2] - 2:6, 255:4

COMMONWEALTH [1] - 255:1

communicate [3] - 150:18, 151:1, 151:3

communicated [1] - 213:5

communicating [1] - 151:13

companies [4] - 19:15, 19:19, 244:13, 244:17

company [9] - 10:10, 10:13, 47:22, 48:1, 66:25, 206:25, 241:18, 250:8, 250:9

Company [2] - 10:16, 10:22

company 's [1] - 54:14

compensated [1] - 41:13

competent [2] - 180:21, 219:24

competitor [2] - 224:6, 224:9

compilation [1] - 178:16

complaint [3] - 24:20, 107:11, 111:3

complete [2] - 30:17, 88:23

completely [1] - 215:22

completes [1] - 114:4

complexity [1] - 124:13

compliance [10] - 21:9, 49:18, 58:11, 70:9, 80:18, 80:19, 81:8, 166:16, 250:5

complied [3] - 36:23, 36:24, 142:16

comply [5] - 20:16, 30:2, 30:5, 48:18, 58:17

complying [1] - 33:23

component [4] - 41:6, 54:22, 113:19, 123:22

components [3] - 40:23, 53:8, 186:18

compromised [1] - 85:15

computer [1] - 55:5

concede [1] - 110:15

conceivable [3] - 175:2, 175:4, 175:6

concept [1] - 101:25

concepts [2] - 48:21, 99:19

concern [1] - 98:24

concerning [1] - 50:14

concerns [1] - 176:11

conclude [6] - 29:20, 116:1, 217:20, 218:25, 235:22, 238:11, 238:16

concluded [3] - 30:1, 221:3, 252:21

conclusion [2] - 236:24, 249:25

conclusions [1] - 237:1

condensation [1] - 221:22

condition [1] - 24:11

conditions [1] - 186:10

conduct [5] - 25:15, 109:10, 110:21, 136:9, 140:11

conducted [5] - 40:20, 91:5, 112:5, 166:8, 185:13

conducting [2] - 185:8, 185:10

configuration [3] - 145:20, 151:10, 180:2

confirm [1] - 36:3

confirmed [1] - 29:15

confused [5] - 14:8, 56:16, 159:19, 160:2, 160:13

confusing [1] - 159:21

conjunction [2] - 42:16, 77:14

connection [2] - 83:5, 88:24

connections [1] - 186:13

Connie [1] - 5:5

consensus [7] - 58:24, 63:6, 64:12, 64:16, 130:6, 246:13

consider [9] - 59:16, 82:5, 82:11, 83:12, 146:21, 171:10, 224:8, 234:10, 239:4

considered [1] - 244:5

considering [1] - 234:12

consistent [1] - 214:16

Constance [3] - 2:4, 255:3, 255:21

constitutes [1] - 255:7

construction [7] - 21:7, 60:21, 63:17, 71:9, 72:14, 225:18, 244:3

consult [6] - 53:3, 224:9, 224:11, 224:12, 225:3

consultancy [1] - 240:23

consultant [8] - 41:18, 43:2, 46:16, 46:23, 48:7, 75:13, 75:19, 245:8

consultants [4] - 239:4, 239:6, 243:19, 243:21

Consultants [11] - 13:1, 13:7, 13:9, 20:3, 46:20, 47:18, 48:11, 50:15, 51:4, 53:9, 225:9

Consultation [4] - 20:4, 41:8, 42:8, 42:22

consultation [26] - 20:7, 20:10, 20:25, 21:2, 21:22, 22:1, 22:14, 23:3, 23:5, 24:7, 24:10, 24:15, 24:22, 41:12, 76:15, 80:24, 82:17, 166:16, 225:6, 225:12, 241:1, 243:19, 243:22, 244:18, 245:4

consulting [10] - 56:5, 224:5, 224:12, 224:19, 224:23, 225:14, 226:5, 226:6, 246:1

consults [1] - 241:5

contact [29] - 20:24, 71:1, 71:3, 71:6, 71:22, 72:2, 72:12, 73:22, 95:25, 96:10, 116:17, 146:6, 159:24, 161:4, 161:7, 161:11, 163:15, 163:21, 196:2, 197:16, 198:20, 198:24, 198:25, 199:2, 199:6, 236:19, 237:13, 248:7, 248:9

contacted [5] - 71:4, 196:16, 197:21, 198:5, 198:15, 210:17

contacting [2] - 24:10, 248:5

contained [1] - 16:21

contains [1] - 6:11

contention [1] - 170:1

contents [1] - 124:10

context [10] - 112:23, 194:23, 219:14, 220:4, 221:12, 234:25, 242:14, 242:19, 243:6, 243:21

contexts [1] - 246:9

continually [2] - 99:20, 240:10

continue [3] - 159:5, 163:15, 237:14

continued [3] - 99:22, 163:19, 237:11

continues [1] - 107:14

continuum [1] - 19:11

contract [2] - 13:16, 42:12

contracted [2] - 48:14, 241:17

contractor [7] - 75:6, 79:2, 99:24, 100:15, 241:16, 241:18, 244:4

contribute [3] - 34:6, 185:6, 230:9

contributed [8] - 29:4, 30:19, 31:24, 34:2, 34:24, 62:16, 177:16, 180:14

contributing [15] - 30:24, 30:25, 34:4, 34:7, 34:8,

6

34:9, 34:10, 34:22, 35:5, 35:9, 37:25, 112:1, 135:7, 179:17, 222:7
contribution [1] - 142:3
control [3] - 58:3, 76:9, 98:8
controlled [2] - 242:3, 250:14
controlling [4] - 101:10, 101:12, 242:2, 251:1
controls [1] - 75:23
conversation [2] - 12:14, 42:4
conversations [1] - 11:6
converse [2] - 175:10, 240:19
conveyance [1] - 243:15
conveyor [102] - 28:6, 28:7, 32:5, 96:1, 105:22, 106:2, 107:20, 111:19, 111:22, 111:23, 112:1, 112:10, 114:1, 116:3, 119:18, 127:8, 127:11, 127:24, 128:1, 128:4, 138:11, 139:10, 140:17, 143:5, 143:11, 144:19, 146:6, 146:25, 147:6, 147:9, 147:18, 148:4, 148:14, 149:6, 149:7, 149:8, 149:13, 149:18, 149:25, 151:9, 152:5, 152:9, 152:15, 153:2, 153:16, 153:20, 156:7, 156:22, 156:23, 157:3, 157:11, 159:3, 159:10, 160:17, 160:20, 160:24, 161:18, 162:1, 162:6, 163:10, 163:12, 163:16, 163:22, 163:25, 164:12, 169:15, 170:20, 170:22, 170:25, 171:9, 181:13, 194:14, 194:25, 196:4, 196:12, 196:17, 196:23, 198:6, 198:15, 201:23, 203:4, 203:5, 204:10, 204:16, 204:18, 206:9, 207:15, 209:16, 209:18, 210:12, 210:17, 212:13, 214:13, 215:9, 215:14, 215:18, 219:19, 234:17, 234:18, 236:19, 238:3, 252:10
conveyors [3] - 118:5, 119:8, 119:12
coordinating [1] - 120:6
coordinator [4] - 119:24, 120:5, 120:11, 120:13
copy [6] - 5:22, 7:22, 88:8, 88:13, 169:5, 192:14
Copy [1] - 3:12
corner [3] - 88:17, 154:3

corporate [3] - 20:21, 28:1, 49:7
corporate -wide [1] - 20:21
CORPORATION [2] - 1:7, 253:6
Corporation [2] - 4:13, 90:10
Corporation 's [1] - 27:7
Correct [1] - 132:14
correct [62] - 4:20, 4:21, 7:24, 9:8, 13:2, 13:5, 14:22, 14:24, 25:11, 25:23, 25:24, 26:3, 26:4, 27:24, 28:25, 29:5, 30:14, 32:16, 38:22, 38:23, 44:7, 46:3, 50:2, 51:2, 51:5, 56:10, 76:17, 77:10, 77:12, 80:13, 81:25, 82:2, 90:8, 92:21, 94:4, 96:8, 102:20, 120:9, 123:23, 124:17, 143:22, 150:15, 161:24, 165:18, 165:20, 167:12, 169:13, 169:20, 171:3, 185:4, 188:6, 191:3, 198:21, 214:6, 227:13, 227:16, 229:11, 231:5, 248:21, 249:16, 249:20, 250:2
corrected [2] - 109:11, 250:15
correcting [3] - 101:17, 242:8, 242:9
corrections [1] - 253:14
correctly [5] - 56:8, 86:7, 93:12, 146:7, 182:16
counsel [6] - 29:13, 55:2, 140:18, 163:6, 255:10, 255:14
COUNSEL [1] - 2:12
count [2] - 64:20, 79:4
counted [1] - 64:19
country [1] - 41:25
COUNTY [1] - 255:1
couple [5] - 113:2, 113:10, 143:3, 146:5, 230:24
course [5] - 42:23, 111:14, 220:13, 232:22, 241:13
courses [2] - 42:23, 43:9
coursework [1] - 123:21
coursework -type [1] - 123:21
COURT [1] - 1:1
court [3] - 4:15, 55:8, 55:11
Court [3] - 121:3, 231:18, 231:20
courtroom [1] - 55:12
courts [1] - 249:21
cover [2] - 12:19, 14:12
covered [5] - 67:5, 102:11, 122:10, 166:5, 197:5
covers [2] - 189:21, 191:23

CPA [1] - 44:8
crane [207] - 5:13, 28:16, 28:21, 29:3, 29:7, 29:8, 29:9, 30:4, 30:13, 33:18, 34:20, 35:7, 35:9, 35:17, 36:10, 36:11, 36:12, 36:13, 36:17, 37:2, 37:4, 37:13, 37:20, 40:21, 40:23, 41:6, 57:23, 68:10, 68:13, 68:15, 68:19, 68:23, 68:24, 68:25, 69:1, 69:3, 69:4, 69:6, 69:9, 69:22, 69:25, 70:14, 70:24, 71:3, 71:6, 71:17, 72:3, 72:4, 72:12, 72:13, 72:19, 75:8, 75:14, 75:21, 76:13, 76:23, 77:1, 77:14, 77:20, 89:17, 89:21, 91:11, 94:1, 94:14, 95:3, 95:6, 95:15, 95:18, 95:19, 96:7, 98:8, 98:9, 98:10, 98:16, 98:18, 99:5, 114:18, 115:1, 116:22, 117:20, 118:1, 120:22, 122:3, 122:10, 123:17, 124:8, 124:9, 124:13, 124:20, 124:25, 125:3, 125:6, 125:10, 125:14, 126:20, 126:21, 126:22, 129:21, 130:9, 130:10, 130:12, 130:22, 130:25, 131:6, 131:17, 131:20, 132:4, 133:2, 133:10, 134:21, 134:22, 135:9, 140:22, 141:3, 141:10, 141:12, 141:14, 141:17, 142:18, 151:12, 151:13, 151:20, 152:8, 159:2, 163:25, 164:5, 165:25, 167:21, 167:23, 168:11, 169:21, 169:24, 171:3, 171:15, 175:23, 178:21, 181:1, 181:6, 181:8, 181:20, 181:23, 181:25, 182:4, 182:6, 182:12, 182:23, 183:20, 184:5, 184:8, 185:14, 186:7, 188:11, 188:14, 189:10, 189:13, 189:14, 189:16, 189:18, 189:19, 191:22, 192:13, 194:16, 197:25, 198:14, 201:23, 203:2, 203:7, 203:13, 203:25, 204:2, 204:5, 204:6, 205:6, 206:2, 209:25, 210:3, 210:4, 210:15, 211:20, 212:2, 212:4, 214:12, 232:12, 232:15, 233:16, 233:19, 233:21, 234:12, 234:14, 234:19, 234:20, 234:23,

234:25, 237:4, 237:11, 237:17, 238:13, 243:8, 243:9
craned [1] - 92:13
cranes [16] - 69:16, 69:19, 70:8, 70:10, 71:7, 71:9, 127:4, 127:7, 165:23, 166:2, 167:20, 181:3, 181:18, 182:10, 187:16, 212:4
Cranes [1] - 188:24
crate [1] - 209:1
created [4] - 68:8, 101:13, 242:3, 242:7
creating [3] - 14:18, 101:13, 242:6
credentials [1] - 226:24
credibility [1] - 239:20
cribbing [23] - 94:24, 95:7, 95:8, 95:17, 95:19, 95:22, 96:2, 96:6, 96:13, 96:18, 97:1, 97:11, 143:18, 145:25, 146:12, 147:1, 147:2, 147:18, 198:7, 206:10, 236:6, 236:7, 236:12
Crispin [19] - 31:9, 102:21, 104:17, 107:16, 113:2, 115:3, 115:24, 118:2, 118:5, 119:7, 119:25, 129:25, 163:22, 163:24, 163:25, 164:10, 164:17, 213:6, 214:4
Crispin 's [1] - 119:5
Criteria [2] - 246:18, 247:3
critical [10] - 110:18, 112:8, 152:1, 210:8, 226:2, 226:4, 228:16, 236:5, 251:17, 251:19
criticism [2] - 231:10, 232:8
cross [1] - 20:8
crossing [1] - 20:8
crush [3] - 58:1, 66:7, 86:19
crushed [1] - 86:20
crux [1] - 141:6
CSP [4] - 1:12, 2:1, 4:3, 44:4
culpability [3] - 221:7, 221:9, 222:24
culpable [4] - 109:9, 221:6, 221:11, 221:19
culture [21] - 14:19, 15:3, 15:17, 18:4, 18:6, 18:20, 19:11, 19:17, 19:21, 25:17, 25:21, 27:11, 27:16, 27:17, 28:2, 47:16, 180:15, 224:12, 225:8, 245:2
cultures [7] - 19:1, 19:13, 19:20, 19:24, 47:19, 48:3, 244:15

7

curious [1] - 182:21
current [6] - 8:4, 8:6, 8:9, 18:10, 18:18, 18:19, 48:1, 245:22
Curriculum [1] - 3:9
curriculum [1] - 7:22
cursory [1] - 228:20
curtain [1] - 138:23
custom [1] - 91:10
customarily [1] - 232:23
customary [7] - 93:14, 93:23, 233:4, 233:7, 233:8, 233:9, 233:10
customer [3] - 66:21, 66:22, 99:23
customer 's [1] - 100:23
customs [3] - 89:9, 89:10, 91:9
cut [1] - 83:3
CV [6] - 43:21, 55:24, 56:2, 59:4, 74:4, 87:5

**D**

daily [8] - 136:10, 167:23, 185:1, 185:2, 185:8, 185:17, 186:13, 186:16
damaged [3] - 176:12, 176:16, 177:3
danger [1] - 139:12
dangerous [4] - 139:24, 140:16, 181:3, 181:9
DATE [1] - 254:24
date [5] - 8:22, 9:12, 167:21, 179:2, 182:18
Daub [1] - 65:20
David [2] - 4:14, 53:4
DAVID [1] - 1:4
daydreaming [1] - 163:7
days [2] - 47:12, 255:11
dead [1] - 215:20
deal [3] - 129:3, 181:19, 241:2
dealing [2] - 101:8, 190:5
deals [4] - 189:5, 191:19, 191:20, 246:22
debatable [1] - 103:8
deceleration [2] - 194:5, 195:20
decent [1] - 54:13
decide [1] - 231:18
decided [1] - 101:18
decides [1] - 250:1
deciding [1] - 231:19
decision [4] - 27:23, 139:23, 140:13, 140:14
decision -making [1] - 27:23
deck [7] - 155:17, 155:18,

156:19, 156:21, 196:23, 197:11, 197:12
decking [7] - 154:12, 154:15, 155:20, 156:1, 156:2, 156:25, 175:20
DECLARATION [1] - 253:8
declare [1] - 253:10
dedicated [1] - 42:25
deeply [4] - 22:19, 49:22, 50:7, 50:8
default [5] - 97:18, 98:25, 139:13, 251:25, 252:1
defect [2] - 29:2, 181:13
defective [3] - 176:12, 176:16, 177:3
defects [2] - 176:23, 183:11
defend [1] - 61:21
Defendant [3] - 1:8, 2:2, 2:16
defendant [16] - 4:13, 13:20, 57:5, 57:7, 58:17, 59:20, 60:6, 60:7, 60:12, 62:1, 63:21, 63:22, 67:21, 73:13, 74:10, 79:8, 248:8
defense [14] - 62:17, 62:19, 62:24, 64:7, 64:14, 64:15, 64:24, 65:1, 65:2, 65:21, 67:2, 74:20, 89:1, 89:2
deficiencies [1] - 18:24
define [4] - 17:6, 20:18, 144:6, 144:7
defined [2] - 128:8, 197:8
defines [2] - 123:7, 123:8
definite [1] - 115:24
definitely [2] - 104:5, 173:22
definition [8] - 144:8, 144:9, 144:10, 187:5, 195:9, 196:18, 196:21, 250:17
definitions [1] - 145:22
degree [6] - 34:17, 60:3, 174:7, 227:12, 227:15, 251:1
degrees [2] - 144:14, 144:18
deleted [4] - 85:17, 85:21, 240:15, 240:18
Demnicki [1] - 60:25
demonstrative [1] - 77:9
denied [3] - 32:15, 32:21, 32:24
Department [6] - 42:11, 82:7, 82:9, 82:10, 82:20, 87:7
department [2] - 49:10, 114:20
deposed [2] - 26:17, 110:3
Deposition [12] - 3:8, 3:11, 3:15, 5:19, 5:23, 7:19, 50:20, 54:24, 88:10, 213:12, 216:16, 216:19
deposition [34] - 4:17, 4:23, 6:3, 11:13, 11:14, 11:20,

12:2, 12:10, 26:5, 26:18, 33:14, 41:4, 55:9, 55:11, 55:23, 56:13, 56:16, 91:23, 102:19, 112:19, 158:19, 164:18, 164:22, 198:11, 198:12, 198:16, 228:21, 241:13, 253:11, 255:5, 255:6, 255:10, 255:12
DEPOSITION [5] - 1:11, 2:1, 253:1, 253:15, 254:1
deprived [1] - 112:6
derived [1] - 54:15
describe [1] - 146:3
described [1] - 199:24
description [2] - 120:10, 153:11
descriptions [1] - 115:12
designate [2] - 68:25, 114:23
designated [7] - 114:25, 122:9, 122:16, 122:19, 122:20, 123:7, 188:13
designed [2] - 180:12, 180:13
detached [11] - 50:9, 189:12, 190:22, 193:22, 194:21, 194:22, 194:24, 195:13, 202:5, 202:14, 202:15
details [2] - 58:16, 73:3
detect [3] - 180:12, 180:13, 226:1
detected [1] - 183:17
determination [4] - 33:10, 208:2, 249:22, 249:24
determine [10] - 25:2, 29:7, 38:15, 183:20, 184:19, 185:10, 185:13, 187:22, 242:1, 251:17
determined [2] - 25:9, 250:5
determining [1] - 69:9
develop [5] - 16:19, 130:20, 130:22, 133:1, 133:5
developed [1] - 13:15
developing [1] - 89:5
device [7] - 62:25, 63:1, 68:21, 72:20, 77:2, 94:24, 130:2
devices [3] - 71:10, 167:22, 207:23
dictated [1] - 183:2
dictates [1] - 94:18
difference [2] - 105:4, 105:7
different [20] - 44:11, 52:2, 61:14, 68:17, 69:19, 79:1, 141:20, 142:1, 144:2, 152:25, 157:8, 158:11, 158:12, 158:20, 180:10, 213:20, 215:13, 217:21, 225:23
differently [4] - 152:3,

157:17, 157:19, 234:5
dig [3] - 80:20, 109:7, 153:9
digress [1] - 117:24
direct [6] - 79:3, 116:15, 116:17, 117:15, 120:15, 206:21, 233:17, 233:18
directed [6] - 95:2, 133:16, 139:15, 139:20, 141:6, 141:9, 141:10, 161:18
directing [7] - 38:7, 141:23, 233:11, 233:16, 233:21, 234:2
direction [3] - 232:12, 232:15, 255:7
directions [1] - 76:3
directly [1] - 255:14
director [6] - 21:24, 49:7, 49:9, 103:4, 103:13, 103:14, 105:11, 245:7
directs [1] - 123:2
disagree [11] - 43:13, 98:20, 98:23, 105:2, 157:14, 213:20, 227:3, 228:16, 230:2, 230:3, 231:2
disagreed [1] - 230:1
disagreement [3] - 106:17, 157:13, 231:1
disagrees [1] - 107:19
disclosures [1] - 217:8
discovery [5] - 4:17, 11:15, 33:10, 105:12, 105:15
discrete [2] - 179:18, 229:21
discuss [2] - 166:17
discussed [4] - 90:19, 142:6, 188:15, 217:2
discusses [1] - 122:16
Discussion [1] - 50:18
discussion [8] - 10:19, 10:24, 128:25, 180:22, 188:16, 219:1, 220:1, 229:18
discussions [3] - 11:4, 128:17, 153:12
display [1] - 66:19
disposal [1] - 225:22
disprove [3] - 176:4, 176:8, 183:16
disproven [3] - 175:7, 175:9, 175:11
dispute [2] - 108:4, 138:21
disqualified [1] - 67:24
disrespect [1] - 35:13
disrespectfully [1] - 34:14
distinguishing [1] - 226:3
distracted [2] - 59:25, 163:7
distributed [1] - 148:21
distribution [2] - 148:10, 148:15

8

District [1] - 4:15
DISTRICT [2] - 1:1, 1:2
disturbed [2] - 145:1, 145:2
dividing [1] - 24:2
doctrine [3] - 102:5, 249:7, 249:8
document [15] - 55:1, 55:3, 70:16, 87:11, 88:3, 105:25, 117:18, 121:16, 122:8, 154:6, 214:24, 216:24, 217:23, 246:17, 247:20
documentation [7] - 28:22, 31:4, 32:12, 33:20, 33:22, 168:24, 229:12
documented [1] - 9:7
documents [7] - 6:6, 6:8, 6:9, 25:25, 88:24, 217:3, 217:17
Documents [1] - 88:20
Doherty [1] - 64:25
dollar [3] - 84:22, 85:8, 224:13
Dom [1] - 65:5
Domanque [1] - 65:5
Don [3] - 214:12, 215:5, 215:7
don'ts [1] - 5:1
done [56] - 15:10, 15:14, 16:18, 17:14, 17:15, 18:11, 18:20, 18:25, 22:6, 22:8, 24:11, 33:1, 33:2, 37:21, 37:22, 37:23, 38:20, 38:21, 38:24, 70:22, 77:5, 84:13, 85:23, 99:25, 124:23, 145:7, 177:18, 177:19, 178:6, 182:2, 182:3, 182:5, 183:3, 183:4, 183:5, 202:12, 202:13, 208:4, 208:13, 212:15, 213:22, 213:25, 214:1, 214:8, 229:14, 229:15, 234:4, 235:4, 235:7, 235:24, 235:25, 236:1, 248:5
door [2] - 9:24, 225:24
dos [1] - 5:1
DOT [2] - 59:1, 92:24
double [2] - 64:19, 86:15
down [32] - 12:1, 16:7, 27:23, 43:21, 54:9, 65:5, 76:3, 88:2, 92:17, 92:18, 93:1, 93:3, 93:4, 103:25, 106:18, 110:7, 110:24, 144:16, 147:16, 152:4, 154:4, 156:15, 170:25, 207:18, 208:17, 214:22, 215:2, 219:8, 220:1, 221:15, 231:21
drafting [1] - 246:2
drape [1] - 156:15

draped [1] - 157:10
draw [2] - 100:19, 237:1
drawing [1] - 63:14
drew [2] - 156:22, 160:11
Drive [1] - 7:12
drive [2] - 78:11, 167:1
driver [23] - 77:15, 89:17, 89:20, 89:23, 90:3, 91:11, 91:15, 92:2, 94:17, 94:22, 95:2, 95:14, 99:10, 100:15, 206:4, 206:20, 208:2, 210:2, 210:23, 211:14, 211:15, 211:19, 215:5
driver 's [1] - 209:9
drivers [1] - 95:12
drives [1] - 27:22
driving [3] - 59:25, 92:17, 92:18
drop [4] - 190:10, 204:10, 204:12, 204:15
dropped [5] - 80:15, 85:11, 166:9, 190:2, 204:18
dropping [1] - 190:3
drove [2] - 78:24, 79:1
drugs [1] - 35:16
drum [1] - 186:25
due [1] - 224:15
duke [1] - 62:23
duly [2] - 4:4, 255:4
DuPont [5] - 46:23, 47:6, 47:7, 47:12, 47:22, 48:2
during [9] - 40:1, 40:3, 46:15, 52:11, 195:21, 197:14, 198:19, 219:17, 240:12
duties [2] - 46:8, 122:14
duty [1] - 166:23

### E

early [2] - 5:25, 53:10
easily [3] - 148:3, 150:1, 209:1
east [1] - 159:21
Edgar [3] - 61:20, 61:23, 74:15
edge [3] - 145:6, 147:1, 147:19
Edison [1] - 91:3
education [7] - 13:10, 15:16, 53:11, 223:4, 231:7, 245:13, 245:15
Edward [1] - 65:22
effect [12] - 50:25, 80:6, 94:7, 97:25, 100:25, 101:3, 111:23, 147:3, 151:7, 168:13, 252:3, 252:5
effective [1] - 133:2

effectively [2] - 15:6, 118:9
egregious [2] - 111:17, 166:21
egregiously [1] - 166:10
eight [5] - 73:25, 74:2, 126:10, 148:13, 148:14
eight-thousand-pound [2] - 126:10, 148:14
either [21] - 9:19, 10:9, 17:9, 31:3, 41:5, 53:3, 55:8, 55:20, 67:20, 82:19, 87:14, 102:21, 104:12, 136:4, 149:22, 161:6, 167:11, 168:24, 214:5, 250:14, 255:14
elderly [1] - 144:15
elected [4] - 45:9, 45:11, 46:4, 46:5
electric [6] - 71:1, 71:3, 71:4, 71:6, 73:22, 246:7
Electric [1] - 246:6
electrical [2] - 71:22, 72:2
electrocution [2] - 57:24, 65:19
element [1] - 178:22
elevated [1] - 60:23
eliminates [1] - 39:21
elongated [1] - 186:4
elongating [1] - 180:9
elsewhere [1] - 154:15
employee [25] - 14:17, 15:8, 23:18, 24:20, 66:18, 66:20, 82:6, 82:12, 100:13, 100:15, 100:21, 122:16, 122:17, 206:12, 206:24, 207:1, 220:10, 232:10, 241:19, 250:8, 250:13, 251:4, 255:14
employees [27] - 11:3, 14:21, 16:16, 16:19, 18:16, 20:19, 51:6, 51:10, 51:11, 52:4, 52:6, 52:22, 53:2, 82:16, 99:18, 99:20, 100:8, 121:20, 121:24, 123:3, 169:11, 170:13, 171:14, 206:18, 242:5, 244:2, 248:3
employer [53] - 61:21, 61:24, 79:17, 86:4, 86:24, 87:1, 87:2, 99:23, 101:9, 101:10, 101:12, 101:13, 101:16, 101:17, 101:25, 102:5, 102:9, 122:12, 130:18, 166:22, 228:24, 239:24, 240:3, 241:6, 241:13, 241:15, 241:21, 241:22, 241:23, 241:25, 242:2, 242:4, 242:6, 242:8, 242:9, 242:12, 242:16, 242:19,

242:20, 242:21, 242:25, 243:17, 243:25, 249:7, 249:23, 250:10, 250:11, 250:16, 251:14, 251:18, 251:23
employer 's [2] - 122:13, 240:15
employer /employee [1] - 242:14
employers [5] - 23:9, 244:20, 244:21, 244:24, 251:13
employment [2] - 60:4, 99:22
encountering [1] - 243:10
end [8] - 8:5, 8:6, 16:16, 34:19, 178:18, 192:21, 210:21, 213:3
ended [1] - 136:23
endure [1] - 64:2
enforce [1] - 130:21
enforcement [12] - 20:6, 21:19, 23:1, 23:4, 23:8, 23:16, 24:1, 24:4, 24:12, 24:16, 80:24, 249:14
engaged [4] - 22:18, 197:4, 197:7, 198:21
engagement [1] - 15:8
engineer [1] - 90:21
engineering [1] - 90:22
Engineers [2] - 13:12, 46:1
enhancement [1] - 212:18
ensure [3] - 93:11, 131:16, 132:21
entangled [2] - 106:9, 107:3
entered [1] - 12:13
entire [7] - 44:19, 46:9, 86:8, 90:25, 116:20, 154:18, 253:11
entirely [1] - 142:1
entities [1] - 82:19
entitled [1] - 252:20
entity [1] - 246:14
entry [2] - 226:10, 226:11
entry-level [1] - 226:11
environment [2] - 220:16, 244:10
Environmental [2] - 246:19, 247:4
environments [1] - 90:6
envision [1] - 199:7
equipment [10] - 5:9, 5:10, 106:7, 106:10, 107:1, 107:4, 181:4, 181:10, 183:10, 185:11
ergonomic [2] - 16:8, 16:9
Erie [11] - 2:19, 26:25, 27:8, 81:7, 81:8, 83:16, 84:8, 84:11, 85:25, 240:25, 241:3
Erin [4] - 2:14, 108:13,

9

153:13, 217:7

ERRATA [3] - 253:1, 253:15, 254:1

Esq [2] - 2:14, 2:18

essentially [4] - 14:25, 17:1, 95:22, 224:13

established [1] - 188:5

estimated [1] - 96:9

evaluate [5] - 15:20, 18:17, 75:22, 76:10, 89:11, 186:12

evaluated [5] - 39:23, 84:24, 85:3, 89:6, 250:23

evaluating [4] - 37:7, 37:12, 39:25, 241:24

evaluation [1] - 231:2

evenly [1] - 252:11

event [14] - 23:18, 24:3, 28:21, 84:19, 84:23, 101:14, 157:18, 179:18, 182:2, 182:4, 182:7, 182:8, 221:1

events [4] - 24:2, 158:12, 221:4, 221:5

eventually [1] - 85:10

evidence [84] - 27:15, 27:16, 28:1, 28:20, 29:1, 31:11, 33:13, 35:6, 35:8, 35:10, 36:2, 36:7, 36:9, 36:19, 36:22, 36:23, 37:1, 37:2, 40:18, 40:21, 41:1, 41:2, 105:16, 107:5, 114:16, 115:14, 115:16, 115:19, 115:20, 124:21, 124:24, 125:18, 127:25, 128:2, 128:3, 168:1, 168:4, 168:12, 168:13, 175:12, 175:14, 175:16, 176:15, 176:21, 177:1, 177:2, 177:5, 177:6, 177:20, 177:22, 177:24, 178:6, 179:14, 179:19, 179:22, 180:25, 181:12, 181:15, 183:4, 184:20, 185:5, 185:12, 185:20, 185:21, 197:12, 202:10, 204:20, 205:14, 224:24, 229:12, 230:14, 236:6, 236:10, 236:12, 237:18, 237:19, 239:18, 240:13, 243:12, 250:21, 250:24

evident [3] - 25:20, 102:16, 228:14

evidentiary [1] - 241:10

evil [1] - 173:19

evils [1] - 180:11

exact [7] - 8:22, 23:4, 23:7, 71:12, 128:7, 180:23, 182:18

exactly [21] - 82:14, 96:10, 99:3, 99:7, 104:25, 108:20, 139:1, 145:4, 145:23, 155:14, 160:12, 172:24, 175:17, 199:3, 202:14, 203:14, 204:13, 219:16, 236:20, 236:22, 237:19

exam [2] - 44:8, 45:1

examination [1] - 2:3

EXAMINATION [4] - 3:2, 4:6, 238:23, 248:18

examine [1] - 177:12

examined [1] - 4:5

example [7] - 15:24, 18:7, 79:22, 86:5, 146:17, 167:1, 180:16

examples [2] - 211:10, 240:8

exams [3] - 44:22, 45:3, 45:5

exceed [1] - 167:2

excellence [2] - 47:20, 48:22

except [1] - 253:14

exception [2] - 103:3, 130:1

excerpted [1] - 156:8

excessive [1] - 186:17

excluding [1] - 132:8

exclusively [1] - 29:11

exercise [1] - 166:12

exhibit [5] - 7:18, 160:11, 213:21, 213:25, 214:12

Exhibit [15] - 5:19, 5:22, 7:19, 7:21, 50:19, 50:20, 54:24, 55:1, 56:3, 88:8, 88:10, 88:12, 213:12, 216:16, 216:19

EXHIBITS [1] - 3:7

exhibits [2] - 6:20, 7:1

exist [3] - 36:20, 36:21, 178:4

existing [1] - 246:2

expected [2] - 40:8, 206:12

experience [20] - 19:12, 100:18, 100:20, 117:4, 223:4, 226:8, 227:4, 227:6, 227:8, 227:18, 227:23, 228:5, 231:7, 232:5, 235:18, 235:19, 235:20, 245:14, 245:16

experienced [5] - 94:14, 94:15, 109:5, 178:20, 233:21

EXPERT [1] - 1:11

expert [34] - 4:19, 9:4, 13:19, 29:15, 38:8, 38:9, 43:6, 53:12, 54:15, 54:22, 56:5, 56:9, 67:20, 67:22, 89:2, 89:5, 168:23, 172:2, 176:25, 218:3, 223:8, 226:24, 227:8, 227:10, 228:10, 228:11, 231:6,

231:19, 235:22, 236:8, 239:15, 247:10, 247:14

expertise [3] - 38:17, 68:2, 226:7

experts [3] - 43:13, 220:11, 227:22

explain [3] - 109:21, 109:24, 110:6

explained [2] - 167:8, 167:9

explaining [1] - 140:10

explanation [2] - 39:17, 39:18

explosion [5] - 58:5, 58:6, 61:10, 63:25, 65:23

exposed [5] - 17:5, 242:5, 243:5, 243:8, 243:16, 250:15

exposing [4] - 101:15, 242:4, 242:20, 250:25

exposure [1] - 57:22

extensive [1] - 231:7

extensively [1] - 222:22

extent [2] - 11:9, 25:2

external [1] - 40:16

extremely [1] - 251:17

eye [4] - 159:24, 161:4, 161:6, 161:10

eyes [1] - 41:3

eyesight [1] - 154:10

---

## F

fabrication [2] - 105:10

fabrics [1] - 47:8

facets [2] - 13:8, 13:9

facilities [2] - 27:2, 233:3

facility [15] - 23:11, 28:3, 33:4, 70:14, 71:8, 86:22, 89:17, 89:18, 89:21, 91:18, 92:19, 92:20, 97:7, 97:8, 233:2

fact [45] - 5:24, 6:23, 30:15, 32:17, 33:19, 35:6, 37:24, 39:25, 40:2, 83:19, 94:23, 98:9, 99:18, 100:16, 102:7, 102:11, 107:19, 117:19, 138:13, 159:1, 160:24, 162:15, 172:25, 176:22, 177:17, 180:2, 183:20, 185:11, 209:18, 209:24, 210:3, 211:3, 211:19, 212:17, 212:20, 215:3, 226:16, 227:2, 229:2, 235:21, 237:4, 238:12, 240:10, 252:7, 252:8

factitious [1] - 248:24

factor [5] - 34:22, 39:23, 112:12, 112:16, 135:7

factors [17] - 30:24, 30:25, 34:4, 34:7, 34:10, 34:23, 35:5, 35:10, 36:25, 37:1, 37:25, 102:2, 112:1, 180:10, 220:25, 250:22

facts [12] - 6:9, 6:11, 6:14, 6:17, 102:18, 120:4, 120:7, 162:23, 162:25, 163:2, 221:21, 239:17

factual [1] - 153:10

fail [5] - 31:20, 37:10, 38:5, 40:17, 204:1, 204:2

failed [21] - 27:17, 31:18, 31:21, 31:23, 33:22, 41:6, 112:13, 114:11, 117:19, 118:15, 118:16, 121:6, 124:25, 128:19, 128:23, 129:19, 129:20, 129:22, 129:24, 180:17, 255:12

failing [2] - 72:3

Failure [1] - 117.25

failure [46] - 29:2, 32:3, 34:1, 34:19, 36:10, 36:11, 36:13, 36:15, 36:17, 37:4, 38:25, 39:21, 40:21, 58:16, 72:6, 72:20, 81:10, 85:5, 110:9, 110:13, 110:24, 111:6, 111:9, 111:17, 112:9, 120:19, 120:21, 123:20, 129:6, 129:11, 129:24, 130:5, 130:8, 130:15, 130:20, 131:1, 131:2, 131:4, 131:7, 133:1, 133:5, 136:9, 178:17, 178:18, 181:12

failures [5] - 30:15, 30:17, 30:18, 129:4, 136:8

fair [3] - 79:6, 113:17, 166:10

fairly [7] - 8:8, 85:21, 102:24, 112:18, 112:19, 166:6, 218:3

fall [20] - 60:14, 60:18, 60:21, 61:1, 61:2, 61:5, 61:14, 61:17, 62:2, 62:16, 64:16, 65:11, 65:15, 92:17, 125:20, 126:11, 158:5, 193:14, 209:11

fallen [1] - 179:12

falling [4] - 66:19, 169:16, 202:3, 202:5

falls [8] - 170:6, 191:2, 192:4, 192:22, 195:6, 222:10, 222:11

familiar [4] - 90:4, 153:13, 224:1, 224:4

far [12] - 8:8, 53:16, 68:7, 84:3, 88:5, 89:24, 152:15, 152:16, 154:9, 157:10, 218:13, 248:11

10

fashion [4] - 71:20, 195:1, 209:3, 209:5
fastening [2] - 176:17, 177:4
fastenings [1] - 176:13
fatality [4] - 23:17, 84:19, 84:23, 86:15
fault [2] - 220:17, 222:3
federal [7] - 4:14, 41:10, 42:13, 59:2, 81:20, 81:22, 83:8
Federal [3] - 2:3, 92:11, 207:25
Fee [1] - 3:10
feet [9] - 14:9, 145:25, 146:3, 146:5, 146:8, 146:11, 146:19, 147:1, 147:14
fell [10] - 54:4, 61:3, 126:13, 161:5, 198:7, 200:23, 201:15, 201:23, 201:24, 201:25
felt [3] - 93:6, 108:20, 219:4
field [5] - 59:15, 67:22, 226:8, 226:25, 231:8
fifth [1] - 15:9
fifty [1] - 52:13
fight [2] - 87:3, 162:13
figure [1] - 145:23
file [8] - 6:5, 6:7, 12:3, 12:10, 115:21, 115:22, 217:14, 218:7
filed [1] - 51:18
files [2] - 73:15, 218:8
filing [1] - 88:17
finder [2] - 16:25, 17:1
findings [1] - 240:13
fine [5] - 69:1, 84:22, 85:8, 85:9, 177:1
finish [12] - 37:11, 99:2, 110:14, 110:17, 123:25, 135:23, 135:25, 139:18, 183:23, 183:25, 190:3
fire [3] - 47:5, 50:16, 65:21
firm [11] - 10:6, 10:9, 10:12, 13:17, 61:20, 65:1, 66:4, 74:12, 74:17, 87:9, 91:17
firmly [1] - 159:23
first [21] - 4:4, 15:1, 15:7, 18:16, 44:14, 56:13, 59:8, 89:4, 121:19, 124:23, 133:8, 169:6, 213:21, 215:10, 217:6, 227:10, 228:17, 243:4, 247:15, 251:11, 255:4
first-line [1] - 18:16
five [3] - 79:15, 87:19, 247:8
flat [6] - 105:9, 146:11, 146:22, 147:14, 147:17, 196:4
flat-out [1] - 105:9

flatbed [17] - 77:24, 78:10, 78:14, 78:19, 78:20, 92:16, 93:8, 94:3, 95:4, 96:6, 96:24, 97:12, 98:17, 141:16, 149:19, 205:22, 207:20
flawed [1] - 210:6
floor [10] - 16:7, 22:4, 49:4, 61:4, 61:5, 61:6, 65:15, 136:24, 147:10
Florida [4] - 7:9, 70:5, 72:19, 73:4
flows [1] - 193:13
focus [1] - 180:20
focused [5] - 20:14, 225:6, 225:7, 225:10
focusing [1] - 140:13
FOIA [1] - 218:16
folks [3] - 81:8, 104:3, 166:7
follow [3] - 81:8, 81:11, 208:7
followed [2] - 18:14, 94:9
following [4] - 37:18, 70:23, 122:15, 124:14
follows [1] - 4:5
foot [2] - 146:21, 158:15
FOR [1] - 1:2
force [1] - 148:8
foregoing [1] - 255:5
foremost [3] - 121:20, 243:4, 251:12
forget [1] - 124:21
forklift [2] - 57:22, 78:11
forklifts [2] - 78:4, 78:5
form [1] - 143:25
formal [1] - 123:14
former [1] - 119:24
forming [2] - 217:4, 217:18
forth [7] - 5:7, 26:3, 29:22, 79:10, 97:2, 115:10, 251:1
Fortune [2] - 19:15, 19:19
founder [1] - 51:4
four [12] - 79:15, 95:23, 154:3, 158:15, 173:3, 173:5, 174:25, 175:18, 175:19, 215:3, 247:8
four-by-four [1] - 95:23
four-foot-high [1] - 158:15
fourth [1] - 15:7
fractured [1] - 186:5
frame [4] - 48:8, 128:7, 128:8, 222:20
frankly [1] - 92:15
free [1] - 138:12
frequent [6] - 37:15, 37:17, 37:18, 37:22, 183:11, 185:9
freshly [1] - 60:9

FROM [1] - 1:17
front [5] - 5:11, 12:7, 138:10, 148:22, 157:25
Ft [2] - 56:16, 57:9
full [8] - 7:5, 24:21, 46:10, 46:12, 141:11, 228:18, 228:20, 228:22
full-blown [1] - 24:21
full-time [2] - 46:10, 46:12
fully [1] - 99:15
function [20] - 16:23, 16:24, 49:12, 50:9, 113:4, 113:6, 114:17, 114:22, 115:24, 116:2, 116:7, 116:8, 116:12, 116:18, 116:20, 116:22, 120:6, 120:7, 120:9
functional [2] - 184:21, 186:16
functioned [1] - 182:6
functions [2] - 54:18, 243:13
funded [1] - 41:10
funding [1] - 81:15
funds [1] - 82:3
furloughed [3] - 83:4, 83:9, 83:11
future [3] - 110:19, 112:9, 242:11

## G

gain [2] - 235:18, 235:19
gaining [1] - 15:4
game [1] - 236:11
gamut [1] - 19:18
gantry [2] - 69:7, 69:8
Gary [4] - 56:16, 57:9, 58:1, 60:24
Gas [7] - 55:23, 55:25, 56:21, 57:3, 58:4, 58:5, 63:24
gas [2] - 57:22, 58:5
gears [1] - 88:8
General [1] - 49:25
general [7] - 71:25, 100:7, 148:19, 166:23, 188:12, 244:1, 244:3
generally [3] - 27:12, 69:14, 94:22
generic [1] - 69:16
gentleman [1] - 227:19
geographical [1] - 225:4
geographically [1] - 53:6
given [8] - 56:14, 100:14, 100:16, 151:9, 166:7, 168:1, 177:14, 255:7
glass [2] - 221:16, 221:20
glassware [1] - 221:25
goals [1] - 14:23

goodness [1] - 137:1
goodwin [1] - 65:16
government [1] - 83:8
grab [2] - 76:9, 149:14
grabbed [1] - 77:1
grade [1] - 45:3
graduate [1] - 227:15
graduating [1] - 227:11
Grant [2] - 2:7, 2:15
grant [5] - 42:25, 81:21, 81:23, 81:24, 82:3
grasp [1] - 221:20
great [2] - 244:15, 245:1
greater [1] - 193:14
green [2] - 40:6, 40:11
Greensburg [4] - 71:5, 73:9, 73:24, 74:20
gross [2] - 53:20, 53:21
ground [6] - 48:9, 48:12, 50:4, 114:2, 146:22, 170:24
Group [1] - 224:2
grown [2] - 99:1, 99:13
Gualardo [15] - 4:8, 4:9, 4:10, 5:19, 7:8, 7:19, 50:20, 54:24, 88:10, 183:22, 213:12, 216:16, 216:19, 229:11
GUALARDO [5] - 1:12, 2:1, 4:3, 253:24, 254:24
guess [19] - 31:8, 32:20, 35:1, 35:3, 46:22, 64:22, 118:25, 128:18, 132:5, 168:25, 188:21, 205:1, 208:25, 211:4, 213:10, 216:2, 232:8, 236:12, 251:3
guesstimated [1] - 96:10
guidance [1] - 111:1
guidelines [1] - 244:5
guy [2] - 103:8, 231:22

## H

half [1] - 12:11
halfway [3] - 215:2, 219:7, 219:8
Halilovic [1] - 65:24
hall [1] - 221:15
Hampshire [2] - 86:16, 88:6
hand [6] - 5:21, 88:17, 153:22, 155:5, 155:8, 255:16
handed [1] - 7:21
handled [5] - 124:13, 189:7, 189:9, 189:11, 202:18
handles [1] - 10:18
handling [16] - 189:5,

189:16, 189:21, 189:25, 190:1, 190:4, 190:6, 190:7, 191:19, 192:16, 192:17, 192:19, 192:20, 193:2, 193:7
hands [2] - 113:16, 221:16
hands -on [1] - 113:16
handwriting [3] - 53:11, 217:21, 218:3
hanging [1] - 107:22
happy [2] - 206:5
harm [3] - 212:3, 234:24
harm 's [8] - 211:16, 234:7, 234:11, 234:13, 234:15, 234:22, 235:1, 235:10
harmed [2] - 131:20, 138:13
Harrisburg [2] - 84:10, 84:17
Harwick [1] - 7:9
hazard [10] - 17:5, 48:15, 49:17, 101:14, 132:16, 137:21, 139:4, 139:5, 139:7, 242:7
hazards [7] - 22:6, 121:25, 242:3, 242:5, 243:4, 243:9, 243:16
headquartered [1] - 26:24
Health [3] - 244:19, 246:19, 247:3
health [4] - 44:2, 49:7, 220:11, 226:25
hear [3] - 5:2, 39:18, 222:4
heard [18] - 103:5, 127:5, 127:6, 127:7, 128:3, 163:24, 163:25, 164:1, 164:10, 164:11, 164:19, 165:23, 165:25, 166:2, 179:13, 183:22, 215:12, 237:4
heavy [2] - 16:1, 148:5
height [2] - 60:19, 60:20
held [1] - 50:18
help [3] - 47:18, 68:8, 142:9
hereby [1] - 255:4
herein [3] - 2:2, 4:4, 255:6
hereof [1] - 253:16
hereunto [1] - 255:16
Herrmann [79] - 31:9, 41:5, 102:21, 104:17, 106:4, 106:7, 106:17, 106:23, 107:2, 107:15, 107:17, 107:23, 116:23, 120:20, 120:22, 121:7, 121:11, 121:17, 123:12, 123:20, 125:25, 126:21, 127:2, 127:4, 127:16, 127:22, 128:19, 129:25, 130:8, 131:1, 131:7, 133:16, 133:20, 134:13, 135:11, 137:8, 137:12, 139:15,

139:20, 139:25, 141:11, 141:22, 150:18, 151:1, 152:1, 152:4, 152:17, 153:3, 153:12, 153:14, 153:24, 154:10, 157:8, 157:23, 158:13, 159:16, 159:24, 160:16, 161:20, 162:4, 162:15, 163:5, 163:23, 188:19, 202:21, 202:22, 202:23, 211:2, 213:5, 214:4, 233:12, 233:15, 234:1, 236:14, 236:16, 236:18, 252:9
Herrmann 's [7] - 127:1, 129:5, 152:8, 158:9, 158:24, 162:1, 197:24
Hershey [2] - 91:3, 246:8
high [2] - 113:14, 158:15
higher [5] - 84:1, 84:15, 84:25, 85:3, 226:7
highest [3] - 27:13, 44:1, 54:21
highest -level [1] - 27:13
highest -ranking [1] - 44:1
highly [1] - 41:21
himself [3] - 200:24, 234:7, 235:9
hire [2] - 52:3, 52:6
hired [1] - 121:2
History [1] - 3:11
history [4] - 25:1, 25:15, 79:11, 240:16
hit [12] - 145:4, 158:3, 160:23, 199:8, 199:13, 199:15, 199:16, 200:2, 200:11, 200:18, 234:20
hitting [1] - 160:19
holst [26] - 5:12, 29:3, 31:21, 31:23, 32:4, 32:16, 33:15, 70:14, 135:9, 159:10, 181:21, 182:15, 182:24, 186:13, 187:2, 187:9, 187:21, 194:17, 196:7, 196:9, 196:14, 196:22, 199:5, 210:16, 237:6, 237:16
holsted [5] - 196:1, 196:4, 197:2, 197:10, 206:2
holsting [15] - 37:8, 195:22, 195:24, 195:25, 196:2, 196:3, 196:8, 197:5, 197:8, 197:15, 197:17, 198:19, 198:22, 199:7, 200:9
hoists [1] - 203:7
hold [5] - 56:18, 86:3, 87:10, 94:25, 207:21
holding [2] - 26:6, 212:21
holds [1] - 90:25
hole [1] - 65:15

home [1] - 221:15
honest [2] - 35:20, 43:14
honesty [1] - 229:16
hook [23] - 31:12, 31:15, 154:20, 154:21, 154:25, 155:12, 155:15, 156:16, 170:4, 171:9, 172:10, 177:11, 177:12, 177:14, 181:13, 186:3, 186:9, 194:13, 196:11, 205:2, 215:25, 216:13, 216:14
hooked [3] - 190:8, 237:25, 252:10
hooks [30] - 29:3, 34:21, 106:6, 106:8, 106:25, 107:3, 152:20, 152:21, 152:23, 153:4, 154:12, 154:24, 155:5, 155:19, 161:4, 161:17, 185:17, 186:8, 186:9, 186:12, 189:12, 206:1, 210:24, 212:13, 214:13, 216:7, 216:8, 216:12, 230:15, 237:7
hope [1] - 108:12
hoped [1] - 68:1
horribly [1] - 80:16
hospitalization [1] - 23:18
hospitalizations [1] - 23:19
hour [1] - 12:11
hours [2] - 12:11, 52:10
huge [2] - 18:2
hundreds [3] - 43:19, 222:19, 225:10
hurt [5] - 134:25, 136:19, 212:4, 220:15

─────────── I ───────────

i.e [2] - 72:1, 116:2
idea [10] - 9:12, 9:15, 20:18, 51:16, 52:10, 94:2, 109:20, 110:5, 151:23, 176:3
identical [1] - 23:4
identification [10] - 5:20, 7:20, 49:17, 50:21, 54:25, 88:11, 178:10, 213:13, 216:17, 216:20
identified [5] - 12:25, 21:24, 22:20, 29:10, 53:10, 56:20
identify [3] - 25:12, 81:10, 185:25
ignorance [1] - 183:13
ignorant [1] - 181:19
ignored [6] - 135:16, 178:23, 180:25, 183:5, 185:2, 187:23
ii [2] - 192:4, 193:5

iii [2] - 192:4, 193:5                    11
ILLIG [1] - 2:17
illustrated [3] - 30:4, 83:18, 211:8
illustrating [1] - 240:25
immediately [5] - 83:9, 83:11, 127:11, 127:16, 127:23, 237:16
impact [2] - 105:7, 112:10
impaired [2] - 35:15, 36:4
impalement [1] - 64:8
implement [1] - 133:2
implementation [1] - 27:23
implemented [2] - 210:22, 210:25
implying [1] - 144:2
importance [1] - 15:18
impression [1] - 223:23
improvement [1] - 19:9
IN [2] - 1:1, 255:16
in-person [1] - 40:20
inability [1] - 150:25
inaccurate [4] - 59:6, 106:21, 228:8, 251:15
Inc [1] - 13:1
incident [1] - 3:13
incident [25] - 23:11, 28:10, 39:24, 59:24, 104:10, 112:11, 118:7, 153:11, 165:15, 170:17, 182:14, 194:9, 210:15, 211:1, 220:12, 220:13, 229:5, 229:21, 232:21, 236:6, 236:7, 236:13, 236:14, 236:15, 236:21, 236:22
incidental [1] - 194:13
incidents [3] - 70:7, 110:18, 112:8
include [3] - 12:13, 14:5, 124:7
included [1] - 122:24
includes [2] - 119:16, 194:12
including [7] - 34:20, 99:17, 102:8, 119:18, 119:20, 161:17, 222:18
incompetence [2] - 83:18, 168:21
incompetent [4] - 80:18, 83:16, 219:4, 219:25
inconceivable [1] - 149:17
inconsistency [2] - 151:25, 214:11
incorrectly [2] - 5:14, 83:22
independently [2] - 13:13, 20:9
INDEX [1] - 3:1
Indiana [1] - 41:18
indicate [2] - 176:22, 179:21

12

indicated [9] - 29:1, 35:14, 72:24, 82:24, 127:25, 176:20, 233:19, 247:11, 253:15
indicating [1] - 178:25
indicating [1] - 156:19
indication [1] - 185:5
indications [1] - 218:6
indirectly [1] - 255:14
individual [12] - 15:18, 18:12, 26:14, 26:17, 26:19, 48:25, 52:15, 81:1, 110:11, 110:12, 142:9, 142:12
individuals [8] - 27:13, 52:11, 86:21, 142:14, 165:16, 214:2, 221:10, 251:16
industries [1] - 225:5
industry [5] - 14:7, 21:7, 244:1, 244:3, 246:7
inferior [2] - 228:1, 228:4
inferred [1] - 233:9
influence [2] - 35:15, 36:4
influenced [1] - 25:18
influencing [1] - 25:16
inform [1] - 239:16
informal [2] - 123:15, 216:23
information [20] - 6:2, 7:4, 9:14, 11:10, 11:15, 11:16, 14:6, 17:13, 22:22, 26:9, 26:13, 29:16, 105:12, 105:13, 114:5, 167:25, 178:3, 178:5, 239:11, 245:12
ingested [1] - 67:3
inherently [1] - 233:20
initial [7] - 181:17, 181:18, 182:9, 183:1, 185:8, 187:15, 217:7
initiated [1] - 191:21
injured [2] - 139:2, 139:6
injuries [1] - 169:17
injury [9] - 23:13, 23:15, 57:18, 57:21, 58:1, 58:2, 138:24, 178:21, 229:22
input [1] - 248:12
inside [1] - 71:7
inspect [12] - 34:2, 72:3, 131:2, 131:8, 131:16, 167:23, 181:9, 184:5, 225:18, 230:17, 230:18, 230:22
inspected [16] - 28:13, 28:16, 28:21, 29:8, 31:5, 35:7, 37:3, 38:3, 39:1, 40:5, 40:7, 179:15, 184:19, 204:6, 230:18, 230:21
inspecting [5] - 30:3, 30:8, 131:18, 132:5, 230:15

inspection [55] - 29:22, 37:6, 37:13, 37:14, 37:16, 39:19, 39:25, 40:2, 40:3, 40:9, 40:12, 69:14, 76:8, 76:14, 86:22, 131:12, 132:16, 176:18, 176:22, 177:8, 177:17, 177:19, 179:2, 180:11, 180:20, 181:17, 182:10, 183:2, 183:17, 183:19, 184:4, 184:6, 184:7, 184:8, 184:21, 185:1, 185:2, 185:8, 185:9, 185:10, 185:16, 185:17, 185:25, 186:2, 186:16, 186:20, 224:17, 229:13, 230:9, 240:11, 240:12, 255:9
inspections [21] - 33:1, 37:16, 37:17, 37:18, 37:19, 37:21, 37:22, 38:21, 40:20, 91:4, 136:10, 167:21, 168:11, 176:11, 177:2, 183:11, 185:12, 186:14, 229:20, 241:4, 245:1
inspects [1] - 167:23
install [1] - 13:16
installation [2] - 18:2
installations [3] - 17:21, 17:23, 18:3
installed [5] - 13:22, 17:19, 182:15, 182:24, 183:9
installing [2] - 30:10, 181:20
instance [4] - 21:6, 34:1, 170:16, 211:14
instances [1] - 67:19
institute [1] - 246:6
instructed [1] - 215:5
instructions [1] - 94:9
instructor [3] - 41:18, 43:2, 46:17
insurance [2] - 10:16, 10:22
insurance [2] - 10:10, 10:12
intended [3] - 48:23, 137:17, 173:20
intent [2] - 171:13, 171:16
intentional [1] - 197:1
interested [2] - 109:23, 255:14
intern [1] - 90:23
internal [2] - 115:12, 249:14
internationally [1] - 222:22
internship [1] - 90:11
interpret [3] - 56:7, 243:21, 245:9
interpretation [11] - 122:15, 194:11, 195:9, 196:7, 196:14, 196:19, 197:17, 199:5, 203:19, 249:11, 249:18

interpretations [3] - 245:16, 245:18, 245:23
interpreting [1] - 245:11
interrupted [1] - 121:3
interview [2] - 18:15, 168:22
interviewed [1] - 110:8
interviews [1] - 3:13
interviews [2] - 18:14
introduced [1] - 4:11
introduction [2] - 89:3, 89:4
intuitively [1] - 238:9
investigated [5] - 24:11, 70:7, 70:9, 222:19, 222:20
investigating [1] - 104:10
investigation [29] - 21:18, 21:19, 24:21, 24:24, 25:19, 26:11, 26:12, 81:2, 102:15, 110:22, 111:10, 111:14, 111:21, 111:25, 112:4, 112:7, 115:23, 166:5, 166:8, 167:16, 168:9, 182:2, 202:13, 217:12, 217:22, 238:8, 240:21, 248:5, 250:21
investigations [1] - 50:7
investigative [1] - 50:4
investigator [3] - 219:1, 219:3, 219:7
investigators [1] - 167:16
invoice [1] - 9:18
invoiced [1] - 9:13
invoices [2] - 9:9, 9:23
invoicing [1] - 9:20
involve [3] - 18:4, 57:18, 58:11
involved [53] - 8:13, 22:25, 23:13, 26:12, 28:16, 45:16, 46:19, 49:22, 50:7, 50:8, 60:1, 60:2, 62:7, 63:3, 63:7, 64:9, 64:13, 64:15, 64:16, 65:9, 67:2, 67:10, 68:13, 68:15, 68:23, 69:10, 70:25, 71:4, 71:11, 72:9, 72:15, 77:7, 80:22, 81:1, 85:7, 86:11, 90:14, 90:16, 92:1, 94:2, 97:11, 100:22, 119:17, 119:21, 131:24, 217:22, 218:7, 220:13, 221:8, 221:10, 222:17, 222:21
involvement [2] - 21:23, 223:23
involves [6] - 15:2, 15:3, 15:6, 15:8, 92:25, 189:18
involving [14] - 58:2, 59:25, 62:25, 66:7, 68:10, 69:24, 70:8, 71:6, 72:19, 74:1, 86:16, 89:16, 90:11
irons [1] - 47:5

irrelevant [3] - 33:5, 135:1, 135:3
IS [1] - 1:17
issue [13] - 22:18, 23:6, 23:7, 23:9, 51:22, 62:9, 67:13, 129:20, 129:22, 151:14, 232:9, 250:18, 250:19
issued [15] - 60:15, 60:16, 62:3, 69:25, 83:23, 84:4, 84:23, 85:9, 85:14, 137:23, 137:24, 138:1, 167:11, 167:13, 240:22
issues [4] - 11:21, 18:24, 30:6
issuing [1] - 85:7
items [1] - 124:8
itself [9] - 76:12, 98:14, 112:6, 130:13, 130:14, 146:6, 156:7, 156:23, 210:7
IUP [17] - 7:13, 41:19, 42:4, 42:9, 42:24, 43:3, 43:5, 43:18, 46:16, 59:9, 81:19, 81:24, 82:1, 83:10, 222:18, 239:7, 243:19
ivory [1] - 50:11

### J

J)(2)(I [1] - 184:21
J)(2)(III [1] - 185:17
Jack [1] - 86:19
job [10] - 92:23, 99:25, 111:7, 115:12, 118:23, 120:10, 159:20, 239:16, 245:4, 245:7
jobs [1] - 46:11
jog [1] - 10:14
Johnstown [1] - 7:16
jolted [1] - 237:25
JONES [1] - 2:17
jostle [1] - 148:3
jostling [1] - 147:25
journey [1] - 93:18
judge [5] - 67:22, 68:2, 174:5, 250:1
Judge [1] - 231:21
judgment [1] - 114:8
Julia [1] - 65:22
jump [2] - 99:6, 140:25
jumped [8] - 97:20, 131:6, 136:23, 142:8, 201:12, 201:15, 252:8, 252:11
juncture [1] - 95:1
jury [5] - 161:25, 162:18, 162:20, 162:22, 239:16

**K**

Kalownski [1] - 61:25
keep [4] - 149:6, 171:14, 206:23, 245:22
keeping [1] - 79:4
Kelly [1] - 65:1
Kentucky [2] - 55:23, 56:1
kept [3] - 121:20, 169:11, 170:13
keynote [1] - 59:8
kicked [1] - 28:15
kids [3] - 52:23, 52:24, 53:4
kind [12] - 16:22, 22:12, 22:13, 24:25, 66:16, 94:24, 144:1, 152:1, 178:10, 183:12, 205:4, 207:5
kinds [3] - 22:21, 84:24, 241:6
Kleeman [1] - 87:9
Kletcho [1] - 61:16
knock [1] - 147:25
knocked [5] - 136:23, 140:24, 201:15, 219:20, 219:22
knowing [4] - 41:25, 42:2, 125:6, 125:7
knowledge [16] - 17:2, 29:2, 55:17, 67:25, 68:4, 128:7, 182:1, 203:1, 203:3, 203:5, 205:12, 224:14, 226:8, 226:12, 226:13, 243:15
known [5] - 81:10, 97:16, 100:3, 134:19, 226:14
knows [6] - 149:3, 173:16, 235:13, 236:14, 236:20, 236:22
Konecranes [1] - 167:22
Kulovic [1] - 64:14

**L**

Labor [7] - 82:8, 82:9, 82:10, 82:20, 87:7, 87:23, 88:6
lack [6] - 29:21, 58:11, 117:23, 228:24, 229:19, 229:20
Lackawanna [2] - 10:16, 10:22
lacked [1] - 19:16
lacking [1] - 19:21
ladder [3] - 61:4, 65:11, 84:3
lading [1] - 114:5
LaGamba [1] - 65:14
Lane [1] - 7:9
language [1] - 248:11
laps [1] - 16:16

large [1] - 20:12
last [10] - 8:1, 8:21, 9:17, 17:19, 22:11, 63:23, 79:15, 118:10, 119:12, 210:22
laundry [4] - 122:21, 122:24, 123:2, 123:5
law [14] - 2:7, 10:12, 20:8, 41:24, 66:4, 74:12, 82:18, 87:9, 102:4, 166:19, 167:4, 245:3, 250:1, 250:8
lawsuit [1] - 4:13
layers [1] - 85:4
laying [3] - 155:17, 155:18, 216:8
leadership [1] - 111:2
leading [3] - 98:13, 147:1, 147:19
learned [1] - 25:9
least [13] - 5:9, 8:4, 20:24, 79:24, 101:22, 117:15, 158:2, 197:20, 200:6, 204:25, 209:15, 217:21, 220:4
leave [4] - 70:20, 94:5, 94:6, 95:20
leaving [1] - 98:22
lecture [1] - 225:12
lectured [1] - 222:21
Lee [3] - 2:4, 255:3, 255:21
left [1] - 76:3
leg [1] - 148:22
legal [7] - 106:20, 108:10, 239:20, 242:14, 248:2, 250:2
lengths [1] - 95:23
less [10] - 19:2, 52:13, 54:1, 54:2, 54:3, 54:4, 147:21, 147:24, 148:16, 148:24
letter [1] - 122:14
level [19] - 27:13, 27:19, 27:22, 47:20, 48:22, 61:2, 61:14, 84:15, 84:25, 85:3, 85:23, 145:12, 147:10, 147:11, 147:16, 224:11, 226:7, 226:10, 226:11
levels [1] - 84:1
Levine [2] - 2:7, 10:8
LEVINE [1] - 2:14
lies [3] - 104:21, 104:24, 105:3
life [3] - 220:14, 220:15, 246:10
lift [36] - 62:25, 63:1, 115:1, 129:15, 130:3, 132:22, 132:23, 135:12, 141:17, 160:17, 161:6, 163:15, 164:20, 171:10, 171:11, 175:22, 175:25, 179:20, 180:4, 196:9, 196:15,

196:22, 196:23, 196:25, 200:17, 203:4, 203:15, 204:17, 204:21, 204:24, 233:16, 233:17, 233:21, 237:11, 252:11
lifted [37] - 32:6, 121:21, 125:13, 133:11, 134:10, 135:10, 135:11, 151:21, 153:3, 161:3, 169:12, 169:19, 169:20, 169:21, 169:24, 170:9, 170:12, 170:14, 170:15, 170:16, 170:22, 170:24, 171:4, 171:7, 171:8, 171:11, 173:7, 196:16, 197:3, 200:25, 210:16, 211:21, 211:22, 212:1, 236:20
lifting [25] - 32:1, 68:21, 72:20, 125:14, 134:22, 157:22, 159:10, 160:20, 161:20, 167:22, 175:19, 179:21, 179:23, 179:25, 197:2, 202:20, 203:2, 203:14, 203:15, 203:22, 204:4, 204:7, 204:14, 233:23, 237:16
lifts [1] - 233:1
light [4] - 40:6, 40:11, 100:1
likely [1] - 238:4
limit [1] - 167:2
limited [10] - 68:1, 118:21, 124:11, 124:14, 227:4, 227:5, 227:8, 228:5, 231:9, 240:7
line [12] - 14:16, 15:7, 18:16, 24:2, 27:23, 36:12, 36:14, 36:16, 36:18, 165:4, 196:6, 208:7
Line [11] - 254:2, 254:4, 254:6, 254:8, 254:10, 254:12, 254:14, 254:16, 254:18, 254:20, 254:22
lines [1] - 40:7
link [2] - 122:16, 203:8
list [15] - 20:14, 31:5, 55:19, 67:4, 68:8, 70:23, 74:4, 87:4, 88:23, 122:21, 122:25, 123:2, 123:5, 132:25, 228:13
listed [13] - 8:25, 9:1, 9:5, 13:3, 42:19, 56:15, 59:7, 64:21, 72:24, 72:25, 117:13, 142:25, 247:15
listing [2] - 56:4, 89:6
litigation [2] - 86:10, 247:11
live [1] - 55:10
LLC [2] - 2:7, 2:14
LLP [1] - 2:17
load [160] - 31:19, 31:20,

76:23, 76:25, 78:8, 78:18, 13
92:3, 92:8, 92:11, 92:13, 92:24, 93:3, 93:9, 93:13, 93:15, 94:16, 94:19, 94:20, 94:23, 95:4, 95:7, 96:20, 97:11, 98:16, 119:22, 120:22, 120:23, 124:13, 125:15, 125:16, 125:19, 126:15, 126:18, 130:16, 141:7, 141:17, 144:10, 144:19, 145:24, 148:9, 159:5, 169:19, 169:23, 170:9, 170:12, 170:15, 170:20, 172:14, 172:17, 172:21, 172:22, 173:6, 173:9, 173:11, 173:13, 174:8, 174:9, 174:10, 174:11, 174:12, 174:18, 174:19, 175:21, 175:24, 175:25, 176:1, 179:16, 179:20, 179:25, 180:4, 189:5, 189:7, 189:9, 189:11, 189:15, 189:16, 189:20, 189:22, 189:25, 190:1, 190:3, 190:4, 190:5, 190:7, 190:12, 190:16, 190:19, 191:8, 191:19, 191:21, 191:24, 192:2, 192:5, 192:16, 192:17, 192:25, 193:2, 193:6, 193:7, 193:17, 193:20, 193:22, 194:5, 194:8, 194:12, 194:15, 194:21, 194:22, 194:23, 194:24, 195:5, 195:14, 195:18, 195:21, 196:1, 196:2, 196:3, 196:15, 197:8, 197:15, 198:19, 198:24, 199:7, 200:23, 201:3, 202:17, 202:19, 203:6, 205:2, 206:5, 206:6, 206:13, 206:16, 206:20, 207:2, 207:9, 207:19, 208:15, 209:10, 209:23, 210:4, 210:11, 210:13, 210:24, 211:1, 211:12, 211:21, 234:6, 234:13, 234:14, 235:9, 237:20, 237:23, 237:24
loaded [15] - 28:8, 77:23, 78:3, 78:24, 79:2, 89:18, 89:21, 90:7, 91:16, 96:14, 97:12, 116:4, 119:20, 142:7, 206:4
loading [11] - 90:4, 90:12, 90:15, 90:17, 90:18, 94:15, 96:24, 97:2, 97:6, 113:17, 208:6
loads [14] - 78:20, 121:21,

14

124:15, 126:10, 169:11, 169:12, 169:23, 170:13, 170:14, 200:21, 208:25, 210:23
lobby [1] - 4:12
local [1] - 85:23
located [4] - 27:7, 53:6, 119:19, 148:15
location [3] - 20:20, 93:17, 98:6
locations [4] - 17:25, 18:7, 117:9, 235:24
lock [1] - 210:2
logged [1] - 75:20
look [23] - 6:3, 15:12, 32:15, 35:19, 70:17, 73:14, 76:9, 79:11, 89:19, 103:20, 105:24, 115:6, 133:24, 134:6, 134:7, 155:14, 161:12, 164:22, 214:19, 215:2, 217:6, 218:19, 227:17
looked [6] - 25:4, 25:7, 32:25, 168:8, 210:5, 226:20
looking [11] - 12:18, 153:9, 153:11, 159:4, 159:8, 159:13, 162:8, 163:7, 176:12, 217:20, 242:1
Losada [1] - 67:1
loud [1] - 198:15
love [1] - 118:23
Lowe 's [2] - 66:11, 66:20
lower [1] - 88:17
lying [1] - 104:12

## M

MacDONALD [1] - 2:17
maintain [9] - 34:1, 34:20, 36:13, 36:15, 72:3, 80:23, 131:5, 181:8, 221:24
maintained [6] - 29:9, 31:4, 31:22, 33:19, 35:7, 204:6
maintaining [2] - 30:3, 30:8
maintenance [9] - 29:21, 33:2, 37:22, 69:15, 71:13, 187:24, 188:4, 188:10, 229:14
majority [4] - 67:12, 67:15, 128:2, 129:4
Maleski [7] - 107:15, 109:15, 109:18, 109:20, 110:21, 213:22, 213:25
Maleski 's [2] - 111:1, 112:7
malfunction [3] - 29:2, 166:4, 181:25
malfunctioned [3] - 31:12,

33:15, 188:11
malicious [1] - 109:9
man [3] - 99:1, 99:13, 158:14
managed [1] - 50:8
management [36] - 13:11, 13:15, 13:17, 13:18, 13:21, 14:6, 14:16, 14:17, 14:21, 15:4, 18:15, 18:16, 22:3, 26:7, 27:6, 27:19, 27:22, 48:21, 48:24, 49:5, 49:6, 50:3, 50:12, 53:12, 53:16, 54:17, 99:19, 110:10, 112:13, 178:18, 178:19, 212:19, 220:11, 225:8, 226:9, 231:8
management -based [3] - 13:18, 13:21, 22:3
managing [4] - 15:5, 49:18, 49:21, 76:20
manhandling [1] - 207:17
manner [4] - 15:13, 116:3, 117:20, 129:21
manual [5] - 130:9, 130:10, 130:12, 130:13, 130:14
manuals [1] - 26:2
manufacturer [6] - 17:24, 47:22, 85:9, 86:16, 130:11, 131:6
Manufacturers [1] - 246:9
manufacturing [4] - 15:25, 70:13, 71:8, 89:18
mark [2] - 7:17, 213:10
Mark [1] - 23:3
marked [12] - 5:20, 5:22, 7:20, 7:21, 50:19, 50:21, 54:25, 76:2, 88:11, 213:13, 216:17, 216:20
marketing [3] - 21:4, 21:7, 21:13
Marks [1] - 64:25
mass [2] - 207:21, 208:16
materials [2] - 124:15, 147:10
math [1] - 59:5
Matt [2] - 4:11, 103:18
matter [15] - 4:20, 6:5, 6:21, 9:10, 10:2, 10:16, 138:4, 138:6, 150:16, 154:14, 226:15, 239:1, 239:20, 252:20, 253:12
Matthew [3] - 2:18, 43:17, 223:5
mcCULLOUGH [1] - 231:25
McCullough [27] - 2:18, 3:5, 4:11, 38:7, 38:10, 38:14, 38:18, 39:13, 87:19, 87:21, 101:20, 136:2, 140:12, 144:3, 162:17, 164:9, 165:5, 165:18, 165:20,

205:16, 205:19, 218:8, 218:11, 218:18, 238:18, 248:19, 252:16
McCULLOUGH [2] - 3:3, 4:7
mean [41] - 5:12, 18:23, 20:25, 30:4, 34:13, 35:12, 37:9, 38:4, 38:10, 38:25, 40:14, 50:10, 61:3, 114:5, 129:2, 129:11, 132:6, 143:25, 144:5, 144:12, 145:24, 156:2, 164:7, 166:25, 167:4, 172:19, 174:20, 189:11, 190:7, 195:8, 197:11, 198:18, 206:17, 215:23, 216:5, 235:20, 241:14, 245:19, 248:24 ~
meaning [4] - 14:20, 144:2, 195:15, 195:17
means [11] - 67:5, 122:11, 132:8, 177:2, 192:20, 196:9, 196:15, 196:22, 196:23, 229:3
meant [2] - 193:24, 207:5
measure [1] - 146:9
measured [1] - 28:13
measurement [2] - 101:22, 146:10
measures [1] - 17:6
mechanism [6] - 57:21, 59:22, 60:13, 66:17, 130:3, 187:9
mechanisms [3] - 75:23, 184:22, 186:17
meet [5] - 117:10, 117:11, 122:17, 188:19, 244:11
meeting [2] - 123:16, 244:8
member [2] - 83:2, 247:6
members [1] - 22:7
memory [3] - 10:14, 64:3, 68:7
mentioned [7] - 10:14, 20:3, 51:6, 57:15, 105:19, 113:2, 240:2
mere [3] - 138:13, 212:17, 235:21
messed [1] - 240:12
met [3] - 37:5, 37:6, 40:2
method [2] - 134:19
methodology [1] - 209:21
Metropolitan [1] - 91:3
Meyer [1] - 56:16
Meza [3] - 57:7, 57:24, 61:16
Miami [1] - 73:6
midlevel [1] - 18:15
might [20] - 7:17, 47:22, 52:1, 52:17, 70:3, 75:6, 84:6, 110:6, 119:18, 129:2, 144:22, 149:13, 166:12,

174:13, 191:17, 196:11, 204:5, 209:1, 222:15, 231:11
miJack [1] - 65:7
million [3] - 54:1, 54:2
mincing [2] - 82:13, 192:6
mind [10] - 34:14, 100:5, 128:11, 135:5, 136:15, 137:7, 147:21, 200:15, 206:23, 234:15
mine [1] - 126:25
minimum [6] - 180:18, 244:6, 244:7, 244:8, 244:11, 244:23
minute [4] - 123:24, 170:18, 194:20, 201:2
minutes [2] - 7:14, 87:19
mis [1] - 104:5
mischaracterize [2] - 50:6, 233:5
mischaracterizing [1] - 137:19
misheard [1] - 164:8
misinformation [1] - 103:3
misreported [1] - 105:13
missed [1] - 137:1
missing [2] - 143:9, 145:22
mistake [10] - 56:19, 108:8, 108:11, 108:13, 108:16, 108:19, 109:10, 109:12, 111:6, 111:8
mistakes [3] - 79:19, 108:16, 108:17
mitigation [1] - 62:21
mixed [1] - 250:2
mixing [1] - 63:18
Mohawk [3] - 49:8, 77:6, 91:4
moment [1] - 12:13
month [1] - 8:18
monthly [1] - 167:23
months [7] - 37:4, 37:10, 38:21, 38:24, 39:1, 39:20, 39:21
Montilla [1] - 65:20
moot [2] - 28:17, 28:19
most [7] - 27:21, 53:14, 101:7, 206:19, 226:10, 231:3, 243:23
motor [2] - 59:2, 59:24
Motor [2] - 92:12, 207:25
mounted [1] - 71:7
mouth [5] - 21:16, 140:19, 160:1, 160:4, 160:6
move [8] - 71:19, 148:8, 148:9, 207:22, 208:16, 209:11, 215:6, 235:17
moved [10] - 189:10, 189:14,

194:8, 194:16, 205:10,
205:12, 205:15, 212:1,
212:2

**movement** [2] - 134:9,
238:12

**movements** [1] - 16:9

**moving** [12] - 16:1, 71:19,
92:19, 119:18, 143:9,
144:11, 144:20, 145:21,
194:5, 194:11, 219:19,
238:15

**MR** [28] - 3:3, 3:5, 4:7, 38:7,
38:10, 38:14, 38:18, 39:13,
87:19, 87:21, 101:20,
136:2, 140:12, 144:3,
162:17, 164:9, 165:5,
165:18, 165:20, 205:16,
205:19, 218:8, 218:11,
218:18, 231:25, 238:18,
248:19, 252:16

**MS** [30] - 3:4, 37:11, 38:6,
38:8, 38:12, 38:16, 39:10,
39:15, 100:4, 136:1, 140:8,
143:23, 162:7, 162:12,
164:6, 164:21, 165:9,
165:12, 165:19, 165:21,
213:11, 218:5, 218:9,
218:13, 231:23, 232:3,
238:20, 238:24, 248:15,
252:17

**muddy** [2] - 216:10, 216:11

**multi** [25] - 101:9, 101:25,
102:5, 102:9, 130:18,
166:22, 228:24, 241:13,
241:15, 241:21, 241:25,
242:12, 242:19, 242:25,
243:17, 243:25, 249:7,
249:23, 250:11, 250:16,
251:13, 251:14, 251:18,
251:23

**multi-employer** [24] - 101:9,
101:25, 102:5, 102:9,
130:18, 166:22, 228:24,
241:13, 241:15, 241:21,
241:25, 242:12, 242:19,
242:25, 243:17, 243:25,
249:7, 249:23, 250:11,
250:16, 251:14, 251:18,
251:23

**multi-employers** [1] - 251:13

**multimillion** [2] - 84:22, 85:8

**multimillion-dollar** [2] -
84:22, 85:8

**multinational** [1] - 17:24

**multiple** [10] - 23:18, 28:10,
62:12, 62:15, 62:24, 63:11,
66:14, 124:14, 244:4,
250:22

**must** [11] - 20:9, 22:16,

121:23, 130:22, 130:23,
135:2, 170:3, 178:9,
200:20, 200:21, 241:8

**Myer** [1] - 57:9

**myriad** [1] - 99:21

## N

**n){1** [1] - 191:18

**n){2** [7] - 190:15, 190:24,
190:25, 191:2, 191:3,
191:23, 192:22

**n){2}(i** [2] - 192:4, 193:5

**n){2}(ii** [4] - 191:1, 191:2,
191:6, 191:9

**n){2}(iii** [1] - 188:21

**n){3** [2] - 195:21, 205:1

**n){3}(vi** [1] - 200:21

**n){3}(vii** [1] - 202:16

**name** [10] - 4:10, 7:5, 44:4,
73:12, 73:16, 81:2, 103:19,
247:1

**names** [1] - 73:1

**NATCHER** [2] - 1:4, 253:4

**Natcher** [113] - 4:14, 8:11,
11:1, 11:7, 24:25, 31:9,
41:5, 53:4, 93:24, 96:5,
96:17, 97:13, 98:11, 98:15,
99:1, 99:3, 99:7, 99:9,
100:2, 100:10, 100:12,
100:21, 102:22, 106:5,
106:24, 107:18, 108:1,
113:8, 125:3, 125:24,
127:14, 127:17, 130:16,
132:12, 132:13, 132:20,
133:15, 134:12, 134:23,
135:8, 136:18, 137:8,
137:11, 137:14, 137:16,
137:24, 138:1, 138:6,
139:22, 141:15, 141:19,
141:23, 142:3, 142:5,
142:21, 144:21, 149:5,
149:12, 150:17, 151:25,
152:7, 152:16, 153:16,
153:19, 153:23, 154:2,
155:5, 155:19, 155:23,
155:24, 155:25, 157:2,
157:7, 157:21, 157:24,
159:15, 159:19, 160:11,
160:22, 160:25, 161:16,
161:18, 161:24, 162:11,
162:18, 162:21, 178:22,
200:23, 201:3, 201:5,
201:11, 201:14, 205:21,
206:13, 206:23, 207:8,
219:2, 219:15, 219:17,
220:2, 229:22, 232:10,
232:22, 233:25, 234:8,

235:14, 235:21, 238:3,
242:16, 243:1, 243:15,
252:8, 252:12

**Natcher 's** [17] - 11:10, 11:20,
91:20, 96:21, 98:20, 127:1,
138:22, 140:14, 152:5,
153:2, 153:20, 153:21,
158:25, 160:17, 163:2,
169:17, 233:18

**nation** [1] - 27:2

**National** [12] - 12:25, 13:7,
13:8, 20:2, 46:19, 47:18,
48:10, 50:14, 51:4, 53:9,
225:9, 246:6

**natural** [2] - 142:5, 252:12

**nature** [6] - 66:6, 68:18,
75:23, 77:8, 84:20

**near** [11] - 7:13, 7:16, 91:11,
91:15, 95:15, 142:21,
205:3, 205:6, 210:4,
234:12, 234:13

**necessarily** [1] - 129:23

**necessary** [2] - 6:24, 154:25

**need** [17] - 5:7, 19:2, 35:10,
52:4, 52:5, 52:7, 80:23,
92:7, 93:21, 101:7, 121:4,
121:24, 122:25, 123:25,
133:25, 134:2

**needed** [10] - 16:1, 18:22,
52:9, 94:24, 101:18, 116:9,
167:6, 207:17, 208:19,
210:14

**needs** [1] - 94:6

**negative** [2] - 84:22, 100:1

**negligence** [3] - 102:13,
211:5, 211:7

**negligent** [7] - 102:15,
102:16, 114:8, 166:8,
219:25, 241:4

**Nelson** [1] - 66:11

**neutral** [2] - 239:5, 239:11

**never** [33] - 19:4, 26:14,
26:18, 32:14, 32:23, 67:24,
68:4, 76:22, 77:23, 104:17,
104:25, 105:1, 108:13,
109:25, 139:6, 139:14,
139:19, 150:7, 150:11,
150:14, 151:2, 153:4,
183:4, 184:18, 220:19,
220:21, 221:8, 221:14,
222:22, 228:9, 228:11,
238:8

**nevertheless** [1] - 221:5

**New** [2] - 86:16, 88:6

**new** [10] - 60:8, 181:18,
181:20, 182:10, 182:12,
182:15, 182:23, 183:2,
183:9, 187:21

**new/altered** [1] - 187:15

**newsuan** [1] - 60:6    15

**next** [14] - 40:9, 40:11, 42:22,
43:21, 65:5, 79:13, 150:9,
172:7, 194:1, 207:22,
208:16, 214:8, 215:7

**Niagara** [3] - 49:8, 77:6, 91:4

**nickel** [2] - 145:5, 145:10

**nobody** [12] - 25:22, 97:21,
99:5, 100:16, 134:25,
142:8, 149:3, 173:16,
176:9, 179:13, 222:3,
222:25

**noise** [3] - 150:21, 164:11,
164:20

**noncompliance** [1] - 186:21

**none** [4] - 30:18, 178:12,
178:13, 233:25

**nonprofit** [1] - 45:20

**nonroutine** [1] - 15:24

**nontrained** [1] - 116:21

**normal** [7] - 70:12, 132:2,
142:5, 142:9, 142:11,
176:2, 237:10

**normally** [6] - 84:14, 100:13,
100:16, 192:9, 193:10,
241:11

**north** [5] - 157:10, 159:21,
214:14, 237:23, 238:3

**not-for-profit** [1] - 45:23

**Notary** [2] - 2:5, 255:3

**note** [1] - 75:12

**noted** [1] - 228:4

**notes** [7] - 12:19, 167:20,
214:22, 217:9, 217:11,
219:1, 219:25

**nothing** [21] - 25:7, 25:8,
25:14, 25:16, 33:2, 34:11,
37:23, 74:22, 103:23,
111:18, 125:18, 144:23,
174:22, 177:23, 177:25,
182:5, 208:6, 218:11,
222:25, 229:13, 255:5

**Notice** [3] - 3:8, 3:15, 5:23

**noticed** [1] - 127:24

**notification** [2] - 216:22,
255:12

**Notification** [1] - 3:14

**notorious** [1] - 241:3

**nowhere** [2] - 91:11, 93:24

**NSC** [3] - 52:17, 52:21

**NSC 's** [1] - 53:20

**nuances** [1] - 69:18

**number** [11] - 89:6, 99:11,
102:2, 121:17, 122:2,
125:4, 125:13, 128:17,
136:8, 218:20

**numbered** [1] - 56:4

**numbers** [1] - 227:17

**nutshell** [1] - 43:24

**16**

NYSEG [1] - 65:16

**O**

O'Brien [1] - 64:25
O'Neill [1] - 64:25
Oakridge [1] - 7:12
Oates [1] - 60:11
oath [3] - 30:14, 34:17, 253:17
object [6] - 16:1, 61:3, 77:24, 98:1, 143:24, 203:10
objected [2] - 97:24, 98:11
objecting [2] - 98:4, 98:6
objection [1] - 97:23
objections [1] - 101:21
observe [1] - 236:1
observed [2] - 235:23, 235:25
obstacles [4] - 188:25, 189:3, 191:11, 192:11
obstruction [2] - 200:11, 200:18
obstructions [4] - 197:16, 198:20, 200:2
obtained [4] - 6:14, 26:2, 118:22, 245:13
obvious [1] - 218:3
obviously [16] - 11:25, 28:5, 43:10, 49:9, 80:17, 101:17, 101:20, 111:23, 132:7, 139:5, 164:17, 189:1, 200:23, 221:17, 230:25, 235:25
occasion [2] - 76:5, 77:13
occasionally [1] - 51:11
occasions [2] - 97:5, 119:8
occupational [4] - 14:13, 14:14, 41:22, 226:25
occur [20] - 17:2, 17:5, 24:4, 30:17, 89:16, 94:10, 109:16, 116:13, 116:14, 133:12, 198:6, 204:18, 208:11, 210:9, 220:23, 223:2, 229:4, 230:9, 250:24
occurred [34] - 26:12, 28:9, 30:15, 32:4, 40:1, 103:6, 103:10, 105:4, 109:15, 111:14, 127:4, 127:5, 129:5, 160:18, 165:16, 169:25, 170:17, 172:25, 173:20, 175:3, 175:25, 176:22, 183:10, 194:9, 199:23, 204:21, 208:10, 208:12, 210:15, 210:18, 210:20, 232:13, 235:1, 238:8

occurrence [2] - 70:13, 142:6
occurring [18] - 36:21, 59:7, 95:18, 128:4, 130:3, 159:4, 164:20, 166:4, 175:22, 182:3, 182:5, 189:13, 196:24, 196:25, 199:3, 229:4, 232:21, 238:13
occurs [4] - 24:19, 129:15, 206:3, 240:14
OF [7] - 1:2, 1:11, 1:17, 2:1, 253:8, 255:1, 255:1
offend [1] - 52:19
offer [2] - 20:24, 253:16
Office [1] - 78:3
office [7] - 12:4, 55:4, 79:3, 81:7, 84:16, 113:12, 255:16
officer [2] - 80:18, 80:19
officers [2] - 81:8, 250:6
offices [2] - 2:7, 241:2
official [1] - 171:25
often [10] - 27:21, 43:13, 75:19, 76:5, 77:18, 79:7, 240:5, 240:23, 240:24, 249:2
Ohio [1] - 53:7
on-site [1] - 250:9
once [9] - 143:16, 180:16, 185:7, 206:1, 215:4, 242:25, 248:22, 248:25
one [130] - 10:25, 13:9, 15:10, 16:4, 16:16, 18:3, 18:10, 20:6, 20:20, 29:6, 30:20, 31:2, 32:11, 33:16, 35:12, 35:13, 39:23, 43:21, 52:23, 53:3, 55:18, 55:19, 56:20, 58:13, 58:17, 63:14, 63:23, 64:2, 64:18, 65:5, 65:17, 65:25, 70:18, 72:17, 72:21, 72:23, 73:8, 73:9, 73:22, 73:24, 74:1, 74:8, 79:12, 80:16, 82:18, 85:6, 93:4, 98:4, 99:19, 99:22, 102:22, 103:2, 105:5, 110:5, 112:10, 112:12, 112:16, 113:10, 114:4, 115:5, 121:15, 121:17, 121:18, 122:2, 123:5, 125:4, 125:13, 126:13, 127:15, 127:21, 131:17, 140:13, 144:4, 147:10, 147:16, 149:23, 155:5, 155:7, 157:9, 158:18, 161:14, 162:24, 165:4, 167:15, 173:4, 178:22, 180:16, 183:15, 187:23, 193:13, 194:1, 194:24, 197:20, 198:17, 199:16,

199:18, 200:4, 200:6, 200:12, 202:10, 211:9, 211:10, 214:5, 215:2, 215:4, 215:11, 215:12, 218:6, 223:24, 225:15, 225:17, 228:17, 228:23, 235:16, 236:4, 236:9, 237:3, 237:8, 238:6, 238:11, 241:22, 241:23, 242:20, 246:4, 250:4, 250:8, 250:13, 251:19, 251:22
ones [2] - 35:23, 72:23
op [1] - 153:19
operable [1] - 187:19
operate [21] - 36:17, 76:10, 77:13, 117:20, 122:10, 123:17, 124:25, 125:8, 125:10, 125:12, 129:20, 178:21, 181:6, 183:21, 184:9, 185:11, 185:14, 186:1, 188:13, 237:11, 237:14
operated [12] - 35:7, 75:8, 75:9, 75:13, 76:22, 81:18, 125:3, 127:4, 151:20, 184:8, 184:10, 185:24
operates [1] - 184:5
operating [14] - 30:3, 35:16, 37:7, 37:20, 71:17, 75:9, 75:20, 98:10, 181:8, 184:22, 186:17, 192:13, 205:6, 244:10
operation [40] - 15:13, 16:4, 16:5, 30:7, 71:14, 90:13, 91:11, 95:16, 95:18, 95:19, 96:7, 98:12, 113:17, 114:12, 114:15, 114:18, 116:14, 116:16, 119:25, 120:22, 126:20, 130:22, 131:17, 131:20, 140:22, 141:3, 141:10, 141:12, 141:14, 141:17, 142:18, 160:13, 171:15, 176:24, 189:13, 189:16, 189:18, 208:6, 233:23, 234:25
operational [6] - 129:12, 129:20, 129:21, 130:24, 187:12
operations [11] - 77:17, 91:1, 118:1, 122:4, 124:20, 181:2, 210:1, 233:19, 235:22, 243:8, 243:9
operator [26] - 35:14, 36:4, 77:20, 94:1, 94:14, 98:8, 98:18, 99:6, 116:22, 123:10, 132:4, 151:12, 151:13, 151:20, 159:2, 197:25, 200:20, 200:21,

203:2, 203:13, 210:15, 232:12, 232:15, 233:16, 233:21, 237:17
Operator [1] - 202:16
operator 's [2] - 95:3, 95:6
opine [6] - 62:14, 132:19, 132:22, 140:8, 186:11, 230:22
opined [2] - 102:10, 102:12
opinion [30] - 8:11, 25:17, 25:18, 58:15, 63:10, 64:11, 79:16, 80:6, 80:8, 80:10, 86:3, 89:5, 102:14, 105:4, 105:8, 108:10, 120:3, 123:19, 128:19, 131:25, 139:22, 143:20, 150:13, 217:18, 228:18, 236:8, 238:25, 239:19, 242:15
opinions [5] - 134:15, 165:3, 217:4, 231:3, 231:5
opponent [1] - 248:6
opportunity [3] - 32:15, 32:21, 32:24
opposed [9] - 72:6, 76:20, 77:11, 95:12, 100:1, 105:15, 231:12, 231:16, 236:24
opposite [1] - 153:15
order [6] - 12:1, 12:10, 14:23, 16:10, 151:3, 155:12
ordinarily [2] - 84:13, 242:13
organization [21] - 14:19, 15:9, 15:11, 19:3, 19:25, 20:23, 27:12, 43:23, 44:18, 44:19, 45:13, 45:21, 45:23, 46:9, 47:13, 47:21, 48:21, 76:11, 111:2, 221:10, 229:3
organization 's [2] - 15:2, 21:13
organizations [12] - 13:16, 14:25, 47:17, 47:19, 50:13, 91:2, 91:14, 100:24, 206:18, 206:20, 207:2, 246:1
orientation [1] - 243:14
originally [1] - 66:5
Ormond [1] - 7:9
OSHA [147] - 11:15, 19:25, 20:4, 20:5, 20:6, 20:10, 20:25, 21:2, 21:18, 21:25, 23:1, 23:11, 23:15, 24:4, 24:7, 24:20, 24:23, 24:25, 25:3, 25:19, 30:2, 30:5, 35:18, 41:8, 41:10, 42:8, 42:13, 42:22, 58:11, 58:17, 60:1, 61:7, 62:7, 62:10, 62:13, 62:24, 63:3, 64:9,

64:15, 65:12, 66:8, 66:14, 66:16, 70:12, 71:11, 78:8, 76:15, 79:17, 79:18, 80:4, 80:12, 80:15, 80:24, 81:3, 81:11, 81:14, 81:15, 81:16, 81:17, 82:5, 82:11, 82:12, 82:14, 83:4, 83:5, 83:13, 83:14, 83:23, 84:3, 85:7, 85:14, 86:4, 86:7, 86:21, 87:3, 91:4, 102:7, 102:14, 115:19, 115:20, 115:21, 115:22, 121:10, 122:14, 123:7, 124:1, 128:11, 129:13, 129:22, 129:24, 130:1, 130:6, 130:22, 131:2, 131:5, 131:9, 166:5, 166:16, 167:17, 168:6, 171:13, 171:18, 172:4, 180:18, 217:9, 217:11, 217:14, 218:15, 226:18, 228:25, 229:2, 229:7, 239:3, 239:8, 239:21, 240:11, 240:20, 240:23, 241:1, 241:8, 241:24, 242:17, 243:2, 243:18, 243:19, 244:5, 244:14, 244:16, 244:18, 245:1, 245:4, 245:9, 245:12, 245:20, 246:2, 246:5, 246:11, 248:20, 249:12, 249:25
OSHA 's [12] - 33:3, 33:23, 37:23, 81:16, 85:22, 135:16, 178:23, 181:1, 181:19, 183:6, 244:23, 245:22
otherwise [2] - 160:18, 197:13
ourselves [1] - 4:11
outline [1] - 193:11
outright [1] - 178:23
outside [1] - 93:25
outstanding [5] - 14:18, 19:1, 19:20, 19:23, 48:3
over-the-road [2] - 208:5, 211:13
overall [2] - 9:3, 180:15
overhead [13] - 68:10, 69:3, 69:4, 69:5, 69:22, 69:25, 70:8, 70:10, 75:6, 75:14, 75:21, 76:23, 77:1
overload [1] - 203:24
overloaded [3] - 179:7, 179:8, 179:11
oversaw [3] - 44:19, 46:9, 119:11
oversee [4] - 21:25, 116:17, 240:25, 244:18
overseeing [1] - 116:20

oversees [1] - 246:14
overview [2] - 15:16, 228:21
own [4] - 104:15, 165:17, 206:15, 248:4
ownership [3] - 14:16, 14:17, 15:5
owning [1] - 30:13

## P

p.m [2] - 2:9, 252:21
PA [6] - 2:15, 2:19, 20:4, 41:8, 42:8, 76:15
pad [1] - 146:18
page [28] - 56:3, 56:4, 88:15, 88:16, 88:17, 89:3, 106:12, 107:7, 118:4, 120:24, 120:25, 121:19, 123:9, 128:18, 129:16, 129:17, 155:20, 168:25, 194:2, 210:22, 213:3, 213:21, 214:11, 214:20, 218:20, 219:18
Page [11] - 254:2, 254:4, 254:6, 254:8, 254:10, 254:12, 254:14, 254:16, 254:18, 254:20, 254:22
PAGE [2] - 3:2, 3:7
pages [5] - 12:20, 213:14, 213:24, 213:25, 217:7
paid [9] - 10:1, 45:7, 46:6, 82:1, 82:13, 82:15, 82:24, 82:25, 83:10
pallet [1] - 78:12
paper [1] - 116:10
paperwork [3] - 113:24, 115:8, 118:22
paragraph [3] - 89:4, 107:9, 213:6
paraphrase [2] - 104:14, 229:11
paraphrasing [1] - 172:13
pardon [2] - 104:7, 235:5
parlance [1] - 5:9
part [48] - 12:12, 15:23, 18:9, 18:12, 21:20, 24:24, 32:8, 33:22, 35:2, 37:14, 41:25, 42:10, 44:15, 47:17, 73:4, 76:15, 82:7, 82:8, 82:21, 85:17, 93:6, 104:19, 105:11, 106:9, 107:4, 109:17, 111:1, 114:6, 129:6, 129:13, 136:15, 138:5, 142:3, 154:23, 168:12, 171:23, 182:5, 193:6, 207:14, 211:6, 211:7, 216:14, 217:12, 225:11, 233:22, 245:7,

246:6, 246:8
participant [3] - 113:18, 113:20, 114:3
participate [1] - 245:25
participated [2] - 100:2, 100:10
participating [3] - 90:18, 132:8, 132:14
participation [2] - 14:17, 97:1
particular [64] - 9:5, 15:13, 15:19, 15:24, 16:18, 16:20, 21:23, 28:6, 37:4, 39:24, 47:12, 49:10, 52:5, 59:3, 67:22, 68:25, 72:16, 80:25, 85:6, 90:5, 93:13, 95:1, 95:21, 98:21, 101:10, 101:14, 101:16, 103:10, 110:25, 112:5, 121:7, 124:9, 125:4, 125:13, 131:19, 132:20, 137:21, 139:5, 142:2, 167:5, 169:24, 170:16, 172:21, 173:1, 173:5, 173:17, 173:19, 174:10, 174:12, 174:25, 176:12, 181:10, 199:23, 206:22, 221:11, 223:16, 229:5, 232:13, 238:1, 242:7, 243:5, 243:10
particularly [1] - 208:25
parties [1] - 255:10
parts [2] - 44:11, 44:14
passes [1] - 38:4
PASSHE [1] - 83:2
passing [1] - 172:2
past [2] - 118:6, 119:8
path [4] - 234:16, 234:18, 234:19, 234:23
paths [2] - 20:8, 20:9
Pauloski [1] - 65:10
paying [1] - 83:6
payroll [2] - 9:21, 52:23
pays [1] - 42:15
penalties [2] - 23:6, 23:9
penalty [2] - 216:22, 253:10
PENALTY [1] - 253:8
Penalty [1] - 3:14
pending [3] - 4:14, 75:23, 76:9
PENNSYLVANIA [2] - 1:2, 255:1
Pennsylvania [21] - 2:6, 2:8, 4:15, 7:10, 7:11, 7:12, 19:25, 20:12, 22:1, 27:8, 41:11, 41:19, 70:4, 82:15, 82:21, 225:11, 241:1, 241:3, 244:17, 244:22, 255:4

people [14] - 11:2, 49:14, 52:2, 130:23, 131:22, 131:24, 157:14, 157:18, 200:22, 212:4, 217:22, 226:14, 235:18, 249:25
per [2] - 15:20, 52:15
percent [6] - 42:25, 49:20, 141:13, 141:15, 141:18, 233:10
percentage [2] - 54:14, 54:21
perfect [1] - 181:7
perfectly [1] - 145:12
perform [5] - 97:21, 116:22, 122:14, 232:11, 242:23
performance [1] - 124:12
performed [8] - 70:22, 75:16, 91:6, 116:6, 119:11, 142:5, 167:24, 243:13
performing [4] - 17:3, 54:18, 115:25, 232:11
performs [1] - 167:22
perhaps [12] - 5:8, 55:11, 66:8, 93:25, 94:1, 96:6, 112:8, 131:25, 221:24, 225:22, 227:25, 231:11
period [14] - 37:3, 37:14, 40:9, 40:10, 40:12, 46:15, 50:1, 143:21, 144:20, 151:16, 212:2, 235:10, 247:12, 248:2
periodic [5] - 37:17, 37:18, 37:21, 136:10, 185:9
periodically [1] - 172:3
PERJURY [1] - 253:8
perjury [1] - 253:10
permanent [2] - 7:8, 208:21
permitted [3] - 122:10, 188:13, 244:13
person [19] - 26:10, 26:11, 40:20, 48:9, 110:7, 113:8, 123:7, 132:11, 144:15, 150:23, 168:6, 178:20, 180:21, 209:24, 218:7, 220:1, 234:1, 235:11, 237:10
person 's [1] - 103:19
personally [1] - 44:23
personnel [8] - 119:21, 122:9, 131:19, 132:7, 168:13, 205:3, 205:7, 225:21
perspective [9] - 22:19, 92:12, 112:14, 114:4, 116:9, 137:18, 153:18, 242:21, 242:22
pertain [1] - 115:13
pertinent [2] - 66:13, 131:13
Philadelphia [1] - 84:16

17

18

photo [1] - 156:21
photographs [2] - 40:19, 177:14
photos [2] - 28:10, 28:11
physical [11] - 40:18, 40:20, 40:23, 41:1, 41:2, 113:19, 113:20, 124:11, 168:1, 168:4, 230:14
physically [5] - 27:7, 28:12, 76:9, 76:19, 116:13, 159:3
physics [2] - 176:2
pick [5] - 161:9, 190:10, 190:12, 203:10, 203:12
picture [1] - 136:16
pictures [2] - 175:23, 215:19
piece [3] - 124:15, 181:10, 183:9
pieces [1] - 181:3
pile [1] - 244:9
plied [5] - 155:20, 156:1, 156:19, 160:21, 161:17
Pinzino [3] - 57:11, 58:2, 66:22
Pittsburgh [8] - 2:8, 2:15, 70:25, 73:8, 73:23, 74:8, 74:17, 84:10
place [21] - 17:10, 54:10, 93:16, 94:22, 94:25, 95:4, 95:7, 95:16, 95:18, 111:22, 139:24, 142:15, 142:17, 180:19, 207:21, 211:4, 231:24, 232:1, 255:6
placed [12] - 93:21, 94:21, 95:7, 96:1, 96:20, 98:17, 98:23, 98:24, 145:25, 146:4, 146:25, 170:25
plaintiff [33] - 13:20, 57:5, 57:7, 57:8, 57:10, 57:12, 59:19, 59:21, 60:6, 61:1, 61:11, 61:12, 61:15, 61:18, 61:19, 63:21, 63:25, 65:3, 65:8, 65:11, 65:14, 65:19, 66:3, 66:12, 66:13, 66:20, 67:20, 73:12, 74:10, 74:11, 79:7, 248:7, 248:9
Plaintiff [6] - 1:5, 2:13, 4:18, 4:19, 57:6, 65:23
PLAINTIFF 'S [1] - 1:11
plaintiffs [1] - 74:6
plant [5] - 15:14, 16:7, 17:25, 18:1, 74:1
planted [1] - 143:16
plants [1] - 77:5
plate [1] - 147:19
platform [1] - 61:15
play [8] - 173:21, 173:22, 174:2, 176:5, 180:10, 198:13, 236:11, 242:19
pleasantly [1] - 229:6

pleasantries [1] - 12:16
point [100] - 6:19, 6:22, 7:8, 16:2, 22:8, 24:17, 28:17, 28:18, 28:19, 28:23, 29:14, 31:1, 31:3, 32:2, 32:19, 33:4, 33:10, 37:19, 37:25, 49:21, 57:1, 70:2, 70:7, 70:19, 76:13, 80:9, 98:13, 98:18, 118:25, 119:15, 127:9, 127:23, 133:25, 141:20, 149:2, 150:5, 155:7, 156:25, 157:1, 157:24, 158:17, 159:6, 159:12, 161:2, 162:14, 163:14, 165:12, 168:5, 169:24, 173:1, 174:11, 174:19, 175:13, 176:16, 177:20, 178:2, 182:15, 182:22, 184:13, 184:18, 189:2, 189:9, 190:22, 193:21, 193:22, 194:24, 194:25, 195:24, 196:1, 198:22, 200:25, 201:5, 201:17, 201:18, 202:2, 202:5, 202:14, 204:14, 206:8, 206:17, 207:7, 207:13, 208:3, 209:12, 209:19, 215:3, 219:12, 219:14, 228:19, 229:4, 230:8, 231:21, 232:13, 232:21, 238:13, 246:4, 247:23, 248:1
points [6] - 96:1, 96:10, 96:14, 146:7, 160:13, 234:10
poison [1] - 161:9
Poissinger [1] - 61:13
police [1] - 167:3
policies [5] - 91:14, 100:25, 101:2, 101:4, 115:12, 251:8
policy [15] - 101:19, 209:18, 210:5, 210:6, 211:4, 241:24, 241:25, 249:9, 249:12, 249:15, 250:17, 251:6, 251:7, 251:12
portion [4] - 138:15, 147:17, 167:15, 215:25
position [21] - 22:12, 22:13, 26:6, 26:7, 45:7, 46:4, 94:16, 98:25, 107:5, 110:25, 118:7, 118:13, 118:16, 147:13, 158:18, 188:18, 189:20, 200:24, 229:22, 229:24, 234:7
positioned [7] - 93:7, 93:11, 93:16, 93:18, 94:3, 175:23, 206:6
positions [1] - 228:7

possibility [3] - 36:5, 39:21, 171:8
possible [6] - 57:14, 104:6, 108:7, 116:8, 164:4, 164:8
possibly [3] - 59:6, 174:23, 174:24
post [3] - 24:8, 28:10, 79:3
Post [2] - 78:2, 146:18
post-accident [1] - 24:8
post-incident [1] - 28:10
Post-It [1] - 146:18
postal [1] - 78:23
Postal [1] - 78:25
postincident [1] - 230:20
potential [2] - 17:4, 22:6
potentially [3] - 76:10, 84:21, 194:14
pound [3] - 126:10, 148:12, 148:14
power [1] - 77:5
Power [2] - 77:6, 91:4
practical [1] - 93:23
practice [3] - 41:24, 42:1, 89:15
practices [4] - 16:9, 89:9, 89:11, 91:9
Practices [2] - 246:19, 247:3
precise [3] - 79:6, 95:25, 136:3
precisely [1] - 135:9
preclude [3] - 101:19, 166:19, 175:12
predominantly [1] - 49:6
preflight [3] - 16:17, 16:20, 16:22
prematurely [3] - 133:21, 134:15, 137:13
preoperational [1] - 229:14
preparation [1] - 12:12
prepare [3] - 12:1, 12:10, 67:9
prepared [1] - 88:13
PRESENT [1] - 2:12
present [4] - 10:21, 13:4, 68:9, 99:5
presently [2] - 12:24, 42:6
president [6] - 12:25, 43:22, 44:17, 45:18, 45:25, 51:3
presumably [2] - 155:11, 207:8
presume [2] - 10:3, 58:14
presumes [1] - 209:24
pretty [3] - 18:23, 200:19, 216:10
prevent [4] - 36:21, 145:9, 145:11, 242:10
preventative [1] - 187:24
prevented [4] - 66:14,

132:18, 219:10, 220:8
preventing [1] - 112:8
prevention [1] - 110:18
preventive [2] - 188:4, 188:9
previous [2] - 233:1, 246:10
previously [1] - 245:8
primarily [3] - 13:11, 20:14, 65:2
primary [2] - 16:15, 222:8
probability [1] - 175:18
problem [9] - 32:12, 104:19, 104:21, 104:24, 105:3, 151:11, 151:12, 152:24, 203:24
problems [1] - 81:6
Procedure [1] - 2:4
procedure [3] - 15:14, 225:15, 225:16
procedures [7] - 89:10, 89:11, 100:25, 101:2, 101:5, 115:13, 130:23
proceeding [1] - 106:21
process [21] - 13:18, 14:6, 14:7, 14:12, 14:25, 15:1, 15:2, 15:23, 17:7, 17:21, 17:24, 18:2, 18:13, 99:20, 114:6, 190:18, 210:9, 211:11, 211:17, 211:18, 211:19
produce [2] - 168:23, 221:1
produces [1] - 53:14
production [3] - 75:11, 75:16, 77:11
profession [2] - 222:17, 224:15
Professional [2] - 2:5, 255:3
professional [8] - 34:18, 44:15, 44:16, 220:14, 225:19
Professionals [4] - 43:23, 44:1, 45:14, 45:17
professionals [4] - 44:3, 51:14, 52:24, 224:16
professor [2] - 21:24, 42:20
profit [2] - 45:22, 45:23
Program [5] - 20:4, 41:8, 42:8, 42:22, 244:20
program [18] - 13:21, 13:24, 22:1, 41:12, 41:22, 42:13, 81:16, 81:17, 81:20, 81:22, 82:17, 188:4, 188:10, 243:20, 244:18, 245:5
programs [1] - 124:10
prohibited [1] - 20:8
PROHIBITED [1] - 1:17
Promotions [1] - 65:7
proper [1] - 34:18
properly [21] - 29:7, 29:8, 29:9, 31:5, 31:16, 33:15,

35:8, 93:7, 111:9, 118:1, 120:21, 121:6, 124:25, 129:23, 129:25, 131:2, 131:4, 131:8, 182:6, 221:25
property [4] - 75:7, 207:3, 241:16, 241:19
proposition [1] - 148:19
protect [1] - 142:14
protecting [1] - 142:11
protection [1] - 17:6
protocols [2] - 76:14, 133:2
prove [20] - 28:22, 29:6, 31:4, 33:20, 35:8, 35:11, 168:24, 176:4, 176:7, 177:23, 177:25, 182:6, 183:16, 202:10, 202:11, 230:3, 230:6, 230:8, 230:10
proved [1] - 168:5
proven [5] - 31:1, 31:2, 32:11, 33:16, 175:8
provide [9] - 6:1, 8:11, 13:10, 15:22, 16:14, 20:12, 97:19, 100:17, 224:15
provided [15] - 7:25, 9:9, 11:17, 26:1, 29:12, 47:16, 50:22, 55:1, 55:9, 118:9, 123:14, 137:15, 178:3, 217:7, 233:2
provides [1] - 20:10
providing [3] - 48:13, 225:10, 239:11
provision [1] - 228:25
prudent [3] - 209:14, 209:17, 235:11
Public [3] - 2:5, 49:25, 255:3
publicity [2] - 84:21, 84:22
puck [1] - 215:9
pull [8] - 32:5, 70:2, 172:13, 172:14, 195:14, 196:23, 197:21
pulled [2] - 167:3, 195:7
pulling [1] - 195:18
punitive [1] - 109:10
punitive -type [1] - 109:10
pure [3] - 32:7, 173:18, 222:2
purporting [1] - 213:4
purpose [15] - 4:16, 75:10, 75:21, 137:19, 162:25, 177:7, 183:19, 184:1, 184:4, 184:6, 185:7, 185:10, 185:24, 186:2, 205:8
purposefully [1] - 170:11
purposes [3] - 75:10, 75:11, 211:13
pursuant [3] - 2:3, 81:21, 81:22

purview [1] - 170:7
push [1] - 149:7
put [17] - 52:11, 93:17, 96:6, 99:25, 100:1, 112:25, 119:20, 140:19, 156:6, 160:1, 160:3, 160:5, 160:7, 187:21, 218:15, 231:12, 245:19
putting [2] - 93:4, 156:21

## Q

qualifications [6] - 68:3, 123:11, 123:13, 226:24, 231:4
qualified [26] - 67:21, 96:12, 96:15, 97:19, 116:25, 117:1, 122:13, 122:17, 122:20, 122:22, 123:6, 123:17, 125:11, 138:19, 224:22, 231:22, 233:22, 233:24, 234:4, 235:6, 235:8, 235:12, 235:13, 235:14
questions [9] - 50:14, 55:7, 143:4, 150:13, 164:23, 238:19, 248:16, 250:4
quick [2] - 143:4, 238:20
quickly [2] - 61:22, 163:18
quite [4] - 77:17, 108:7, 109:6, 240:5
quoted [1] - 169:10

## R

racing [1] - 65:9
raise [6] - 133:16, 134:14, 134:20, 137:8, 159:5, 215:6
raised [5] - 134:13, 163:19, 163:22, 214:12, 237:4
raising [10] - 106:4, 106:7, 106:24, 107:2, 126:21, 133:20, 137:12, 137:14, 157:23, 237:21
random [1] - 18:14
ranging [1] - 14:15
ranking [1] - 44:1
rare [2] - 18:23, 52:3
rarely [1] - 99:18
rated [1] - 202:19
rates [1] - 50:25
raw [1] - 124:15
re [2] - 197:4, 197:7
re-engaged [2] - 197:4, 197:7
reach [2] - 149:6, 149:14

reaction [1] - 252:12
read [40] - 5:5, 13:6, 25:20, 26:18, 29:18, 31:8, 33:14, 35:14, 41:4, 91:20, 96:21, 96:22, 103:15, 104:16, 106:11, 106:12, 109:19, 117:14, 117:16, 121:4, 127:19, 127:25, 136:4, 138:15, 138:18, 165:2, 167:14, 167:20, 193:16, 198:10, 198:12, 215:21, 215:23, 216:2, 220:6, 233:13, 252:18, 253:11, 253:12
reading [16] - 11:12, 11:14, 11:20, 127:17, 146:24, 151:6, 154:9, 156:8, 156:13, 164:17, 165:9, 165:14, 170:19, 192:8, 193:10, 255:10
realigning [1] - 15:3
reality [6] - 40:15, 98:3, 98:7, 139:2, 140:20, 161:10
realize [5] - 24:5, 59:5, 125:24, 133:15, 138:16
realized [1] - 40:19
really [10] - 10:10, 19:21, 57:4, 145:22, 158:17, 167:6, 208:2, 222:16, 229:10, 232:6
reanalysis [1] - 182:3
reason [8] - 63:14, 102:8, 199:4, 215:22, 226:23, 230:2
Reason [11] - 254:3, 254:5, 254:7, 254:9, 254:11, 254:13, 254:15, 254:17, 254:19, 254:21, 254:23
reasonable [4] - 34:17, 174:1, 174:4, 174:6
reasons [2] - 99:22, 121:5
reassessment [1] - 15:10
reattached [1] - 200:7
receipts [1] - 53:21
receive [1] - 117:7
received [2] - 77:19, 255:12
receiving [2] - 113:5, 114:20
recent [2] - 67:8, 101:7
recently [3] - 23:20, 44:13, 48:5
recess [2] - 87:20, 205:18
recite [1] - 153:14
Recognition [1] - 244:20
recognition [2] - 20:1, 99:23
recognize [2] - 15:17, 67:4
recognized [5] - 48:2, 82:9, 133:7, 244:25
recognizing [1] - 41:23
recollect [1] - 70:18

recollection [12] - 11:11, 43:16, 55:4, 55:21, 79:5, 152:3, 164:10, 164:19, 164:24, 223:13, 223:16
recollections [1] - 152:25
recommendations [2] - 19:6, 186:21
reconstructed [1] - 149:24
reconstruction [6] - 148:17, 149:4, 173:17, 181:16, 202:12, 238:7
record [10] - 25:3, 32:25, 33:1, 42:3, 50:18, 88:12, 166:20, 184:2, 240:6, 255:7
recorded [1] - 255:6
records [2] - 29:12, 29:16
recourse [1] - 166:12
recreation [1] - 15:9
redacted [1] - 218:17
reduced [1] - 255:7
reeving [3] - 186:21, 186:23, 187:5
refer [7] - 24:6, 24:21, 69:5, 213:6, 213:9, 241:4, 244:16
reference [9] - 59:14, 87:22, 103:5, 103:7, 123:1, 123:2, 129:24, 130:1, 229:1
referenced [1] - 241:12
references [9] - 26:9, 102:18, 102:25, 115:21, 115:22, 115:24, 124:1, 129:22, 146:1
referral [1] - 24:9
referred [4] - 41:19, 84:15, 243:24, 245:1
referring [9] - 88:16, 89:14, 89:15, 103:25, 156:24, 164:4, 191:12, 191:13, 213:15
refers [2] - 187:6, 244:19
reflect [1] - 6:9
reflected [1] - 112:13
reflective [1] - 117:21
reflects [1] - 11:10
refreshing [1] - 154:8
refused [1] - 141:19
reg [1] - 249:17
regard [3] - 6:5, 128:20, 228:1
regarded [1] - 41:22
regarding [6] - 9:10, 10:20, 11:10, 53:4, 219:1, 246:2
regardless [3] - 83:10, 134:18, 192:12
regional [1] - 84:16
Registered [2] - 2:5, 255:3

20

regs [2] - 192:14, 195:16
regular [1] - 240:9
regulation [27] - 30:2, 30:6, 36:24, 122:5, 124:2, 135:4, 135:6, 142:20, 169:22, 170:7, 171:13, 171:16, 173:19, 176:5, 182:9, 187:23, 189:21, 190:14, 192:13, 193:18, 199:6, 199:21, 199:22, 200:16, 200:18, 202:8, 207:24
regulations [80] - 20:15, 20:16, 30:12, 33:3, 33:24, 35:13, 36:20, 36:23, 37:5, 37:24, 39:2, 39:8, 48:18, 58:12, 58:18, 58:19, 58:22, 59:2, 60:1, 62:7, 62:11, 62:13, 62:25, 63:3, 66:8, 68:18, 71:11, 71:12, 71:15, 81:11, 85:10, 86:9, 92:24, 121:19, 121:25, 122:3, 122:6, 128:12, 128:25, 129:3, 129:7, 130:21, 135:16, 136:9, 142:13, 142:15, 142:17, 142:24, 143:1, 161:13, 169:3, 171:18, 172:3, 178:23, 180:18, 181:1, 181:20, 183:6, 183:14, 191:13, 192:6, 192:8, 195:10, 196:10, 196:20, 197:5, 197:9, 207:25, 229:8, 244:12, 244:24, 245:9, 245:12, 245:17, 245:19, 245:23, 246:3
regulatory [3] - 123:1, 249:10, 250:3
reiterated [1] - 236:13
related [3] - 5:10, 49:19, 251:23
relating [2] - 106:13, 220:1
relative [1] - 255:13
released [1] - 211:16
releasing [1] - 211:15
relevance [2] - 32:18, 69:10
relevant [3] - 25:6, 27:5, 27:9
relied [1] - 217:17
relocated [1] - 93:21
reluctant [1] - 99:21
rely [2] - 22:22, 176:20
remaining [1] - 200:13
remember [9] - 66:6, 74:12, 86:13, 127:17, 147:3, 173:4, 174:25, 197:22, 233:15
remove [5] - 129:11, 129:14, 129:19, 209:13, 209:23
removed [6] - 98:18, 206:1, 210:24, 212:12, 235:9,

240:15
render [1] - 231:4
rendered [3] - 79:16, 80:8, 86:3
renders [1] - 187:16
rental [1] - 224:16
reoccurring [2] - 101:19, 242:10
repair [3] - 34:2, 167:21, 167:22
repaired [1] - 186:1
repairing [1] - 30:8
repairs [2] - 118:6, 119:8
repeat [2] - 5:3, 5:4
repeated [2] - 112:20, 229:1
repeating [1] - 219:11
rephrase [2] - 67:17, 164:9
report [70] - 6:11, 6:18, 11:9, 22:18, 23:24, 25:10, 25:13, 28:25, 29:10, 29:18, 30:5, 58:8, 58:9, 60:15, 60:16, 62:3, 62:10, 67:9, 67:10, 67:13, 69:15, 69:25, 79:24, 80:11, 88:9, 88:13, 88:15, 88:16, 89:2, 101:6, 102:17, 103:1, 103:20, 105:19, 106:12, 112:20, 117:13, 121:13, 122:25, 128:10, 129:1, 142:22, 142:25, 143:5, 146:2, 153:10, 154:4, 158:18, 165:2, 165:6, 166:11, 168:10, 168:12, 169:1, 169:6, 182:19, 182:23, 208:23, 209:15, 210:21, 213:2, 217:3, 218:15, 223:5, 223:21, 228:16, 228:19, 228:20, 248:12, 248:13
Report [1] - 3:12
reportable [2] - 23:10, 23:22
reported [1] - 105:15
reporter [1] - 121:3
Reporter [2] - 2:5, 255:3
reporting [1] - 49:14
reports [1] - 23:7
repositioned [1] - 93:15
represent [3] - 103:10, 156:20, 214:21
representative [2] - 10:21, 122:13
representatives [3] - 248:4, 248:7, 248:9
represented [1] - 141:12
representing [4] - 4:12, 11:1, 75:2, 150:24
represents [1] - 146:18
REPRODUCTION [1] - 1:17
request [3] - 12:1, 55:2, 218:17

requested [2] - 6:2, 32:23
requests [1] - 21:10
require [1] - 123:20
required [11] - 19:8, 58:9, 67:11, 121:18, 130:12, 203:14, 209:16, 243:6, 244:14, 244:16, 245:2
requirement [5] - 129:13, 130:9, 135:1, 185:3, 188:19
requirements [13] - 21:9, 37:6, 40:2, 40:4, 90:4, 117:10, 117:12, 122:18, 130:24, 131:7, 166:18, 188:12, 241:10
requires [1] - 226:7
requiring [3] - 208:24, 210:23, 211:12
research [5] - 11:3, 25:10, 25:15, 52:9, 74:19
reserve [1] - 6:23
reserving [1] - 101:21
residence [3] - 7:7, 7:8, 7:10
Resources [4] - 46:23, 47:7, 47:12, 47:23
resources [3] - 24:6, 225:22, 225:24
respect [41] - 11:5, 26:10, 30:2, 30:6, 40:6, 44:2, 69:16, 69:19, 70:9, 71:13, 77:4, 81:7, 91:1, 103:5, 105:5, 107:14, 108:11, 109:14, 115:8, 117:11, 123:12, 124:1, 124:3, 130:21, 142:17, 152:19, 155:15, 159:22, 181:1, 181:20, 182:4, 224:15, 224:19, 237:25, 238:1, 240:12, 240:25, 244:9, 246:12, 246:15
respective [1] - 255:10
respects [1] - 83:12
respond [7] - 21:12, 21:14, 21:17, 23:15, 23:16, 24:1, 255:12
responded [1] - 111:2
responds [1] - 23:11
response [3] - 21:18, 39:17, 218:16
responsibilities [4] - 119:1, 119:4, 119:5, 243:1
responsibility [21] - 93:6, 93:11, 95:3, 95:6, 100:20, 114:15, 116:3, 139:23, 140:9, 141:11, 141:14, 141:15, 141:18, 203:22, 209:8, 209:9, 209:13, 220:17, 233:17, 233:18, 243:3

responsible [10] - 54:22, 92:2, 93:9, 94:18, 94:20, 113:23, 115:5, 116:6, 212:21, 242:9
responsive [1] - 55:8
rest [2] - 189:20, 218:7
rested [1] - 172:23
resting [11] - 143:18, 172:15, 172:17, 172:25, 173:2, 173:6, 173:8, 173:9, 174:7, 174:8, 206:10
restrict [1] - 91:15
result [5] - 18:19, 84:21, 176:5, 178:18, 251:5
resulted [1] - 240:21
results [3] - 18:17, 45:1, 45:2
retain [1] - 47:22
retained [32] - 4:18, 8:10, 8:12, 8:17, 9:6, 33:7, 33:12, 43:6, 56:8, 56:9, 56:22, 56:24, 57:1, 57:4, 60:9, 61:20, 66:4, 67:8, 67:13, 67:19, 68:5, 68:9, 74:12, 74:23, 75:4, 79:7, 79:15, 86:25, 87:2, 248:2, 248:6, 248:8
retains [1] - 239:1
retention [1] - 9:4
retreated [1] - 138:9
Rettew [1] - 64:6
return [1] - 205:25
returned [3] - 98:15, 206:8, 207:13
returns [1] - 206:4
reveal [1] - 111:25
revealed [4] - 107:5, 131:13, 132:17, 176:19
revenue [4] - 53:15, 53:17, 53:21, 54:8
revenue-wise [1] - 54:8
revenues [1] - 54:14
review [11] - 9:23, 12:6, 22:16, 22:23, 26:5, 45:1, 168:4, 171:23, 172:1, 214:4, 243:21
reviewed [18] - 12:3, 25:25, 26:10, 83:24, 84:6, 88:24, 110:7, 110:11, 114:16, 115:15, 117:2, 117:3, 168:2, 178:7, 217:4, 217:12, 217:14, 223:5
Reviewed [1] - 88:21
reviewing [2] - 12:9, 172:3
reviews [12] - 70:16, 87:11, 88:3, 105:25, 117:18, 121:16, 122:8, 154:6, 216:24, 217:23, 246:17, 247:20
revising [1] - 246:2

21

revision [1] - 171:24
revolving [1] - 225:24
rig [2] - 202:17, 208:21
rigged [2] - 76:25, 190:8
rigger [16] - 77:16, 96:19, 97:20, 98:2, 125:11, 132:3, 233:2, 233:22, 234:4, 235:3, 235:6, 235:8, 235:12, 235:13, 243:7, 251:24
riggers [7] - 95:9, 95:10, 95:11, 96:12, 96:15, 97:7, 132:1
rigging [9] - 74:2, 74:25, 120:22, 130:16, 151:21, 167:20, 204:24, 242:23
right-hand [1] - 88:17
risk [9] - 16:18, 16:25, 17:6, 26:7, 48:15, 49:16, 49:17, 50:8
risks [1] - 49:23
road [7] - 92:17, 92:18, 93:10, 110:24, 208:5, 211:13, 231:21
rocker [1] - 93:5
role [7] - 44:17, 48:10, 92:23, 115:15, 174:2, 243:1, 245:11
rolling [3] - 145:9, 145:11, 145:13
roof [1] - 62:2
room [9] - 12:13, 91:13, 91:18, 94:1, 104:8
rope [8] - 77:3, 186:20, 186:23, 186:24, 187:5, 187:6, 187:8
rough [1] - 94:2
roughly [5] - 8:1, 49:15, 51:21, 93:2, 244:21
routine [1] - 16:22
rubbing [2] - 159:2, 159:9
Rudert [11] - 2:14, 6:1, 8:1, 8:15, 9:10, 9:13, 10:20, 11:18, 12:14, 26:1, 50:22
RUDERT [30] - 3:4, 37:11, 38:6, 38:8, 38:12, 38:16, 39:10, 39:15, 100:4, 136:1, 140:8, 143:23, 162:7, 162:12, 164:6, 164:21, 165:9, 165:12, 165:19, 165:21, 213:11, 218:5, 218:9, 218:13, 231:23, 232:3, 238:20, 238:24, 248:15, 252:17
Rudert's [1] - 10:5
rule [13] - 34:11, 34:15, 36:6, 36:25, 37:3, 37:24, 38:1, 38:2, 40:24, 210:22, 210:25, 211:4

ruled [8] - 34:10, 34:11, 34:24, 35:5, 173:23, 173:24, 173:25, 174:3
Rules [1] - 2:3
rules [5] - 5:1, 39:20, 130:21, 130:23, 215:1
run [4] - 41:9, 41:11, 42:13, 81:18
runs [1] - 19:18
résumé [5] - 7:23, 12:18, 89:25, 226:21, 247:12

## S

S-shaped [1] - 147:9
sad [1] - 62:22
safe [41] - 16:10, 22:5, 117:20, 129:21, 130:21, 131:17, 132:6, 132:21, 138:14, 138:17, 138:18, 138:24, 139:24, 140:14, 140:16, 140:18, 140:20, 142:18, 160:5, 160:7, 160:9, 177:6, 177:7, 177:18, 177:23, 178:7, 178:8, 179:15, 179:20, 184:9, 184:12, 184:17, 184:19, 185:11, 185:14, 185:20, 185:21, 187:22, 235:20, 243:7, 244:10
safely [11] - 15:15, 36:17, 95:3, 125:8, 180:4, 183:21, 184:6, 184:8, 235:23, 235:25, 236:1
safer [1] - 15:19
Safety [26] - 12:25, 13:7, 13:8, 13:12, 20:3, 42:10, 43:22, 43:25, 45:14, 45:16, 46:1, 46:20, 46:23, 47:6, 47:12, 47:18, 47:22, 48:10, 50:15, 51:4, 53:9, 59:9, 225:9, 244:19, 246:19, 247:3
safety [104] - 13:10, 13:14, 13:17, 13:18, 13:21, 14:6, 14:11, 14:13, 14:14, 14:18, 15:2, 15:6, 16:21, 18:4, 18:6, 18:11, 18:13, 18:17, 18:20, 19:1, 19:10, 19:13, 19:16, 19:20, 19:23, 22:3, 25:17, 26:6, 26:7, 26:10, 26:11, 27:11, 27:15, 27:16, 27:17, 28:2, 34:18, 41:17, 41:22, 43:2, 44:2, 44:15, 44:16, 46:16, 47:16, 47:19, 47:25, 48:3, 48:20, 49:7, 49:19, 50:10, 50:12, 51:13, 52:24, 53:11, 53:16, 54:17,

59:14, 59:16, 90:21, 90:22, 92:12, 99:20, 103:4, 103:13, 105:11, 110:9, 112:13, 123:15, 130:9, 130:10, 130:12, 133:3, 137:15, 139:11, 178:17, 178:19, 180:15, 212:18, 220:10, 220:11, 224:10, 224:12, 224:16, 224:19, 224:22, 225:8, 225:18, 226:5, 226:6, 226:8, 226:11, 226:25, 231:8, 235:22, 244:15, 245:2, 245:8, 246:15
safety-related [1] - 49:19
sake [4] - 6:25, 30:16, 110:15, 111:4
salary [2] - 41:15, 42:15
Salix [1] - 7:12
sample [1] - 18:14
SAMUEL [5] - 1:12, 2:1, 4:3, 253:24, 254:24
Samuel [1] - 7:6
sat [1] - 50:11
save [2] - 28:24, 253:13
saw [23] - 28:10, 29:12, 36:2, 36:7, 40:18, 40:19, 105:14, 127:12, 146:1, 153:25, 155:13, 155:15, 157:18, 168:14, 181:10, 204:20, 215:19, 239:24, 240:3, 252:9, 252:12, 252:13
scaffold [1] - 64:16
scaffolding [1] - 60:22
scenario [1] - 98:13
scene [1] - 113:10
Schedule [1] - 3:10
Sciences [1] - 42:10
scope [7] - 67:25, 114:22, 118:20, 119:1, 119:3, 171:13
se [1] - 15:20
seal [1] - 255:16
search [2] - 25:1
second [9] - 7:17, 13:14, 15:3, 44:15, 107:9, 117:25, 147:10, 213:24, 214:19
secondary [2] - 7:10, 222:9
seconds [1] - 126:19
secretary [1] - 87:23
Secretary [1] - 88:6
Section [1] - 189:24
section [14] - 88:20, 117:14, 121:7, 121:22, 122:11, 124:7, 124:20, 128:10, 128:16, 129:3, 153:10, 167:14, 249:10, 249:11
sections [2] - 128:23, 167:11
secure [7] - 93:3, 94:20,

206:5, 206:16, 206:20, 207:22, 208:20
secured [10] - 78:8, 78:18, 78:20, 125:15, 206:13, 209:5, 210:17, 210:23, 211:12, 212:13
securement [2] - 92:24, 207:14
securing [8] - 92:2, 92:8, 92:10, 92:11, 92:13, 207:2, 207:9, 207:23
see [49] - 19:24, 21:23, 27:15, 27:16, 31:11, 36:9, 36:18, 40:25, 41:2, 75:25, 76:1, 76:2, 101:2, 151:9, 151:21, 152:17, 152:20, 152:21, 152:22, 152:24, 153:4, 154:12, 154:13, 154:23, 154:24, 154:25, 155:12, 157:16, 158:13, 158:22, 159:2, 162:5, 162:16, 163:9, 163:12, 163:13, 167:5, 192:14, 192:24, 198:2, 198:4, 219:8, 225:12, 230:15, 237:6, 237:9, 243:12
seeing [3] - 28:1, 151:12, 151:13
seek [1] - 27:18
seeking [1] - 67:23
seem [1] - 238:9
sees [1] - 163:3
selected [1] - 122:12
self [1] - 75:12
senior [5] - 14:16, 15:4, 18:15, 27:22, 49:5
senior-level [1] - 27:22
sense [1] - 238:10
sent [2] - 5:23, 9:17
sentence [2] - 118:10, 215:10
separation [2] - 80:23, 166:15
sequester [1] - 83:4
sequestered [1] - 83:9
series [4] - 128:20, 128:23, 221:4, 221:5
serious [1] - 24:2
serve [5] - 56:8, 56:9, 231:6, 246:13, 247:14
served [1] - 227:10
service [9] - 9:4, 34:2, 34:20, 36:10, 36:11, 38:20, 41:13, 54:15, 78:23
Service [1] - 78:25
services [7] - 9:10, 9:13, 10:2, 20:11, 20:12, 20:24, 225:10
servicing [1] - 30:8

22

serving [3] - 131:25, 227:7, 247:9
sessions [1] - 26:3
set [17] - 40:12, 40:13, 82:17, 85:10, 86:8, 154:4, 156:14, 156:17, 156:18, 190:12, 191:14, 192:9, 207:8, 244:5, 255:16
setting [2] - 60:4, 110:23
settled [1] - 85:15
settlement [5] - 21:20, 85:18, 85:19, 85:20, 216:23
seventh [1] - 215:3
several [6] - 15:1, 26:8, 28:23, 45:19, 99:12, 99:13
shall [10] - 124:7, 124:10, 169:11, 170:13, 188:24, 191:9, 192:10, 195:22, 197:15, 202:16
shaped [1] - 147:9
SHARP [4] - 20:1, 244:16, 244:18, 244:24
SHEET [3] - 253:1, 253:15, 254:1
shift [1] - 88:8
shimmy [4] - 127:11, 127:13, 143:14, 181:14
shimmying [1] - 127:24
shipment [3] - 115:5, 115:7, 115:9
shipped [6] - 118:2, 118:5, 118:18, 118:19, 119:7
shipper [4] - 93:20, 118:24, 119:2, 119:4
shipping [12] - 113:4, 114:6, 114:20, 118:20, 119:12, 119:17, 119:23, 120:5, 120:7, 120:9, 120:11, 120:13
shop [3] - 49:4, 124:23, 136:24
shops [1] - 19:23
shortly [1] - 140:17
shout [3] - 150:19, 151:2, 151:3
show [5] - 43:10, 55:24, 87:4, 87:8, 165:1
showed [1] - 160:12
shown [4] - 55:12, 104:18, 104:22, 105:1
sic [4] - 66:18, 119:13, 140:3, 212:6
sic) [1] - 213:10
side [61] - 10:18, 20:6, 20:7, 20:10, 23:1, 23:8, 23:16, 24:1, 24:4, 24:7, 24:16, 126:22, 127:7, 152:5, 152:8, 152:12, 152:13, 152:15, 152:16, 152:22,

152:23, 153:2, 153:15, 153:20, 153:21, 153:23, 154:11, 157:10, 158:5, 158:8, 158:9, 159:3, 159:8, 159:9, 159:13, 159:14, 159:16, 159:17, 159:19, 159:24, 160:17, 160:19, 160:23, 162:1, 162:5, 162:6, 163:4, 163:9, 163:11, 174:22, 175:24, 199:18, 237:20, 237:22, 238:3, 248:4
sides [2] - 20:5, 78:15
sight [1] - 151:22
signal [3] - 134:17, 134:18, 161:19
signaled [3] - 137:8, 137:14, 157:23
signaling [7] - 133:2, 133:4, 133:5, 133:7, 134:16, 134:19
signaller [1] - 77:15
signals [1] - 205:4
signature [1] - 22:17
Signature [1] - 252:19
SIGNATURE [1] - 254:24
signatures [2] - 116:10, 118:21
signed [3] - 110:11, 255:11, 255:12
Signed [1] - 253:20
significant [7] - 46:13, 81:6, 84:15, 84:18, 85:21, 90:12
signing [1] - 255:10
silicon [1] - 21:9
similar [2] - 22:2, 71:15
simply [3] - 126:10, 134:1, 226:2
single [6] - 36:12, 36:14, 36:16, 36:18, 36:19, 245:10
sit [5] - 12:1, 44:10, 87:18, 135:19, 147:14
site [7] - 18:12, 21:19, 100:23, 172:7, 205:25, 250:9, 251:5
sitting [10] - 17:10, 91:12, 142:18, 144:19, 146:12, 146:22, 148:2, 148:7, 206:9, 215:24
situation [21] - 19:5, 23:25, 89:16, 97:11, 99:4, 102:2, 131:15, 135:14, 135:15, 142:10, 161:10, 222:23, 242:10, 242:12, 242:15, 249:23, 250:7, 250:12, 251:4, 251:18, 252:13
situations [6] - 93:14, 225:5, 239:24, 240:3, 240:20,

244:1
sixth [1] - 215:4
skill [1] - 255:8
skip [1] - 61:21
sky [2] - 222:10, 222:12
skylight [1] - 62:2
slack [1] - 233:13
slant [1] - 239:19
slanted [3] - 109:13, 109:17
slid [3] - 160:25, 161:25, 163:3
slide [2] - 175:20, 176:1
slightest [1] - 147:24
sling [64] - 77:2, 126:21, 129:11, 129:14, 129:19, 133:11, 154:18, 154:23, 155:19, 160:16, 160:20, 172:10, 172:14, 172:15, 172:17, 173:4, 173:5, 173:8, 173:9, 173:10, 174:7, 174:8, 174:9, 174:12, 174:18, 176:11, 176:17, 176:21, 176:23, 177:3, 177:5, 177:7, 177:9, 177:18, 177:21, 177:23, 178:7, 178:10, 178:25, 179:14, 179:20, 179:21, 180:1, 180:2, 188:25, 191:10, 192:11, 194:16, 195:2, 196:1, 196:16, 197:20, 198:5, 198:14, 199:1, 199:2, 210:24, 215:25, 216:13, 216:14, 234:23, 238:1
slings [48] - 32:2, 32:5, 125:14, 128:3, 151:22, 151:23, 154:11, 154:17, 155:25, 158:13, 158:22, 159:2, 159:9, 159:25, 161:7, 161:16, 162:5, 162:16, 163:9, 163:12, 163:13, 163:15, 173:3, 173:5, 174:25, 175:18, 175:19, 175:20, 175:24, 176:1, 176:13, 199:15, 199:17, 200:3, 200:4, 203:7, 209:23, 210:16, 211:15, 211:16, 211:20, 212:4, 215:24, 216:12, 237:5, 237:13, 237:14
slipped [3] - 48:5, 86:19, 152:12
slippery [1] - 61:6
slips [1] - 221:16
small [9] - 20:11, 20:15, 20:17, 20:18, 20:22, 21:12, 22:4, 244:20, 244:21
smaller [1] - 193:14
Smith [1] - 65:22

snag [1] - 211:25
snagged [1] - 212:1
snarky [1] - 226:2
Snyder [2] - 61:20, 74:15
Society [2] - 13:12, 46:1
software [3] - 14:1, 14:3, 14:5
solicit [4] - 20:23, 21:1, 21:3, 21:11
someone [1] - 66:5
someplace [1] - 145:10
sometime [1] - 162:1
sometimes [12] - 14:8, 21:17, 24:3, 24:19, 25:5, 25:6, 102:22, 144:16, 144:17, 179:2, 222:14, 248:20
somewhat [2] - 157:19, 231:9
somewhere [3] - 6:14, 91:19, 205:23
soon [1] - 169:5
sorry [13] - 22:15, 44:20, 65:25, 85:8, 88:2, 141:7, 145:22, 148:9, 149:10, 160:10, 173:10, 206:25, 232:19
sort [4] - 5:13, 44:8, 70:14, 91:18
sound [1] - 176:24
sounds [2] - 12:23, 62:21
source [1] - 89:19
sources [3] - 6:16, 29:25, 100:19
south [6] - 152:13, 158:8, 159:21, 162:5, 163:4, 238:5
speaker [1] - 59:9
speaking [3] - 56:5, 151:18, 219:13
specialized [1] - 224:19
specific [11] - 34:1, 48:8, 52:7, 78:6, 82:24, 89:10, 122:3, 122:6, 122:14, 240:8, 246:24
specifically [6] - 69:21, 74:21, 77:9, 124:5, 124:6, 165:3, 245:9, 249:17
specifics [6] - 60:8, 63:18, 73:11, 77:8, 86:13, 124:2
speculate [1] - 34:5
speculated [2] - 126:2, 126:3
speculation [7] - 32:7, 32:9, 32:10, 126:10, 126:23, 170:3, 173:18
speech [1] - 59:18
speed [1] - 167:2
spend [2] - 12:9, 87:12
spoken [2] - 110:1, 248:3

spot [7] - 107:6, 140:14, 140:16, 140:18, 140:20, 140:23
spotter [9] - 77:16, 97:20, 98:2, 125:11, 132:3, 233:2, 233:24, 243:7, 251:24
spotters [3] - 96:16, 97:6, 131:25
spotting [3] - 120:23, 130:16, 242:23
sprays [1] - 47:9
square [1] - 146:18
stability [1] - 144:14
stabilize [1] - 139:9
stable [18] - 126:19, 143:5, 143:7, 143:22, 144:9, 144:12, 144:13, 144:17, 144:22, 145:10, 145:18, 145:19, 145:21, 145:24, 147:22, 148:16, 148:25
staff [6] - 11:3, 22:8, 49:15, 84:7, 226:16, 226:18
stages [1] - 33:11
stamina [2] - 12:21, 12:23
stamped [1] - 179:2
stand [1] - 166:6
standard [9] - 23:20, 35:18, 89:15, 121:10, 130:6, 244:6, 244:8, 246:14, 246:24
standards [9] - 48:19, 58:24, 63:7, 64:12, 64:16, 68:17, 69:10, 171:19, 246:13
standing [3] - 138:23, 145:20, 163:5
stardom [2] - 59:14, 59:16
Stardom .. [1] - 59:10
start [10] - 117:19, 121:22, 136:5, 136:6, 136:7, 137:12, 137:13, 157:23, 161:20, 169:3
started [11] - 66:3, 67:5, 73:3, 89:6, 143:13, 157:22, 161:22, 162:2, 207:15, 219:19, 247:13
starting [3] - 5:25, 118:10, 205:2
starts [4] - 27:14, 56:4, 189:19, 213:7
State [2] - 2:18, 82:15
state [31] - 18:10, 18:18, 18:19, 19:24, 20:11, 22:1, 30:14, 30:20, 30:22, 30:23, 41:9, 41:11, 41:12, 42:13, 42:17, 58:9, 67:10, 82:4, 82:19, 82:20, 82:21, 82:22, 89:4, 128:18, 225:11, 241:1, 241:3, 244:17, 244:22

state-run [1] - 41:9
statement [14] - 100:8, 104:1, 104:23, 106:19, 108:22, 109:2, 109:21, 110:6, 110:10, 214:22, 214:23, 214:24, 214:25, 215:1
statements [11] - 104:2, 104:3, 104:13, 104:14, 104:18, 105:1, 105:2, 105:3, 106:14, 107:15, 213:4
States [3] - 78:2, 78:25, 79:3
STATES [1] - 1:1
stationary [9] - 143:8, 143:11, 143:21, 144:6, 144:7, 144:8, 145:16, 145:17, 145:21
statutory [1] - 249:10
steel [1] - 90:12
Steel [6] - 74:1, 74:25, 75:4, 75:5, 87:24, 90:10
stem [1] - 191:20
stenographically [1] - 255:6
step [9] - 15:1, 15:3, 15:6, 15:8, 15:9, 15:10, 18:10, 119:17
steps [1] - 15:1
stern [1] - 191:20
stick [1] - 43:20
sticking [1] - 206:12
still [11] - 36:5, 37:9, 113:11, 189:11, 189:13, 190:4, 190:5, 200:25, 210:18, 234:9, 253:17
stints [1] - 99:13
stop [12] - 99:18, 99:21, 127:8, 127:23, 131:10, 133:4, 133:13, 135:18, 136:4, 159:5, 237:16
stopped [4] - 119:25, 127:9, 127:10, 127:16
story [1] - 236:22
strap [3] - 93:1, 207:18, 208:17
strapping [2] - 93:3, 208:21
straps [1] - 207:9
stray [1] - 131:22
Street [3] - 2:8, 2:15, 2:18
street [1] - 144:16
stretch [4] - 195:3, 195:4, 195:11, 196:11
stretching [1] - 180:8
strict [1] - 251:4
strike [6] - 17:17, 26:22, 67:16, 75:3, 86:24, 121:9
strong [4] - 24:18, 33:18, 175:18, 237:3
struck [2] - 64:8, 66:18

struggling [1] - 252:10
stuck [2] - 228:23, 229:1
student [3] - 43:17, 59:13, 223:14
Student [1] - 59:9
students [2] - 43:19, 51:12
stuff [1] - 218:14
subcategory [1] - 191:5
subcontractors [1] - 244:4
subject [1] - 68:10
submitted [1] - 58:8
subpart [3] - 191:14, 191:18, 193:2
subsequent [3] - 101:22, 182:2, 182:4
substance [1] - 67:3
substantial [2] - 34:22, 148:8
substantiated [1] - 198:8
successful [1] - 59:15
successfully [1] - 98:17
successive [1] - 85:4
succinct [1] - 57:14
sudden [2] - 194:4, 195:20
sufficient [2] - 207:21, 208:16
suggest [1] - 36:7
suggested [1] - 197:13
suggesting [9] - 96:4, 97:13, 183:1, 222:11, 222:14, 224:21, 225:2, 230:7
suggestion [2] - 24:17, 24:18
Suite [3] - 2:8, 2:15, 2:18
summaries [1] - 11:17
summarize [1] - 213:5
sun [1] - 224:18
Sunoco [2] - 66:1, 66:5
superior [1] - 228:4
supervise [6] - 114:12, 118:1, 118:8, 118:15, 118:17, 129:23
supervised [5] - 114:17, 114:18, 114:19, 207:1, 207:4
supervision [7] - 16:19, 114:23, 115:6, 115:7, 116:17, 118:9, 206:21
supervisor [5] - 84:7, 114:20, 116:16, 116:19, 119:24
supervisors [2] - 15:7, 18:16
supervisory [8] - 113:6, 114:12, 114:21, 116:2, 116:7, 116:12, 120:6
support [2] - 229:13, 237:18
supports [1] - 237:19
supposed [2] - 178:24, 189:2
surface [4] - 61:5, 61:6,

61:17, 145:12                    23
surprise [2] - 134:13, 135:10
surprised [1] - 229:6
surroundings [1] - 72:7
survey [3] - 18:11, 18:13, 18:17
susceptible [1] - 147:24
suspended [11] - 121:21, 169:12, 170:14, 215:8, 215:16, 215:17, 215:21, 215:23, 216:6, 216:7, 216:9
sustain [1] - 180:4
sustained [3] - 47:20, 48:22, 249:20
sway [1] - 195:1
swinging [1] - 234:24
swings [1] - 79:10
sworn [2] - 4:4, 255:4
swung [1] - 172:22
sync [1] - 223:3
synonymous [1] - 189:17
Syracuse [1] - 49:8
system [16] - 13:15, 13:17, 14:2, 14:3, 14:7, 23:7, 36:15, 41:6, 82:16, 82:22, 110:10, 112:13, 178:18, 178:19, 212:19
systems [9] - 14:8, 17:18, 37:7, 37:8, 53:12, 53:16, 133:3, 225:8

### T

table [4] - 145:16, 203:10, 203:12, 203:20
tag [4] - 178:10, 178:24, 179:20, 180:12
talks [4] - 178:9, 183:12, 190:15, 195:21
tall [1] - 158:14
taller [1] - 158:14
target [1] - 48:23
targeted [2] - 21:4, 21:6
task [15] - 15:19, 15:25, 16:18, 16:20, 16:22, 16:24, 17:3, 17:4, 97:21, 232:11, 232:12, 232:14, 242:23
tasks [3] - 15:20, 46:14, 48:8
taught [1] - 43:19
taxes [1] - 51:19
Taylor [4] - 43:5, 43:17, 223:6, 231:2
Taylor's [1] - 226:20
teach [4] - 15:21, 42:23, 42:24, 99:19
teaching [2] - 15:16, 100:21
team [1] - 22:6

24

technical [2] - 5:8, 5:14
technically [1] - 196:3
techniques [1] - 235:15
temporarily [1] - 208:20
temporary [3] - 241:19,
241:20, 244:2
ten [6] - 17:19, 73:25, 74:2,
183:3, 183:8, 187:20
tend [1] - 43:13
term [9] - 5:14, 34:19, 68:24,
93:2, 166:9, 187:6, 241:14,
242:13, 242:16
terminology [1] - 5:10
terms [26] - 5:12, 6:13, 15:4,
15:5, 21:22, 23:22, 26:2,
28:1, 71:16, 76:3, 76:12,
76:13, 85:22, 98:21,
105:14, 109:15, 113:16,
115:7, 134:10, 165:7,
172:2, 179:17, 181:8,
230:25, 231:1, 231:18
terrible [2] - 213:18, 215:10
test [2] - 187:12, 202:16
tested [1] - 33:21
testified [50] - 4:5, 38:14,
56:22, 56:24, 57:2, 69:24,
69:25, 79:23, 81:14, 86:2,
86:23, 91:25, 92:1, 92:5,
93:6, 98:1, 104:3, 106:17,
107:18, 107:23, 113:9,
125:25, 127:10, 127:14,
133:15, 133:19, 133:23,
134:9, 134:12, 137:11,
138:9, 138:16, 149:5,
150:17, 150:24, 151:8,
152:4, 152:7, 153:5,
156:10, 161:16, 162:10,
162:11, 162:13, 162:15,
205:20, 232:4, 232:23,
236:17, 236:18
testify [12] - 4:19, 34:15,
34:16, 34:17, 34:23, 35:4,
68:1, 80:14, 153:15,
157:21, 204:19, 255:4
testifying [3] - 75:3, 100:11,
100:12
testimony [92] - 6:10, 6:12,
8:11, 10:7, 11:13, 11:14,
11:18, 11:21, 11:22, 13:19,
25:19, 26:6, 29:15, 31:7,
31:11, 33:14, 41:4, 53:12,
55:9, 55:10, 56:5, 56:14,
58:10, 67:23, 91:21, 91:23,
95:5, 96:21, 97:25, 101:8,
102:19, 102:25, 103:7,
104:16, 107:4, 109:19,
112:20, 115:16, 115:17,
117:2, 117:3, 117:6, 118:2,
118:4, 119:16, 120:2,

120:3, 125:22, 138:22,
139:18, 146:16, 146:25,
147:3, 150:20, 155:14,
156:9, 156:13, 156:25,
158:19, 158:20, 158:22,
158:24, 159:20, 159:23,
162:14, 163:17, 163:21,
165:1, 165:4, 165:7,
165:14, 170:6, 171:12,
190:23, 194:23, 199:20,
201:9, 201:10, 208:15,
214:17, 228:13, 230:12,
231:12, 232:25, 236:16,
237:2, 237:3, 238:15,
240:7, 252:4, 252:7, 255:7
testing [2] - 64:3, 229:20
tests [1] - 229:14
THE [9] - 1:1, 1:2, 1:17,
100:6, 135:25, 136:6,
140:6, 165:11, 232:6
themselves [5] - 14:21,
16:13, 21:15, 146:8, 239:6
theories [4] - 167:12, 198:1,
198:4, 198:17
theory [11] - 100:9, 127:2,
127:5, 170:2, 197:23,
197:24, 198:2, 198:5,
198:8, 198:10, 198:14
thereafter [1] - 140:17
therefore [2] - 26:17, 99:16
therein [3] - 104:21, 104:24,
105:3
thereof [1] - 117:23
they've [2] - 41:21, 44:5
thinking [3] - 73:6, 104:8,
208:8
thinks [3] - 153:24, 198:13,
237:12
third [5] - 13:19, 15:6, 54:20,
54:23, 218:20
THIS [1] - 1:17
thorough [3] - 110:22, 112:4,
182:2
thoughts [1] - 238:21
thousand [3] - 126:10,
148:13, 148:14
thousands [1] - 222:19
three [18] - 13:9, 46:11, 52:2,
53:8, 53:14, 73:23, 74:9,
77:24, 95:22, 200:12,
200:13, 213:14, 213:21,
215:3
three-by-three [1] - 95:22
three-page [1] - 213:21
three-ton [1] - 77:24
throughout [7] - 15:8, 90:25,
101:6, 102:17, 225:11,
241:2, 241:12
tight [1] - 221:20

tip [22] - 114:10, 125:16,
126:1, 126:14, 126:15,
126:16, 126:18, 126:20,
137:4, 139:10, 170:3,
181:14, 181:23, 194:25,
209:1, 209:11, 214:14,
215:9, 237:23, 237:24,
238:4
tipped [14] - 111:22, 112:2,
126:13, 126:17, 138:11,
138:22, 140:17, 143:13,
158:2, 169:15, 171:2,
196:5, 201:1, 211:1
tire [3] - 38:4, 38:8, 40:17
tires [2] - 40:6, 40:12
title [2] - 59:17, 247:4
titled [2] - 189:22, 246:16
today [14] - 4:12, 4:16, 6:25,
11:25, 12:23, 17:11, 38:3,
51:1, 53:10, 55:10, 67:14,
80:1, 109:5, 142:19
today's [2] - 12:10, 243:24
toe [2] - 227:23
toe-to-toe [1] - 227:23
together [2] - 86:20, 221:1
token [1] - 19:22
tomorrow [1] - 38:5
ton [2] - 77:24, 164:23
tons [3] - 203:4, 203:8, 204:7
took [9] - 44:13, 106:18,
110:25, 111:22, 154:3,
157:9, 158:18, 228:7,
234:6
tool [3] - 14:24, 16:25, 17:1
tool-based [1] - 14:24
tools [5] - 15:21, 15:22,
16:13, 16:15, 17:10
top [11] - 27:6, 27:14, 88:18,
124:1, 148:4, 156:19,
157:2, 160:21, 160:24,
161:17, 219:18
topics [2] - 11:22, 225:4
topple [1] - 149:18
toppling [1] - 234:16
total [1] - 98:8
totally [14] - 116:5, 135:16,
139:16, 178:23, 180:17,
181:19, 183:5, 189:14,
189:19, 210:2, 223:2,
223:3, 228:8, 230:2
touched [2] - 138:12, 144:23
touching [4] - 113:20, 147:2,
147:18, 216:1
toward [1] - 213:3
towards [2] - 239:14, 243:15

tower [1] - 50:11
toxic [1] - 57:22
track [2] - 71:9, 112:18
traffic [1] - 58:2
trailer [50] - 77:24, 78:14,
78:19, 93:12, 95:4, 95:8,
96:14, 96:20, 97:12, 98:17,
114:2, 125:20, 138:10,
140:24, 144:11, 147:18,
148:2, 148:7, 148:9,
149:19, 154:5, 155:20,
156:1, 156:25, 157:25,
158:6, 158:8, 158:9,
158:15, 163:4, 195:6,
202:6, 205:25, 206:3,
207:20, 215:8, 215:13,
215:17, 215:20, 215:23,
215:24, 216:1, 216:8,
216:9, 219:20, 219:22,
232:18, 232:19, 232:20
trailers [6] - 78:10, 78:20,
78:21, 126:11, 126:12
train [10] - 48:17, 120:20,
120:21, 121:6, 121:23,
130:5, 130:8, 130:15,
130:23, 243:3
trained [20] - 101:4, 116:23,
116:24, 121:11, 121:18,
121:24, 122:2, 122:6,
123:3, 124:5, 124:6,
124:19, 124:22, 178:20,
235:14, 235:23, 243:6,
243:7
Training [2] - 246:20, 247:4
training [30] - 26:3, 48:13,
48:16, 48:17, 48:20, 76:13,
77:7, 77:20, 117:6, 117:21,
117:22, 117:24, 120:18,
120:19, 123:12, 123:13,
123:14, 123:15, 124:3,
124:7, 124:9, 124:24,
130:13, 136:11, 223:3,
235:16, 235:19, 243:14,
246:14, 246:22
training/education [1] -
123:21
transcribed [1] - 103:4
transcript [5] - 26:18,
118:12, 236:25, 253:11,
255:11
TRANSCRIPT [1] - 1:17
transport [2] - 147:9, 206:7
transposed [1] - 26:13
travel [1] - 208:5
traveling [1] - 93:10
tree [1] - 179:12
trial [4] - 6:20, 7:2, 34:16,
56:13
TRICO [1] - 66:1

25

tried [1] - 144:4

truck [56] - 63:2, 77:15, 78:24, 89:17, 89:20, 89:23, 90:3, 90:5, 91:10, 91:16, 91:19, 92:2, 92:14, 93:17, 94:16, 94:17, 94:19, 94:21, 94:22, 94:23, 95:2, 95:12, 95:14, 99:9, 100:15, 113:9, 116:4, 119:20, 138:19, 138:20, 140:19, 140:20, 141:1, 141:7, 141:16, 141:17, 196:5, 200:24, 201:6, 201:8, 201:12, 201:13, 201:15, 201:17, 201:20, 206:4, 206:20, 206:25, 209:8, 210:1, 234:9, 234:10, 242:24, 252:9

Trucking [2] - 80:11, 100:21

trucking [2] - 206:25, 241:17

trucks [5] - 78:3, 78:25, 79:1, 79:2, 94:15

true [9] - 27:25, 33:9, 90:25, 107:5, 163:8, 229:19, 253:13, 255:7

truth [8] - 103:9, 103:21, 103:22, 103:23, 255:5, 255:5

try [6] - 5:11, 25:2, 57:13, 80:22, 128:9, 149:6

trying [11] - 27:11, 103:10, 145:23, 165:13, 200:24, 201:5, 201:7, 208:7, 218:2, 226:1, 234:22

turn [5] - 56:2, 56:3, 56:4, 168:25, 224:13

turned [2] - 113:11, 199:5

turning [1] - 64:5

turns [1] - 109:6

two [41] - 12:11, 13:8, 16:15, 20:5, 33:4, 44:12, 44:14, 51:23, 52:2, 52:6, 72:11, 73:8, 73:23, 74:9, 77:23, 78:25, 82:19, 86:20, 118:6, 119:8, 125:13, 151:25, 152:24, 157:18, 158:11, 158:12, 200:12, 204:23, 204:25, 213:24, 214:8, 215:3, 217:6, 217:21, 218:12, 225:7, 240:2, 240:3, 240:8, 242:19

type [12] - 16:24, 55:2, 55:4, 69:2, 69:9, 109:10, 123:21, 124:13, 138:3, 226:5, 226:6, 247:10

typed [1] - 215:12

types [1] - 69:19

typewriting [1] - 255:7

typical [12] - 18:1, 54:8, 54:9,

78:14, 89:16, 89:20, 89:22, 91:6, 97:4, 119:2, 119:4, 220:9

typically [16] - 10:12, 21:3, 21:10, 23:15, 23:25, 67:13, 76:7, 84:2, 84:24, 96:23, 165:23, 166:3, 168:10, 206:3, 207:1, 243:23

## U

U.S [4] - 74:1, 74:25, 75:4, 75:5

ultimately [3] - 16:15, 94:18, 222:8

unadulterated [1] - 222:3

unattended [2] - 194:13, 206:19

unbiased [1] - 110:22

UNDER [1] - 253:8

under [52] - 9:1, 9:5, 19:25, 30:14, 31:19, 31:20, 32:5, 34:17, 35:15, 36:4, 43:21, 59:8, 86:8, 92:23, 109:22, 125:7, 138:10, 151:9, 166:18, 166:22, 167:11, 172:14, 172:21, 172:22, 173:6, 173:10, 174:8, 174:10, 174:12, 174:18, 174:20, 175:20, 176:1, 188:1, 191:2, 192:4, 192:22, 193:14, 197:16, 199:4, 201:13, 201:20, 203:19, 208:18, 224:18, 225:9, 228:25, 243:2, 244:18, 253:10, 253:17, 255:7

undergraduate [1] - 227:12

underlying [1] - 6:16

underneath [4] - 126:22, 200:24, 201:6, 201:8

understandably [1] - 79:5

understood [4] - 112:15, 112:17, 232:24, 250:25

unexpected [1] - 134:9

unexpectedly [1] - 133:21

unfortunate [1] - 222:15

unfortunately [1] - 230:13

unhook [5] - 156:16, 156:17, 156:18, 209:9, 233:13

unhooked [10] - 106:5, 106:24, 155:16, 155:19, 155:25, 156:14, 209:6, 210:12, 234:6, 235:9

unhooking [1] - 232:20

unintentional [2] - 196:25, 197:1

unintentionally [1] - 197:4,

197:7, 200:5

unit [2] - 136:20, 138:22

United [3] - 78:2, 78:25, 79:2

UNITED [1] - 1:1

University [1] - 41:18

university [6] - 42:12, 42:16, 42:18, 82:20, 82:22, 82:25

unlatched [1] - 215:5

unlatching [1] - 235:1

unless [4] - 23:17, 36:3, 93:19, 166:3

unqualified [1] - 234:2

unrealistic [1] - 223:1

unsafe [13] - 22:5, 132:23, 177:21, 178:1, 185:15, 185:16, 185:20, 185:22, 185:23, 186:1, 186:3, 211:2, 233:20

unskilled [1] - 80:18

unstable [8] - 144:17, 145:3, 174:11, 198:7, 209:11, 210:14

untrained [3] - 219:3, 219:7, 220:10

unusual [2] - 157:14, 157:18

up [53] - 5:11, 12:12, 16:16, 18:14, 20:19, 34:19, 37:18, 43:10, 54:9, 55:24, 63:18, 76:3, 76:12, 82:17, 84:3, 87:4, 87:8, 88:17, 89:19, 98:13, 101:18, 104:2, 106:19, 110:23, 113:14, 114:2, 120:20, 136:23, 147:10, 156:17, 156:18, 156:19, 157:1, 157:2, 157:25, 160:21, 161:17, 162:2, 167:21, 170:24, 187:1, 190:8, 191:14, 192:9, 196:13, 206:2, 208:2, 209:21, 213:4, 215:12, 238:14, 240:12

up-to-date [1] - 167:21

update [1] - 171:24

updated [1] - 56:12

upper [3] - 14:21, 27:19, 49:5

upper-level [1] - 27:19

usual [1] - 52:1

Utilities [1] - 49:25

utility [1] - 246:7

utilize [1] - 13:14

utilized [3] - 29:9, 31:5, 31:15

utilizing [1] - 30:3

## V

validate [1] - 184:9

varied [1] - 54:19

varies [2] - 54:16, 79:9

variety [1] - 19:13

various [7] - 48:18, 49:23, 75:22, 102:19, 146:7, 160:13, 235:24

varying [2] - 144:14, 144:18

vehicle [3] - 59:24, 66:7, 141:24

verbal [1] - 161:19

verbally [4] - 101:4, 150:18, 150:25, 151:3

verbatim [2] - 104:13, 143:2

verbiage [2] - 143:7, 164:3

verify [3] - 37:20, 152:10, 177:18

vernacular [2] - 170:19, 172:11

versa [1] - 143:8

version [6] - 11:11, 158:19, 158:20, 158:21, 158:24, 163:2

versions [1] - 151:25

versus [8] - 56:16, 57:9, 65:16, 66:5, 66:11, 87:7, 87:23, 105:5

vice [1] - 143:8

vicinity [5] - 205:22, 209:25, 211:19, 212:2, 212:3

videotaped [1] - 55:11

vie [1] - 227:18

view [1] - 115:11

Vigglano [1] - 59:19

violating [1] - 167:4

violation [8] - 135:4, 135:5, 200:15, 218:14, 250:19, 251:8, 251:10, 251:11

violations [17] - 23:6, 62:10, 62:12, 62:15, 63:9, 64:11, 64:12, 64:15, 66:14, 81:10, 128:10, 128:11, 166:25, 167:4, 229:3, 241:6

virtue [2] - 170:2, 171:8

visit [1] - 28:2

visits [1] - 22:14

visual [2] - 151:22, 237:12

visually [1] - 151:8

Vitae [1] - 3:9

vitae [1] - 7:23

voice [1] - 12:23

voluntarily [1] - 20:23

vs [2] - 1:6, 253:5

## W

W-2 [1] - 52:22

wait [3] - 123:24, 170:18, 201:2

waiting [1] - 91:18

waived [2] - 252:19, 255:10
walk [1] - 167:16
walk-around [1] - 167:16
walked [1] - 124:23
walking [3] - 131:22, 144:16, 221:15
wall [2] - 86:21
wall-to-wall [1] - 86:21
wants [3] - 39:10, 225:16, 225:17
warn [4] - 129:25, 130:3, 134:17, 135:2
warned [1] - 139:3
warning [28] - 130:2, 133:3, 133:5, 133:8, 133:9, 133:10, 133:12, 134:20, 134:23, 134:24, 135:12, 136:12, 137:16, 137:17, 137:20, 137:23, 137:24, 138:1, 138:3, 138:5, 151:16, 205:3, 205:7, 205:8
warnings [1] - 134:16
watch [1] - 204:17
watched [1] - 116:13
watching [2] - 116:14, 237:15
water [3] - 50:17, 66:24, 221:16
ways [1] - 93:3
weakest [1] - 203:7
wear [1] - 186:17
webbing [1] - 93:4
website [1] - 21:16
Wednesday [2] - 1:15, 2:9
week [1] - 8:1
weighed [1] - 203:20
weight [15] - 105:21, 106:2, 148:2, 148:7, 148:11, 148:15, 148:21, 148:22, 173:2, 173:12, 178:25, 203:12, 203:15, 231:11, 231:15
west [1] - 159:21
WESTERN [1] - 1:2
Western [1] - 4:15
whatnot [1] - 90:12
whatsoever [2] - 111:18, 139:23
whereby [4] - 17:1, 18:25, 24:3, 211:12
WHEREOF [1] - 255:16
whichever [1] - 161:9
whoa [1] - 127:17
whole [18] - 50:10, 103:23, 128:20, 132:25, 140:10, 141:5, 150:4, 162:25, 177:7, 183:19, 183:25,

184:4, 185:7, 185:9, 185:24, 186:2, 232:9, 255:5
wide [1] - 20:21
wife [7] - 9:21, 10:17, 51:7, 51:10, 52:22, 221:24, 222:4
wind [1] - 24:5
winds [2] - 187:3, 187:4
wire [1] - 187:6
wires [3] - 71:4, 71:23, 72:2
wise [2] - 54:8, 207:12
WITHOUT [1] - 1:17
WITNESS [7] - 100:6, 135:25, 136:6, 140:6, 165:11, 232:5, 255:16
witness [20] - 2:2, 4:4, 4:20, 9:4, 54:15, 54:22, 56:10, 67:20, 67:22, 172:2, 227:8, 227:10, 228:10, 247:10, 247:14, 255:4, 255:8, 255:11, 255:11
Witness [12] - 70:16, 87:11, 88:3, 105:25, 117:18, 121:16, 122:8, 154:6, 216:24, 217:23, 246:17, 247:20
witnessed [1] - 77:17
witnesses [1] - 230:12
wobble [2] - 149:20, 149:21
wobbled [1] - 150:1
woods [1] - 179:12
word [12] - 21:16, 64:8, 68:24, 134:3, 134:4, 144:22, 145:1, 152:11, 165:22, 165:23, 196:7, 196:14
words [28] - 8:12, 16:14, 17:23, 24:14, 80:10, 82:13, 92:8, 104:15, 118:11, 137:13, 140:15, 140:19, 143:24, 151:2, 160:1, 160:3, 160:5, 202:7, 203:17, 219:11, 220:6, 236:24, 237:2, 237:3, 242:2, 252:3
workplace [16] - 23:17, 61:2, 89:9, 89:10, 103:6, 124:12, 221:8, 241:5, 242:3, 242:4, 242:6, 242:8, 243:5, 243:11, 246:15, 249:8
workplaces [2] - 240:24, 243:24
works [1] - 58:2
worksheets [1] - 250:5
worksite [21] - 75:24, 101:9, 102:9, 130:18, 166:23, 224:17, 228:25, 241:14, 241:15, 241:21, 241:25,

242:12, 243:17, 250:12, 250:14, 250:16, 251:13, 251:14, 251:18, 251:23
worksites [5] - 81:9, 81:11, 91:6, 97:5, 243:25
world [8] - 42:1, 44:2, 48:3, 132:2, 135:12, 237:12, 239:21, 243:24
worldwide [1] - 17:23
worst [1] - 80:16
write [6] - 45:5, 80:6, 80:7, 208:23, 225:15, 225:16
writing [1] - 103:25
written [11] - 39:2, 79:24, 82:18, 103:1, 106:18, 108:22, 143:2, 152:4, 193:11, 213:4, 215:11
wrongfully [6] - 79:17, 80:3, 80:12, 86:4, 239:25, 240:4
wrote [11] - 88:2, 103:15, 103:16, 106:19, 109:2, 110:6, 168:7, 215:11, 220:1, 220:6, 248:12

## X

xi) [1] - 205:1

## Y

year [26] - 8:18, 8:20, 8:21, 9:1, 9:5, 9:6, 33:4, 33:8, 51:24, 54:8, 54:9, 54:11, 54:12, 54:13, 54:16, 54:19, 56:14, 64:2, 79:9, 79:11, 79:13, 88:1
years [43] - 17:19, 28:23, 33:5, 43:1, 43:2, 43:20, 45:19, 52:25, 64:22, 67:18, 68:12, 70:8, 70:10, 73:24, 74:2, 74:9, 77:6, 77:21, 77:22, 78:3, 79:16, 85:7, 89:23, 91:5, 99:11, 118:6, 119:9, 119:13, 172:4, 182:24, 183:3, 183:8, 187:20, 226:15, 227:11, 227:14, 227:22, 245:13, 247:8, 247:24
yourself [8] - 22:4, 51:9, 59:16, 82:5, 82:11, 83:13, 228:1, 239:4

## Z

Z490 [3] - 246:18, 247:2
Z590 [1] - 246:16
zero [4] - 138:4, 243:14

zone [11] - 138:17, 138:19, 139:4, 139:5, 139:8, 139:11, 139:12, 140:21, 160:5, 160:7, 160:9

26

255

COMMONWEALTH OF PENNSYLVANIA)
COUNTY OF ALLEGHENY            )

        I, Constance Lee, Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that the witness was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was recorded stenographically by me and then reduced to typewriting under my direction, and constitutes a true record of the testimony given by said witness, all to the best of my skill and ability.

        I further certify that the inspection, reading and signing of said deposition were not waived by counsel for the respective parties and by the witness and if after 30 days the transcript has not been signed by said witness that the witness received notification and has failed to respond and the deposition may then be used as though signed.

        I further certify that I am not a relative, or employee of either counsel, and that I am in no way interested, directly or indirectly, in this action.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 14 day of June , 2018.

*Constance Lee*

--------------------------------------

Constance Lee

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Constance Lee, Notary Public
Marshall Twp., Allegheny County
My Commission Expires Aug. 8, 2021
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID W. NATCHER,     )
  Plaintiff       )
           )
           )
  v.         )  Civil Action No. 1:16-cv-219-BJR
           )
ACCURIDE CORPORATION,   )
  Defendant      )

## NOTICE OF DEPOSITION OF
## PLAINTIFF'S EXPERT WITNESS SAMUEL J. GUALARDO, C.S.P.

To: Erin K. Rudert, Esquire
  Ainsman Levine, LLC
  310 Grant Street, Suite 1500
  Pittsburgh, PA 15219

PLEASE TAKE NOTICE that the deposition of plaintiff's expert witness Samuel J. Gualardo, C.S.P. will take place pursuant to Rules 26(b)(4) and 30 of the Federal Rules of Civil Procedure on Wednesday, May 30, 2018, commencing at 1:00 p.m., at the offices of Ainsman Levine, LLC, 310 Grant Street, Suite 1500, Pittsburgh, PA 15219, before Constance Lee, RPR, RSA, CSR, or some other person duly authorized to administer the oath.

Pursuant to Rule 26(a)(2), the deponent and/or counsel for plaintiff shall bring to the deposition for inspection and use the following:

1. All documents reflecting the facts or data considered by the witness in forming the opinions to which he will testify at trial;

2. All exhibits that will be used to summarize or support the opinions to which he will testify at trial;

3. The witness' qualifications, including a list of all publications authored by the witness in the previous ten (10) years;

> S. Gualardo
> Deposition
> Exhibit __1__

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Notice of Deposition of Plaintiff's Expert Witness Samuel J. Gualardo, C.S.P. was served upon the following attorney of record for plaintiff via Electronic Mail and First-Class United States Mail, postage prepaid, addressed as follows, this 23rd day of May, 2018:

Erin K. Rudert, Esq.
Ainsman Levine, LLC
310 Grant Street, Suite 1500
Pittsburgh, PA 15219
E-mail: cr@ainsmanlevine.com

Matthew W. McCullough

# SAMUEL J. GUALARDO, C.S.P.

1660 Oakridge Drive
Salix, PA 15952

Home Office: 814-266-7401
Mobile: 814-341-5593
Fax: 814-410-6019
squalardo@safetyexcellence.org

## PROFESSIONAL SUMMARY

A highly motivated and nationally recognized leader (Fellow) and expert in the safety and health management field with a passion for safety excellence. Demonstrated measurable success in assisting Fortune 100 corporations attain excellence in safety performance, regulatory compliance and accident cost control. Strong leadership and people skills with proven strategic thinking and entrepreneurial abilities. Outstanding expert witness credentials.

## CAREER HIGHLIGHTS

**1987- Present  President,** National Safety Consultants Incorporated, Salix, PA. Provides safety culture change, safety management, regulatory compliance, and litigation support services to clients internationally. Created the "Management-Based Safety" Safety Management System (SMS) used by numerous global corporations.

**2010- Present  Director, PA OSHA Consultation Program / Assistant Professor** - Directs the federal OSHA Consultation program for the state of Pennsylvania through Indiana University of Pennsylvania. Manages a staff of 16 safety and health consultants and administrative personnel and a $ 2.1 million dollar budget dedicated to providing PA employers federally mandated OSHA regulatory compliance assessments, regulatory training and employer assistance programs.

**1999-2010 Safety Consultant / Instructor-** Indiana University of Pennsylvania, Indiana Pennsylvania. Provided regulatory compliance consultation to business through the federally mandated OSHA Consultation Program. Taught graduate and undergraduate courses in the Safety Sciences Degree programs.

**2010 - President and Chief Executive Officer** – Board of Certified Safety Professionals. Oversaw all national and international activities. BCSP is recognized as leader in high-quality credentialing for safety, health, and environmental practitioners with over 22,000 individuals certified. As President, and CEO led the development and implementation of 600K new computer infrastructure project, the building of a 3 million new BCSP headquarters building and the full integration of a the recently purchased CCHEST paraprofessional certification organization.

**2000 - 2001 President and Chairman of the Board** - American Society of Safety Engineers, Des Plaines, IL. As an elected officer and Chairman of the Board of Directors, oversaw all national and international activities for the 33,000 member organization. Founded in 1911, ASSE is the world oldest and largest organization of safety and health professionals dedicated to protecting people, property and the environment.

**2000 - 2006 Consultant** - Dupont Safety Resources, Wilmington Delaware. Provides senior and middle management level training and consulting to clients globally as part of Dupont's 65 million dollar safety consultation business.

**1992 - 1999 Director, Corporate Safety & Health** - Niagara Mohawk Power Corporation, Syracuse, New York. Directed Safety Management, Regulatory Compliance, Occupational Health and Public Safety programs through a direct staff of 30 Safety and Occupational Health professionals at the Fortune 200 electric and gas utility.

*Major Accomplishments:*

*Successfully implemented a significant corporate-wide culture change initiative in a heavily unionized and highly regulated environment.*

*Achieved an average 4.2 safety commitment rating out of 4.5 on annual employee attitude surveys.*

*Reduced Annual OSHA Recordable Rates by 45%, Lost Workday Rates by 68, overall Workers' Compensation Claims by 65% and Workers' Compensation Costs by 70%.*

S. Gualardo
Deposition
Exhibit 2

*Designed and implemented a regulatory compliance strategy yielding significant avoided penalty costs.*

**1987- 1992   Manager, Corporate Safety & Health** - General Public Utilities/Metropolitan Edison Company, Reading, Pennsylvania. Managed Safety, Occupational Health and Public Safety programs for a major electric utility with a staff of sixteen safety and health professionals and a $2M budget.

### Major Accomplishments:

*Successfully implemented a significant corporate-wide culture change initiative in a heavily unionized and highly regulated environment.*

*Reduced Workers' compensation costs by 62%, OSHA cases by 18%, Lost work day cases by 64%, and all accidents by 40%.*

*Established the lowest Workers' Compensation Experience Modification Rate in the history of the Company (.39 for 1992).*

*Established a national total electric utility safe work hour record of 4,756,654 hours.*

*Reduced significant OSHA penalty potentials by establishing a comprehensive auditing program.*

**1989 - 1992   Adjunct Professor (Part-time)** - Millersville University of PA, Occupational Safety & Hygiene Management Program. Taught undergraduate safety and health courses in the Occupational Safety & Hygiene Management Baccalaureate degree program.

**1985 - 1987   Manager, Safety-** Hershey Chocolate USA, Hershey, Pennsylvania. Managed Safety, Industrial Hygiene and Fire Programs for the world's largest chocolate and confectionery products producer. With a staff of five safety professionals and administrative personnel and a $300,000 budget, directed activities of nine confectionery manufacturing and support facilities.

**1983 - 1984  Corporate Safety Engineer -** Hershey Foods Corporation, Hershey, Pennsylvania. With a staff of 2 safety and health professionals and a $50K budget, provided consultative and technical support on Safety, Industrial Hygiene and Fire Protection to 19 international manufacturing plants and numerous support facilities.

**1982 - 1983 Safety Specialist** - Hershey Chocolate USA, Hershey, Pennsylvania. Supervised all Safety, Industrial Hygiene and Fire program activities for second shift production operations (2,000 employees) at Hershey's flagship manufacturing plant.

**1980 - 1982  Loss Control Representative** - Maryland Casualty Company, Camp Hill, Pennsylvania. Provided safety engineering/loss control services to major and specialty accounts.

**1980 Safety Internship -** Bethlehem Steel Corporation, Johnstown, Pennsylvania. Conducted various major projects while working in the Safety, Environmental Health, Plant Fire Protection and Human Resources departments.

## EDUCATION

| 1980 | B.S. Degree | Safety Management - Indiana University of Pennsylvania |
|------|-------------|---------------------------------------------------------|
| 1986 | M.A. Degree | Industrial Relations - St. Francis College |
| 1985 | C.S.P. Designation | Board of Certified Safety Professionals of the Americas |

## AWARDS & HONORS

2014   Sponsored Programs Award for Outstanding Achievement in Public Service, Indiana University of PA

2013   Outstanding Grantsmanship Recognition Award, Indiana University of PA

2012   Outstanding Grantsmanship Recognition Award, Indiana University of PA

2011   Awarded the Fellow designation by the American Society of Safety Engineers

2006   Nominated by ASSE to serve as Deputy Asst. Secretary of Labor-OSHA

2004   Nominated by ASSE to serve as Asst. Secretary of Labor-OSHA

1997   ASSE National Charles H. Culbertson Outstanding Volunteer Service Award

1993   Numerous PA Electrical Assn., Edison Electric Institute & National Safety Council Awards

1990    Metropolitan Edison - National Electric Utility Safe Work Hour Record Established - 4,756,654 hours
1986    ASSE Region XII - "Safety Professional of the Year"
1986    Hershey Area Kiwanis - "Kiwanian of the Year"
1985    ASSE Central Pennsylvania Chapter - "Safety Professional of the Year"
1985    ASSE Central Pennsylvania Chapter - Outstanding Chapter Achievement Award

# SAMUEL J. GUALARDO, CSP

## COMPENDIUM OF PROFESSIONAL ACTIVITIES

### Board of Certified Safety Professionals

| | |
|---|---|
| 2017-Present | Member, Judicial Commission |
| 2012-13 | Member, Strategic Planning Task Force |
| 2011 | Past President |
| 2010 | President |
| 2005 - 2011 | Member, Board of Directors |
| 2009 | Vice President |
| 2009-2011 | Member, Executive Committee |
| 2009-2011 | Member, Finance Committee |
| 2009 | Chair, Strategic Planning Committee |
| 2009 | Chair, Examination Committee |
| 2011 | Chair, Nominating Committee |
| 2009-2011 | Member, Nominating Committee |
| 2009-2010 | Member, OSHA Alliance Agreement Implementation |
| 2009-2010 | Member, National Organization for Competency Assurance Representative |
| 2007 –2011 | Member, Succession Planning Committee |
| 2007 – 2011 | Member, Strategic Planning Committee |
| 2007 – 2008 | Chair, Professional Standards Committee |
| 2007 - 2008 | Examination Manager, Comprehensive Practice Examination |
| 2006 – 2008 | Member, Professional Development Committee |
| 2006 – 2007 | Member, Governance Committee |
| 2005 – 2011 | Member, Examination Committee |
| 2005 – 2008 | Member, Professional Standards Committee |
| 2005 – 2006, 2008 | Member, Continuance of Certification Committee |

### American Society of Safety Engineers - National

| | |
|---|---|
| 2014-Current | Member, ANSI Z490 Criteria for Accepted Practices in Safety, Health & Environmental Training Committee |
| 2015 | Member, Chapter of the Year Committee |
| 2014 | Member, ASSE 2014 Safety Symposium Task Force |
| 2014 | Member, Chapter of the Year Committee |
| 2013-14 | Chapter Author, Consultant Business Development Guide |
| 2012 | Chapter Author, Construction Safety Management and Engineering, 2nd Edition |
| 2012 | Member, Nominations and Elections Subcommittee |
| 2011 | Chair, Certificate in International Safety Management Program Task Force |
| 2011-Present | Member, International Training Advisory Task Force |
| 2010-Present | Member, ASSE Board Advisory Task Force |
| 2007 – 2011 | Member, ASSE's 100th Anniversary Task Force |
| 2002 – 2005 | Member, ASSE Business of Safety Committee |
| 2002 – 2003 | Author, ASSE's Construction Safety Publication, Power line Safety Chapter |
| 2002 – 2003 | Member, Human Error Symposium Task Force |
| 2001 – 2002 | Chairperson, Nominations and Elections Committee |
| 2000 - 2001 | President and Chairman of the Board of Directors |
| 2000 - 2001 | Ex Officio Member of all ASSE Board level committees |
| 1999 - 2000 | President Elect and Chairperson, Congress of Councils |
| 1999 - 2000 | Chairperson, Long Range Planning |
| 1999 - 2000 | Chairperson, Nominating and Elections Committee |
| 1998 - 1999 | Senior Vice President |

| 1998 - 1999 | Chairperson, Council on Member/Region Affairs |
| 1998 - 1999 | Member, Nominations and Elections Committee |
| 1996 - 1998 | Vice President, Finance |
| 1996 - 2000 | Director, Executive Committee and Board of Directors |
| 1997 - 1999 | Member, Executive Director, Transition Task Force |
| 1997 - 1997 | Chairperson and Member, Staff Compensation Subcommittee |
| 1996 - 2000 | Chairperson, Finance Committee |
| 1996 - 2000 | Member, Long Range Planning Committee |
| 1995 - 1996 | Member, Professional Development Conference Committee |
| 1994 - Present | Faculty Member, Professional Development Department Faculty |
| 1994 - 1995 | Member, Professional Affairs Task Force |
| 1994 - 1995 | Member, National Restructure Committee |
| 1990 - 94, 96-01 | Director, American Society of Safety Engineers, Board of Directors |
| 1993 - 1994 | Member, Merger & Acquisition Task Force |
| 1993 - 1994 | Member, Nominating & Elections Committee |
| 1991 - 1992 | Member, Professional Development Advisory Committee |
| 1991 - 1993 | Member, Finance Committee |
| 1991 - 1995 | Member, Member Development and Retention Committee |
| 1991 - 1992 | Member, International Section Task Force |
| 1991 - 1992 | Chairperson, Subcommittee on Professional Recognition |
| 1987 - 1991 | Chairperson, Career Progression Task Force |
| 1990 - 1991 | Co-Author, "Safety Profession Year 2000" - ASSE Publication |
| 1989 - 1990 | Member, Long Range Planning Committee |
| 1987 - 1988 | Media Spokesperson, Region XII |

## Region XII

| 1990 - 1994 | Regional Vice President, (PA, NJ, NY, & DE) |
| 1987 - 1989 | Appointed Regional Vice President, Student Affairs/Scholarships |
| 1986 - 1987 | Appointed Regional Vice President, Awards & Honors |
| 1983 - 1990 | Member, Regional Operating Committee |

## Central PA Chapter

| 1985 - 1988 | Chairperson, Annual Professional Development Conference |
| 1984 - 1985 | President |
| 1983 - 1984 | President Elect |
| 1982 - 1983 | Treasurer |
| 1983 - 1990 | Assembly Delegate, ASSE's Professional Development Conference |
| 1982 - 1990 | Member, Executive Committee |
| 1982 - 1990 | Committee Chair, Various Committees |

## National Safety Council

| 1994 - 1996 | Member, Public Utilities Section - Executive Committee |
| 1984 - 1987 | Member, Food & Beverage Executive Committee |
| 1986 - 1987 | Chairman, Canners, Freezers, Processed Foods Committee |

## Other

| 2003 - 2007 | Member Administrative Board, First United Methodist Church, Salix, PA |
| 1999 - Present | Advisor, Indiana University of PA Safety Sciences Program Advisory Committee |
| 1999 - 2000 | Chairperson, New York State Public Utilities Safety Directors Association |
| 1997 - 1999 | Deacon, First Presbyterian Church, Baldwinsville NY |
| 1995 - 1999 | Member, Safety Executives of New York |
| 1993 - 1996 | Member, Business Council - State of New York Safety & Health Committee |
| 1992 - 1998 | Director, New York State Public Utility Safety Directors Association |
| 1993 - 1996 | Director, New York State Head Injury Association |
| 1994 | Charter Member, New York Head Injury Association - Brain Trust |
| 1993 - 1996 | Member, Edison Electric Institute - OSHA Reform Task Force |
| 1989 - 1998 | Member, Edison Electric Institute - Safety & Industrial Health Committee |
| 1990 - 1991 | Vice Chairman and Board Member, Manufacturers Association of Berks County Accident Prevention Committee |
| 1988 - 1992 | Board Member, Board of Directors - Burn Prevention Foundation |
| 1987 - 1998 | Member, National Fire Protection Association |

| 1985 - 1992 | **Advisor,** Millersville University of Pennsylvania, Occupational Safety & Hygiene Management Program Advisory Council |
| 1988 - 1989 | **Member,** Manufacturers Association of Berks County - Accident Prevention Committee -    Program Planning Committee |
| 1987 | **President Elect,** Hershey Area Kiwanis |
| 1984 - 1985 | **Advisor,** Pennsylvania Governor's Safety & Health Conference |
| 1984 | **Member,** Pennsylvania Seat Belt Task Force |

## Speaking, Consulting, Expert Testimony

**2018**

- Keynote Speaker - Leading Your Consultation Program to Sustained Excellence, OSHA Consultation Conference, San Antonio TX
- National Webinar Speaker - OSHA's Safe and Sound Campaign,
- Guest Lecturer - Overcoming the Organizational Barriers to Safety Performance Excellence, Indiana University of PA, Indiana PA
- Principal Consultant - Implementation of the Management Based Safety Process, Erie Coke, Buffalo, NY
- Course Leader - Leadership Techniques to Influence Safety Performance, American Society of Safety Engineers, Seminarfest, Las Vegas NV
- Course Leader - Creating Line Management Safety Leadership, American Society of Safety Engineers, Seminarfest, Las Vegas NV
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Las Vegas NV
- Course Leader - Overcoming the Organizational Barriers to Safety Performance Excellence American Society of Safety Engineers, Seminarfest, Las Vegas NV

**2017**

- Keynote Speaker, ASSE Student Chapter, , "From IUP to Safety Stardom...What It Takes" Indiana University of PA, Indiana PA
- Expert Witness - (Viggiano v. Wunderlich-Lockman), Abrahamson and Uiterwyk, Tampa FL
- Expert Witness - (Karen Newsuan v Republic) Fowler, Hirtzel, McNaulty & Spaulding, Philadelphia, PA
- Expert Witness - (Oates v.  Accelerated Fire et. al) Marks, O'Neill, O'Brian Doherty & Kelly, Philadelphia PA
- Expert Witness - (Gary v. Ft. Myer Construction), Koontz, McKenney, Johnson, Depaolis, Lightfoot, Washington D.C.
- Expert Witness - (Demnicki et.al v.First Quality Enterprises Inc.), Alfred V. Altopiedi, P.C. Springfield, PA  19064
- Expert Witness - (Cerritelli v. PSE&G et al.) Kline Specter, Philadelphia, PA
- Expert Witness - (Poissinger v. Susquehanna Nuclear) Cohen, Feeley, Altemose & Rambo, Bethlehem PA
- Expert Witness - (Meza v PG&E ) Walkup, Melodia, Kelley & Schoenberger,  San Francisco, CA
- Expert Witness - (Kletcho v. Lafayette Post No. 51, The American Legion, et al) Edgar Snyder and Associates, Pittsburgh, PA,
- Expert Witness - (Kalownski v.2626 Market St.), Cipriani & Werner, Philadelphia, PA
- Expert Witness - (Duke v. Altec), Fowler, Hirtzel, McNaulty & Spaulding, Philadelphia, PA
- Expert Witness - (Callaghan v. Torcon) Weber Gallagher, Philadelphia, PA
- Expert Witness - (Burkett v. Turner) Marks, O'Neill, O'Brian Doherty & Kelly, Philadelphia PA
- Expert Witness – (Belcher v. Columbia Gas) Herren & Adams, Lexington, KY
- Course Leader - Executive Safety Management Program, American Society of Safety Engineers Reno NV
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Long Island NY
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Denver CO
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Scottsdale AZ
- Principal Consultant –Implementation of the Management Based Safety Process, Tonawanda Coke, Buffalo, NY
- Course Leader - Creating Line Management Safety Leadership, American Society of Safety

Engineers, Seminarfest, Las Vegas NV
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Las Vegas NV
- Course Leader – Overcoming the Organizational Barriers to Safety Performance Excellence American Society of Safety Engineers, Seminarfest, Las Vegas NV
- Course Leader – Corporate Safety Management, American Society of Safety Engineers U.S Army, Fort Bragg, NC
- Course Leader – Safety Leadership for Effecting Change, American Society of Safety Engineers U.S Army, Fort Bragg, NC

### 2016

- Expert Witness - (Rettew v. Graham), Fowler, Hirtzel, McNaulty & Spaulding, Philadelphia, PA
- Expert Witness - (Kulovic v. Brand Energy & Infrastructure Services, Inc., et al.) Ciprianl & Werner, Philadelphia PA
- Course Leader – Executive Safety Management Program, American Society of Safety Engineers Des Plaines IL
- Expert Witness – (Burkert v. Turner et al) Marks, O'Neill, O'Brien, Doherty and Kelly, P.C. Philadelphia PA
- Expert Witness – (Blanch v. Honeywell) Marks, O'Neill, O'Brien, Doherty and Kelly, P.C. Philadelphia PA
- Expert Witness – (Domanque v. MiJack Promotions) Laminack, Pirtle & Martines, LLP, Houston TX
- Expert Witness – (Natcher v. Accuride), Ainsman Levine, LLC, Pittsburgh PA
- Expert Witness – (Pauloski v. Liokareas) Edgar Snyder and Associates, Pittsburgh PA,
- Expert Witness – (LaGamba v. Governors Hotel) Edgar Snyder and Associates, Pittsburgh PA,
- Course Leader – Creating Line Management Safety Leadership, American Society of Safety Engineers U.S Army, Aberdeen, MD
- Course Leader – Overcoming the Organizational Barriers to Safety and Health, American Society of Safety Engineers U.S Army, Aberdeen, MD
- Course Leader - Corporate Safety Management, American Society of Safety Engineers Professional Development Conference, Atlanta GA
- Expert Witness – (Goodwin v. NYSEG), Duke, Holzman, Photiadis & Gresens, LLC, Seneca, NY
- Expert Witness – (Abraham v. ConEd), The Cochran Firm P.C., New York, NY
- Speaker, OSHA Region III Annual Meeting, Hershey PA
- Keynote Speaker, Achieving Safety Performance Excellence, Corporate Safety Conference, EMP Millapore, Keene NH
- Expert Witness – (Montilla, Daub, v. Dice, Pappas), Tucker Arensberg, Lebanon PA
- Speaker, OSHCON Onsite Consultation Training Conference, Kansas City, MO
- Expert Witness – (Julia and Edward Smith v. Philadelphia Gas Works et al.), John T. Dooley Law Offices, Philadelphia, PA
- Expert Witness – (Halilovic v. Genco), Weber Gallagher, Philadelphia,PA
- Expert Witness – (Sunoco v. Trico), Reed Smith, Philadelphia, PA
- Expert Witness – (Nelson v. Lowes), Bostwick, Peterson & Mitchell, LLP, Redwood City, CA
- Keynote Speaker, Achieving Safety Performance Excellence, North American Hoganas, Johnstown PA
- Keynote Speaker, Achieving Safety Performance Excellence, North American Hoganas, Holsopple PA
- Keynote Speaker, Achieving Safety Performance Excellence, Corporate Safety Conference, EMP Millapore, Bedford MA
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Boston MA
- Expert Witness – (Pinzino v. Raytown Water Cpmpany et.al.), The Klamann Law Firm, Kansas City MO
- Expert Witness – (Losada-Buendia v. Perkiomen School), Marks, O'Neil, O'Brian, Doherty & Kelly P.C. Philadelphia, PA
- Course Leader - Creating Line Management Safety Leadership, American Society of Safety Engineers, Seminarfest, Las Vegas NV
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Las Vegas NV
- Course Leader – Overcoming the Organizational Barriers to Safety Performance Excellence American Society of Safety Engineers, Seminarfest, Las Vegas NV

- Member - Executive Safety Management Program Planning Committee, American Society of Safety Engineers

**2015**

- Expert Witness – (Watson v. Allied Tube), Law Offices of Conrad Benedetto, Philadelphia, PA
- Expert Witness - (Smith v. ETFFMA et al), Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing P.C., Houston, TX
- Expert Witness - (McIntosh v. Heit and McDonald), Andracki Law Offices, P.C., Pittsburgh, PA
- Expert Witness - (Greentech CM3 v. Phelan), Weber Gallagher,,Philadelphia,PA
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Portland, OR
- Member - Executive Safety Management Program Planning Committee, American Society of Safety Engineers
- Expert Witness - (Domangue v. Mi-Jack Promotions), Laminack, Pirtle & Martines, LLP, Houston, TX
- Expert Witness - (Davis v. NASCAR) Coker, Schickel, Sorenson, Posgay, Camerlengo and Iracki, Jacksonville, FL
- Expert Witness - (Abdul v. Cabot Oil & Gas), Law Offices of Salvatore Vito, Stroudsburg, PA
- Expert Witness - (Horan v. Univar) Leonard, Sciolla, Hutchison, Leonard & Tinari, LLP Philadelphia, PA
- Expert Witness - (Walters v. Hunter) Dell, Moser, Lane and Loughney, Pittsburgh, PA
- Expert Witness - (Fiore v. Astec), Chambliss, Bahner & Stophel, P.C., Chattanooga, TN
- Expert Witness - (Danz v. Giant Eagle), Edgar Snyder and Associates, Pittsburgh PA
- Expert Witness - (Imhoff v. Irwin Car), Edgar Snyder and Associates, Pittsburgh PA
- Expert Witness - (Stansberry v. Belk), Chambliss, Bahner & Stophel, P.C., Chattanooga, TN
- Expert Witness, (Davila v. Alcoa) K&L Gates Dallas,TX
- Expert Witness, (Moreles v. Alcoa) K&L Gates Dallas,TX
- Expert Witness, (Matthew Morant v. Integrated Project Services, Inc.) Weber Gallagher Phila, PA
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Boston MA
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Dallas TX
- Course Leader – Strategic Safety Leadership, ProcessMAP EHS Conference, Ft. Lauderdale FL
- Course Leader – Integrating EHS into Strategic Planning, ProcessMAP EHS Conference, Ft. Lauderdale FL
- Course Leader - Creating Line Management Safety Leadership, American Society of Safety Engineers, Seminarfest, Las Vegas NV
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Jacksonville, FL
- Expert Witness, (Stone v. United Sound and Electronics) Dell, Moser, Lane and Loughney, Pittsburgh, PA
- Principal Consultant – North America implementation of the Management Based Safety Process, Morgan Ceramic Fibers, Latrobe, PA
- Principal Consultant – Global Implementation of the Management Based Safety Process, Pittsburgh Corning, Pittsburgh PA
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Seminarfest, Las Vegas NV
- Course Leader - Creating Line Management Safety Leadership, American Society of Safety Engineers, Seminarfest, Las Vegas NV

**2014**

- Expert Witness,(McDermott v. Golden Triangle), Tucker Arensburg, Pittsburgh, PA
- Expert Witness, (Keeney v. NVR), Weber Gallagher, Philadelphia, PA
- Expert Witness, (Robert and Ginger Ciaccia V. National Gypsum Company), Weber Gallagher, Philadelphia, PA
- Expert Witness, (EEOC v. Bond) Equal Employment Opportunity Commission, New York NY
- Keynote Speaker, Corporate Safety Conference, Morgan Thermal Products, Cleveland OH
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Oklahoma City, OK
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Des Plaines IL
- Principal Consultant – Safety Leadership for Iberdrola USA, Rochester, NY
- Speaker, Beyond Safety- The Real Causes of Worker and Workplace Risk American Society of Safety Engineers, Professional Development Symposium, Denver, CO

- Speaker, Beyond Safety- The Real Causes of Worker and Workplace Risk
- American Society of Safety Engineers, Professional Development Conference, Orlando FL
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Conference, Orlando FL
- Expert Witness, (Zentinska v. Nitterhouse) Weber-Gallagher, Harrisburg, PA
- Expert Witness - (Manning. v. Sunbelt et. al), Abrahamson and Uiterwyk, Tampa FL
- Expert Witness - (Smith v. Mastec) Cipriani and Werner, Wheeling, WV
- Expert Witness - (Eustice v. Suburban Manufacturing Co.), Chambliss, Bahner & Stophel, P.C., Chattanooga, TN
- Keynote Speaker, Corporate Safety Conference, R&H Construction Portland, OR
- Principal Consultant - Corporate implementation of the Management Based Safety Process Thomas Industrial Painting, St Louis MO
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Seminarfest, Las Vegas NV
- Course Leader - Creating Line Management Safety Leadership, American Society of Safety Engineers, Seminarfest, Las Vegas NV
- Expert Witness, Johnson v. Astec, Chambliss, Bahner & Stophel, P.C., Chattanooga, TN

## 2013

- Expert Witness – Lehnwer v. Sheetz, Edgar Snyder Associates, Pittsburgh PA
- Expert Witness - Demko v. XTO, Edgar Snyder Associates, Pittsburgh PA
- Expert Witness - Ross v. Ambrosia Machine, Dell, Moser, Lane & Loughney, LLC, Pittsburgh PA
- Expert Witness - Spagnola v. EQS et.al, Dell, Moser, Lane & Loughney, LLC, Pittsburgh PA
- Expert Witness - Rosenstel v. Palladino & Sunoco Inc., Kline and Specter, Philadelphia PA
- Course Leader - Corporate Safety Management, Calpine Corporation, Denver, CO
- Course Leader - Corporate Safety Management, Calpine Corporation, USAF, McGuire AFB, NJ
- Audio-conference Speaker, Beyond Safety... The Organizational Barriers to Safety Excellence, American Society of Safety Engineers Des Plaines, IL
- Speaker, The Management Based Safety Process, American Society of Safety Engineers, Augusta GA Chapter, Augusta GA
- Course Leader - Corporate Safety Management, Calpine Corporation, Houston TX
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Conference, Las Vegas NV
- Speaker, Overcoming the Organizational Barriers to Safety Excellence, American Society of Safety Engineers, Professional Development Conference, Las Vegas NV
- Speaker, OSHA Tools for Small Business, American Society of Safety Engineers, Professional Development Conference, Las Vegas NV
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Calpine Corporation, Houston TX
- Principal Consultant - Divisional Implementation of the Management Based Safety Process Morgan Ceramic Fibers, Augusta, GA
- Principal Consultant - Divisional Implementation of the Management Based Safety Process Curtiss-Wright Corporation, Groquip, Baton Rouge LA
- Principal Consultant - Divisional Implementation of the Management Based Safety Process Curtiss-Wright Corporation, Farris Industries, Ohio
- Principal Consultant - Divisional implementation of the Management Based Safety Process Curtiss-Wright Corporation, Tapco-Enpro Houston, TX
- Principal Consultant - Divisional Implementation of the Management Based Safety Process Curtiss-Wright Corporation, Cimarron, Oklahoma City, OK
- Speaker- Beyond Safety, OSHA Consultation Training Conference, Salt Lake City, UT
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Seminarfest, Las Vegas NV
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Conference, Des Plaines IL
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Conference, Dallas TX
- Keynote Speaker- Creating Line Management Safety and Health Leadership, VCNA Corporate Safety Conference, Orlando FL

## 2012

- Keynote Speaker- Beyond Safety, ASSE Student Chapter, Embry Riddle Aeronautical University,

Daytona Beach, FL
- Expert Witness - Dell, Moser, Lane & Loughney, LLC (Williams v. PBS Coals, Taggart, Southern Cross Const., Pilchuk, Tradesmen Intl. IPS Corp, Peterson Filters)
- Expert Witness - Tate v. Chesapeake Energy, et al, Cameron, Kline & Specter, P.C. Philadelphia PA
- Principal Consultant - Divisional Implementation of the Management Based Safety Process Curtiss-Wright Corporation, Wright EPD Division, Phillipsburg N.J.
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Conference, Dallas TX
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Conference, St Petersburg FL
- Principal Consultant - Safety Culture Assessment and Management Based Safety Process Implementation BRP Corporation, Milwaukee WI
- Expert Witness - Weber, Gallagher, Simpson, Stapleton, Fires & Newby LLC, Phila. PA, (Donnelly v. National Gypsum Company et al.)
- Expert Witness - Kasalius and Kasalius (Poesnecker v. Wilkes-Barre Hospital
- Expert Witness- Dell, Moser, Lane & Loughney, LLC, (Williams case)
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Conference, Denver CO
- Course Leader - Overcoming the Organizational Barriers to Safety, American Society of Safety Engineers, Professional Development Conference, Denver CO
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Conference, Las Vegas NV
- Course Leader - Creating Line Management Safety Leadership, American Society of Safety Engineers, Professional Development Conference, Las Vegas NV
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Seminar, Baltimore MD
- Principal Consultant - Safety Culture Assessment. Curtiss Wright Flow Control Business Unit, Pittsburgh PA,
- Principal Consultant - Divisional Implementation of the Management Based Safety Process Curtiss-Wright Corporation, EMD Division, Pittsburgh PA,
- Speaker - Curtiss Wright Corporation, Strategic Planning Meeting, Cheswick, PA
- Course Leader- Corporate Safety Management, American Society of Safety Engineers, Professional Development Conference, Las Vegas NV

2011
- Speaker - The OSHA Consultation Process, National Safety Council Safety Congress 2011, Philadelphia. PA
- Principal Consultant - The Management Based Safety Process Kennametal Corporation, New Castle PA
- Principal Consultant - The Management Based Safety Process Kennametal Corporation, Birmingham AL
- Course Leader - The Management Based Safety Process Refresher Kennametal Corporation, Latrobe PA
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Calpine Corporation Middletown CA
- Speaker - Beyond Safety - Calpine Senior Managers Meeting, Houston TX
- Expert Witness - Edgar Snyder Associates, Pittsburgh PA (Michael Reed case)
- Expert Witness - Edgar Snyder Associates, Altoona, PA (Christopher Lovell case)
- Speaker - Beyond Safety - Curtiss Wright Corporation, Strategic Planning Meeting, Cheswick, PA
- Course Leader Overcoming the Organizational Barriers to Safety and Health Excellence, American Society of Safety Engineers Professional Development Conference, Chicago, Il
- Speaker - Overcoming the Organizational Barriers to Safety and Health Excellence, American Society of Safety Engineers Professional Development Conference, Chicago, Il
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Seminar Pittsburgh, PA
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Conference, Chicago, Il
- Expert Witness - CB&S Meritas (Robert Sellers v. Dillman Equipment, Inc. Plaintiff And Dillman Equipment, Inc., A division of Astec, Inc.And Astec, Inc)
- Expert Witness - Wardell, Craig, Annin & Baxter, LLP ( Ptaszenski v. Miller Truck Leasing, et al)
- Speaker - Organizational Barriers to Safety and Health Excellence, American Petroleum Institute

Conference, San Antonio TX
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Seminarfest, Las Vegas NV.
- Principal Consultant - Global implementation of the Management Based Safety Process for Office/Sales, Kennametal Corporation, US, Europe, Asia Pacific Implementation for 65 locations worldwide
- Principal Consultant -The Management Based Safety Process, Curtiss Wright Corporation, Cheswick, PA

2010
- Expert Witness - Edgar Snyder Associates, Pittsburgh, PA (Christoff v. The Compass Group USA and Crothall Healthcare Inc)
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Calpine Corporation Houston TX
- Course Leader- Corporate Safety Management, American Society of Safety Engineers, Calpine Corporation Middletown CA
- Expert Witness - Bass, Berry Sims LLC..Nashville TN (Finchum v. John Manville)
- Expert Witness - Thomas Creanney and Associates, Pittsburgh PA, (Ream v. McQuaide)
- Speaker - Organizational Barriers to Safety and Health Excellence, Fostoria OH Chamber of Commerce, Fostoria OH
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Des Plaines IL
- Speaker - Organizational Barriers to Safety and Health Excellence, American Society of Safety Engineers Professional Development Conference, Baltimore MD
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Baltimore MD
- Principal Consultant - Corporate-wide implementation of the Management Based Safety Process, Arizona Public Service, Fossil Generation
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Seminarfest, Las Vegas NV.

2009
- Principal Consultant- Global implementation of the Management Based Safety Process, Kennametal Corporation, 65 locations worldwide
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Houston TX
- Webinar Speaker - Overcoming the Organizational Barriers to Safety and Health Excellence, American Society of Safety Engineers
- Keynote Speaker - Proactive Safety Management Symposium, Organizational Barriers to Safety and Health Excellence, American Society of Safety Engineers Professional Development Conference, Miami FL.
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Miami FL.
- Keynote Speaker - The Management Based Safety Process, Mid Atlantic Safety and Health Conference, Cranberry Twp. PA
- Expert Witness - Cipriani and Werner, Blue Bell, PA (Mecutchen v. Bitterbencder Construction)
- Expert Witness - Edgar Snyder Associates, Pittsburgh, PA (Grimm v. Healthcare Services)
- Expert Witness - Myers Laffferty Law Offices, Philadelphia PA (Disimone v. NPRC-Amtrak)
- Expert Witness –Anthony Slefanon Attorneys, Camp Hill PA. (Bavir v. Roberts Corporation)
- Expert Witness - Griffith, Strickler, Lerman, Solymos and Calkinns, York PA. (Melja v.Eldersburg Building Supply et al.)
- Expert Witness - Griffith, Strickler, Lerman, Solymos and Calkinns, York PA. (QEI Construction Group Case)
- Expert Witness - Dell, Moser, Lane & Loughney, LLC (Varner v. Reiger Crane)
- Expert Witness - Dell, Moser, Lane & Loughney, LLC (Obermeir v. Dynamic Building Corp.)
- Expert Witness - Dell, Moser, Lane & Loughney, LLC (Oiler v. RJ Recycling)
- Expert Witness - Atlee Hall and Brookhart, Lancaster PA (Pleger Case)
- Expert Witness - Fox Rothschild LLP, Lawrenceville N.J. (Tarabokia v.Hilti,et als.)
- Expert Witness - Edgar Snyder Associates, Pittsburgh, PA (Gyregyo v. Fairway LLC)
- Expert Witness - Edgar Snyder Associates, Pittsburgh, PA (Jeffries v. Penn-National Construction Inc.; and Amrynzo Group LLC: and Bloom Electric Heating and Plumbing Inc.)

- Course Leader- Corporate Safety Management, American Society of Safety Engineers, Cincinnati OH
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Buffalo, NY
- Speaker - Organizational Barriers to Safety and Health Excellence, American Society of Safety Engineers Professional Development Conference, San Antonio TX
- Course Leader - Creating Line Management Safety Leadership, American Society of Safety Engineers Professional Development Conference,, San Antonio TX
- Webinar Speaker - The Management Based Safety Process, American Society of Safety Engineers, Des Plaines IL
- Keynote Speaker - The Management Based Safety Process Jennmar Corporation, Corporate Safety Conference, Pittsburgh, PA.
- Keynote Speaker - The Management Based Safety Process Kennametal Corporation, Corporate Safety Conference, Salon OH.
- Keynote Speaker - Organizational Barriers to Safety Performance Excellence, Curtiss Wright Corporate Safety Conference, New Orleans LA.
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, U.S. Army, Fort Rucker, AL
- Principal Consultant – The Management Based Safety Process, Safety Climate Survey, Valley National Gases, Greensburg, PA
- Course Leader- Corporate Safety Management, American Society of Safety Engineers, Seminarfest, Las Vegas NV
- Course Leader - Creating Line Management Safety Leadership, American Society of Safety Engineers, Seminarfest, Las Vegas NV.
- Principal Consultant - The Management Based Safety Process, Human Genome Sciences Incorporated, Gaithersburg MD
- Principal Consultant - The Management Based Safety Process, Kennametal Corporation, Rogers, AK
- Principal Consultant - The Management Based Safety Process, Kennametal Corporation, New Castle, PA
- Principal Consultant - The Management Based Safety Process, Kennametal Corporation, Irwin, PA
- Principal Consultant - The Management Based Safety Process, Kennametal Corporation, Latrobe, PA

2008
- Principal Consultant - The Management Based Safety Process, Human Genome Sciences Incorporated, Gaithersburg MD
- Expert Witness - Thomas Creanney and Associates, (Estate of Gilbert Eutsey)
- Principal Consultant - The Management Based Safety Process, Kennametal Corporation Rogers, AK
- Expert Witness - Ronald L. Shipman Law Offices, Easton PA (Kocher v. Con-Stone Inc.)
- Principal Consultant - The Management Based Safety Process, Kennametal Corporation Chilhowie, VA
- Course Leader - Corporate Safety Management, Calpine Corporation, Houston TX.
- Principal Consultant - The Management Based Safety Process, Kennametal Corporation Bedford, PA
- Keynote Speaker - Critical Elements for Attaining Safety Performance Excellence, Transportation Security Administration (TSA) Inaugural Corporate Safety Conference, Orlando FL.
- Principal Consultant - The Management Based Safety Process, Curtiss Wright Cheswick, PA
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, St Louis MO
- Course Leader - Corporate Safety Management, Calpine Corporation, Folsom, CA
- Principal Consultant - Management Based Safety assessment, Boeing Aircraft Company, Seattle, WA
- Course Leader - Creating Line Management Safety Leadership, American Society of Safety Engineers, Professional Development Conference, Las Vegas NV.
- Speaker - Roles and Responsibilities of Managers, Supervisors and Safety Professionals for Maximizing Safety Performance, American Society of Safety Engineers, Professional Development Conference, Las Vegas NV.
- Expert Witness - Clyde O. Bartel Law Offices (Michael Then v. Maines Paper and Food Service, et. al.)

- Keynote Speaker - Critical Elements for Maximizing Safety Performance Excellence, American Industrial Hygiene Conference and Exhibition, Minneapolis, MN.
- Keynote Speaker - Critical Elements for Maximizing Safety Performance Excellence, Curtiss Wright Corporate Safety Conference, Cincinnati, OH.
- Principal Consultant - The Management Based Safety Process, Kennametal Corporation , Bedford, PA
- Course Developer - Corporate Safety Management, American Society of Safety Engineers, Des Plaines, IL
- Expert Witness - Moran & Moran, Pittsburgh, PA (Szmanitis v. Coen Oil Company)
- Expert Witness - Cipriani & Werner Pittsburgh, PA (Sabula v. Zeransky and W&K Steel)
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Baltimore, MD.
- Course Leader - OSHA 501 Course, Keystone Occupational Safety and Health Center, Monroeville, PA.
- Course Leader - Creating Line Management Safety Leadership, American Society of Safety Engineers, Seminarfest, Las Vegas NV.
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Seminarfest, Las Vegas NV.
- Expert Witness - Andrew L. Horvath, Johnstown, PA (Sekerak v. Winners et al.)

2007
- Expert Witness - Edgar Snyder Associates, Altoona PA (Moncrief v.Suscon Inc. and Diamond Drinks Inc.)
- Expert Witness - Edgar Snyder Associates, Altoona PA (Anderson v. Foradori)
- Course Leader - OSHA 501 Course, Keystone Occupational Safety and Health Center, Scranton PA.
- Principal Consultant - The Management Based Safety Process, The Raymond Group, Orange CA.
- Speaker/Industry Coordinator - The IUP-ALCOA Foundation, Fatality Prevention in the Workplace Forum, Pittsburgh PA
- Principal Consultant - The Management Based Safety Process, USEC, Paducah KY.
- Speaker - The Management-Based Safety Process at Jennmar, American Society of Safety Engineers, Western PA Chapter/IUP Student Chapter meeting, Indiana PA
- Keynote Speaker - Critical Elements for Maximizing Safety Performance Excellence Consolidated Edison of NY, Corporate Safety Conference, New York NY.
- Expert Witness - Dell, Moser, Lane & Loughney, LLC (Cassandra Mackey v. MPW Industrial Services and Appleton Papers)
- Expert Witness - Kelly, Wardell, Craig, Annin&Baxter, LLP (McDonald v. Mercedes Benz of Cherry Hill et al.)
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Seminar, Pittsburgh, PA.
- Course Leader - Corporate Safety Management, US Navy, Norfolk, VA.
- Speaker - Critical Elements for Maximizing Safety Performance Excellence, American Industrial Hygiene Conference Philadelphia, PA.
- Speaker - The Management-Based Safety Process, American Society of Safety Engineers, Professional Development Conference, Orlando FL.
- Course Leader - Management Based Safety, American Society of Safety Engineers, Professional Development Conference, Orlando FL.
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Conference, Orlando FL
- Principal Consultant - The Management Based Safety Process, Superior Essex, Fort Wayne IN
- Webex Presenter- Roles and Responsibilities of Managers, Supervisors and Safety Professionals for Maximizing Safety Performance, American Society of Safety Engineers, Des Plaines IL
- Audio Conference Speaker - Roles and Responsibilities of Managers, Supervisors and Safety Professionals for Maximizing Safety Performance, American Society of Safety Engineers, Des Plaines IL
- Expert Witness - Zarwin, Baum, Devito, Kaplan, Schaer, Toddy, Philadelphia PA (Hatzleftathiou v. Superior Scaffold Services)
- Principal Consultant - The Management Based Safety Process, Curtiss Wright Cheswick, PA
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Seminar, Costa Mesa CA

- Expert Witness - Edgar Snyder Associates, Pittsburgh, PA, (Lemmon v. Otis Elevator)
- Course Leader - Management Based Safety, American Society of Safety Engineers, Professional Development Seminar, Las Vegas NV
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Seminar, Las Vegas NV

## 2006

- Expert Witness - Meyer, Unkivic, & Scott, Pittsburgh PA, (John H. Davis and Sheila Davis v. AK Steel Corporation)
- Principal Consultant - The Management Based Safety Process, Eastman Chemical, Columbia N.C.
- Course Leader - Corporate Safety Management,/ Management Based Safety ABM Corporation, Houston TX
- Audio Conference Speaker - Critical Elements for Maximizing Safety Performance Excellence, American Society of Safety Engineers, Des Plaines IL.
- Course Leader - OSHA 501 Course, Keystone Occupational Safety and Health Center, Wilkes Barre PA.
- Expert Witness - Katherman, Briggs, and Greenberg, York, PA (Mary Mays v. Malcolm Berman and Sandra Berrman, 48th St Construction Company, Hamilton Devepment Corp. ,Hamilton Custom Home Builders, Hagan G. Hamilton, Dean Miller, and Miller Bros. Const. Services)
- Expert Witness - Hardesy, Tyde, Green and Ashton, Jacksonville FL, (Koceja v. Hanson Pipe)
- Expert Witness - Marshall, Dennehey, Warner, Coleman, & Goggin, Philadelphia., PA (John Hagan and Helenann Hagan v. Marvelous Entertainment)
- Expert Witness - Levy, Angstreich, Finney, Baldante, Rubenstein, & Coren, Philadelphia., PA (Estate of William Henderson)
- Expert Witness - Feldstein, Greinberg, Stein, Mckee, Pittsburgh, PA (Faron M. Tucker and Christine Tucker v. Patricia Ramey, Francis Heppinger, West Penn Power, Cranford Construction, Piedmont Crane Inc. and James Steange)
- Expert Witness - Edgar Snyder Associates, Pittsburgh, PA (James Harrison III v. NVR Inc. Ryan Homes Sales, t/b/d/a Ryan Homes)
- Expert Witness - Myers Lafferty Law Offices, Philadelphia PA (Stephen Frederick v. NPRC-Amtrak)
- Expert Witness - Atlee Hall and Brookhart, Lancaster PA, (Donald B. Hampton v. Jay Scott Builders)
- Expert Witness - Quatrini, Rafferty, Galloway, Greensburg PA (Estate of Monty Freed- Complaint Pending)
- Expert Witness - Feldstein, Greinberg, Stein, Mckee, Pittsburgh, PA (Robert Kerr and Stephanie Johns v. David J. Steinberger, Steinberger Floors Inc., Three River Floor Covering LLC)
- Course Leader- Corporate Safety Management, American Society of Safety Engineers, Providence, RI.
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, St. Louis    MO
- Course Leader- Management Based Safety, American Society of Safety Engineers, Professional Development Conference , Seattle WA
- Speaker - Critical Elements for Maximizing Safely Performance Excellence, American Society of Safety Engineers, Professional Development Conference, Seattle WA.
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Baltimore, MD
- Principal Consultant - The Management Based Safety Process, Boeing Aircraft Corporation, Seattle, WA
- Course Leader - Management Based Safety, American Society of Safety Engineers, Seminarfest, Las Vegas NV

## 2005

- Expert Witness - Feldstein, Greinberg, Stein, Mckee, Pittsburgh, PA (Richard Weaver v. KMA 35, Inc, Bachman Homes, Randall Bachman, Lynor Bachman, Kevin Regal, Cynthia Regal)
- Principal Consultant - The Management Based Safety Process, Superior Essex Corporation, Franklin TN
- Principal Consultant - Reliant Energy, New Florence Pa
- Keynote Speaker, Critical Elements for Maximizing Safety Performance Excellence ,US Dept. of Interior, National Park Service, Safety Summit-2005, Seattle WA
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Calpine

Corporation, Houston TX
- Course Leader - Management Based Safety , US Dept. of Interior, National Park Service, Seattle WA
- Course Leader- Corporate Safety Management, American Society of Safety Engineers, Calpine Corporation, Folsom, CA
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Seminar, San Francisco CA
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Seminar, Washington, DC
- Course Leader - Management Based Safety , Superior Essex Corporation ,Plant Managers Conference, Nashville TN
- Course Leader - Management Based Safety , American Society of Safety Engineers, Professional Development Conference New Orleans LA
- Speaker - Management Based Safety , American Society of Safety Engineers, Professional Development Conference New Orleans LA
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Calpine Corporation, Decatur AL
- Seminar Leader - Critical Elements for Achieving Safety Excellence , Senior Manager Conference, El Paso Corporation , Tinley Park Il
- Keynote Speaker - Critical Elements for Achieving Safety Excellence , Baystate Health System Corporate Safety Conference, Springfield MA
- Keynote Speaker - Critical Elements for Achieving Safety Excellence , Herman Miller Corporation Corporate Safety Conference, Grand Rapids MI
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Seminar,, San Diego CA
- Course Leader - Management Based Safety , American Society of Safety Engineers, Seminarfest Professional Development Conference, Las Vegas NV
- Seminar Leader - Critical Elements for Achieving Safety Excellence , Senior Manager Conference, El Paso Corporation , Farmington Hills, MI
- Keynote Speaker - OSHA Update, PA Rural Electric Cooperative Safety Conference, State College, PA

2004
- Expert Witness/Consultant - Terrell, Hogan, Ellis, and Yegelwel. Jacksonville FL (Stephen L. Neck v Sugar Cane Growers Cooperative of Fl.)
- Seminar Leader - Critical Elements for Achieving Safety Excellence , Senior Manager Conference, El Paso Corporation , Fort Wayne IN
- Keynote Speaker - Using the Senior Manager to Attain Safety Performance Excellence, Genesee Valley Safety Council, Rochester NY
- Seminar Leader - Critical Elements for Achieving Safety Excellence , Senior Manager Conference, El Paso Corporation Hartford, CT
- Principal Consultant - The Management Based Safety Process, Jennmar Corporation, Pittsburgh PA,
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Seminar, Philadelphia, PA
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Seminar, Portland, OR
- Course Leader - Using the Senior Manager to Attain Safety Performance Excellence, American Society of Safety Engineers, National Professional Development Seminar, Las Vegas NV
- Course Leader - Creating Line Management Safety and Health Leadership, American Society of Safety Engineers, National Professional Development Conference, Las Vegas NV
- Course Leader - Legal Aspects for Safety Health and Environmental Professionals, American Society of Safety Engineers National Professional Development Conference, Las Vegas NV
- Seminar Leader- Critical Elements for Achieving Safety Excellence , Senior Manager Conference, El Paso Corporation , Houma , La
- Seminar Leader - Critical Elements for Achieving Safety Excellence , Battelle Corporation Corporate Safety Summit, Columbus OH
- Seminar Leader - Critical Elements for Achieving Safety Excellence , American Society of Safety Engineers World Class Safety Symposium, New Orleans LA
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Seminar, New Orleans LA
- Course Leader - Creating Line Management Safety and Health Leadership, American Society of

Safety Engineers, Seminarfest Professional Development Conference, San Diego CA
- Course Leader - Legal Aspects for Safety Health and Environmental Professionals, American Society of Safety Engineers Seminarfest, San Diego CA

**2003**
- Course Presenter - Law Symposium for the EHS Professional, American Society of Safety Engineers, Professional Development Seminar, Fort Lauderdale FL.
- Keynote Speaker - American Society of Safety Engineers Student Leadership Conference, Pittsburgh PA
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Seminar, Seattle, WA
- Course Leader - Creating Line Management Safety and Health Leadership, American Society of Safety Engineers, National Professional Development Conference, Denver. CO
- Chapter Author, ASSE's Construction Safety, American Society of Safety Engineers
- Chapter Author, ASSE's The Business of Safety, American Society of Safety Engineers
- Expert Witness/Consultant - Edgar Snyder and Associates, Pittsburgh, PA
- Seminar Leader - Dupont's "Managing Safety, Techniques that work for Operations Managers" Kansas City Power and Light, Kansas City MO
- Seminar Leader - Dupont's "Managing Safety, Techniques that work for Operations Managers" Mercury Marine, Fondu-Lac WI
- Course Leader - Creating Line Management Safety and Health Leadership, American Society of Safety Engineers Seminarfest, Orlando FL
- Course Leader - Legal Aspects for Safety Health and Environmental Professionals, American Society of Safety Engineers Seminarfest, Orlando FL
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Seminar, Atlanta, GA

**2002**
- Course Leader - Corporate Safety Management, American Society of Safety Engineers, Professional Development Seminar, Pittsburgh, PA.
- Keynote Speaker - "Creating Line Management Safety and Health Leadership, Oceaneering Inc, International Safety Conference, Houston TX.
- Keynote Speaker - "Creating Line Management Safety and Health Leadership, Oceaneering Inc, Plant Managers Conference, New Orleans, LA
- Keynote Speaker - "Creating Line Management Safety and Health Leadership and Critical Elements for Achieving Safety Excellence", Baxter Healthcare Corporation, Ponce, Puerto Rico
- Seminar Leader - Dupont's "Managing Safety, Techniques that work for Line Managers" Newsday, Melville NY
- Seminar Leader - Dupont's "Managing Safety, Techniques that work for Line Managers", QANTAS, Melbourne Australia
- Seminar Leader- Dupont's "Managing Safety, Techniques that work for Operations Managers", Smurfit Stone Container Corporation, St. Louis, MO
- Course Leader - Achieving Safety and Health Excellence for Managers and Supervisors, American Society of Safety Engineers, Professional Development Conference, Nashville, TN.
- Keynote Speaker - "Critical Elements for Achieving Safety Excellence", American Society of Safety Engineers, Professional Development Conference, Harrisburg, PA
- Principal Consultant - Reliant Energy, New Florence Pa
- Course Leader- Achieving Safety and Health Excellence for Managers and Supervisors, American Society of Safety Engineers Seminarfest, Primm, Nevada
- Keynote Speaker - "Creating Line Management Safety and Health Leadership and Critical Elements for Achieving Safety Excellence", Baxter Healthcare Corporation Worldwide Safety, Health and Environmental Conference, Dallas TX
- Keynote Speaker - "Creating Line Management Safety and Health Leadership and Critical Elements for Achieving Safety Excellence", Campbell Soup Company, Global Safety Conference, Sacramento CA

**2001**
- Keynote Speaker - "Creating Line Management Safety and Health Leadership", Basell Polyolefins Inc. North American Senior Management staff, Houston TX
- Keynote Speaker - "Creating Line Management Safety and Health Leadership", Basell Polyolefins Inc. North American safety and health managers, Houston TX
- Keynote Speaker - "Creating Line Management Safety and Health Leadership", PA Governors

Safety and Health Conference, Hershey PA
- Seminar Leader - Dupont's "Managing Safety, Techniques that work for Operations Managers", Smurfit Stone Container Corporation, St. Louis, MO
- Keynote Speaker - "Creating Line Management Safety and Health Leadership" Organizational Resource Counselors, Washington D.C.
- Speaker - "Bridging the Gap between SHE professionals, National Assn. of Environmental Managers, Chicago IL.
- Keynote Speaker- "From Triumph to Tragedy – The Dale Earnhardt Story" ASSE Student Chapter, Indiana PA
- Keynote Speaker - "Creating Line Management Safety and Health Leadership", Michigan State Safety Conference, Lansing MI
- Keynote Speaker - "A World without Borders", Institute of Occupational Safety and Health, London England
- Keynote Speaker - "Creating Line Management Safety and Health Leadership", Western Pa Chapter ASSE, Pittsburgh, PA

### 2000
- Keynote Speaker - "Creating Line Management Safety and Health Leadership", Philadelphia Chapter ASSE, Philadelphia, PA
- Keynote Speaker - "Creating Line Management Safety and Health Leadership", PA Governors Safety and Health Conference, Harrisburg PA
- Keynote Speaker - "Creating Line Management Safety and Health Leadership", ASSE New England Chapters Professional Development Conference, Sturbridge, MA
- Keynote Speaker - "Creating Line Management Safety and Health Leadership", ASSE Region VI Professional Development Conference, Myrtle Beach SC
- Keynote Speaker - "Realizing your Dreams" Indiana University of PA, Commencement Address to 2000 graduates. Indiana PA
- Course Leader - "Creating Line Management Safety and Health Leadership Course" OSRAM Sylvania, Towanda, PA
- Speaker - "Creating Line Management Safety and Health Leadership" ASSE Professional Development Conference, Orlando FL
- Keynote Speaker- "Creating Line Management Safety and Health Leadership", Central PA Chapter ASSE Professional Development Conference, Harrisburg PA
- Executive Presentation - "Creating Line Management Safety and Health Leadership", Campbell's Soup Company Senior Management Staff. Paris TX
- Executive Presentation - "Creating Line Management Safety and Health Leadership", Johnson Matthey Chemical Corporation, Cherry Hill N.J.

### 1999
- Expert Witness/Consultant - Kleeman Law Offices, Philadelphia, PA (William Butts v. National Railroad Passsenger Corp.-Amtrak)
- Keynote Speaker - "Creating Line Management Safety and Health Leadership", ASSE Region VI Professional Development Conference, Myrtle Beach S.C.
- Speaker - "Creating Line Management Safety and Health Leadership", American Gas Association Conference, Cleveland, OH
- Speaker - "Creating Line Management Safety and Health Leadership", New Jersey State Safety Council, Atlantic City, New Jersey
- Expert Witness/Consultant - Tuckor,Aresnborg Law Offices, Pittsburgh, PA
- Speaker - Best Practices in Safety Management Symposium, American Society of Safety Engineers, Las Vegas, NV

### 1998
- Expert Witness/Consultant - Nicholas, Perot Law Firm, Syracuse, NY
- Keynote Speaker - The Roles of Management, Labor and Employees in Safety - Industrial Relations Research Association, Syracuse, NY
- Consultant - Fortis/Canadian Niagara Power, Fort Erie, Ontario, Canada
- Keynote Speaker - Getting Executives to Talk the Safety Talk and Walk the Safety Walk - American Society of Safety Engineers, Buffalo, NY Chapter
- Expert Witness/Consultant - Claremont Steel Corporation, Claremont, NH (Secretary of Labor v. Claremont Steel)
- Expert Witness/Consultant - Kleeman and Abloeser, PC, Philadelphia, PA
- Keynote Speaker - Getting Executives to Talk the Safety Talk and Walk the Safety Walk, Empire

State Conference, Syracuse, NY
- Panelist - OSHA Crossfire - Empire State Safety Conference, Syracuse, NY

**1997**
- Course Leader - Safety and Health for Managers, Supervisors and Crew Chiefs, Eastern Municipal Water District, Perris, California
- Course Leader - Achieving Safety Excellence for Employees-Eastern Municipal Water District, Perris, California
- Keynote Speaker - World Class Safety - Genesee Valley Safety Conference, Rochester, NY
- Course Leader - Safety and Health for Supervisors - Sylvania, Towanda, Pennsylvania
- Keynote Speaker - ASSE Region X Professional Development Conference - "Creating a World Class Safety and Health Culture" and How to Get Your Executives to Talk the Safety Talk and Walk the Safety Walk, Buffalo, NY
- Keynote Speaker - Northern Chautauqua Safety Council - "Creating a World Class Safety Culture", Fredonia, NY

**1996**
- Keynote Speaker - Western New York Safety and Health Conference - "Creating a World Class Safety Culture"
- Course Leader - Safety Excellence Resources - "OSHA Safety and Health Program Management Standard", Erie/ Buffalo/ Saratoga, NY
- Course Leader - Safety Excellence Resources - "OSHA Recordkeeping and Reporting", Albany, Syracuse, Buffalo, NY

**1995**
- Course Leader - Safety Excellence Resources - "Return to Work/Workers' Compensation Cost Control", Albany/Syracuse/Buffalo, NY
- Speaker - New York State Head Injury Association Conference - 13th Annual Conference "Workplace Head Injury Prevention", Saratoga, NY
- Keynote Speaker - Genesee Chapter ASSE - "Achieving Safety and Health Excellence", Rochester, NY

**1994**
- Speaker - New York State Public Utilities Safety Directors Association - "Niagara Mohawk's Public Accident Prevention Strategy", Alexandria Bay, NY
- Speaker - Inter-Utility Training Association - "Safety Training Paradigm Shift", Saratoga, NY
- Keynote Speaker - ASSE Syracuse Chapter - "Changing a Safety Culture - The Niagara Mohawk Experience", Syracuse, NY
- Keynote Speaker - ASSE Albany Chapter - "Changing a Safety Culture - The Niagara Mohawk Experience", Albany, NY
- Course Leader - OSHA Standards Overview - IBM, Poughkeepsie, New York

**1993**
- Keynote Speaker - ASSE Long Island Chapter - ASSE Update, Long Island, NY
- Keynote Speaker - ASSE Buffalo Chapter - "Changing a Safety Culture - The Niagara Mohawk Experience", Buffalo, NY

**1992**
- Consultant - American Packaging Corporation, Rochester, NY

**1991**
- Consultant - GAI-Tronics Corporation, Reading, PA
- Consultant - The Allentown Hospital - Lehigh Valley Hospital Center, Allentown, PA
- Keynote Speaker - Safety Management in Small Business - PA Chamber of Business and Industry, Reading, PA
- Keynote Speaker - Critical Elements for Managing Safety & Health - Lebanon Industrial Management Club, Reading, PA
- Keynote Speaker - Workers' Compensation Cost Control - PA Chamber of Business & Industry, Reading, PA
- Course Leader - OSHA Recordkeeping - Manufacturers Association of Berks County, Reading, PA
- Course Leader - Industrial Safety for Supervisors - Manufacturers Association of Berks County,

Reading, PA
- Course Leader - Safety Department Management - Manufacturer Association of Berks County, Reading, PA

**1990**
- Seminar Presenter - Managing for Safety & Health Excellence - Utilities Mutual Insurance Company - Safety Conference, Mt. Pocono, PA
- Course Leader - Managing for Safety & Health Excellence - Bachman Foods Corporation, Reading, PA
- Panel Presenter - Emerging Issues in Workers Compensation - Pennsylvania Job Service, Harrisburg, PA
- Course Leader - Industrial Safety for Supervisors - Manufacturers Association of Berks County, Reading, PA

**1989**
- Course Leader - Safety Department Management - Manufacturers Association of Berks County, Reading, PA
- Keynote Speaker - Critical Elements Necessary for Maximizing Safety Performance - Reading Industrial Management Club, Reading, PA
- Keynote Speaker - Current Trends in Occupational Safety & Health Management -Berks County Industrial Management Club, Reading, PA
- Keynote Speaker - Criminal Liability in the Workplace - Manufacturers Association of Berks County, Reading, PA
- Guest Lecturer - Electro Magnetic Fields - Millersville University of PA, Millersville, PA

**1988**
- Keynote Speaker - Managing for Safety & Health Excellence - Manufacturers Association of Berks County, Reading, PA
- Course Leader - Good Safety = Good Business - Reading Conference on Excellence, Harrisburg, PA

**1987**
- Keynote Speaker - The DuPont Safety Management Strategy at Hershey Chocolate Company - Central Pennsylvania ASSE, Harrisburg, PA
- Seminar Presenter - The DuPont Approach to Managing Safety in Food Manufacturing Grocery - Manufacturer Assn., Chicago, Illinois
- Guest Lecturer - Recognition, Evaluation & Control of Heat Stress - Millersville University of Pennsylvania, Millersville, PA
- Guest Lecturer - Current Safety Topics - Pennsylvania State University, Hershey, PA

**1986**
- Guest Lecturer - Current Safety Topics - Pennsylvania State University, Hershey, PA
- Keynote Speaker - Career Outlook in Safety Management - Indiana University of Pennsylvania, Indiana, PA

## Books, Magazine Articles and Quotations

| | |
|---|---|
| 2017 | Human Resources Executive Online, Production Over Safety? |
| 2012 | Chapter Author, Construction Safety Management and Engineering, 2nd Edition |
| 2010 | Distribution Group Magazine -Feb. 2010 -Improve Your Safety Record in the Distribution Industry by Overcoming Your Organizational Barriers to Safe Behavior |
| 2009 | Process Cleaning Magazine -May/June 2009 - The Safest Companies by S.J. Gualardo |
| 2008 | Business Insurance-Safety from the Ground Floor |
| 2008 | Occupational Hazards- Breakthrough Safety Management |
| 2008 | Manufacturing News- Safety Is A Social, Managerial and Organizational Responsibility |
| 2007 | Business Insurance Magazine- Jan. 2007 BP Slammed for Poor Safety Leadership |
| 2006 | The Charlotte Observer, Feb. 19, 2006 - Dale Earnhardt's Last Gift 5 Years Later |
| 2004 | Chapter Author, Construction Safety Management and Engineering, 1st Edition |

# National Safety Consultants Inc.
## 2018 Fee Schedule

## Litigation Support/Expert Witness (new cases beginning 2018)

|  |  |
|---|---|
| Research and report writing | $325.00/hour |
| Site visits | $2600.00/day*** |
| Court Appearances/Depositions | $3000.00/day*** |
| New case retainer | $2000.00* |

## The Management Based Safety Process

### Option A – Standard Implementation

|  |  |
|---|---|
| Safety Culture Assessment | $2500/day |
| Safety Climate Surveys | $9.95/survey |
| Manager and Supervisor Training | 1 day-$695.00/attendee |
| Worker training | $175.00/attendee |

### Option B - Shared Implementation

|  |  |
|---|---|
| Site License | $95/site employee** |
| Senior Leader | 1 day-$695.00/attendee |
| Train the trainer | 1 day-$695.00/attendee |
| Voice-Over PPT | Included |
| Safety Climate Surveys | Included |

|  |  |
|---|---|
| Annual process maintenance/consultation | $2500.00/year |

## Safety Culture Assessments

|  |  |
|---|---|
| On-Site Safety Culture Assessment | $2500.00/day |
| Safety Climate Surveys | $9.95/survey |
| Safety Culture Surveys | $9.95/survey |
| 360 Degree Review | $250.00/survey |

## Other Courses and Seminars

|  |  |
|---|---|
| Courses/seminars-Prices per attendee | 1/2 day-$347.50/attendee |
|  | 1 day-$695.00/attendee |
|  | 2 days -$1390.00/attendee |

## Keynote Speeches                   $3000.00/day

**Note: All rates exclusive of normal travel, living, and related project expenses. $700.00/24 hour travel rate applied when travel involves non-billable time necessary for transit prior to or beyond the date(s) the activity was performed.**

**\* New case retainer due when case initial documents are sent for review.**

**\*\*Site license applies to Shared implementation option only.**

**\*\*\*Hourly rate applied for all non-personal time while in transit for site visits, depositions and court cases**

**Please make all checks payable to:** National Safety Consultants Inc.
**Federal TAX ID 16-1569388**
**D&B # 026859315**
**Mail remittance to:** 1660 Oakridge Drive, Salix PA 15952
**Contact Phone # 814-341-5593**

S. Gualardo
Deposition
Exhibit __3__

Samuel J. Gualardo

Cased Where Deposed or Court Testimony

2017

- Deposition – ( Meza v. PG&E) Walkup Law Office, San Francisco, CA
- Deposition - (Gary v. Ft. Meyer) Koontz McKenney, Washington D.C.
- Deposition - (Pinzino v. Raytown Water Company et.al.), The Klamann Law Firm, Kansas City, MO

2016

- Deposition - TONIA NELSON, KRISTOPHER PALLESEN, BRYAN GARCIA and NICHOLAS NELSON, Plaintiffs, vs. LOWE'S HOME CENTER, INC. Case No. 2:15-CV-00092- KJM-DAD

2015

- None

2014

- Deposition and Court Testimony -  (Manning. v. Sunbelt et. al), Abrahamson and Ulterwyk,, Tampa FL

2013

- None

2012

- Deposition -- (Donnelly v. National Gypsum Company et al) Weber, Gallagher, Simpson, Stapleton, Fires & Newby LLC, Phila. PA,

2011

- None

2010

- None

S. Gualardo
Deposition
Exhibit 4



# National Safety Consultants Inc.

## DAVID W. NATCHER, Plaintiff,

## v.

## ACCURIDE CORPORATION, Defendant

S. Gualardo
Deposition
Exhibit 5

EXHIBIT
B

National Safety Consultants Inc.                    (AL525234.1)1

## Documents Reviewed

In preparation for this case, this expert reviewed the following information:

1) Complaint in Civil Action
2) Defendant Accuride Answer to Plaintiffs Complaint in Civil Action
3) Defendant's Supplemental Disclosures
4) Deposition Transcript of David Natcher
5) Deposition Transcript of Donald Herrmann
6) Deposition Transcript of Mark Crispin
7) Defendants First Supplemental Initial Disclosures
8) Defendants Answers to Interrogatories
9) Defendants Discovery Responses
10) Defendants Initial Disclosures
11) Defendants Responses to Request for Production of Documents
12) Defendants Second Supplemental Disclosures
13) Defendants Supplemental Discovery Documents
14) OSHA Documents
15) Plaintiffs Discovery Responses
16) Accuride color photos
17) Applicable OSHA Laws, Standards and Regulations
18) Applicable National Consensus Standards
19) Applicable Industry Guidelines and Recommendations

## Introduction

This report methodology for this case included an analysis of the facts and circumstances involved in this incident. In developing an opinion, this expert evaluated company policies, procedures, industry standards codes and regulations, government standards and regulations, workplace customs, practices and procedures. Additionally, documents provided for case preparation purposes were also reviewed and analyzed.

The Occupational Safety and Health Administration (OSHA) regulates worker and workplace safety and health at the vast majority of workplaces including the work site where this incident occurred. OSHA has specific standards and regulations required to be implemented by employers to prevent occupational injuries or illnesses of workers. Although other standards and guidelines will be used as supporting information in this report, OSHA's standards and regulations are the ones most applicable to this incident. OSHA Standards and Regulations are the foundation in workplace safety for determining the safe acceptable standards, customs and practices within the industry. They are also used to establish a degree of reasonable care that a prudent person would exercise in a similar situation.

National Safety Consultants Inc.          [AL525234.1]2

Beyond OSHA requirements, employers also follow the safety guidance provided by widely accepted National Consensus Standards in an effort to protect employees and members of the public. The American Society of Mechanical Engineers (ASME) standards will be referenced in this case. ASME is a professional association that, "promotes the art, science, and practice of multidisciplinary engineering and allied sciences around the globe" via "continuing education, training and professional development, codes and standards, research, conferences and publications, government relations, and other forms of outreach. ASME has over 130,000 members in 158 countries worldwide. ASME is one of the oldest standards-developing organizations in America. It produces approximately 600 codes and standards.

In addition to regulations and consensus standards, occupational safety and health industry guidance is often used by employers and safety professionals, as another source to determine whether their approach to dealing with issues is appropriate. Employers and safety professionals rely on the recommendations of the National Safety Council (NSC) and the American Society of Safety Engineers (ASSE) for this purpose. The National Safety Council (NSC) is a nonprofit, nongovernmental, international public service organization dedicated to protecting life and promoting health. The NSC is a membership organization, founded in 1913 and chartered by the U.S. Congress in 1953. Members include more than 48,000 businesses, labor organizations, schools, public agencies, private groups and individuals. For this case, the National Safety Council's Accident Prevention Manual for Business and Industry 12th edition was used as a resource. Another source used in this report was information provided by the American Society of Safety Engineers. Founded in 1911, the American Society of Safety Engineers (ASSE) is the oldest and largest safety organization and represents more than 37,000 SH&E practitioners committed to protecting people, property and the environment and are at the forefront of safety engineering, design, standards development, management and education in virtually every industry, governmental agency, labor and education.

Finally, since this case involved an over the road commercial truck, the requirements of the Federal Department of Transportation were reviewed.

**Key Persons and Entities Involved**

- Mr. David Natcher was an over the road truck driver for Berkmire Trucking since 2007. (Natcher Dep.25)
- Mr. Mark Crispin worked as a stores coordinator for Accuride. Mr. Crispin was responsible for shipping the conveyor involved in the incident. Previously he was a maintenance supervisor, maintenance technician and millwright. He last used a crane 14 years ago. He used cranes at previous employers. He never loaded a flatbed trailer with a crane in any previous position. (Crispin Dep. 9-10, 12, 14-16)
- Mr. Don Herrmann worked at Accuride as a Millwright. In that position he performed welding/fabricating, plumbing, carpentry, painting, truck loading and unloading, and equipment repair. (Herrmann Dep. 15)

National Safety Consultants Inc.                    [AL525234.1]3

- Mr. Kevin Maleski was a Human Resources Manager for Accuride Corporation.
- Mr. Matt Brady was an Environmental Health & Safety Coordinator for Accuride Corporation.
- Ms. Sheryl Jordano was a Senior Buyer for Accuride Corporation.
- Corporation.
- Representatives of Dalley Supply, Inc. performed sling inspections for Accuride.

## Incident Overview

- ✓ Mr. David Natcher was involved in an incident at Accuride Corporation in Erie, PA on April 15, 2016 at approximately 10:15 AM.
- ✓ On that date, Mr. Natcher was dispatched to pick up an approximate 8000-pound conveyor at Accuride Corporation in Erie. Mr. Natcher was planning to transport the cargo from Accuride back to Berkmire where another driver was to transport it to Wisconsin.
- ✓ Mr. Natcher had been to Accuride previously. On the day of the incident, he was dispatched to the east bays to pick up the conveyor. When at the facility, Mr. Natcher was directed by an Accuride shipping supervisor where to go for loading.  He was told specifically where to park his truck. He stopped the truck and set the brakes. Mr. Natcher was never loaded in that bay previously. (Natcher Dep. 83,92, 95)
- ✓ Mr. Herrmann was not informed in advance that he was to be loading the conveyor that Mr. Natcher was dispatched for. Mr. Herrmann was informed by radio by his foreman to do so at some point when Mr. Natcher arrived. (Herrmann Dep. 50)
- ✓ Prior to the day of the incident, that same conveyor was loaded onto flatbed trucks 2-3 times annually by Mr. Herrmann. (Herrmann Dep. 45)
- ✓ Mr. Herrmann testified that he loaded conveyors onto Berkmire trailers 6-8 times previously. (Herrmann Dep. 53)
- ✓ Mr. Herrmann never loaded the conveyor with Mr. Natcher as a Berkmire driver previously. (Herrmann Dep. 58)
- ✓ Mr. Natcher never picked up or dropped off a load at Accuride, which utilized the overhead crane that was used on the day of your accident. (Natcher Dep. 75)
- ✓ The conveyor load was already rigged for the crane lift by Mr. Herrmann with a four legged sling attached to the hoist hook. Mr. Natcher was not involved in original rigging the load for crane transport to his trailer. (Natcher Dep. 69, 102, 103)
- ✓ Mr. Herrmann was using a remote control device to operate the crane and was positioned on the driver's side of the truck. (Natcher Dep. 85)(Herrmannn Dep. 59)
- ✓ Mr. Herrmann was having difficulty getting the center of gravity for the load, which concerned Mr. Natcher from a safety perspective. (Natcher Dep. 85)

- ✓ Mr. Herrmann was cussing because of his difficulty. (Natcher Dep. 105)
- ✓ Mr. Herrmann advised Mr. Natcher that he was having trouble hooking up the conveyor at which time Mr. Natcher offered to assist. (Natcher Dep. 98)
- ✓ Mr. Herrmann and Mr. Natcher did not like the way the conveyor first lifted and set it back down. Both individuals readjusted the hooks at that point. Once satisfied, the lift onto the trailer occurred. (Herrmann Dep. 52, 60, 68-69)
- ✓ Nobody else was in the area supervising or spotting the lift. (Natcher Dep. 106)(Herrmann Dep. 69)
- ✓ Mr. Natcher got on the flatbed to set wooden cribbing to accept the conveyor load because the conveyor legs would penetrate the bed. (Natcher Dep. 132) (Herrmann Dep. 54)
- ✓ Mr. Herrmann testified that he believed at that point that the use of the cribbing would make the load unstable. He testified that he was always told that it was the driver's responsibility to set the load, as they desired which he disagreed with. However, Mr. Herrmann did not have any discussion about the placement of the cribbing with Mr. Natcher. (Herrmann Dep. 54, 71-75)
- ✓ Mr. Crispin approached the area to get paperwork signed. At that point, the conveyor was sitting on the flatbed. He testified that apparently "Wayne" did not like how it was sitting. Mr. Natcher was standing on the trailer on the driver's side front area. Mr. Herrmann was on the ground on the south side of the trailer. Mr. Crispin did not hear any commands or see any hand signals from Mr. Natcher. Mr. Natcher allegedly shook his head no and Mr. Herrmann was getting ready to pick it back up. Mr. Crispin turned around and walked away because he knew it was going to be some time before it was fully loaded. (Crispin Dep. 25, 26)
- ✓ Mr. Natcher was on the trailer and he adjusted the blocks as the load was being placed by Mr. Herrmann. (Natcher Dep. 121)
- ✓ The load was eventually lowered onto the cribbing. (Natcher Dep. 127)
- ✓ Mr. Herrmann then lowered the hoist to create slack in the sling chains. (Natcher Dep. 143)
- ✓ Mr. Natcher unhooked the sling hooks and piled them on the trailer decking. (Natcher Dep. 150-152)
- ✓ Mr. Herrmann stated that when the hooks were unhooked they were thrown to the north side of the conveyor on the side where Mr. Natcher was standing, which was on the opposite side where Mr. Herrmann was positioned. (Herrmann Dep. 83,84)
- ✓ Mr. Herrmann raised the hoist and chains from the deck after Mr. Natcher told him the chains were removed. (Natcher Dep. 153)
- ✓ The chain slings were moving up and then slid off on the south side of the machine onto the trailer deck. (Natcher Dep. 157-158)
- ✓ Mr. Crispin reproached the area about 15 minutes later. The conveyor was on the truck at that point, and then the chains were disconnected and hanging

straight down as opposed to being pulled out to the four corners of the conveyor. (Crispin Dep. 33, 34)

✓ After Mr. Crispin approached the area, he was standing there and he could heard the clicking. Out of the corner of his eye, he could see the crane chains moving up. He then saw the conveyor tip to the north. (Crispin Dep. 35, 37,62)

✓ Mr. Natcher unhooked the hook and signaled Mr. Herrmann to go up with the chain sling. He raised the hoist and chain sling and saw the conveyor shimmy as he was on the south side. At that time, Mr. Natcher grabbed the conveyor and tried to push it back onto the trailer. (Herrmann Dep. 81-82, 86)

✓ Mr. Herrmann believed that when the last hook was unattached, the sling was free from the conveyor prior to him raising the hoist. (Herrmann Dep. 84)

✓ According to Mr. Herrmann, Mr. Natcher had one hook in his hand. (Herrmann Dep. 99)

✓ Prior to raising the hoist, Mr. Herrmann testified that he could not see the location of the chain sling hooks. He could only see a portion of the chains. (Herrmann Dep 82)

✓ Mr. Herrmann then began to raise the chains. They began dragging on the side of the conveyor as they were being raised causing it to become unstable. The crane operator should have stopped the lift hoist or moved the trolley south to prevent the chains from making contact with the conveyor but did not do so. (Natcher Dep. 192)

✓ Mr. Herrmann raised the hoist 2 times prior to seeing the conveyor shimmy. (Herrmann Dep. 89)

✓ Mr. Natcher went to the area where the chains were dragging up the side of the conveyor to try to push them clear at which time the conveyor started shaking. He called to Mr. Herrmann to stop while trying to stabilize the conveyor and prevent it from tipping. That is when the conveyor flipped. (Natcher Dep. 160-165)

✓ Mr. Herrmann yelled to the operator to move away. (Herrmann Dep. 86)

✓ Mr. Crispin witnessed Mr. Natcher moving backward as the conveyor was tipping but he was not sure if it was pushing him. He noted that it appeared Mr. Natcher jumped at that point. (Crispin Dep. 41)

✓ As the conveyor continued to move, Mr. Natcher believed that he fell off the trailer and positioned himself underneath of it and the load continued to fall. (Natcher Dep. 166)

✓ Mr. Crispin saw Mr. Natcher crawl under the trailer after the conveyor was on the ground. (Crispin Dep. 57)

✓ Mr. Natcher was treated on the scene and transported by ambulance to the hospital

✓ Mr. Natcher suffered serious and disabling injuries because of the incident.

**Summary of Conclusions**

National Safety Consultants Inc.                    {AL525234.1}6

The opinions expressed by this expert in this report are offered with a reasonable degree of professional safety certainty and are based on the information that was available for developing these opinions. I reserve the right to change my opinion if new or additional information becomes available at a future time.

Accuride Corporation had actual and constructive knowledge of the unsafe, dangerous, and/or otherwise hazardous operation of the crane. Accuride Corporation knew or should have known through the exercise of reasonable care that the unsafe, dangerous, and/or otherwise hazardous operation of cranes on its premises could cause serious injury. Accuride had a duty of reasonable care to provide safe premises to Mr. Natcher as a business invitee. However, as this report will illustrate, Accuride was reckless in its conduct while intentionally disregarding or acting in plain indifference to the safety of Mr. Natcher. Accuride breached its duty of reasonable care to Mr. Natcher. The incident and its injurious outcomes were clearly foreseeable. As a direct and proximate result of the incident, Mr. Natcher suffered serious and disabling injuries.

**Discussion of Significant Issues**

**The conveyor load was stable after being loaded onto the flatbed trailer**

The conveyor load was stable and did not fall from the flatbed trailer because cribbing was used to support it on the flatbed trailer. Per Accuride, the conveyor being shipped to Jorgenson Conveyor for rebuilding was a metal belt puck conveyor, which had a weight 3500 lbs. per Plaintiff responses. The bill of lading however noted the load was 12,000 lbs. The conveyor had dimensions of 23' x 3' x 6' (Accuride 000001) Mr. Natcher testified that load had a solid stable base on the back and the feet on the front. (Natcher Dep. 46-48)

The load was clearly stable on the flatbed while on the wooden cribbing prior to it being tipped by the movement of the crane hoist. Mr. Herrmann testified that he actually raised the hoist two times prior to seeing the conveyor shimmy. (Herrmann Dep. 99) Mr. Crispin further confirmed that the load was stable in his testimony as well. He reported that when he reproached the area, the conveyor was on the truck and the chains were disconnected and hanging. (Crispin Dep. 33, 34)

Mr. Natcher observed in his deposition that the cribbing did not roll and was in the same place in the post incident photo as it was originally placed. (Natcher Dep. 134, 193) Further, according to Mr. Natcher, post incident, the conveyor was placed onto the trailer the same way by Mr. Rodgers with the cribbing that Mr. Natcher used. (Natcher Dep. 234) At the informal OSHA hearing, Berkmire argued that the load was stable for 30 seconds and that the sling was heard dragging over conveyor and it snagged. They further noted that the same load was loaded after incident same way (using the cribbing) and it was stable. However, in his deposition, Mr. Herrmann emphatically believed the cribbing caused the conveyor to fall and it was not the raising of the hoist. However, after the load was set, the entire weight of the conveyor was on the flatbed. Enough time elapsed for the driver to remove the hooks before the load fell from the trailer. Consequently, the load

was stable up until the pointy the crane hoist was moved upwards. Mr. Herrmann confirmed that the conveyor did not shimmy or wobble during that time. (Herrmann Dep. 120, 121)

According to the OSHA compliance safety and health officer interview notes, Mr. Herrmann advised that the hook might have caught on the conveyor after the driver advised him to raise the hoist. This is consistent with the OSHA interview account of Mr. Natcher who stated that when he unhooked, the hook got snagged on something. Thus, this Expert concludes that the cribbing had nothing to do with the conveyor becoming unstable.

**Failure of Accuride to provide a qualified crane rigger and spotter for a dangerous crane lift operation**

**Spotter**

Accuride was required to provide a qualified crane rigger and spotter to safely move the load from the floor level onto the flatbed trailer. Accuride failed to provide a spotter, supervisor, or other individual to assist Mr. Herrmann in the operation of the crane to ensure that the crane and chains were free of all obstacles before the crane was lifted. Nobody else was in the area supervising or spotting the lift per the testimony of Mr. Natcher and Mr. Herrmann. (Natcher Dep. 108)(Herrmann Dep. 69) Furthermore, because of not providing a spotter for this operation, Accuride failed to assure Mr. Natcher was clear of the lift zone and positioned in a safe area.

Mr. Herrmann testified that he used truck drivers mainly as spotters at his previous employer when loading and unloading trucks. At times, his employer also provided spotters. (Herrmann Dep. 18) Mr. Herrmann agreed in his testimony that that his union representative informed OSHA during their investigation that Accuride used to use two employees for flatbed loading. (Herrmann Dep. 97) While working at Accuride, Mr. Herrmann testified that if the load was too big for him to see, he used an Accuride spotter. However, he further testified that every time he ever loaded the truck, the driver has always been the one what told him where they wanted the load placed, how they wanted it positioned and they watched how it was being placed before it was set down on their truck. (Herrmann Dep 95) Consequently, he did not request an Accuride spotter to be used in that circumstance. Mr. Herrmann affirmed that no spotter was used during the conveyor lift at Accuride. (Herrmann Dep. 95) Mr. Natcher also confirmed that there was no spotter on the day of the incident. (Natcher Dep. 144) However, he testified that other personnel in addition to the crane operator were present previously at Accuride while Mr. Natcher's cargo were being loaded. Mr. Natcher did not know their purpose. (Natcher Dep. 144, 240-241)

**Rigging**

In addition to not providing a spotter, Accuride also did not provide a rigger and/or a rigging crew to assist Mr. Herrmann with the loading process of the conveyor. Because

National Safety Consultants Inc.                {AL525234.1}8

Accuride did not provide a qualified rigger and/or spotter for lifting and placing the conveyor onto the flatbed trailer, Mr. Natcher was required to climb onto the flatbed to unhook the chain sling connecting the overhead crane to the conveyor. Accuride did not advise him that this activity was not permissible and clearly permitted him to perform the duties of a rigger.

According to the testimony of Mr. Herrmann, he was not informed in advance that he was to be loading the conveyor that Mr. Natcher was dispatched for that day. Mr. Herrmann was only informed via radio by his foreman to attend to the needed crane lift at some point when Mr. Natcher arrived. (Herrmann Dep. 50)

The conveyor load was already rigged for the crane lift by Mr. Herrmann with a four legged sling attached to the hoist hook. Mr. Natcher was not involved in original rigging the load for crane transport to his trailer. (Natcher Dep. 69, 102, 103)

Mr. Natcher reported that Mr. Herrmann was having difficulty getting the center of gravity for the load, which concerned Mr. Natcher from a safety perspective. (Natcher Dep. 85) Mr. Natcher stated that Mr. Herrmann was cussing because of his difficulty. (Natcher Dep. 105) Mr. Natcher stated that Mr. Herrmann advised him that he was having trouble hooking up the conveyor at which time Mr. Natcher offered to assist. (Natcher Dep. 98)

After the initial lift was performed, Mr. Herrmann and Mr. Natcher, he did not like the way the conveyor lifted and Mr. Herrmann set it back down. Both individuals readjusted the hooks at that point. Once satisfied, the lift onto the trailer occurred. (Herrmann Dep. 52, 60, 68-69)

Prior to the load being placed on the flatbed trailer, Mr. Natcher got on the flatbed to set wooden cribbing to accept the conveyor load. This was because the conveyor legs would penetrate the bed. (Natcher Dep. 132) (Herrmann Dep. 54)

Mr. Herrmann testified that he did not have any discussion about the placement of the cribbing with Mr. Natcher. However, Mr. Herrmann testified that he had concerns about the use of the cribbing but did not make those concerns known to Mr. Natcher. He stated that he was always told that it was the driver's responsibility to set the load, as they desired which he disagreed with. Mr. Herrmann testified that he felt the use of the cribbing would make the load unstable. (Herrmann Dep. 54, 71-76)

Mr. Crispin approached the area to get paperwork signed. At that point, the conveyor was sitting on the flatbed. He testified that apparently "Wayne" did not like how it was sitting. Mr. Natcher was standing on the trailer on the driver's side front area. Mr. Herrmann was on the ground on the south side of the trailer. Mr. Crispin testified that he did not hear any commands or see any hand signals from Mr. Natcher. Mr. Natcher allegedly shook his head no and thought Mr. Herrmann was getting ready to pick it back up. Mr. Crispin turned around and walked away because he knew it was going to be some time before it was fully loaded. (Crispin Dep. 25, 26)

National Safety Consultants Inc.                    (AL525234.1)9

The load was eventually hoisted and lowered onto the cribbing. (Natcher Dep. 127) Mr. Natcher was on the trailer and he adjusted the cribbing blocks as the load was being lowered by Mr. Herrmann. (Natcher Dep. 121) After the load was on the cribbing blocks, Mr. Herrmann further lowered the hoist to create slack in the sling chains so that they could be removed from the conveyor lifting lugs. (Natcher Dep. 143) At that point, Mr. Natcher unhooked the crane slings and piled them on the trailer decking. (Natcher Dep. 150-152) Mr. Herrmann stated that when the hooks were unhooked, they were thrown to the north side of the conveyor on the side where Mr. Natcher was standing and on the opposite side where Mr. Herrmann was positioned. (Herrmann Dep. 83, 84) The chain slings were moving up and then slid off on the south side of the machine onto the trailer deck. (Natcher Dep. 157-158) Mr. Herrmann reportedly believed that when the last hook was unattached, the sling was free from the conveyor prior to him raising the hoist. (Herrmann Dep. 84) According to Mr. Herrmann, Mr. Natcher had one hook in his hand when the raising of the hoist began. (Herrmann Dep. 99) Prior to raising the hoist, Mr. Herrmann testified that he could not see the location of the chain sling hooks and could only see a portion of the chains. (Herrmann Dep 82)

Mr. Herrmann began raising the hoist and chains from the deck after Mr. Natcher told him the chains were removed. (Natcher Dep. 153) According to Mr. Herrmann, Mr. Natcher unhooked the hook and signaled Mr. Herrmann to go up with the chain sling. Mr. Herrmann stated that he raised the hoist and chain sling and saw the conveyor shimmy from where he was positioned on the south side floor area. At that time, He indicated that he saw Mr. Natcher grab the conveyor and try to push it back onto the trailer. (Herrmann Dep. 81-82, 86) Mr. Crispin reproached the area around the time the above was occurring 15 minutes after his initial visit to the location. He reported that the conveyor was on the truck at that point, and then the chains were disconnected and hanging straight down as opposed to being pulled out to the four corners of the conveyor. (Crispin Dep. 33, 34) It is important to note that the load was completely stable. Mr. Crispin testified that after he approached the area, he was standing there and he could heard the clicking. Out of the corner of his eye, he reported that he could see the crane chains moving up. He then testified that he saw the conveyor tip to the north. (Crispin Dep. 35, 37, 62) This was confirmed by Mr. Natcher. He testified that as Mr. Herrmann began to raise the chain sling, the sling chains began dragging on the side of the conveyor causing the conveyor to become unstable. He noted that the crane operator should have stopped the lift hoist or moved the trolley south to prevent the chains from making contact with the conveyor but did not do so. (Natcher Dep. 192) Mr. Herrmann did not stop the upward movement of the hoist and crane sling chains while this was occurring. Instinctively, Mr. Natcher went to the area where the chains were dragging up the side of the conveyor and tried to push them clear at which time the conveyor started shaking. He called to Mr. Herrmann to stop while trying to stabilize the conveyor and prevent it from tipping. However, that is when the conveyor flipped. (Natcher Dep. 160-165)

As the load was tipping, Mr. Herrmann testified that he yelled to the operator to move away. (Herrmann Dep. 86) Mr. Crispin witnessed Mr. Natcher moving backward as the conveyor was tipping but was not sure if it was pushing him. He noted that it appeared Mr. Natcher have jumped from the trailer at that point. (Crispin Dep. 41) As the conveyor

continued to move, Mr. Natcher believed that he fell off the trailer and positioned himself underneath of it and the load continued to fall. (Natcher Dep. 166) Mr. Crispin reportedly saw Mr. Natcher crawl under the trailer after the conveyor was on the ground. (Crispin Dep. 57)

Had a qualified spotter and rigger been used by Accuride, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride and Mr. Herrmann to assure the crane sling was removed from the conveyor area and properly secured before lifting the hoist**

As discussed previously, Mr. Herrmann clearly understood that he began raising/lifting the overhead crane while Mr. Natcher was standing on the driver's side of the flatbed trailer. He was further aware visibly and audibly that the sling chains were not clear from the conveyor while moving the crane perpendicularly to the flatbed trailer. As a result, the chains became entangled and/or otherwise caught on the conveyor as the hoist and sling was being raised. After the chain slings became entangled and/or caught on the conveyor, Mr. Herrmann continued raising/lifting the overhead and caused the conveyor to lift, tilt, and overturn toward the driver's side of the flatbed trailer where Mr. Natcher

It is interesting to note that Mr. Herrmann testified that if he was actually removing the four sling hooks; they would be physically controlled (restrained) by him while they were being raised by the hoist. He testified that if he was the one that was unhooking the chains before the crane hoist was raised, he would make sure that all the chains were together and at least in one area so you could see all the hooks. Nevertheless, he never asked the driver to do that before he raised the crane hoist as he assumed he knew. He testified though that did not know him that well and only met him that day. (Herrmann Dep. 83, 85)

Had Accuride assured the crane sling was removed from the conveyor area and properly secured before lifting the hoist, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride and Mr. Herrmann to operate the crane in a safe manner**

Accuride and Mr. Herrmann failed to take any precautions to confirm that it was safe to raise the crane after the hook were detached. Mr. Herrmann knew or should have known the sling chains were not clear of the equipment. Furthermore, Mr. Herrmann did not attempt to remove the chains from the conveyor area before commencing to raise the hoist after the load was detached. After not taking any precautions, he operated the crane in an unsafe manner causing the chain slings to become entangled and/or catch on the conveyor as the hoist was being raised causing it to tip over and fall from the flatbed trailer. Mr. Herrmann did not operate and/or lift the crane without first moving the crane perpendicularly and/or laterally to clear the chains from the equipment and ensure that the chains were not tangled in and could not become entangled in the equipment while being lifted.

Mr. Herrmann also did not make eye contact with Mr. Natcher or communicate and/or warn him audibly or in any manner to assure he knew the crane was about to be operated. Additionally, Mr. Herrmann did not confirm or assure Mr. Natcher was in a safe location prior to lifting the hoist after the sling hooks were removed. Mr. Herrmann was not in a proper area to observe the crane, sling and or conveyor movement and to communicate with Mr. Natcher. While not observing the chain slings, Mr. Herrmann continued to raise the hoist after the chain slings were making contact with the conveyor. He was aware Mr. Natcher was not in a safe area but did not stop the crane operation upon hearing the claims hitting the conveyor.

Accuride and Mr. Herrmann operated the crane without the use of a spotter and/or rigging crew or a rigger. Accuride permitted Mr. Herrmann to operate a crane, which he was not trained, experienced and/or qualified to operate. They did so without proper supervision of his activities. Moreover, Accuride permitted Mr. Herrmann to operate a crane that was not properly inspected. Additionally, the testimony of Mr. Herrmann revealed that he was not aware of the weight of the conveyor. (Herrmann Dep. 58) The first rule for using a crane is to assure the crane is capable of making the lift safely.

Had Accuride and Mr. Herrmann operated the crane in a safe manner, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride to properly supervise crane operations**

Accuride had a duty to properly supervise the training, inspection, maintenance and use of the hoist. However, as the testimony and case record confirm, Accuride did not properly supervise and/or manage the use of the crane or this operation to ensure that its employees were not operating overhead cranes in a dangerous and/or hazardous manner or condition.

Section 2.4 of the Konecrane manual defines the safe working principles for the hoist. This manual instructs operators that carefully following safe working principles is one of the most effective ways of preventing damage to property and injury to personnel. It affirms that: the operator, serviceman and work manager for the hoist should be familiar with the safe working principles for the hoist; management has an important role in implementing the principles for using the hoist safely. The manual affirms that management must ensure that: the hoist and its accessories are fit for the intended purpose, servicing and maintenance of the equipment is carried out as scheduled, and personnel are adequately trained in the safe operation of handling loads. It further states: the hoist operator, the hoist serviceman and personnel in charge of hoist operation and servicing shall be familiar with and comply with the safe working principles described in the instruction, read all safety instructions supplied with products, and study the meaning of stickers on products. As stated previously, no evidence provided demonstrates that anyone at Accuride reviewed the operating manual and/or enforced its contents.

According to the testimony of Mr. Crispin, he shipped these conveyors for repairs two times in the past 1.5 years prior to the day of the incident. (Crispin Dep. 16) Thus, he was

National Safety Consultants Inc.                    (AL525234.1)12

In a position at Accuride to supervise these activities or to assure supervision was effectively provided.

Mr. Herrmann testified that he was not informed in advance that he was to be loading the conveyor that Mr. Natcher was dispatched for. Mr. Herrmann was only informed by radio by his foreman to do so at some point when Mr. Natcher arrived. (Herrmann Dep. 50) This heavy lift should have required some preplanning on the part of Accuride. However, it was evident, none occurred.

Mr. Crispin testified that he approached the area to get paperwork signed after the load was placed onto the flatbed trailer. He testified that apparently "Wayne" did not like how it was sitting. He witnessed Mr. Natcher standing on the trailer on the driver's side front area at that time and saw Mr. Herrmann positioned on the ground on the south side of the trailer. Mr. Crispin testified that he did not hear any commands or see any hand signals from Mr. Natcher. According to Mr. Crispin, he saw Mr. Natcher shake his head no (meaning he was not satisfied) and Mr. Herrmann was getting ready to pick the conveyor back up. At that point. Mr. Crispin turned around and walked away because he knew it was going to be some time before it was fully loaded. (Crispin Dep. 25, 26) As a shipping coordinator and former Accuride supervisor, Mr. Crispin should have stopped the operation at that time, as he was aware they were no spotters or riggers from Accuride present. However, he did not do so.

Mr. Crispin then reproached the area about 15 minutes later. At that point, the conveyor was on the truck, and then the chains were disconnected and hanging straight down as opposed to being pulled out to the four corners of the conveyor. (Crispin Dep. 33, 34) Mr. Crispin at that point should have recognized the chain slings were not in a safe position.

According to Mr. Crispin's testimony, after he approached the area, he was standing there and he could heard the clicking. Out of the corner of his eye, he could see the crane chains moving up. He then saw the conveyor tip to the north. (Crispin Dep. 35, 37, 62) Once again, at that juncture, he had a third opportunity to stop the crane operation. However, he unfortunately failed to do so.

Had Accuride provided proper supervision to this crane lift, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride, Mr. Crispin and Mr. Herrmann to properly warn Mr. Natcher of impending hazardous conditions and unsafe actions**

Accuride Mr. Crispin and Mr. Herrmann failed to instruct Mr. Natcher to keep clear of the vicinity of the equipment and crane when the crane was in operation. Additionally, they failed to warn him to not remain on the flatbed trailer after unhooking the chains from the equipment. Furthermore, they failed to warn Mr. Natcher in any manner prior to operating and/or moving the crane.

As the previous testimony affirmed, both Mr. Crispin and Mr. Herrmann had numerous opportunities to verbally warn Mr. Natcher about the dangerous conditions and actions unfolding prior to the incident.

Had Accuride provided proper warning to Mr. Natcher, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride to properly train Mr. Herrmann on crane operation, load rigging and load spotting activities**

Accuride failed to provide a trained, competent, certified and experienced operator for the crane. In addition, Accuride failed to instruct Mr. Herrmann and Mr. Crispin to not lift the crane until the chains were free of any and all potential obstructions, catch points, or other objects that could be caught as the crane was lifted. Accuride also never advised Mr. Herrmann and Mr. Crispin what actions to take if chain slings became become entangled on any object while the crane was in operation.

When Mr. Herrmann was interviewed for a position at Accuride, management advised him he would be using a crane. However, his previous training was not discussed. Only his prior experience was discussed during his interview. (Herrmann Dep. 22) Mr. Herrmann testified that he received (on the job) crane training at a previous employer. He did not receive any formal crane training certifications while working at his previous employer o (Herrmann Dep. 10, 11, 20, 39)

After being hired by Accuride, Mr. Herrmann testified that he was not formally trained to use a crane. (Herrmann Dep. 23-24) Mr. Herrmann testified that he attended an hour-long crane-training course 4 months after he was hired. However, he could not recall what the training covered. The training was classroom only and not hands on. A case exhibit shows Don Herrmann was trained on 7/24/08 for 1 hr. (Accuride 0000162) Mr. Herrmann testified that he attended monthly safety meeting where crane safety was discussed. Again, he could not recall what was discussed at this meeting. (Herrmann Dep. 27) (Exhibits 5) A monthly training tracker showed crane training occurred in 2011. (Accuride 000162) Mr. Herrmann further testified that he attended toolbox talks each week, which did not have any hands on crane training. He reported that crane related topics might have been discussed at these meetings. Nevertheless, he could not confirm it. (Herrmann Dep. 28 – 33)

Mr. Herrmann did affirm that any crane training he had did not cover loading and unloading of flatbed trucks. (Herrmann Dep. 25-27)(Exhibits 4) Mr. Crispin also confirmed in his testimony that he never had any crane training for loading flatbed trailers in any position while at Accuride. (Crispin Dep. 15, 17-18, 19)

Although, Mr. Herrmann indicated that he did rigging and cribbing at a previous employer, he did not receive training for performing those activities. (Herrmann Dep. 19-21) Mr. Herrmann stated that Accuride training also did not include cribbing and this was learned on the job. (Herrmann Dep. 37)

Mr. Herrmann testified that he was never provided with any training by Accuride regarding the crane controllers and their operation. (Herrmann Dep. 38-39) Moreover, Mr. Herrmann was never trained by Accuride that when lifting the hoist from a placed load, the hoist was to be inched upward before being fully raised to assure the sling chains were clear of the load. (Herrmann Dep. 88, 89)

Had Accuride provided proper training to Mr. Herrmann and Mr. Crispin, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride to train Mr. Herrmann on the crane hoist safety manual requirements**

The Konecrane Hoist Safety Instructions (Accuride 000144) Section 2.4 discussed operating the hoist. This section stated that the operator was to read all the instructions supplied with the hoist and that the hoist operator must be familiar with the instructions and follow them. This section also stated that: the hoist operator must be competent for the task, must know all the controls of the hoist and must be able to use them correctly and safely, must know how to operate the hoist and must be aware of any risk of accident posed by the operating site. The manual advised operators to: learn how to operate the hoist in safe conditions before actually starting to work with the hoist, learn how to control the movements of the hook and load and to use the Hoist Owner's Manual to familiarize yourself with the hoist and hoist controls and with the signs and warnings marked on the hoist. The manual further indicated that: the he direction symbols for hoist motions are the same as the symbols marked on the pushbutton controller and instructed users to check the direction symbols in the Hoist Owner's Manual. It instructed users to: learn the hand signals for indicating hoisting motion, trolley traversing and crane travel and that the hoist operator should only accept hand signals from a person authorized to give them. The manual advised users to ensure that there is adequate lighting as well as proper tools and equipment for the working site, and that appropriate working procedures are established. Mr. Herrmann testified that he was never provided a copy of the crane or hoist instruction manuals at Accuride. (Herrmann Dep. 24-25) Mr. Natcher reported in his deposition that he never received formal crane hand signal training. (Natcher Dep. 66)

This manual further stated to follow instructions when preparing to start work including: check that all safety switches and brakes operate. Mr. Herrmann testified that the only thing that was inspected daily was the hook safety latch and that the hoist operated up and down. He also said he checked the upper limit function. However, nothing was documented or provided by Accuride for these inspections with respect to policies or procedures. (Herrmann Dep. 40, 41, 89)

This manual further instructed operators of the following: Before hoisting a load, make sure you know a safe and effective path for the load. Ensure that the load will not collide against objects or people. When using a lifting accessory (sling, belt etc.), always follow the instructions provided by the lifting accessory manufacturer. Avoid swinging the hook or load during travel motion. A load must never be lifted

in a way that can injure a person if the load drops. During hoisting and travel motion, ensure that the hook, the load, the crane and its moving parts do not collide with objects or people. If the hoist is provided with a horn, sound the horn when you move the load in the vicinity of people who are not paying attention to the moving load. Do not move the load until you have received a signal from the person attaching the load to the hook or lifting appliance. Do not use the hoist if there are visible defects in or damage to the hoist, the hoisting rope, or any other hoist structure or hoist function. Stop operating the hoist if it operates abnormally (for example, a high noise level, uneven starting or malfunctions). Using faulty equipment is strictly prohibited. If you feel you are losing control of the hoist motions, press the emergency stop button. It was evident from the testimony that Mr. Herrmann disregarded the above instructions.

Section 2.4 of the Konecrane manual requirements defined the safe working principles for the hoist. This manual instructs operators that carefully following safe working principles was one of the most effective ways of preventing damage to property and injury to personnel.  It affirmed that: the operator, serviceman and work manager for the hoist should be familiar with the safe working principles for the hoist; management has an important role in implementing the principles for using the hoist safely. Management must ensure that: the hoist and its accessories are fit for the intended purpose, servicing and maintenance of the equipment is carried out as scheduled, and personnel are adequately trained in the safe operation of handling loads. It further states that: the hoist operator, the hoist serviceman and personnel in charge of hoist operation and servicing shall be familiar with and comply with the safe working principles described in the instruction, read all safety instructions supplied with products, and study the meaning of stickers on products. As stated previously, no evidence provided demonstrates that anyone at Accuride reviewed this operating manual and/or enforced its contents.

Section 2.5 discussed using the controller. Accordingly, it noted that the hoisting and travel motions of the hoist as well as crane travel motions are controlled with the pushbutton controller or by remote control. A skilled operator always uses the low speed (step 1) when starting to hoist. Slack is taken out of rigging and the wire rope is subjected to the load in the low speed. Proceed to high speed (step 2) when the load is clear of all obstacles. (Accuride 000133-134)

Had Accuride provided proper training to Mr. Herrmann on the crane safety manual requirements, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride to properly train Mr. Natcher on proper crane rigging and load spotting activities**

Accuride permitted Mr. Natcher to perform the activities of a crane load rigger and/or load spotter without providing proper training to him to perform those activities. Mr. Rodgers confirmed that Accuride did not provide Berkmire truck drivers with any type of training. (Rogers email dated 6/22/17)

Had Accuride provided proper training to Mr. Natcher, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride to develop and enforce rules, regulations etc. with respect to safe crane operation**

Accuride failed to develop and enforce procedures and/or rules to prevent the incident involving Mr. Natcher. Specifically, Accuride failed to create and enforce rules to assure the crane hoist was not raised while chain slings were not cleared from objects, secured and/or visible to the operator. Accuride failed to develop rules with respect to the proper communication during crane operations and to prevent personnel access to load areas during crane movement. Accuride failed to develop and implement regarding the use of qualified riggers and/or trained spotters. Accuride failed to develop rules to assure crane and rigging equipment were properly inspected and maintained.

According to Accuride, no safety rules existed for crane rigger, spotter, user or signal person, no safety rules existed for crane and sling inspections, no safety rules were in place to prevent driver access to loading areas or to prevent them from performing rigger functions. (Defendants Responses to Plaintiffs First Request for Production of Documents)

Mr. Herrmann testified that he was never advised by Accuride that persons were not permitted on trailers when loads were being placed. He confirmed that there was no rule at Accuride that prohibited that. (Herrmann Dep. 70, 71, 93)

Mr. Herrmann understood that he was responsible for the lift. However, he further testified that he was not responsible when the driver was satisfied that the hooks were to be released. (Herrmann Dep. 71) According to Mr. Herrmann, oOnly after the incident did Accuride implement a rule requiring loads to be secured by the driver before sling hooks were removed from the load. (Herrmann Dep. 118-119, 125)

Had Accuride developed and enforced effective safety rules, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride and Mr. Herrmann to properly inspect the crane and sling attachments according to the manufacturer requirements**

**Crane and hoist**

The 20 Ton Whiting Bridge Crane 1957 equipped with a Konecrane Hoist was placed in service in 2009. However, no in service inspection completed for this crane as was required by OSHA regulations and by Konecranes. (Defendants Responses to Plaintiffs First Request for Production of Documents)

In addition to in service inspections, annual crane inspections were required. Section 3 of the Kronecranes manual stated that if the crane is used continuously, it should be

inspected weekly and if used intermittently, it should be inspected before each use. Numerous visual, aural and measurement requirements were specified for these crane inspections. Hoist inspections were to follow the hoist manufacturer specifications. These inspections were to be performed annually by persons qualified to do so by Konecranes.

A crane inspection occurred on 5/13/15. The Safety Summary section of this inspection revealed that direction labels worn off radio transmitter and the holding brake glazed. (Accuride 000055) Following the incident, an inspection occurred on 5/4/16. This inspection indicated that preventative maintenance **was performed for the holding brake and a wire rope.** (Accuride 000059)

Monthly crane inspections were performed by an outside company (Konecranes). (Herrmann Dep. 39) However, these monthly inspections were **not** occurring monthly as required as reflected by the dates below:

- Whiting 20 Ton Crane 4/18/16...this was 3 days post incident... no findings
- Whiting 20 Ton Crane 3/24/16... no findings
- Whiting 20 Ton Crane 2/15/16... no findings
- Whiting 20 Ton Crane 1/5/16... no findings

Daily hoist inspections were also required by Konecranes for the wire rope, hoist block, hoist limit switch, and the controller function. However, no evidence or testimony proved that these inspections were occurring per the manufacturer requirements.

### Sling Inspections

A Peerless four-legged sling with 58,000 capacity was in use for this operation. Peerless specified that sling users were to abide by the following safety information, which was to be read and followed: Always inspect hook and latch before using, Never use a latch that is distorted or bent. Always make sure spring will force the latch against the tip of the hook. Always make sure hook supports the load. Do not point load hooks–load should bear on the bowl of hook. The latch must never support the load. Latches are intended to retain loose sling of devices under slack conditions. Latches are not intended to be an anti-fouling device. Peerless also provided users a Chain Sling Safety Checklist, which stated the following:

Check #1 - Inspections. Visually examine the sling before each use. Look for stretched, gouged, bent or worn links and components, including hooks, with open throats, cracks or distortion, if damaged, remove from service.

Check #2 - Balance Know the load — determine the weight, center of gravity, angle and lift and select the proper size of sling.

Check #3 - Overload Never overload the sling — check the working load limit on the identification tag. Always consider the effect of Angle of Lift — the tension on each leg of the sling is increased as the angle of lift, from horizontal, decreases. Use the chart in the

Peerless Industrial Group, Inc. catalog or in the Peerless Chain Sling User's Manual for this purpose.

Check #4 - Knots, Twists & Kinks Make sure chain is not twisted, knotted or kinked before lifting load. Slings should not be shortened with knots, bolts or other makeshift devices.

Check #5 - Sharp Edges Protect chain with padding when lifting sharp edged loads.

Check #6 - Abrupt Movement Lift and lower loads smoothly. Do not jerk.

Check #7 - High Temperatures - Do not expose alloy chain or sling to temperatures of 400°F or higher.

Check #8 - Chain Care Store slings properly on an A-Frame and protect chain slings from corrosion during storage.

Sling inspections were conducted by Dalley Supply Inc. These inspections did not meet the requirements of OSHA or ASME. Inspections were not occurring on a monthly basis. Documents provided indicate slings were inspected on 11/17/15 and 12/19/16. From the inspection documents, it could not be determined that the Peerless chain sling used to lift the conveyor was actually inspected.

Mr. Herrmann testified that he was a crane inspector at a previous employer. (Herrmann Dep. 14) However, there was no evidence provided that Mr. Herrmann was ever trained to properly inspect the Accuride crane he was using on the day of the incident. Furthermore, no evidence or testimony suggested that Mr. Herrmann was provided with Peerless sling safety requirements for review.

Mr. Herrmann admitted in his testimony that the only thing that was inspected daily as the hook safety latch and that the hoist operates up and down. He also said he checked the upper limit function. However, nothing was documented or provided by Accuride for these inspections with respect to policies or procedures. (Herrmann Dep. 40, 41, 89) Moreover, Mr. Herrmann was not trained to perform daily crane inspections. (Herrmann Dep. 40)

Although there was no indication that the crane, hoist or chain sling was defective and contributed to the incident, the fact that the inspection requirements were ignored by Accuride was consistent with their overall ignorance of crane operation safety requirements which led to the incident which produced serious and disabling injuries caused to Mr. Natcher.

**Failure of Accuride to properly maintain the crane, hoist and sling attachments in a safe condition**

Accuride failed to have the crane properly maintain the crane hoist. According to the case record, crane hoist repairs were made on 2/5/16. On that date it was determined that the hoist was drifting and it would not hold a load resulting in a brake repair. This Expert

questions why these critical safety issues were not identified during monthly inspection conducted by Konecranes on 1/5/16.

Although there was no indication that the crane, hoist or chain sling was defective and contributed to the incident, the fact that the inspections did not identify serious issues was problematic and symptomatic of serious safety management flaws at Accuride.

**Failure of Accuride and Mr. Herrmann to properly inspect the work area**

Accuride and Mr. Herrmann did not perform pre-lift work area inspections to assure the lift could occur in the area in a safe manner. Additionally, they did not assure Mr. Natcher was in a safe area prior to commencing the lift.

Had Accuride performed a pre-lift work area inspection, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride to develop and implement effective crane signaling protocols or safety warning systems**

A proper crane signaling protocol was not established and/or utilized prior to this operation occurring. Accuride failed to have the crane properly equipped with any audible warning device. Furthermore, Accuride and Mr. Herrmann failed to alert in any manner alert Mr. Natcher about the impending movement of the crane and operated a crane without having full visual sight of chain sling hooks and Mr. Natcher and his position. To compound this issue, Mr. Natcher reported in his deposition that he never received formal crane hand signal training. (Natcher Dep. 66)

The testimony was conflicting with respect to whether hand any signals or verbal commands were used during the lifting operation. Mr. Herrmann testified that up and down hand signals were used because of the loud scrubber operation in the lift area. He testified that he could not hear the driver. (Herrmann Dep. 76-78) When Mr. Crispin was first in the area and observing the operation, he did not hear any commands or see any hand signals from Mr. Natcher. He testified that Mr. Natcher allegedly shook his head no and Mr. Herrmann was getting ready to pick it back up. According to Mr. Hermann, Mr. Natcher unhooked the hook and signaled Mr. Herrmann to go up with the chain sling. He raised the hoist and chain sling and saw the conveyor shimmy as he was on the south side. At that time, Mr. Natcher grabbed the conveyor and tried to push it back onto the trailer. (Herrmann Dep. 81-82, 86) However, according to Mr. Natcher. Mr. Herrmann raised the hoist and chains from the deck after Mr. Natcher told him the chains were removed. (Natcher Dep. 153) Mr. Herrmann raised the hoist 2 times prior to seeing the conveyor shimmy. (Herrmann Dep. 99) Mr. Natcher went to the area where the chains were dragging up the side of the conveyor to try to push them clear at which time the conveyor started shaking. He called to Mr. Herrmann to stop while trying to stabilize the conveyor and prevent it from tipping. That is when the conveyor flipped.

From the above, it is evident that there were discrepancies between whether verbal or hand signals were used. Had Accuride and Mr. Hermann established and/or utilized a proper signaling protocol or safety warnings system, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride and Mr. Herrmann to comply with OSHA regulations**

Accuride had a legal duty to comply with the requirements of the Occupational Safety and Health Act of 1970.  Additionally, they were obligated to meet industry best practices and standards for safe crane operation.

With respect to sling use, the following regulations were breached by Accuride and Mr. Herrmann.

- 1910.184(c)(9) All employees shall be kept clear of loads about to be lifted and of suspended loads.
- 1910.184(c)(12) A sling shall not be pulled from under a load when the load is resting on the sling.

With respect to sling inspections, the following regulations were breached by Accuride and Mr. Herrmann.

- 1910.184(d) Sling Inspections. Each day before being used, the sling and all fastenings and attachments shall be inspected for damage or defects by a competent person designated by the employer. Additional inspections shall be performed during sling use, where service conditions warrant. Damaged or defective slings shall be immediately removed from service.
- 1910.184(e)(1) Sling identification. Alloy steel chain slings shall have permanently affixed durable identification stating size, grade, rated capacity, and reach.
- 1910.184(e)(3)(i) In addition to the inspection required by paragraph (d) of this section, a thorough periodic inspection of alloy steel chain slings in use shall be made on a regular basis, to be determined on the basis of (A) frequency of sling use; (B) severity of service conditions; (C) nature of lifts being made; and (D) experience gained on the service life of slings used in similar circumstances. Such inspections shall in no event be at intervals greater than once every 12 months.
- 1910.184(e)(3)(ii) The employer shall make and maintain a record of the most recent month in which each alloy steel chain sling was thoroughly inspected, and shall make such record available for examination.
- 1910.184(e)(3)(iii) The thorough inspection of alloy steel chain slings shall be performed by a competent person designated by the employer, and shall include a thorough inspection for wear, defective welds, deformation and increase in length. Where such defects or deterioration is present, the sling shall be immediately removed from service.

With respect to crane inspections, the following regulations were breached by Accuride and Mr. Herrmann.

National Safety Consultants Inc.          {AL525234.1}21

### Initial Inspection

- 1910.179(j)(1)(i) Initial Inspection. Prior to initial use, all new and altered cranes shall be inspected to insure compliance with the provisions of this section.
- 1910.179(j)(2) Frequent Inspection. The following items shall be inspected for defects at intervals as defined in paragraph (j)(1)(ii) of this section or as specifically indicated, including observation during operation for any defects that might appear between regular inspections. All deficiencies such as listed shall be carefully examined and determination made as to whether they constitute a safety hazard:
- 1910.179(j)(2)(i) All functional operating mechanisms for maladjustment interfering with proper operation.

### Daily Inspections

- 1910.179(j)(2)(ii) Deterioration or leakage in lines, tanks, valves, drain pumps, and other parts of air or hydraulic systems.
- 1910.179(j)(2)(iii) Hooks with deformation or cracks. Visual inspection daily; monthly inspection with a certification record which includes the date of inspection, the signature of the person who performed the inspection and the serial number, or other identifier, of the hook inspected. For hooks with cracks or having more than 15 percent in excess of normal throat opening or more than 10° twist from the plane of the unbent hook refer to paragraph (i)(3)(iii)(a) of this section.
- 1910.179(j)(2)(iv) Hoist chains, including end connections, for excessive wear, twist, distorted links interfering with proper function, or stretch beyond manufacturer's recommendations. Visual inspection daily; monthly inspection with a certification record which includes the date of inspection, the signature of the person who performed the inspection and an identifier of the chain, which was inspected.
- 1910.179(j)(2)(vi) All functional operating mechanisms for excessive wear of components.
- 1910.179(j)(2)(vii) Rope reeving for noncompliance with manufacturer's recommendations.

### Operational tests.

- 1910.179(k)(1)(i) Prior to initial use all new and altered cranes shall be tested.

### Preventative Maintenance

- 1910.179(l)(1) A preventive maintenance program based on the crane manufacturer's recommendations shall be established.

With respect to crane use, the following regulations were breached by Accuride and Mr. Herrmann.

National Safety Consultants Inc.                    {AL525234.1}22

- 1910.179(b)(8) Designated personnel - Only designated personnel shall be permitted to operate a crane covered by this section. 1910.179(a)(35) "Designated" means selected or assigned by the employer or the employer's representative as being qualified to perform specific duties. According to OSHA letter of interpretation found at the following link:

https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=INTERPRETATIO NS&p_id=22813

*"...please be advised that 29 CFR 1910.179(b)(8) requires that only designated personnel be permitted to operate a crane. OSHA defines designated at 1910.179(a)(35) as: Selected or assigned by the employer or the employer's representative as being qualified to perform specific duties [emphasis added]. Because the term "qualified" is not itself defined, OSHA would interpret "qualified" in light of operator-qualifications provisions of industry standards such as ANSI B30.2.*

- 1910.179(n)(2)(iii) Care shall be taken to make certain that the sling clears all obstacles.
- During hoisting care shall be taken that: 1910.179(n)(3)(iii)(a) There is no sudden acceleration or deceleration of the moving load. 1910.179(n)(3)(iii)(b) The load does not contact any obstructions.
- 1910.179(n)(3)(vi) The employer shall require that the operator avoid carrying loads over people.
- 1910.179(n)(3)(vii) The operator shall test the brakes each time a load approaching the rated load is handled. The brakes shall be tested by raising the load a few inches and applying the brakes.
- 1910.179(n)(3)(xi) When starting the bridge and when the load or hook approaches near or over personnel, the warning signal shall be sounded.

Finally, under OSHA's multiemployer worksite policy, Accuride was considered a hazard creating, hazard exposing, hazard controlling and hazard correcting entity.

Had Accuride complied with the abovementioned OSHA regulations, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride and Mr. Herrmann to comply with ASME standards**

The ASME B30.2-2011 Standard for Overhead and Gantry Cranes also governed the inspection, training, use and maintenance of this crane. Accuride had a duty to recognize and incorporate this standard into its operations but they failed to do. The following provisions were applicable to this situation.

SECTION I: SCOPE The ASME B30 Standard contains provisions that apply to the construction, installation, operation, inspection, testing, maintenance, and use of cranes and other lifting and material-movement related equipment.

SECTION V: EFFECTIVE DATE Existing Installations. Equipment manufactured and facilities constructed prior to the effective date of this Volume of the B30 Standard shall be subject to the inspection, testing, maintenance, and operation requirements of this Standard after the effective date.

SECTION 2-0.2: DEFINITIONS

- Appointed: assigned specific responsibilities by the employer or the employer's representative.
- Authorized: appointed by a duly constituted administrative or regulatory authority.
- Designated person: a person selected or assigned by the employer or the employer's representative as being competent to perform specific duties.
- Qualified person: a person who, by possession of a recognized degree in an applicable field or a certificate of professional standing, or who by extensive knowledge, training, and experience, has successfully demonstrated the ability to solve or resolve problems relating to the subject matter and work.
- exposed: applies to hazardous objects not guarded or isolated, and capable of being contacted inadvertently

SECTION 2-1.15: WARNING DEVICES OR MEANS FOR A CRANE WITH A POWER TRAVELING MECHANISM

- 2-1.15.2 Floor-Operated Cranes (a) A warning device should be provided for installations where the ability of the operator to warn persons in the path of the load is impaired. (b) Refer to paras. 2-3.3.4(b)(18) and 2-3.3.4(c)(17) for operation of the device.
- 2-1.16.2 Safety Personnel Personnel responsible for the supervision, installation, operation, inspection, or maintenance of the crane shall be familiar with the applicable contents of the manual furnished with the crane.

SECTION 2-2.1: INSPECTION

- 2-2.1.1 General (a) This Chapter on Inspection and Testing establishes and defines the criteria for determining whether cranes can be expected to perform as intended. (b) Five types of inspections are defined, each with the common purpose of keeping equipment performing as intended. Each inspection is directed toward a different set of circumstances. The five types of inspection are (1) initial inspection (2) functional test inspection (3) frequent inspection (4) periodic inspection (5) inspection of equipment not in regular use (c) In addition to the five types of inspection listed in para. 2-2.1.1(b), the inspection provisions found in manuals supplied by the manufacturer(s) of the crane and the crane components shall be followed. (d) All inspections shall be performed by a designated person. Any deficiencies identified shall be examined and a determination made by a qualified person as to whether they constitute a hazard and if a more detailed inspection is required.

National Safety Consultants Inc.                    [AL525234.1]24

- 2-2.1.2 Initial Inspection (a) An initial inspection is a visual and audible examination of the crane. (b) New, reinstalled, altered, repaired, and modified equipment shall be inspected prior to initial use to verify compliance with the applicable provisions of Chapter 2-1 of this Volume. (d) The cranes shall be tested in accordance with the requirements of Section 2-2.3.
- 2-2.1.4 Frequent Inspection (a) A frequent inspection is a visual and audible examination of the crane. (b) Equipment shall be inspected at intervals dependent on the use of the equipment as follows: (1) normal service — monthly
- 2-2.1.5 Periodic Inspection (a) A periodic inspection is a visual and audible examination of the crane. (b) Equipment shall be inspected at intervals dependent on the use of the equipment as follows: (1) normal service — yearly

## SECTION 2-2.2: ROPE INSPECTION

- 2-2.2.1 General All inspections shall be performed by a designated person. Any deficiencies identified shall be examined and a determination made by a qualified person as to whether they constitute a hazard and if a more detailed inspection is required.
- 2-2.2.2 Frequent Rope Inspection (a) All ropes should be visually inspected at the start of each shift. These visual observations should be concerned with discovering gross damage, such as listed below, that may be a hazard.

## SECTION 2-2.3: TESTING

- 2-2.3.1 Operational Tests (a) New, reinstalled, altered, repaired, and modified cranes shall be tested by a designated person prior to initial use to confirm that the crane performs in compliance with the provisions of this Volume.

## SECTION 2-3.1: CRANE OPERATOR TRAINING

- 2-3.1.2 Crane Operator Training: General (a) Training shall include those items that apply to the crane and the particular application of the crane. (b) Training programs and their contents shall be based upon but not limited to (1) physical characteristics of the workplace. (2) performance characteristics and complexity of the crane. (3) type of load to be handled, such as, but not limited to the following: (a) multiple piece loads (b) raw materials (c) bulk materials (d) machine assemblies (e) hot molten materials (f) hot materials (g) fragile or durable materials (4) responsibilities of the crane operator and other persons involved in the movement of the load.

## SECTION 2-3.2: TRAINING FOR PERSONS OTHER THAN CRANE OPERATORS

- 2-3.2.1 Scope. Other persons, such as, but not limited to, maintenance personnel, test personnel, and crane inspectors, when it is necessary to operate a crane in the performance of their duties, shall be trained in accordance with the training requirements of this Volume.

## SECTION 2-3.3: OPERATION

- 2-3.3.1 Scope of Crane Operation The operation of overhead and gantry cranes shall be in accordance with the provisions included in this Volume, and in manuals furnished by the manufacturer of the crane as required in para. 2-1.16. The requirements of paras. 2-3.3.3(c) and (d) for certification as an operator of a crane apply to both dedicated operators, whose primary job is the operation of a crane (cab or pulpit), and no dedicated operators who use a crane (floor or remote) as another tool in performing their job. 2-3.3.2 General Requirements The following requirements shall be followed by all personnel involved with the crane operation: (l) Persons shall stay clear of a suspended load.

- 2-3.3.3 Responsibilities of Management (Owners/Users) Management (owners/users) shall (a) identify, document, and assign responsibilities of the crane operator and other persons involved in the movement of the load for each crane installation. (See paras. 2-3.3.2 and 2-3.3.4.) (b) Provide training to persons who will operate a crane. (c) Provide written and practical examinations that verify that the person has acquired the knowledge and skill to operate the particular crane(s) that will be operated by the person. The examinations shall be defined by the owner/user and in accordance with any local, state, and federal provisions that may apply. (d) Issue a certificate, or formal record, that verifies that the person has been trained and has passed the examination required in para. 2-3.3.3(c), or confirm that the person has a valid certificate or formal record that satisfies the requirements of para. 2-3.3.3(c).

- 2-3.3.4 Responsibilities of Crane Operators (a) Lifting and Moving the Load (1) Three phases of lifting and moving the load shall be addressed as follows: (a) before the lift (b) during the lift (c) after the lift (2) In most crane operations, all of the requirements listed in para. 2-3.3.4(b) are the responsibility of the operator of the crane. (3) Rigging the load, attaching the load to the crane hook, and other tasks related to moving the load are sometimes handled by persons other than the crane operator. (4) Crane operation characteristics such as, but not limited to, the type of crane, cab, floor, pulpit, or remote operated, the vantage point of the operator, and the purpose for which the crane is being used are conditions that determine whether the crane operator or another person is responsible for lift and move functions. (5) Assignment of responsibilities is determined, identified, and documented by management for each crane application. (b) Before the Lift. Crane operators shall (1) read and be familiar with the applicable provisions of crane equipment safety standards and the instructions listed in manual(s) provided with the equipment (2) be familiar with controls, instructions, and warnings located on the lifting equipment (8) perform a functional test inspection and test in accordance with the requirements of para. 2-2.1.3 (9) not remove or obscure the warning or safety labels, plates, or tags furnished on the lifting equipment (10) be familiar with and understand hand signals (see Section 2-3.6 and Fig. 2-3.6.1-1) (11) verify that the hook, bridge, and trolley travel in the same direction as shown on the controls (12) verify that the hoist rope is free from kinks or twists and is not wrapped around the load (13) attach the load to the hook or have the load attached to the hook by means of slings or other lifting devices (18) activate the warning

device, when a device is furnished (a) before starting the bridge or trolley motion of the crane (b) intermittently during travel of the crane when approaching persons in the path of the load (c) During the Lift. Crane operators shall (1) respond to signals from the person directing the lift or a designated signalperson. (2) Be responsible for the lift when a signalperson is not used. (3) Obey any stop signal regardless of who gives it. (a) The operator shall verify the weight of the total load if there is a question whether the total load to be lifted exceeds the rated load of the crane and/or hoist(s). (8) Minimize swinging of the load or load hook. (12) Verify that the load and rigging are free to move and will clear all obstructions. (15) Avoid carrying loads over people. (16) Concentrate on operating the crane and shall not allow attention to be diverted while operating the crane. (17) activate the warning device, when a device is furnished (a) before starting the bridge or trolley motion of the crane (b) intermittently during travel of the crane when approaching persons in the path of the load

## SECTION 2-3.6: SIGNALS

- 2-3.6.1 Standard Signals (a) Signals to the operator shall be in accordance with this Volume, unless voice communication (telephone, radio, or equivalent) is utilized. (b) Signals should be discernible or audible to the operator. (c) Hand signals shall be posted conspicuously and should be as illustrated in Fig. 2-3.6.1-1.

Had Accuride complied with the abovementioned ASME regulations, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Concluding Opinion**

The following opinion is based on:

- ✓ Being formally educated by a nationally accredited university in Safety Sciences,
- ✓ Serving as a distinguished Past National President of the American Society of Safety Engineers,
- ✓ Being a Certified Safety Professional (CSP) certified by the Board of Certified Safety Professionals,
- ✓ Serving as distinguished Past National President and Chief Executive Officer of the Board of Certified Safety Professionals,
- ✓ Directing and Managing Safety and Health Programs for Fortune 100 Manufacturing and Utility Corporations for nearly 20 years,
- ✓ Directing the State of Pennsylvania's Consultation Program for the Federal Occupational Safety and Health Administration,
- ✓ Reviewing and approving over 750 workplace OSHA inspections annually conducted by PA OSHA consultants many of which utilize overhead cranes,
- ✓ Personally conducting over 800 OSHA workplace inspections, and providing assistance and consultation compliance with OSHA regulations and National Consensus Standards to business, many of which utilize overhead cranes,

✓ Serving as an Adjunct Professor for 2 nationally accredited safety and health degree programs including Indiana University of Pennsylvania and Millersville University of Pennsylvania,

✓ Serving on the national faculty for the American Society of Safety Engineers,

✓ Being a past certified instructor for the Occupational Safety and Health Administration,

✓ Speaking, writing and providing expertise internationally on the attainment of safety and health performance excellence and

✓ Being recognized as a Fellow, the highest honor in the safety and health profession.

This opinion is also based on the information that was provided and reviewed as of this date and is offered with a reasonable degree of professional certainty. I reserve the right to change my opinion if new or additional information becomes available at a future time.

Accuride Corporation had actual and constructive knowledge of the unsafe, dangerous, and/or otherwise hazardous operation of the crane. Accuride Corporation knew or should have known through the exercise of reasonable care that the unsafe, dangerous, and/or otherwise hazardous operation of cranes on its premises could cause a serious injury. Accuride had a duty of reasonable care to provide safe premises to Mr. Natcher as a business invitee. Accuride did not do so and was reckless in its conduct while intentionally disregarding or acting in plain indifference to the safety of Mr. Natcher. Accuride breached its duty of reasonable care to Mr. Natcher. The incident and its injurious outcomes were clearly foreseeable. As a direct and proximate result of the incident, Mr. Natcher suffered serious and disabling injuries.

The conveyor load was stable after being loaded onto the flatbed trailer. It became unstable and fell from the flatbed trailer due to the actions of Mr. Hermann while operating the crane. Mr. This incident occurred because Accuride and/or their agents Mr. Hermann and Mr. Crispin failed to:

1. provide a qualified crane rigger and spotter for a dangerous crane lift operation,
2. assure the crane sling was removed from the conveyor area and properly secured before lifting the hoist,
3. operate the crane in a safe manner,
4. properly supervise crane operations,
5. properly warn Mr. Natcher of impending hazardous conditions and unsafe actions,
6. properly train Mr. Hermann on crane operation, load rigging and load spotting activities,
7. properly train Mr. Hermann on the crane hoist safety manual requirements,
8. properly train Mr. Natcher on proper crane rigging and load spotting activities,
9. develop and enforce rules, regulations etc. with respect to safe crane operation,
10. properly inspect the crane and sling attachments according to the manufacturer requirements,
11. properly maintain the crane, hoist and sling attachments in a safe condition
12. properly inspect the work area,

National Safety Consultants Inc.                    {AL525234.1}28

13. develop and implement effective crane signaling protocols or safety warning systems,
14. comply with OSHA regulations
15. comply with ASME standards

The collection of the above failures represents a colossal failure on the part of Accuride to implement an effective safety management system. Although Mr. Herrmann was identified as a contributor to these failures, he was merely a product or Accuride's negligence.

The Accuride Answers provided were inaccurate. They admitted that Mr. Herrmann began raising the chains after Mr. Natcher had unhooked them.  Accuride believed the hooks and chains were adequately cleared from the equipment when Mr. Herrmann began raising the chains, and neither the chains nor the hooks became entangled in or with any part of the equipment. As the testimony and evidence revealed, this position was not true.

Additionally, the "interview and statements" made by Mr. Herrmann and Mr. Crispin during an investigation conducted by Accuride also lacked credibility. These interviews and statements were not recorded or written statements but were apparently transcribed by Mr. Maleski from Accuride.  Accordingly, Mr. Crispin testified that he did not prepare Accuride 00009-000011 documents. Furthermore, he stated that he was never asked to review the documents for accuracy. His "statement and interview" indicated that he witnessed the incident when he turned the corner to enter Building 22. However, Mr. Crispin noted in his testimony that he was already at the trailer location when the incident occurred. Furthermore, Mr. Crispin's "statements and interview" did not discuss the positions of the chain slings as he witnessed him, and the important fact that he heard the chain sling contacting the conveyor when it was being raised. Furthermore, the statement and interview of Mr. Crispin did not discuss crane signal or verbal commands. Mr. Herrmann Accuride reported information was equally inaccurate.

Mr. Herrmann testified that he too was never asked to write a statement. (Herrmann Dep. 111-113) Mr. Herrmann testified that he did not recall seeing the notes written by Mr. Maleski or verify them for accuracy. He noted that he played no role in preparing post incident documents but did not disagree with its contents. (Herrmann Dep. 117) (Exhibit 7) However, the "Interview and statement" said that on the day of the incident, Mr. Herrmann raised the chains above the conveyor and the chains were hanging above the conveyor when the conveyor began to tip. This was not accurate as Mr. Herrmann testified that they had not cleared the conveyor when the incident occurred. (Herrmann Dep. 125, 126)  Mr. Herrmann testified that the he did not see the hooks clear the conveyor. (Herrmann Dep. 126) Mr. Herrmann testified that he assumed the hook got caught as the hoist was being raised. (Herrmann Dep. 100) This in addition, was left out of the statement and interview prepared by Mr. Maleski.

Critical testimony was when Mr. Herrmann testified that if he were removing the sling hooks, he would control them while they were being raised. He testified that if he was the

- National Safety Consultants Inc.                    {AL525234.1}29

one that was unhooking the chains before the crane was raised, he would make sure all the chains were together and at least in one area so you could see all the hooks. He testified though that did not know him that well and only met him that day. Unfortunately, he never asked the driver to do that before he raised the crane hoist as he assumed he knew. (Herrmann Dep. 83, 85) This incident was not caused by an unstable load. It was caused by Mr. Herrmann raising the four-legged sling in an unsafe manner as it was contacting the conveyor. Prior to raising the hoist, Mr. Herrmann testified that he could not see the location of the chain sling hooks. He could only see a portion of the chains. (Herrmann Dep 82) He testified that he raised the hoist and chain sling and saw the conveyor shimmy as he was on the south side. (Herrmann Dep. 81-82, 86) Mr. Herrmann noted in his deposition that he had personally seen hooks and chains get caught previously causing the load to wobble. (Herrmann Dep. 100-102)

Further critical evidence was that fact that both Mr. Hermann and Mr. Natcher were consistent in advising the OSHA compliance safety and health officer during interviews that that the hook may have caught on the conveyor or become snagged as it the sling was being raised by Mr. Herrmann.

In retrospect, Mr. Herrmann testified said that he should have personally observed the position of all hooks before raising the hoist. (Herrmann Dep. 100) He was correct and if he had done so, the incident would not have occurred.

Mr. Natcher testified that Mr. Herrmann should have moved the crane in a southerly direction to stop the chains from touching the conveyor as the chains were being hoisted, but he did not do so. (Natcher Dep. 174) The crane operator should have stopped the lift hoist or moved the trolley south to prevent the chains from making contact with the conveyor but did not do so. (Natcher Dep. 192) Had Mr. Herrmann don as Mr. Natcher opined, the incident would have able been prevented.

Although cribbing had no contribution to the incident occurrence, Mr. Herrmann testified that did not have any discussion about the placement of the cribbing with Mr. Natcher. He noted that he had concerns about the use of the cribbing as it could make the load unstable. Nevertheless, he did not make those concerns known to Mr. Natcher at any point. Mr. Herrmann testified that he was always told that it was the driver's responsibility to set the load, as they desired which he disagreed with. (Herrmann Dep. 54, 71-75)

Mr. Natcher did not assume the risk of the task of loading a conveyor on the flatbed trailer. Nor, did any negligence on the part of Mr. Natcher contribute to the fall of the conveyor from the trailer.

Finally, Mr. Herrmann testified that he was responsible for the lift. However, he further testified that he was not responsible when the driver was satisfied that the hooks were to be released. (Herrmann Dep. 71) Unfortunately, he was inaccurate in his understanding of what constituted a lift. From this Expert's perspective, a lift included all crane operations including lifting the hoist and chain slings was after the load was set. To further underscore that Accuride was responsible was the fact that because of the incident,

Accuride implemented a rule requiring loads to be secured by the driver before sling hooks were removed from the load. (Herrmann Dep. 118-119, 125) Had Accuride implemented this rule prior to the incident, the load would not have tipped by the unsafe actions of Mr. Hermann.

Respectfully submitted,

*[signature]*

Samuel J. Gualardo C.S.P.

Date: 12/21/17

National Safety Consultants Inc.          {AL525234.1}31

<u>Birkmire Driver Incident Interviews – 4/15/2016</u>

Don Herrmann:

Don was operating the overhead crane & was standing on the south side of the trailer as the load (puck conveyor) was being lowered onto the flatbed trailer. He was following the verbal instructions of the driver as the conveyor was being positioned on the flatbed & the driver was using blocked wood (cribbing) to help stabilize the load. Don mentioned that he would not have used the cribbing; he would've just placed the conveyor directly on the flatbed, but he deferred to the driver's expertise and followed his direction (the driver never asked for Don's input).

When the driver had the load positioned on the cribbing the way he wanted it, he unhooked the chains and released them. Don raised the crane and after the hooks had cleared the conveyor it began to tip to the north, knocking the driver to the ground as it fell off of the trailer. Don ran around the trailer to check on the driver, saw blood on the ground & his lower leg bent at an angle... he immediately called his supervisor and then heard the man down alarm (399 internal emergency alarm system).

Mark Crispin:

Mark was coming around the corner turning into Bldg. 22 when he saw the driver on the flatbed (north side) pushing on the tilting conveyor in an attempt to stop its fall. Then due to the weight/force of the now tipping-over conveyor, the driver was pushed and/or jumped down from the trailer to the ground... upon landing he fell to his left & landed on the ground under the trailer. The conveyor hit the floor & fell to the right of the trailer (either due to his leg giving out or he made himself fall that way).

Mark added that it was a good thing that the driver fell the way he did because if he fell away from the trailer the conveyor would've landed on him...

BY: KEVIN MALESKI

EXHIBIT
7

S. Gualardo
Deposition
Exhibit 6

ACCURIDE 000009

Don Herrmann Statement:

- Don was operating the overhead crane and was loading a puck conveyer onto the trailer
- The driver of the truck was on the bead of the trailer guiding the conveyer down and giving Don instructions
- When the conveyer was place on the cribbing the driver instructed the Don to raise the conveyer so that he could readjust the cribbing
- The driver then instructed the Don to lower the conveyer again
- Once the conveyer was on the cribbing the driver began to unlatch the chains from the conveyer
- Once all of the chains were unlatched the driver instructed Don to raise the chains and move them out of the way.
- Don stated that as he had the chains suspended above the trailer and the puck conveyer began to tip.
- Don stated that he saw the truck operator try to push the conveyer back but was knocked backwards.
- As the truck driver was knocked backwards he stepped/fell off the trailer.
- When the driver hit the ground he pulled himself under the trailer and the conveyer then hit the ground.
- Don went over to check on the truck operator and noticed blood on the ground and half of his lower leg at a 90 degree angle.
- Don called Scott Biggle (1ˢᵗ shift maintenance supervisor)
- Ron Napierkowski call 399 (plant medical emergency alarm)
- First responders showed up and took control of the seen

ACCURIDE 000010

Mark Crispin Statement

Mark Crispin the Store Room Supervisor

- As Mark turned the corner from the hallway into Bldg. 22 he was looking down at his clipboard
- Mark looked up and saw the conveyer start to tip
- Marked yelled move
- He watched the truck driver fall off of the truck and onto the ground
- He watched the driver crawl under the trailer
- The conveyer flipped/rolled off of the trailer
- Ron Napierkowski call 399

ACCURIDE 000011

**U.S. Department of Labor**
Occupational Safety and Health Administration

Inspection Number: 1141132
Inspection Date(s): 04/18/2016 - 07/27/2016
Issuance Date: 07/29/2016



### Citation and Notification of Penalty

**Company Name:** Birkmire Trucking LLC
**Inspection Site:** Accuride 1015 East 12th Street, Erie, PA 16503

---

Citation 1 Item 1    Type of Violation: **Serious**

OSH ACT of 1970 Section (5)(a)(1): The employer did not furnish employment and a place of employment which was free from recognized hazards that were causing or likely to cause death or serious physical harm to employees in that employees were exposed to struck-by an caught between hazards:

A.) Birkmire Trucking, LLC; jobsite at Accuride, Erie, PA - On or about 4/15/16, employees were exposed to struck-by/caught between hazards from not securing cargo and/or not utilizing means/methods to temporarily brace the cargo prior to unhooking the cargo from material handling equipment. A conveyor was loaded onto a flatbed trailer with a crane. The conveyor was not secured to the trailer and/or temporality braced before it was unhooked from the crane. The conveyor tipped over and knocked the employee off of the trailer.

**ABATEMENT NOTE:** Among other methods, feasible and acceptable means to correct this hazard are:

1.) Conduct a hazard analysis/risk assessment on loads that have a higher probability of becoming unstable when they are being loaded on to the flat bed trailers.

2.) Ensure methods are devised to ensure unstable loads are immobilized and/or secured before they are released from the crane and/or other material handling equipment.

3.) Cargo must be firmly immobilized or secured on or within the vehicle by structures of adequate strength, shoring bars, tie downs or a combination of these.

4.) Cargo that is likely to roll must be restrained by chocks, wedges, a cradle, or other equivalent means to prevent rolling.

5.) The tie down must be of adequate strength to be able to secure the load.

See pages 1 through 4 of this Citation and Notification of Penalty for information on employer and employee rights and responsibilities.

Citation and Notification of Penalty                    Page 6 of 10

S. Gualardo
Deposition
Exhibit __7__

OSHA-2

U.S. DEPARTMENT OF LABOR OCCUPATIONAL SAFETY AND
HEALTH ADMINISTRATION

In the Matter of:   Birkmire Trucking, LLC.
OSHA No. 1141132

## INFORMAL SETTLEMENT AGREEMENT

The undersigned Employer and the undersigned Occupational Safety and Health Administration
(OSHA), in settlement of the above citation(s) and penalties which were issued on 07/29/2016 hereby
agree as follows:

1. The Employer agrees to correct the violations as cited in the above citations or as amended
   below. In accordance with 29 CFR 1903.19(c), within 10 calendar days after the abatement
   date, the Employer shall certify to OSHA's Erie Area Office that each citation has been
   abated.

2. The Employer agrees to pay the proposed penalties, if any, as issued with the above citation(s),
   or, if amended by this agreement, as amended below. The penalty payment shall be made
   payable to "**DOL-OSHA**" and submitted to the **Erie Area OSHA Office at 1128 State
   Street, Suite 200, Erie, PA 16501 within 30 days of the date of this Settlement Agreement.**
   Alternately, you may pay online by searching OSHA on www.pay.gov and completing the
   OSHA Penalty Payment Form.

3. The Employer and OSHA agree that the following citations and penalties, if any, are not being
   amended:

   Citation 2-1

4. OSHA agrees that the following citations and penalties are being amended as shown below:

   Citation 1-1 = Citation deleted in its entirety.  Penalty deleted.

   **Total Revised Penalty for Inspection No. 1141132 = $0.00**

5. Company agrees to utilize a third party safety/health consulting entity such as insurance
   company representatives, OSHA Consultation Services, safety/health consultants etc.

6. The Employer has been provided with a copy of OSHA Fact Sheet No. 91-37, Voluntary Safety
   and Health Program Management Guidelines. The Employer agrees to implement the four
   major elements of these guidelines. Management commitment and employer involvement,
   worksite analysis, hazard prevention and control, and safety and health training. As long as
   these four major elements are implemented, the safety and health program may be customized
   to address your site specific needs.

7. The Employer, by signing this Informal Settlement Agreement, hereby waives its rights to contest the above citation(s), and penalties, as amended in paragraph 4 of this agreement.

8. The Employer agrees to immediately post a copy of this Settlement Agreement in a prominent place at or near the location of the violation(s) referred to in paragraph 4 above. This Settlement Agreement must remain posted until the violations cited have been corrected, or for 3 working days (excluding weekends and Federal Holidays), whichever is longer.

9. The Employer agrees to continue to comply with the applicable provisions of the Occupational Safety and Health Act of 1970, and the applicable Safety and Health standards promulgated pursuant to the Act.

10. Each party agrees to bear its/his own attorney's fees, costs and other expenses incurred by such parties in connections with any stages of the above-referenced proceeding including, but not limited to attorney's fees and costs which may be available under the Equal Access to Justice Act, as amended.

11. The Employer shall comply with Section 11c of the OSH Act, 29 U.S.C. 660c and shall not discharge or in any manner discriminate against any employee because the employee has exercised (or intends to exercise), on behalf of himself or others, any right afforded by the Act, including but not limited to filing an OSHA complaint, instituting a proceeding under or related to the Act, or testifying in a proceeding under or related to the Act.

12. None of the foregoing agreements, stipulations, or actions taken by Respondent shall be deemed an admission by Respondent of any of the allegations contained in the citation. The agreements, statements, stipulations, and actions herein are made solely for the purpose of settling this matter economically and amicably without further litigation and shall not be used for any purpose except for proceedings and matters arising under the Occupational Safety and Health Act of 1970.

_____
For Occupational Safety and
Health Administration
Theresa A. Naim
Area Director
(Signature and Date)

8.9.2016

For the Employer
(Signature and Date)

DEC 09 2016

AINSMAN LEVINE, LLC
By:    Erin K. Rudert, Esquire
PA Bar Identification No:   200432
310 Grant Street, Suite 1500
Pittsburgh, PA   15219
(412) 338-9030
er@ainsmanlevine.com
*Attorney for Plaintiff, David W. Natcher*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAVID W. NATCHER,                                Civ. A. No. 1:16-cv-000219

          Plaintiff,

     vs.

ACCURIDE CORPORATION,

          Defendant.

### SUPPLEMENT TO PLAINTIFF'S DISCLOSURES PURSUANT TO
### FEDERAL RULE OF CIVIL PROCEDURE 26(a)(1)

Plaintiff, David W. Natcher, by his attorneys, Ainsman Levine, LLC, hereby provides the

following Supplement to Plaintiff's Disclosures pursuant to Rule 26 (a)(1) of the Federal Rules

of Civil Procedure.   This disclosure is based upon information reasonably available to the

Plaintiff at the present time.

II.        26(a)(1)(ii).        A copy – or a description by category and location – of all
           documents, electronically stored information, and tangible things that the
           disclosing party has in its possession, custody or control and may support its
           claims or defense, unless the use would be solely for impeachment.

{AL469467.1}

S. Gualardo
Deposition
Exhibit ___8___

DISCLOSURE:

Investigative materials received from Occupational Safety & Health Administration.

Plaintiff reserves the right to supplement his Initial Disclosures if he determines there is additional within the scope of Rule 26(a).

AINSMAN LEVINE, LLC

BY:_____

Erin K. Rudert, Esquire
Ainsman Levine, LLC
Pa. Bar Identification No. 200432
310 Grant Street, Suite 1500
Pittsburgh, PA   15219
(412) 338-9030
er@ainsmanlevine.com
*Attorney for Plaintiff, David W. Natcher*

Dated:  December 7, 2016

{AL469467.1}

Birkmire Training.    8/8/16
  SCOTT Rodgers - Safety Supervisor
  Tim Birkmire - VP


→ Written Hazcom program done
→ Send tomorrow so he can back check everything.

- Unit was never unstable
· Before crane knocked over the load...
· Loading conveyor onto Flatbed, put wood out B/c metal on
  metal with trailer ...
- Wayne told me the dry up on the side of the
  Trailer ...

— Rodgers let them chain it down...
— Wayne want this to load this for a load driver
— North to Seaside everyday ...
— Co does not haul coils of steel - try to steer clear of
  flat/high risk flat bed work.. (on coils)
— Safety found is the way it is bh we avoid high risk unstable
                       /unstable
— would not have loaded the load if it is unstable
— when loaded the load was stable..

NATCHER007476

# Birkmire in lift
→ Wayne

→ Accurate
Crane
Operator

Feel it was a stable load...

Loaded it After it was unstable....
Li no problems.



**Tim Birkmire**

7400 Birkmire Drive
Fairview, PA 16415
Ph: 814.833.5855
Cell: 814.450.0751
tim@birkmiretrucking.com



**Scott Rogers**

7400 Birkmire Drive
Fairview, PA 16415
Ph: 814.833.5855
scott@birkmiretrucking.com

NATCHER002477

Walkaround Observation:

Rigging + crane in good repair; up to date crane inspections; lifting device in good repair Konecrane performs annual inspecs; daily + monthly inspecto of crane performed

Birkmire Transportation Solutions -

crane hooks from Driver unhooked conveyor + signaled for crane operator to waist unhooked rigging

Cab

4x4's
legs - on it

belly

NATCHFR002478

[redacted]

8 yrs.
mntne millwright

I've always seen the conveyor sit flat
@ shop - on flat beds.

Bixenine ee on south; I was on northside

Driver used hook + told me to take it
up; Hook may have caught up

Pendant operated crane.

Not seen cribbing used on flat
beds before.

Accuride used to use 2 ee's
for flat bed loading.

NATCHER002479

9 yrs + 10'd
truck driver

The conveyor started moving + knocked
me off the trailer. Right foot may
have got caught.

I unhooked chains + a hook
got snagged on something on other
side.

4x4's under feet so no holes in
floor of flat bed (alum. floor)
I looseneg chains on way
to Wisconsin. Not enough
flat space (legs of conveyor).
I've been trained on loads,
rigging, lockout affected on trucks.

This was just an accident - no way
I know of it could've been prevented

loaded equip. on 4x4's a lot of times
w/ no issues.

I don't remember crawling under
bed/trailer of truck.

NATCHER002480

Think my right foot/leg might be caught under conveyor but was knocked off flat bed & turned to right (left side of body over right side), before I fell.

If mfr flat area to conveyor it can travel w/out cribbing. Same way I was loading it was how Scott said he ended up loading it but kept crane attached until strapped on completely.

I've done this work since late 1980's on + off — mostly on + no problems.

No changes in how this is done. Co. has trained + re-trained us on stuff.

Nothing - on diesel + propane. I'm not at warehouse often though. SDS's are in warehouse + co. also trained us on those.

NATCHER002481

AINSMAN LEVINE, LLC
By:    Erin K. Rudert, Esquire
PA Bar Identification No:  200432
310 Grant Street, Suite 1500
Pittsburgh, PA  15219
(412) 338-9030
er@ainsmanlevine.com
*Attorney for Plaintiff, David W. Natcher*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

---

DAVID W. NATCHER,                              Civ. A. No. 1:16-cv-000219

        Plaintiff,

vs.

ACCURIDE CORPORATION,

        Defendant.

---

### CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2016, the Supplement to Rule 26 Disclosures were

served to counsel of record via United States first class mail, postage prepaid, and electronic mail

addressed as follows:

Craig Murphey, Esquire
MacDonald Illig Jones & Britton LLP
100 State Street, Suite 700
Erie, PA 16507
*Attorney for Defendant*

Erin K. Rudert, Esquire

{AL469467.1}