

# National Safety Consultants Inc.

## DAVID W. NATCHER, Plaintiff,

## v.

## ACCURIDE CORPORATION, Defendant



**Documents Reviewed**

In preparation for this case, this expert reviewed the following information:

1) Complaint in Civil Action
2) Defendant Accuride Answer to Plaintiffs Complaint in Civil Action
3) Defendant's Supplemental Disclosures
4) Deposition Transcript of David Natcher
5) Deposition Transcript of Donald Herrmann
6) Deposition Transcript of Mark Crispin
7) Defendants First Supplemental Initial Disclosures
8) Defendants Answers to Interrogatories
9) Defendants Discovery Responses
10) Defendants Initial Disclosures
11) Defendants Responses to Request for Production of Documents
12) Defendants Second Supplemental Disclosures
13) Defendants Supplemental Discovery Documents
14) OSHA Documents
15) Plaintiffs Discovery Responses
16) Accuride color photos
17) Applicable OSHA Laws, Standards and Regulations
18) Applicable National Consensus Standards
19) Applicable Industry Guidelines and Recommendations

**Introduction**

This report methodology for this case included an analysis of the facts and circumstances involved in this incident. In developing an opinion, this expert evaluated company policies, procedures, industry standards codes and regulations, government standards and regulations, workplace customs, practices and procedures. Additionally, documents provided for case preparation purposes were also reviewed and analyzed.

The Occupational Safety and Health Administration (OSHA) regulates worker and workplace safety and health at the vast majority of workplaces including the work site where this incident occurred. OSHA has specific standards and regulations required to be implemented by employers to prevent occupational injuries or illnesses of workers. Although other standards and guidelines will be used as supporting information in this report, OSHA's standards and regulations are the ones most applicable to this incident. OSHA Standards and Regulations are the foundation in workplace safety for determining the safe acceptable standards, customs and practices within the industry. They are also used to establish a degree of reasonable care that a prudent person would exercise in a similar situation.

Beyond OSHA requirements, employers also follow the safety guidance provided by widely accepted National Consensus Standards in an effort to protect employees and members of the public. The American Society of Mechanical Engineers (ASME) standards will be referenced in this case. ASME is a professional association that, "promotes the art, science, and practice of multidisciplinary engineering and allied sciences around the globe" via "continuing education, training and professional development, codes and standards, research, conferences and publications, government relations, and other forms of outreach. ASME has over 130,000 members in 158 countries worldwide. ASME is one of the oldest standards-developing organizations in America. It produces approximately 600 codes and standards.

In addition to regulations and consensus standards, occupational safety and health industry guidance is often used by employers and safety professionals, as another source to determine whether their approach to dealing with issues is appropriate. Employers and safety professionals rely on the recommendations of the National Safety Council (NSC) and the American Society of Safety Engineers (ASSE) for this purpose. The National Safety Council (NSC) is a nonprofit, nongovernmental, international public service organization dedicated to protecting life and promoting health. The NSC is a membership organization, founded in 1913 and chartered by the U.S. Congress in 1953. Members include more than 48,000 businesses, labor organizations, schools, public agencies, private groups and individuals. For this case, the National Safety Council's Accident Prevention Manual for Business and Industry 12th edition was used as a resource. Another source used in this report was information provided by the American Society of Safety Engineers. Founded in 1911, the American Society of Safety Engineers (ASSE) is the oldest and largest safety organization and represents more than 37,000 SH&E practitioners committed to protecting people, property and the environment and are at the forefront of safety engineering, design, standards development, management and education in virtually every industry, governmental agency, labor and education.

Finally, since this case involved an over the road commercial truck, the requirements of the Federal Department of Transportation were reviewed.

**Key Persons and Entities Involved**

- Mr. David Natcher was an over the road truck driver for Berkmire Trucking since 2007. (Natcher Dep.25)
- Mr. Mark Crispin worked as a stores coordinator for Accuride. Mr. Crispin was responsible for shipping the conveyor involved in the incident. Previously he was a maintenance supervisor, maintenance technician and millwright. He last used a crane 14 years ago. He used cranes at previous employers. He never loaded a flatbed trailer with a crane in any previous position. (Crispin Dep. 9-10, 12, 14-16)
- Mr. Don Herrmann worked at Accuride as a Millwright. In that position he performed welding/fabricating, plumbing, carpentry, painting, truck loading and unloading, and equipment repair. (Herrmann Dep. 15)

- Mr. Kevin Maleski was a Human Resources Manager for Accuride Corporation.
- Mr. Matt Brady was an Environmental Health & Safety Coordinator for Accuride Corporation.
- Ms. Sheryl Jordano was a Senior Buyer for Accuride Corporation.
- Corporation.
- Representatives of Dailey Supply, Inc. performed sling inspections for Accuride.

## Incident Overview

- ✓ Mr. David Natcher was involved in an incident at Accuride Corporation in Erie, PA on April 15, 2016 at approximately 10:15 AM.
- ✓ On that date, Mr. Natcher was dispatched to pick up an approximate 8000-pound conveyor at Accuride Corporation in Erie. Mr. Natcher was planning to transport the cargo from Accuride back to Berkmire where another driver was to transport it to Wisconsin.
- ✓ Mr. Natcher had been to Accuride previously. On the day of the incident, he was dispatched to the east bays to pick up the conveyor. When at the facility, Mr. Natcher was directed by an Accuride shipping supervisor where to go for loading.  He was told specifically where to park his truck. He stopped the truck and set the brakes. Mr. Natcher was never loaded in that bay previously. (Natcher Dep. 83,92, 95)
- ✓ Mr. Herrmann was not informed in advance that he was to be loading the conveyor that Mr. Natcher was dispatched for. Mr. Herrmann was informed by radio by his foreman to do so at some point when Mr. Natcher arrived. (Herrmann Dep. 50)
- ✓ Prior to the day of the incident, that same conveyor was loaded onto flatbed trucks 2-3 times annually by Mr. Herrmann. (Herrmann Dep. 45)
- ✓ Mr. Herrmann testified that he loaded conveyors onto Berkmire trailers 6-8 times previously. (Herrmann Dep. 53)
- ✓ Mr. Herrmann never loaded the conveyor with Mr. Natcher as a Berkmire driver previously. (Herrmann Dep. 58)
- ✓ Mr. Natcher never picked up or dropped off a load at Accuride, which utilized the overhead crane that was used on the day of your accident. (Natcher Dep. 75)
- ✓ The conveyor load was already rigged for the crane lift by Mr. Herrmann with a four legged sling attached to the hoist hook. Mr. Natcher was not involved in original rigging the load for crane transport to his trailer. (Natcher Dep. 69, 102, 103)
- ✓ Mr. Herrmann was using a remote control device to operate the crane and was positioned on the driver's side of the truck. (Natcher Dep. 85)(Herrmannn Dep. 59)
- ✓ Mr. Herrmann was having difficulty getting the center of gravity for the load, which concerned Mr. Natcher from a safety perspective. (Natcher Dep. 85)

- ✓ Mr. Herrmann was cussing because of his difficulty. (Natcher Dep. 105)
- ✓ Mr. Herrmann advised Mr. Natcher that he was having trouble hooking up the conveyor at which time Mr. Natcher offered to assist. (Natcher Dep. 98)
- ✓ Mr. Herrmann and Mr. Natcher did not like the way the conveyor first lifted and set it back down. Both individuals readjusted the hooks at that point. Once satisfied, the lift onto the trailer occurred. (Herrmann Dep. 52, 60, 68-69)
- ✓ Nobody else was in the area supervising or spotting the lift. (Natcher Dep. 106)(Herrmann Dep. 69)
- ✓ Mr. Natcher got on the flatbed to set wooden cribbing to accept the conveyor load because the conveyor legs would penetrate the bed. (Natcher Dep. 132) (Herrmann Dep. 54)
- ✓ Mr. Herrmann testified that he believed at that point that the use of the cribbing would make the load unstable. He testified that he was always told that it was the driver's responsibility to set the load, as they desired which he disagreed with. However, Mr. Herrmann did not have any discussion about the placement of the cribbing with Mr. Natcher. (Herrmann Dep. 54, 71-75)
- ✓ Mr. Crispin approached the area to get paperwork signed. At that point, the conveyor was sitting on the flatbed. He testified that apparently "Wayne" did not like how it was sitting. Mr. Natcher was standing on the trailer on the driver's side front area. Mr. Herrmann was on the ground on the south side of the trailer. Mr. Crispin did not hear any commands or see any hand signals from Mr. Natcher. Mr. Natcher allegedly shook his head no and Mr. Herrmann was getting ready to pick it back up. Mr. Crispin turned around and walked away because he knew it was going to be some time before it was fully loaded. (Crispin Dep. 25, 26)
- ✓ Mr. Natcher was on the trailer and he adjusted the blocks as the load was being placed by Mr. Herrmann. (Natcher Dep. 121)
- ✓ The load was eventually lowered onto the cribbing. (Natcher Dep. 127)
- ✓ Mr. Herrmann then lowered the hoist to create slack in the sling chains. (Natcher Dep. 143)
- ✓ Mr. Natcher unhooked the sling hooks and piled them on the trailer decking. (Natcher Dep. 150-152)
- ✓ Mr. Herrmann stated that when the hooks were unhooked they were thrown to the north side of the conveyor on the side where Mr. Natcher was standing, which was on the opposite side where Mr. Herrmann was positioned. (Herrmann Dep. 83,84)
- ✓ Mr. Herrmann raised the hoist and chains from the deck after Mr. Natcher told him the chains were removed. (Natcher Dep. 153)
- ✓ The chain slings were moving up and then slid off on the south side of the machine onto the trailer deck. (Natcher Dep. 157-158)
- ✓ Mr. Crispin reproached the area about 15 minutes later. The conveyor was on the truck at that point, and then the chains were disconnected and hanging

straight down as opposed to being pulled out to the four corners of the conveyor. (Crispin Dep. 33, 34)

✓ After Mr. Crispin approached the area, he was standing there and he could heard the clicking. Out of the corner of his eye, he could see the crane chains moving up. He then saw the conveyor tip to the north. (Crispin Dep. 35, 37,62)

✓ Mr. Natcher unhooked the hook and signaled Mr. Herrmann to go up with the chain sling. He raised the hoist and chain sling and saw the conveyor shimmy as he was on the south side. At that time, Mr. Natcher grabbed the conveyor and tried to push it back onto the trailer. (Herrmann Dep. 81-82, 86)

✓ Mr. Herrmann believed that when the last hook was unattached, the sling was free from the conveyor prior to him raising the hoist. (Herrmann Dep. 84)

✓ According to Mr. Herrmann, Mr. Natcher had one hook in his hand. (Herrmann Dep. 99)

✓ Prior to raising the hoist, Mr. Herrmann testified that he could not see the location of the chain sling hooks. He could only see a portion of the chains. (Herrmann Dep 82)

✓ Mr. Herrmann then began to raise the chains. They began dragging on the side of the conveyor as they were being raised causing it to become unstable. The crane operator should have stopped the lift hoist or moved the trolley south to prevent the chains from making contact with the conveyor but did not do so. (Natcher Dep. 192)

✓ Mr. Herrmann raised the hoist 2 times prior to seeing the conveyor shimmy. (Herrmann Dep. 99)

✓ Mr. Natcher went to the area where the chains were dragging up the side of the conveyor to try to push them clear at which time the conveyor started shaking. He called to Mr. Herrmann to stop while trying to stabilize the conveyor and prevent it from tipping. That is when the conveyor flipped. (Natcher Dep. 160-165)

✓ Mr. Herrmann yelled to the operator to move away. (Herrmann Dep. 86)

✓ Mr. Crispin witnessed Mr. Natcher moving backward as the conveyor was tipping but he was not sure if it was pushing him. He noted that it appeared Mr. Natcher jumped at that point. (Crispin Dep. 41)

✓ As the conveyor continued to move, Mr. Natcher believed that he fell off the trailer and positioned himself underneath of it and the load continued to fall. (Natcher Dep. 166)

✓ Mr. Crispin saw Mr. Natcher crawl under the trailer after the conveyor was on the ground. (Crispin Dep. 57)

✓ Mr. Natcher was treated on the scene and transported by ambulance to the hospital

✓ Mr. Natcher suffered serious and disabling injuries because of the incident.

**Summary of Conclusions**

The opinions expressed by this expert in this report are offered with a reasonable degree of professional safety certainty and are based on the information that was available for developing these opinions. I reserve the right to change my opinion if new or additional information becomes available at a future time.

Accuride Corporation had actual and constructive knowledge of the unsafe, dangerous, and/or otherwise hazardous operation of the crane. Accuride Corporation knew or should have known through the exercise of reasonable care that the unsafe, dangerous, and/or otherwise hazardous operation of cranes on its premises could cause serious injury. Accuride had a duty of reasonable care to provide safe premises to Mr. Natcher as a business invitee. However, as this report will illustrate, Accuride was reckless in its conduct while intentionally disregarding or acting in plain indifference to the safety of Mr. Natcher. Accuride breached its duty of reasonable care to Mr. Natcher. The incident and its injurious outcomes were clearly foreseeable. As a direct and proximate result of the incident, Mr. Natcher suffered serious and disabling injuries.

**Discussion of Significant Issues**

**The conveyor load was stable after being loaded onto the flatbed trailer**

The conveyor load was stable and did not fall from the flatbed trailer because cribbing was used to support it on the flatbed trailer. Per Accuride, the conveyor being shipped to Jorgenson Conveyor for rebuilding was a metal belt puck conveyor, which had a weight 3500 lbs. per Plaintiff responses. The bill of lading however noted the load was 12,000 lbs. The conveyor had dimensions of 23' x 3' x 6' (Accuride 000001) Mr. Natcher testified that load had a solid stable base on the back and the feet on the front. (Natcher Dep. 46-48)

The load was clearly stable on the flatbed while on the wooden cribbing prior to it being tipped by the movement of the crane hoist. Mr. Herrmann testified that he actually raised the hoist two times prior to seeing the conveyor shimmy. (Herrmann Dep. 99) Mr. Crispin further confirmed that the load was stable in his testimony as well. He reported that when he reproached the area, the conveyor was on the truck and the chains were disconnected and hanging. (Crispin Dep. 33, 34)

Mr. Natcher observed in his deposition that the cribbing did not roll and was in the same place in the post incident photo as it was originally placed. (Natcher Dep. 134, 193) Further, according to Mr. Natcher, post incident, the conveyor was placed onto the trailer the same way by Mr. Rodgers with the cribbing that Mr. Natcher used. (Natcher Dep. 234) At the informal OSHA hearing, Berkmire argued that the load was stable for 30 seconds and that the sling was heard dragging over conveyor and it snagged. They further noted that the same load was loaded after incident same way (using the cribbing) and it was stable. However, in his deposition, Mr. Herrmann emphatically believed the cribbing caused the conveyor to fall and it was not the raising of the hoist. However, after the load was set, the entire weight of the conveyor was on the flatbed. Enough time elapsed for the driver to remove the hooks before the load fell from the trailer. Consequently, the load

was stable up until the pointy the crane hoist was moved upwards. Mr. Herrmann confirmed that the conveyor did not shimmy or wobble during that time. (Herrmann Dep. 120, 121)

According to the OSHA compliance safety and health officer interview notes, Mr. Hermann advised that the hook might have caught on the conveyor after the driver advised him to raise the hoist. This is consistent with the OSHA interview account of Mr. Natcher who stated that when he unhooked, the hook got snagged on something. Thus, this Expert concludes that the cribbing had nothing to do with the conveyor becoming unstable.

**Failure of Accuride to provide a qualified crane rigger and spotter for a dangerous crane lift operation**

**Spotter**

Accuride was required to provide a qualified crane rigger and spotter to safely move the load from the floor level onto the flatbed trailer. Accuride failed to provide a spotter, supervisor, or other individual to assist Mr. Herrmann in the operation of the crane to ensure that the crane and chains were free of all obstacles before the crane was lifted. Nobody else was in the area supervising or spotting the lift per the testimony of Mr. Natcher and Mr. Herrmann. (Natcher Dep. 106)(Herrmann Dep. 69) Furthermore, because of not providing a spotter for this operation, Accuride failed to assure Mr. Natcher was clear of the lift zone and positioned in a safe area.

Mr. Herrmann testified that he used truck drivers mainly as spotters at his previous employer when loading and unloading trucks. At times, his employer also provided spotters. (Herrmann Dep. 18) Mr. Herrmann agreed in his testimony that that his union representative informed OSHA during their investigation that Accuride used to use two employees for flatbed loading. (Herrmann Dep. 97) While working at Accuride, Mr. Herrmann testified that if the load was too big for him to see, he used an Accuride spotter. However, he further testified that every time he ever loaded the truck, the driver has always been the one what told him where they wanted the load placed, how they wanted it positioned and they watched how it was being placed before it was set down on their truck. (Herrmann Dep 95) Consequently, he did not request an Accuride spotter to be used in that circumstance. Mr. Herrmann affirmed that no spotter was used during the conveyor lift at Accuride. (Herrmann Dep. 95) Mr. Natcher also confirmed that there was no spotter on the day of the incident. (Natcher Dep. 144) However, he testified that other personnel in addition to the crane operator were present previously at Accuride while Mr. Natcher's cargo were being loaded. Mr. Natcher did not know their purpose. (Natcher Dep. 144, 240-241)

**Rigging**

In addition to not providing a spotter, Accuride also did not provide a rigger and/or a rigging crew to assist Mr. Herrmann with the loading process of the conveyor. Because

Accuride did not provide a qualified rigger and/or spotter for lifting and placing the conveyor onto the flatbed trailer, Mr. Natcher was required to climb onto the flatbed to unhook the chain sling connecting the overhead crane to the conveyor. Accuride did not advise him that this activity was not permissible and clearly permitted him to perform the duties of a rigger.

According to the testimony of Mr. Herrmann, he was not informed in advance that he was to be loading the conveyor that Mr. Natcher was dispatched for that day. Mr. Herrmann was only informed via radio by his foreman to attend to the needed crane lift at some point when Mr. Natcher arrived. (Herrmann Dep. 50)

The conveyor load was already rigged for the crane lift by Mr. Herrmann with a four legged sling attached to the hoist hook. Mr. Natcher was not involved in original rigging the load for crane transport to his trailer. (Natcher Dep. 69, 102, 103)

Mr. Natcher reported that Mr. Herrmann was having difficulty getting the center of gravity for the load, which concerned Mr. Natcher from a safety perspective. (Natcher Dep. 85) Mr. Natcher stated that Mr. Herrmann was cussing because of his difficulty. (Natcher Dep. 105) Mr. Natcher stated that Mr. Herrmann advised him that he was having trouble hooking up the conveyor at which time Mr. Natcher offered to assist. (Natcher Dep. 98)

After the initial lift was performed, Mr. Herrmann and Mr. Natcher, he did not like the way the conveyor lifted and Mr. Herrmann set it back down. Both individuals readjusted the hooks at that point. Once satisfied, the lift onto the trailer occurred. (Herrmann Dep. 52, 60, 68-69)

Prior to the load being placed on the flatbed trailer, Mr. Natcher got on the flatbed to set wooden cribbing to accept the conveyor load. This was because the conveyor legs would penetrate the bed. (Natcher Dep. 132) (Herrmann Dep. 54)

Mr. Herrmann testified that he did not have any discussion about the placement of the cribbing with Mr. Natcher. However, Mr. Herrmann testified that he had concerns about the use of the cribbing but did not make those concerns known to Mr. Natcher. He stated that he was always told that it was the driver's responsibility to set the load, as they desired which he disagreed with. Mr. Herrmann testified that he felt the use of the cribbing would make the load unstable. (Herrmann Dep. 54, 71-75)

Mr. Crispin approached the area to get paperwork signed. At that point, the conveyor was sitting on the flatbed. He testified that apparently "Wayne" did not like how it was sitting. Mr. Natcher was standing on the trailer on the driver's side front area. Mr. Herrmann was on the ground on the south side of the trailer. Mr. Crispin testified that he did not hear any commands or see any hand signals from Mr. Natcher. Mr. Natcher allegedly shook his head no and thought Mr. Herrmann was getting ready to pick it back up. Mr. Crispin turned around and walked away because he knew it was going to be some time before it was fully loaded. (Crispin Dep. 25, 26)

The load was eventually hoisted and lowered onto the cribbing. (Natcher Dep. 127) Mr. Natcher was on the trailer and he adjusted the cribbing blocks as the load was being lowered by Mr. Herrmann. (Natcher Dep. 121) After the load was on the cribbing blocks, Mr. Herrmann further lowered the hoist to create slack in the sling chains so that they could be removed from the conveyor lifting lugs. (Natcher Dep. 143) At that point, Mr. Natcher unhooked the crane slings and piled them on the trailer decking. (Natcher Dep. 150-152) Mr. Herrmann stated that when the hooks were unhooked, they were thrown to the north side of the conveyor on the side where Mr. Natcher was standing and on the opposite side where Mr. Herrmann was positioned. (Herrmann Dep. 83, 84) The chain slings were moving up and then slid off on the south side of the machine onto the trailer deck. (Natcher Dep. 157-158) Mr. Herrmann reportedly believed that when the last hook was unattached, the sling was free from the conveyor prior to him raising the hoist. (Herrmann Dep. 84) According to Mr. Herrmann, Mr. Natcher had one hook in his hand when the raising of the hoist began. (Herrmann Dep. 99) Prior to raising the hoist, Mr. Herrmann testified that he could not see the location of the chain sling hooks and could only see a portion of the chains. (Herrmann Dep 82)

Mr. Herrmann began raising the hoist and chains from the deck after Mr. Natcher told him the chains were removed. (Natcher Dep. 153) According to Mr. Herrmann, Mr. Natcher unhooked the hook and signaled Mr. Herrmann to go up with the chain sling. Mr. Herrmann stated that he raised the hoist and chain sling and saw the conveyor shimmy from where he was positioned on the south side floor area. At that time, He indicated that he saw Mr. Natcher grab the conveyor and try to push it back onto the trailer. (Herrmann Dep. 81-82, 86) Mr. Crispin reproached the area around the time the above was occurring 15 minutes after his initial visit to the location. He reported that the conveyor was on the truck at that point, and then the chains were disconnected and hanging straight down as opposed to being pulled out to the four corners of the conveyor. (Crispin Dep. 33, 34) It is important to note that the load was completely stable. Mr. Crispin testified that after he approached the area, he was standing there and he could heard the clicking. Out of the corner of his eye, he reported that he could see the crane chains moving up. He then testified that he saw the conveyor tip to the north. (Crispin Dep. 35, 37, 62) This was confirmed by Mr. Natcher. He testified that as Mr. Herrmann began to raise the chain sling, the sling chains began dragging on the side of the conveyor causing the conveyor to become unstable. He noted that the crane operator should have stopped the lift hoist or moved the trolley south to prevent the chains from making contact with the conveyor but did not do so. (Natcher Dep. 192) Mr. Herrmann did not stop the upward movement of the hoist and crane sling chains while this was occurring. Instinctively, Mr. Natcher went to the area where the chains were dragging up the side of the conveyor and tried to push them clear at which time the conveyor started shaking. He called to Mr. Herrmann to stop while trying to stabilize the conveyor and prevent it from tipping. However, that is when the conveyor flipped. (Natcher Dep. 160-165)

As the load was tipping, Mr. Herrmann testified that he yelled to the operator to move away. (Herrmann Dep. 86) Mr. Crispin witnessed Mr. Natcher moving backward as the conveyor was tipping but was not sure if it was pushing him. He noted that it appeared Mr. Natcher have jumped from the trailer at that point. (Crispin Dep. 41) As the conveyor

continued to move, Mr. Natcher believed that he fell off the trailer and positioned himself underneath of it and the load continued to fall. (Natcher Dep. 166) Mr. Crispin reportedly saw Mr. Natcher crawl under the trailer after the conveyor was on the ground. (Crispin Dep. 57)

Had a qualified spotter and rigger been used by Accuride, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride and Mr. Herrmann to assure the crane sling was removed from the conveyor area and properly secured before lifting the hoist**

As discussed previously, Mr. Herrmann clearly understood that he began raising/lifting the overhead crane while Mr. Natcher was standing on the driver's side of the flatbed trailer. He was further aware visibly and audibly that the sling chains were not clear from the conveyor while moving the crane perpendicularly to the flatbed trailer. As a result, the chains became entangled and/or otherwise caught on the conveyor as the hoist and sling was being raised. After the chain slings became entangled and/or caught on the conveyor, Mr. Herrmann continued raising/lifting the overhead and caused the conveyor to lift, tilt, and overturn toward the driver's side of the flatbed trailer where Mr. Natcher

It is interesting to note that Mr. Herrmann testified that if he was actually removing the four sling hooks; they would be physically controlled (restrained) by him while they were being raised by the hoist. He testified that if he was the one that was unhooking the chains before the crane hoist was raised, he would make sure that all the chains were together and at least in one area so you could see all the hooks. Nevertheless, he never asked the driver to do that before he raised the crane hoist as he assumed he knew. He testified though that did not know him that well and only met him that day. (Herrmann Dep. 83, 85)

Had Accuride assured the crane sling was removed from the conveyor area and properly secured before lifting the hoist, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride and Mr. Herrmann to operate the crane in a safe manner**

Accuride and Mr. Herrmann failed to take any precautions to confirm that it was safe to raise the crane after the hook were detached. Mr. Herrmann knew or should have known the sling chains were not clear of the equipment. Furthermore, Mr. Herrmann did not attempt to remove the chains from the conveyor area before commencing to raise the hoist after the load was detached. After not taking any precautions, he operated the crane in an unsafe manner causing the chain slings to become entangled and/or catch on the conveyor as the hoist was being raised causing it to tip over and fall from the flatbed trailer. Mr. Herrmann did not operate and/or lift the crane without first moving the crane perpendicularly and/or laterally to clear the chains from the equipment and ensure that the chains were not tangled in and could not become entangled in the equipment while being lifted.

Mr. Herrmann also did not make eye contact with Mr. Natcher or communicate and/or warn him audibly or in any manner to assure he knew the crane was about to be operated. Additionally, Mr. Herrmann did not confirm or assure Mr. Natcher was in a safe location prior to lifting the hoist after the sling hooks were removed. Mr. Herrmann was not in a proper area to observe the crane, sling and or conveyor movement and to communicate with Mr. Natcher. While not observing the chain slings, Mr. Herrmann continued to raise the hoist after the chain slings were making contact with the conveyor. He was aware Mr. Natcher was not in a safe area but did not stop the crane operation upon hearing the claims hitting the conveyor.

Accuride and Mr. Herrmann operated the crane without the use of a spotter and/or rigging crew or a rigger. Accuride permitted Mr. Herrmann to operate a crane, which he was not trained, experienced and/or qualified to operate. They did so without proper supervision of his activities. Moreover, Accuride permitted Mr. Herrmann to operate a crane that was not properly inspected. Additionally, the testimony of Mr. Herrmann revealed that he was not aware of the weight of the conveyor. (Herrmann Dep. 58) The first rule for using a crane is to assure the crane is capable of making the lift safely.

Had Accuride and Mr. Herrmann operated the crane in a safe manner, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride to properly supervise crane operations**

Accuride had a duty to properly supervise the training, inspection, maintenance and use of the hoist. However, as the testimony and case record confirm, Accuride did not properly supervise and/or manage the use of the crane or this operation to ensure that its employees were not operating overhead cranes in a dangerous and/or hazardous manner or condition.

Section 2.4 of the Konecrane manual defines the safe working principles for the hoist. This manual instructs operators that carefully following safe working principles is one of the most effective ways of preventing damage to property and injury to personnel. It affirms that: the operator, serviceman and work manager for the hoist should be familiar with the safe working principles for the hoist; management has an important role in implementing the principles for using the hoist safely. The manual affirms that management must ensure that: the hoist and its accessories are fit for the intended purpose, servicing and maintenance of the equipment is carried out as scheduled, and personnel are adequately trained in the safe operation of handling loads. It further states: the hoist operator, the hoist serviceman and personnel In charge of hoist operation and servicing shall be familiar with and comply with the safe working principles described in the Instruction, read all safety Instructions supplied with products, and study the meaning of stickers on products. As stated previously, no evidence provided demonstrates that anyone at Accuride reviewed the operating manual and/or enforced its contents.

According to the testimony of Mr. Crispin, he shipped these conveyors for repairs two times in the past 1.5 years prior to the day of the incident. (Crispin Dep. 16) Thus, he was

in a position at Accuride to supervise these activities or to assure supervision was effectively provided.

Mr. Herrmann testified that he was not informed in advance that he was to be loading the conveyor that Mr. Natcher was dispatched for. Mr. Herrmann was only informed by radio by his foreman to do so at some point when Mr. Natcher arrived. (Herrmann Dep. 50) This heavy lift should have required some preplanning on the part of Accuride. However, it was evident, none occurred.

Mr. Crispin testified that he approached the area to get paperwork signed after the load was placed onto the flatbed trailer. He testified that apparently "Wayne" did not like how it was sitting. He witnessed Mr. Natcher standing on the trailer on the driver's side front area at that time and saw Mr. Herrmann positioned on the ground on the south side of the trailer. Mr. Crispin testified that he did not hear any commands or see any hand signals from Mr. Natcher. According to Mr. Crispin, he saw Mr. Natcher shake his head no (meaning he was not satisfied) and Mr. Herrmann was getting ready to pick the conveyor back up. At that point. Mr. Crispin turned around and walked away because he knew it was going to be some time before it was fully loaded. (Crispin Dep. 25, 26) As a shipping coordinator and former Accuride supervisor, Mr. Crispin should have stopped the operation at that time, as he was aware they were no spotters or riggers from Accuride present. However, he did not do so.

Mr. Crispin then reproached the area about 15 minutes later. At that point, the conveyor was on the truck, and then the chains were disconnected and hanging straight down as opposed to being pulled out to the four corners of the conveyor. (Crispin Dep. 33, 34) Mr. Crispin at that point should have recognized the chain slings were not in a safe position.

According to Mr. Crispin's testimony, after he approached the area, he was standing there and he could heard the clicking. Out of the corner of his eye, he could see the crane chains moving up. He then saw the conveyor tip to the north. (Crispin Dep. 35, 37, 62) Once again, at that juncture, he had a third opportunity to stop the crane operation. However, he unfortunately failed to do so.

Had Accuride provided proper supervision to this crane lift, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride, Mr. Crispin and Mr. Herrmann to properly warn Mr. Natcher of impending hazardous conditions and unsafe actions**

Accuride Mr. Crispin and Mr. Herrmann failed to instruct Mr. Natcher to keep clear of the vicinity of the equipment and crane when the crane was in operation. Additionally, they failed to warn him to not remain on the flatbed trailer after unhooking the chains from the equipment. Furthermore, they failed to warn Mr. Natcher in any manner prior to operating and/or moving the crane.

As the previous testimony affirmed, both Mr. Crispin and Mr. Herrmann had numerous opportunities to verbally warn Mr. Natcher about the dangerous conditions and actions unfolding prior to the incident.

Had Accuride provided proper warning to Mr. Natcher, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride to properly train Mr. Herrmann on crane operation, load rigging and load spotting activities**

Accuride failed to provide a trained, competent, certified and experienced operator for the crane. In addition, Accuride failed to instruct Mr. Herrmann and Mr. Crispin to not lift the crane until the chains were free of any and all potential obstructions, catch points, or other objects that could be caught as the crane was lifted, Accuride also never advised Mr. Herrmann and Mr. Crispin what actions to take if chain slings became become entangled on any object while the crane was in operation.

When Mr. Herrmann was interviewed for a position at Accuride, management advised him he would be using a crane. However, his previous training was not discussed. Only his prior experience was discussed during his interview. (Herrmann Dep. 22)  Mr. Herrmann testified that he received (on the job) crane training at a previous employer. He did not receive any formal crane training certifications while working at his previous employer o (Herrmann Dep. 10, 11, 20, 39)

After being hired by Accuride, Mr. Herrmann testified that he was not formally trained to use a crane.  (Herrmann Dep. 23-24) Mr. Herrmann testified that he attended an hour-long crane-training course 4 months after he was hired. However, he could not recall what the training covered. The training was classroom only and not hands on. A case exhibit shows Don Herrmann was trained on 7/24/08 for 1 hr. (Accuride 0000162) Mr. Herrmann testified that he attended monthly safety meeting where crane safety was discussed. Again, he could not recall what was discussed at this meeting. (Herrmann Dep. 27) (Exhibits 5) A monthly training tracker showed crane training occurred in 2011. (Accuride 000162)  Mr. Herrmann further testified that he attended toolbox talks each week, which did not have any hands on crane training. He reported that crane related topics might have been discussed at these meetings. Nevertheless, he could not confirm it. (Herrmann Dep. 28 – 33)

Mr. Herrmann did affirm that any crane training he had did not cover loading and unloading of flatbed trucks. (Herrmann Dep. 25-27)(Exhibits 4) Mr. Crispin also confirmed in his testimony that he never had any crane training for loading flatbed trailers in any position while at Accuride. (Crispin Dep. 15, 17-18, 19)

Although, Mr. Herrmann indicated that he did rigging and cribbing at a previous employer, he did not receive training for performing those activities. (Herrmann Dep. 19-21) Mr. Herrmann stated that Accuride training also did not include cribbing and this was learned on the job. (Herrmann Dep. 37)

Mr. Herrmann testified that he was never provided with any training by Accuride regarding the crane controllers and their operation. (Herrmann Dep. 38-39)  Moreover, Mr. Herrmann was never trained by Accuride that when lifting the hoist from a placed load, the hoist was to be inched upward before being fully raised to assure the sling chains were clear of the load. (Herrmann Dep. 88, 89)

Had Accuride provided proper training to Mr. Herrmann and Mr. Crispin, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride to train Mr. Herrmann on the crane hoist safety manual requirements**

The Konecrane Hoist Safety Instructions (Accuride 000144) Section 2.4 discussed operating the hoist. This section stated that the operator was to read all the instructions supplied with the hoist and that the hoist operator must be familiar with the instructions and follow them. This section also stated that: the hoist operator must be competent for the task, must know all the controls of the hoist and must be able to use them correctly and safely, must know how to operate the hoist and must be aware of any risk of accident posed by the operating site. The manual advised operators to: learn how to operate the hoist in safe conditions before actually starting to work with the hoist, learn how to control the movements of the hook and load and to use the Hoist Owner's Manual to familiarize yourself with the hoist and hoist controls and with the signs and warnings marked on the hoist. The manual further indicated that: the he direction symbols for hoist motions are the same as the symbols marked on the pushbutton controller and instructed users to check the direction symbols in the Hoist Owner's Manual. It instructed users to: learn the hand signals for indicating hoisting motion, trolley traversing and crane travel and that the **hoist operator should only accept hand signals from a person authorized to give them.** The manual advised users to ensure that there is adequate lighting as well as proper tools and equipment for the working site, and that appropriate working procedures are established. Mr. Herrmann testified that he was never provided a copy of the crane or hoist instruction manuals at Accuride. (Herrmann Dep. 24-25) Mr. Natcher reported in his deposition that he never received formal crane hand signal training. (Natcher Dep. 66)

This manual further stated to follow instructions when preparing to start work including: check that all safety switches and brakes operate.  Mr. Herrmann testified that the only thing that was inspected daily was the hook safety latch and that the hoist operated up and down. He also said he checked the upper limit function. However, nothing was documented or provided by Accuride for these inspections with respect to policies or procedures. (Herrmann Dep. 40, 41, 89)

This manual further instructed operators of the following: Before hoisting a load, make sure you know a safe and effective path for the load. **Ensure that the load will not collide against objects or people. When using a lifting accessory (sling, belt etc.), always follow the Instructions provided by the lifting accessory manufacturer. Avoid swinging the hook or load during travel motion. A load must never be lifted**

**in a way that can injure a person if the load drops. During hoisting and travel motion, ensure that the hook, the load, the crane and its moving parts do not collide with objects or people. If the hoist is provided with a horn, sound the horn when you move the load In the vicinity of people who are not paying attention to the moving load. Do not move the load until you have received a signal from the person attaching the load to the hook or lifting appliance.** Do not use the hoist if there are visible defects in or damage to the hoist, the hoisting rope, or any other hoist structure or hoist function. **Stop operating the hoist if it operates abnormally** (for example, a high noise level, uneven starting or malfunctions). Using faulty equipment is strictly prohibited. **If you feel you are losing control of the hoist motions, press the emergency stop button.** It was evident from the testimony that Mr. Herrmann disregarded the above instructions.

Section 2.4 of the Konecrane manual requirements defined the safe working principles for the hoist. This manual instructs operators that carefully following safe working principles was one of the most effective ways of preventing damage to property and injury to personnel.  It affirmed that: the operator, serviceman and work manager for the hoist should be familiar with the safe working principles for the hoist; management has an important role in implementing the principles for using the hoist safely. Management must ensure that: the hoist and its accessories are fit for the intended purpose, servicing and maintenance of the equipment is carried out as scheduled, and personnel are adequately trained in the safe operation of handling loads. It further states that: the hoist operator, the hoist serviceman and personnel in charge of hoist operation and servicing shall be familiar with and comply with the safe working principles described In the Instruction, read all safety Instructions supplied with products, and study the meaning of stickers on products. As stated previously, no evidence provided demonstrates that anyone at Accuride reviewed this operating manual and/or enforced its contents.

Section 2.5 discussed using the controller. Accordingly, it noted that the hoisting and travel motions of the hoist as well as crane travel motions are controlled with the pushbutton controller or by remote control. A skilled operator always uses the low speed (step 1) when starting to hoist. Slack is taken out of rigging and the wire rope is subjected to the load in the low speed. Proceed to high speed (step 2) when the load is clear of all obstacles. (Accuride 000133-134)

Had Accuride provided proper training to Mr. Herrmann on the crane safety manual requirements, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride to properly train Mr. Natcher on proper crane rigging and load spotting activities**

Accuride permitted Mr. Natcher to perform the activities of a crane load rigger and/or load spotter without providing proper training to him to perform those activities. Mr. Rodgers confirmed that Accuride did not provide Berkmire truck drivers with any type of training. (Rogers email dated 6/22/17)

Had Accuride provided proper training to Mr. Natcher, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride to develop and enforce rules, regulations etc. with respect to safe crane operation**

Accuride failed to develop and enforce procedures and/or rules to prevent the incident involving Mr. Natcher. Specifically, Accuride failed to create and enforce rules to assure the crane hoist was not raised while chain slings were not cleared from objects, secured and/or visible to the operator. Accuride failed to develop rules with respect to the proper communication during crane operations and to prevent personnel access to load areas during crane movement. Accuride failed to develop and implement regarding the use of qualified riggers and/or trained spotters. Accuride failed to develop rules to assure crane and rigging equipment were properly inspected and maintained.

According to Accuride, no safety rules existed for crane rigger, spotter, user or signal person, no safety rules existed for crane and sling inspections, no safety rules were in place to prevent driver access to loading areas or to prevent them from performing rigger functions. (Defendants Responses to Plaintiffs First Request for Production of Documents)

Mr. Herrmann testified that he was never advised by Accuride that persons were not permitted on trailers when loads were being placed. He confirmed that there was no rule at Accuride that prohibited that. (Herrmann Dep. 70, 71, 93)

Mr. Herrmann understood that he was responsible for the lift. However, he further testified that he was not responsible when the driver was satisfied that the hooks were to be released.  (Herrmann Dep. 71) According to Mr. Herrmann, oOnly after the incident did Accuride implement a rule requiring loads to be secured by the driver before sling hooks were removed from the load. (Herrmann Dep. 118-119, 125)

Had Accuride developed and enforced effective safety rules, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride and Mr. Herrmann to properly inspect the crane and sling attachments according to the manufacturer requirements**

**Crane and hoist**

The 20 Ton Whiting Bridge Crane 1957 equipped with a Konecrane Hoist was placed in service in 2009. However, no in service inspection completed for this crane as was required by OSHA regulations and by Konecranes. (Defendants Responses to Plaintiffs First Request for Production of Documents)

In addition to in service inspections, annual crane inspections were required. Section 3 of the Kronecranes manual stated that if the crane is used continuously, it should be

inspected weekly and if used intermittently, it should be inspected before each use. Numerous visual, aural and measurement requirements were specified for these crane inspections. Hoist inspections were to follow the hoist manufacturer specifications. These inspections were to be performed annually by persons qualified to do so by Konecranes.

A crane inspection occurred on 5/13/15. The Safety Summary section of this inspection revealed that direction labels worn off radio transmitter and the holding brake glazed. (Accuride 000055) Following the incident, an inspection occurred on 5/4/16. This inspection indicated that preventative maintenance **was performed for the holding brake and a wire rope.** (Accuride 000059)

Monthly crane inspections were performed by an outside company (Konecranes). (Herrmann Dep. 39) However, these monthly inspections **were not** occurring monthly as required as reflected by the dates below:

- Whiting 20 Ton Crane 4/18/16…this was 3 days post incident… no findings
- Whiting 20 Ton Crane 3/24/16… no findings
- Whiting 20 Ton Crane 2/15/16… no findings
- Whiting 20 Ton Crane 1/5/16… no findings


Daily hoist inspections were also required by Konecranes for the wire rope, hoist block, hoist limit switch, and the controller function. However, no evidence or testimony proved that these inspections were occurring per the manufacturer requirements.

**Sling Inspections**

A Peerless four-legged sling with 58,000 capacity was in use for this operation. Peerless specified that sling users were to abide by the following safety information, which was to be read and followed: Always inspect hook and latch before using, Never use a latch that is distorted or bent. Always make sure spring will force the latch against the tip of the hook. Always make sure hook supports the load. Do not point load hooks–load should bear on the bowl of hook. The latch must never support the load. Latches are intended to retain loose sling of devices under slack conditions. Latches are not intended to be an anti-fouling device. Peerless also provided users a Chain Sling Safety Checklist, which stated the following:

Check #1 - Inspections. Visually examine the sling before each use. Look for stretched, gouged, bent or worn links and components, including hooks, with open throats, cracks or distortion, if damaged, remove from service.

Check #2 - Balance Know the load — determine the weight, center of gravity, angle and lift and select the proper size of sling.

Check #3 - Overload Never overload the sling — check the working load limit on the identification tag. Always consider the effect of Angle of Lift — the tension on each leg of the sling is increased as the angle of lift, from horizontal, decreases. Use the chart in the

National Safety Consultants Inc.                    {AL525234.1}18

Peerless Industrial Group, Inc. catalog or in the Peerless Chain Sling User's Manual for this purpose.

Check #4 - Knots, Twists & Kinks Make sure chain is not twisted, knotted or kinked before lifting load. Slings should not be shortened with knots, bolts or other makeshift devices.

Check #5 - Sharp Edges Protect chain with padding when lifting sharp edged loads.

Check #6 - Abrupt Movement Lift and lower loads smoothly. Do not jerk.

Check #7 - High Temperatures - Do not expose alloy chain or sling to temperatures of 400°F or higher.

Check #8 - Chain Care Store slings properly on an A-Frame and protect chain slings from corrosion during storage.

Sling inspections were conducted by Dailey Supply Inc. These inspections did not meet the requirements of OSHA or ASME. Inspections were not occurring on a monthly basis. Documents provided indicate slings were inspected on 11/17/15 and 12/19/16. From the inspection documents, it could not be determined that the Peerless chain sling used to lift the conveyor was actually inspected.

Mr. Herrmann testified that he was a crane inspector at a previous employer. (Herrmann Dep. 14) However, there was no evidence provided that Mr. Herrmann was ever trained to properly inspect the Accuride crane he was using on the day of the incident. Furthermore, no evidence or testimony suggested that Mr. Herrmann was provided with Peerless sling safety requirements for review.

Mr. Herrmann admitted in his testimony that the only thing that was inspected daily as the hook safety latch and that the hoist operates up and down. He also said he checked the upper limit function. However, nothing was documented or provided by Accuride for these inspections with respect to policies or procedures. (Herrmann Dep. 40, 41, 89) Moreover, Mr. Herrmann was not trained to perform daily crane inspections. (Herrmann Dep. 40)

Although there was no indication that the crane, hoist or chain sling was defective and contributed to the incident, the fact that the inspection requirements were ignored by Accuride was consistent with their overall ignorance of crane operation safety requirements which led to the incident which produced serious and disabling injuries caused to Mr. Natcher.

**Failure of Accuride to properly maintain the crane, hoist and sling attachments in a safe condition**

Accuride failed to have the crane properly maintain the crane hoist. According to the case record, crane hoist repairs were made on 2/5/16. On that date it was determined that the hoist was drifting and it would not hold a load resulting in a brake repair. This Expert

questions why these critical safety issues were not identified during monthly inspection conducted by Konecranes on 1/5/16.

Although there was no indication that the crane, hoist or chain sling was defective and contributed to the incident, the fact that the inspections did not identify serious issues was problematic and symptomatic of serious safety management flaws at Accuride.

**Failure of Accuride and Mr. Herrmann to properly inspect the work area**

Accuride and Mr. Herrmann did not perform pre-lift work area inspections to assure the lift could occur in the area in a safe manner. Additionally, they did not assure Mr. Natcher was in a safe area prior to commencing the lift.

Had Accuride performed a pre-lift work area inspection, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride to develop and implement effective crane signaling protocols or safety warning systems**

A proper crane signaling protocol was not established and/or utilized prior to this operation occurring. Accuride failed to have the crane properly equipped with any audible warning device. Furthermore, Accuride and Mr. Herrmann failed to alert in any manner alert Mr. Natcher about the impending movement of the crane and operated a crane without having full visual sight of chain sling hooks and Mr. Natcher and his position. To compound this issue, Mr. Natcher reported in his deposition that he never received formal crane hand signal training. (Natcher Dep. 66)

The testimony was conflicting with respect to whether hand any signals or verbal commands were used during the lifting operation. Mr. Herrmann testified that up and down hand signals were used because of the loud scrubber operation in the lift area. He testified that he could not hear the driver. (Herrmann Dep. 76-78) When Mr. Crispin was first in the area and observing the operation, he **did not hear any commands or see any hand signals** from Mr. Natcher. He testified that Mr. Natcher allegedly shook his head no and Mr. Herrmann was getting ready to pick it back up. According to Mr. Hermann, Mr. Natcher unhooked the hook **and signaled** Mr. Herrmann to go up with the chain sling. He raised the hoist and chain sling and saw the conveyor shimmy as he was on the south side. At that time, Mr. Natcher grabbed the conveyor and tried to push it back onto the trailer. (Herrmann Dep. 81-82, 86) However, according to Mr. Natcher. Mr. Herrmann raised the hoist and chains from the deck after Mr. Natcher **told him** the chains were removed. (Natcher Dep. 153) Mr. Herrmann raised the hoist 2 times prior to seeing the conveyor shimmy. (Herrmann Dep. 99) Mr. Natcher went to the area where the chains were dragging up the side of the conveyor to try to push them clear at which time the conveyor started shaking. He **called** to Mr. Herrmann to stop while trying to stabilize the conveyor and prevent it from tipping. That is when the conveyor flipped.

From the above, it is evident that there were discrepancies between whether verbal or hand signals were used. Had Accuride and Mr. Hermann established and/or utilized a proper signaling protocol or safety warnings system, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride and Mr. Herrmann to comply with OSHA regulations**

Accuride had a legal duty to comply with the requirements of the Occupational Safety and Health Act of 1970.  Additionally, they were obligated to meet industry best practices and standards for safe crane operation.

With respect to sling use, the following regulations were breached by Accuride and Mr. Herrmann.

- 1910.184(c)(9) All employees shall be kept clear of loads about to be lifted and of suspended loads.
- 1910.184(c)(12) A sling shall not be pulled from under a load when the load is resting on the sling.

With respect to sling inspections, the following regulations were breached by Accuride and Mr. Herrmann.

- 1910.184(d) Sling Inspections. Each day before being used, the sling and all fastenings and attachments shall be inspected for damage or defects by a competent person designated by the employer. Additional inspections shall be performed during sling use, where service conditions warrant. Damaged or defective slings shall be immediately removed from service.
- 1910.184(e)(1) Sling identification. Alloy steel chain slings shall have permanently affixed durable identification stating size, grade, rated capacity, and reach.
- 1910.184(e)(3)(i) In addition to the inspection required by paragraph (d) of this section, a thorough periodic inspection of alloy steel chain slings in use shall be made on a regular basis, to be determined on the basis of (A) frequency of sling use; (B) severity of service conditions; (C) nature of lifts being made; and (D) experience gained on the service life of slings used in similar circumstances. Such inspections shall in no event be at intervals greater than once every 12 months.
- 1910.184(e)(3)(ii) The employer shall make and maintain a record of the most recent month in which each alloy steel chain sling was thoroughly inspected, and shall make such record available for examination.
- 1910.184(e)(3)(iii) The thorough inspection of alloy steel chain slings shall be performed by a competent person designated by the employer, and shall include a thorough inspection for wear, defective welds, deformation and increase in length. Where such defects or deterioration is present, the sling shall be immediately removed from service.

With respect to crane inspections, the following regulations were breached by Accuride and Mr. Herrmann.

**Initial Inspection**

- 1910.179(j)(1)(i) Initial inspection. Prior to initial use, all new and altered cranes shall be inspected to insure compliance with the provisions of this section.
- 1910.179(j)(2) Frequent inspection. The following items shall be inspected for defects at intervals as defined in paragraph (j)(1)(ii) of this section or as specifically indicated, including observation during operation for any defects that might appear between regular inspections. All deficiencies such as listed shall be carefully examined and determination made as to whether they constitute a safety hazard:
- 1910.179(j)(2)(i) All functional operating mechanisms for maladjustment interfering with proper operation.

**Daily Inspections**

- 1910.179(j)(2)(ii) Deterioration or leakage in lines, tanks, valves, drain pumps, and other parts of air or hydraulic systems.
- 1910.179(j)(2)(iii) Hooks with deformation or cracks. Visual inspection daily; monthly inspection with a certification record which includes the date of inspection, the signature of the person who performed the inspection and the serial number, or other identifier, of the hook inspected. For hooks with cracks or having more than 15 percent in excess of normal throat opening or more than 10° twist from the plane of the unbent hook refer to paragraph (l)(3)(iii)(a) of this section.
- 1910.179(j)(2)(iv) Hoist chains, including end connections, for excessive wear, twist, distorted links interfering with proper function, or stretch beyond manufacturer's recommendations. Visual inspection daily; monthly inspection with a certification record which includes the date of inspection, the signature of the person who performed the inspection and an identifier of the chain, which was inspected.
- 1910.179(j)(2)(vi) All functional operating mechanisms for excessive wear of components.
- 1910.179(j)(2)(vii) Rope reeving for noncompliance with manufacturer's recommendations.

**Operational tests.**

- 1910.179(k)(1)(i) Prior to initial use all new and altered cranes shall be tested.

**Preventative Maintenance**

- 1910.179(l)(1) A preventive maintenance program based on the crane manufacturer's recommendations shall be established.

With respect to crane use, the following regulations were breached by Accuride and Mr. Herrmann.

- 1910.179(b)(8) Designated personnel - Only designated personnel shall be permitted to operate a crane covered by this section. 1910.179(a)(35) "Designated" means selected or assigned by the employer or the employer's representative as being qualified to perform specific duties. According to OSHA letter of interpretation found at the following link:

https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=INTERPRETATIO NS&p_id=22813

*"…please be advised that 29 CFR 1910.179(b)(8) requires that only **designated** personnel be permitted to operate a crane. OSHA defines **designated** at 1910.179(a)(35) as: **Selected or assigned by the employer or the employer's representative as being qualified to perform specific duties [emphasis added].** Because the term "qualified" is not itself defined, OSHA would interpret "qualified" in light of operator-qualifications provisions of industry standards such as ANSI B30.2.*

- 1910.179(n)(2)(iii) Care shall be taken to make certain that the sling clears all obstacles.
- During hoisting care shall be taken that: 1910.179(n)(3)(iii)(a) There is no sudden acceleration or deceleration of the moving load. 1910.179(n)(3)(iii)(b) The load does not contact any obstructions.
- 1910.179(n)(3)(vi) The employer shall require that the operator avoid carrying loads over people.
- 1910.179(n)(3)(vii) The operator shall test the brakes each time a load approaching the rated load is handled. The brakes shall be tested by raising the load a few inches and applying the brakes.
- 1910.179(n)(3)(xi) When starting the bridge and when the load or hook approaches near or over personnel, the warning signal shall be sounded.

Finally, under OSHA's multiemployer worksite policy, Accuride was considered a hazard creating, hazard exposing, hazard controlling and hazard correcting entity.

Had Accuride complied with the abovementioned OSHA regulations, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Failure of Accuride and Mr. Herrmann to comply with ASME standards**

The ASME B30.2-2011 Standard for Overhead and Gantry Cranes also governed the inspection, training, use and maintenance of this crane. Accuride had a duty to recognize and incorporate this standard into its operations but they failed to do. The following provisions were applicable to this situation.

SECTION I: SCOPE The ASME B30 Standard contains provisions that apply to the construction, installation, operation, inspection, testing, maintenance, and use of cranes and other lifting and material-movement related equipment.

SECTION V: EFFECTIVE DATE Existing Installations. Equipment manufactured and facilities constructed prior to the effective date of this Volume of the B30 Standard shall be subject to the inspection, testing, maintenance, and operation requirements of this Standard after the effective date.

SECTION 2-0.2: DEFINITIONS

- Appointed: assigned specific responsibilities by the employer or the employer's representative.
- Authorized: appointed by a duly constituted administrative or regulatory authority.
- Designated person: a person selected or assigned by the employer or the employer's representative as being competent to perform specific duties.
- Qualified person: a person who, by possession of a recognized degree in an applicable field or a certificate of professional standing, or who by extensive knowledge, training, and experience, has successfully demonstrated the ability to solve or resolve problems relating to the subject matter and work.
- exposed: applies to hazardous objects not guarded or isolated, and capable of being contacted inadvertently

SECTION 2-1.15: WARNING DEVICES OR MEANS FOR A CRANE WITH A POWER TRAVELING MECHANISM

- 2-1.15.2 Floor-Operated Cranes (a) A warning device should be provided for installations where the ability of the operator to warn persons in the path of the load is impaired. (b) Refer to paras. 2-3.3.4(b)(18) and 2-3.3.4(c)(17) for operation of the device.
- 2-1.16.2 Safety Personnel Personnel responsible for the supervision, installation, operation, inspection, or maintenance of the crane shall be familiar with the applicable contents of the manual furnished with the crane.

SECTION 2-2.1: INSPECTION

- 2-2.1.1 General (a) This Chapter on Inspection and Testing establishes and defines the criteria for determining whether cranes can be expected to perform as intended. (b) Five types of inspections are defined, each with the common purpose of keeping equipment performing as intended. Each inspection is directed toward a different set of circumstances. The five types of inspection are (1) initial inspection (2) functional test inspection (3) frequent inspection (4) periodic inspection (5) inspection of equipment not in regular use (c) In addition to the five types of inspection listed in para. 2-2.1.1(b), the inspection provisions found in manuals supplied by the manufacturer(s) of the crane and the crane components shall be followed. (d) All inspections shall be performed by a designated person. Any deficiencies identified shall be examined and a determination made by a qualified person as to whether they constitute a hazard and if a more detailed inspection is required.

- 2-2.1.2 Initial Inspection (a) An initial inspection is a visual and audible examination of the crane. (b) New, reinstalled, altered, repaired, and modified equipment shall be inspected prior to initial use to verify compliance with the applicable provisions of Chapter 2-1 of this Volume. (d) The cranes shall be tested in accordance with the requirements of Section 2-2.3.
- 2-2.1.4 Frequent Inspection (a) A frequent inspection is a visual and audible examination of the crane. (b) Equipment shall be inspected at intervals dependent on the use of the equipment as follows: (1) normal service — monthly
- 2-2.1.5 Periodic Inspection (a) A periodic inspection is a visual and audible examination of the crane. (b) Equipment shall be inspected at intervals dependent on the use of the equipment as follows: (1) normal service — yearly

SECTION 2-2.2: ROPE INSPECTION

- 2-2.2.1 General All inspections shall be performed by a designated person. Any deficiencies identified shall be examined and a determination made by a qualified person as to whether they constitute a hazard and if a more detailed inspection is required.
- 2-2.2.2 Frequent Rope Inspection (a) All ropes should be visually inspected at the start of each shift. These visual observations should be concerned with discovering gross damage, such as listed below, that may be a hazard.

SECTION 2-2.3: TESTING

- 2-2.3.1 Operational Tests (a) New, reinstalled, altered, repaired, and modified cranes shall be tested by a designated person prior to initial use to confirm that the crane performs in compliance with the provisions of this Volume.

SECTION 2-3.1: CRANE OPERATOR TRAINING

- 2-3.1.2 Crane Operator Training: General (a) Training shall include those items that apply to the crane and the particular application of the crane. (b) Training programs and their contents shall be based upon but not limited to (1) physical characteristics of the workplace. (2) performance characteristics and complexity of the crane. (3) type of load to be handled, such as, but not limited to the following: (a) multiple piece loads (b) raw materials (c) bulk materials (d) machine assemblies (e) hot molten materials (f) hot materials (g) fragile or durable materials (4) responsibilities of the crane operator and other persons involved in the movement of the load.

SECTION 2-3.2: TRAINING FOR PERSONS OTHER THAN CRANE OPERATORS

- 2-3.2.1 Scope. Other persons, such as, but not limited to, maintenance personnel, test personnel, and crane inspectors, when it is necessary to operate a crane in the performance of their duties, shall be trained in accordance with the training requirements of this Volume.

SECTION 2-3.3: OPERATION

- 2-3.3.1 Scope of Crane Operation The operation of overhead and gantry cranes shall be in accordance with the provisions included in this Volume, and in manuals furnished by the manufacturer of the crane as required in para. 2-1.16. The requirements of paras. 2-3.3.3(c) and (d) for certification as an operator of a crane apply to both dedicated operators, whose primary job is the operation of a crane (cab or pulpit), and no dedicated operators who use a crane (floor or remote) as another tool in performing their job. 2-3.3.2 General Requirements The following requirements shall be followed by all personnel involved with the crane operation: (i) Persons shall stay clear of a suspended load.

- 2-3.3.3 Responsibilities of Management (Owners/Users) Management (owners/users) shall (a) identify, document, and assign responsibilities of the crane operator and other persons involved in the movement of the load for each crane installation. (See paras. 2-3.3.2 and 2-3.3.4.) (b) Provide training to persons who will operate a crane. (c) Provide written and practical examinations that verify that the person has acquired the knowledge and skill to operate the particular crane(s) that will be operated by the person. The examinations shall be defined by the owner/user and in accordance with any local, state, and federal provisions that may apply. (d) Issue a certificate, or formal record, that verifies that the person has been trained and has passed the examination required in para. 2-3.3.3(c), or confirm that the person has a valid certificate or formal record that satisfies the requirements of para. 2-3.3.3(c).

- 2-3.3.4 Responsibilities of Crane Operators (a) Lifting and Moving the Load (1) Three phases of lifting and moving the load shall be addressed as follows: (a) before the lift (b) during the lift (c) after the lift (2) In most crane operations, all of the requirements listed in para. 2-3.3.4(b) are the responsibility of the operator of the crane. (3) Rigging the load, attaching the load to the crane hook, and other tasks related to moving the load are sometimes handled by persons other than the crane operator. (4) Crane operation characteristics such as, but not limited to, the type of crane, cab, floor, pulpit, or remote operated, the vantage point of the operator, and the purpose for which the crane is being used are conditions that determine whether the crane operator or another person is responsible for lift and move functions. (5) Assignment of responsibilities is determined, identified, and documented by management for each crane application. (b) Before the Lift. Crane operators shall (1) read and be familiar with the applicable provisions of crane equipment safety standards and the instructions listed in manual(s) provided with the equipment (2) be familiar with controls, instructions, and warnings located on the lifting equipment (8) perform a functional test inspection and test in accordance with the requirements of para. 2-2.1.3 (9) not remove or obscure the warning or safety labels, plates, or tags furnished on the lifting equipment (10) be familiar with and understand hand signals (see Section 2-3.6 and Fig. 2-3.6.1-1) (11) verify that the hook, bridge, and trolley travel in the same direction as shown on the controls (12) verify that the hoist rope is free from kinks or twists and is not wrapped around the load (13) attach the load to the hook or have the load attached to the hook by means of slings or other lifting devices (18) activate the warning

device, when a device is furnished (a) before starting the bridge or trolley motion of the crane (b) intermittently during travel of the crane when approaching persons in the path of the load (c) During the Lift. Crane operators shall (1) respond to signals from the person directing the lift or a designated signalperson. (2) Be responsible for the lift when a signalperson is not used. (3) Obey any stop signal regardless of who gives it. (a) The operator shall verify the weight of the total load if there is a question whether the total load to be lifted exceeds the rated load of the crane and/or hoist(s). (8) Minimize swinging of the load or load hook. (12) Verify that the load and rigging are free to move and will clear all obstructions. (15) Avoid carrying loads over people. (16) Concentrate on operating the crane and shall not allow attention to be diverted while operating the crane. (17) activate the warning device, when a device is furnished (a) before starting the bridge or trolley motion of the crane (b) intermittently during travel of the crane when approaching persons in the path of the load

SECTION 2-3.6: SIGNALS

- 2-3.6.1 Standard Signals (a) Signals to the operator shall be in accordance with this Volume, unless voice communication (telephone, radio, or equivalent) is utilized. (b) Signals should be discernible or audible to the operator. (c) Hand signals shall be posted conspicuously and should be as illustrated in Fig. 2-3.6.1-1.

Had Accuride complied with the abovementioned ASME regulations, the incident along with serious and disabling injuries caused to Mr. Natcher would have been prevented.

**Concluding Opinion**

The following opinion is based on:

- ✓ Being formally educated by a nationally accredited university in Safety Sciences,
- ✓ Serving as a distinguished Past National President of the American Society of Safety Engineers,
- ✓ Being a Certified Safety Professional (CSP) certified by the Board of Certified Safety Professionals,
- ✓ Serving as distinguished Past National President and Chief Executive Officer of the Board of Certified Safety Professionals,
- ✓ Directing and Managing Safety and Health Programs for Fortune 100 Manufacturing and Utility Corporations for nearly 20 years,
- ✓ Directing the State of Pennsylvania's Consultation Program for the Federal Occupational Safety and Health Administration,
- ✓ Reviewing and approving over 750 workplace OSHA inspections annually conducted by PA OSHA consultants many of which utilize overhead cranes,
- ✓ Personally conducting over 800 OSHA workplace inspections, and providing assistance and consultation compliance with OSHA regulations and National Consensus Standards to business, many of which utilize overhead cranes,

✓ Serving as an Adjunct Professor for 2 nationally accredited safety and health degree programs including Indiana University of Pennsylvania and Millersville University of Pennsylvania,

✓ Serving on the national faculty for the American Society of Safety Engineers,

✓ Being a past certified instructor for the Occupational Safety and Health Administration,

✓ Speaking, writing and providing expertise internationally on the attainment of safety and health performance excellence and

✓ Being recognized as a Fellow, the highest honor in the safety and health profession.

This opinion is also based on the information that was provided and reviewed as of this date and is offered with a reasonable degree of professional certainty. I reserve the right to change my opinion if new or additional information becomes available at a future time.

Accuride Corporation had actual and constructive knowledge of the unsafe, dangerous, and/or otherwise hazardous operation of the crane. Accuride Corporation knew or should have known through the exercise of reasonable care that the unsafe, dangerous, and/or otherwise hazardous operation of cranes on its premises could cause a serious injury. Accuride had a duty of reasonable care to provide safe premises to Mr. Natcher as a business invitee. Accuride did not do so and was reckless in its conduct while intentionally disregarding or acting in plain indifference to the safety of Mr. Natcher. Accuride breached its duty of reasonable care to Mr. Natcher. The incident and its injurious outcomes were clearly foreseeable. As a direct and proximate result of the incident, Mr. Natcher suffered serious and disabling injuries.

The conveyor load was stable after being loaded onto the flatbed trailer. It became unstable and fell from the flatbed trailer due to the actions of Mr. Hermann while operating the crane. Mr. This incident occurred because Accuride and/or their agents Mr. Herrmann and Mr. Crispin failed to:

1. provide a qualified crane rigger and spotter for a dangerous crane lift operation,
2. assure the crane sling was removed from the conveyor area and properly secured before lifting the hoist,
3. operate the crane in a safe manner,
4. properly supervise crane operations,
5. properly warn Mr. Natcher of impending hazardous conditions and unsafe actions,
6. properly train Mr. Herrmann on crane operation, load rigging and load spotting activities,
7. properly train Mr. Herrmann on the crane hoist safety manual requirements,
8. properly train Mr. Natcher on proper crane rigging and load spotting activities,
9. develop and enforce rules, regulations etc. with respect to safe crane operation,
10. properly inspect the crane and sling attachments according to the manufacturer requirements,
11. properly maintain the crane, hoist and sling attachments in a safe condition
12. properly inspect the work area,

13. develop and implement effective crane signaling protocols or safety warning systems,
14. comply with OSHA regulations
15. comply with ASME standards

The collection of the above failures represents a colossal failure on the part of Accuride to implement an effective safety management system. Although Mr. Herrmann was identified as a contributor to these failures, he was merely a product or Accuride's negligence.

The Accuride Answers provided were inaccurate. They admitted that Mr. Herrmann began raising the chains after Mr. Natcher had unhooked them. Accuride believed the hooks and chains were adequately cleared from the equipment when Mr. Herrmann began raising the chains, and neither the chains nor the hooks became entangled in or with any part of the equipment. As the testimony and evidence revealed, this position was not true.

Additionally, the "interview and statements" made by Mr. Herrmann and Mr. Crispin during an investigation conducted by Accuride also lacked credibility. These interviews and statements were not recorded or written statements but were apparently transcribed by Mr. Maleski from Accuride. Accordingly, Mr. Crispin testified that he did not prepare Accuride 00009-000011 documents. Furthermore, he stated that he was never asked to review the documents for accuracy. His "statement and interview" indicated that he witnessed the incident when he turned the corner to enter Building 22. However, Mr. Crispin noted in his testimony that he was already at the trailer location when the incident occurred. Furthermore, Mr. Crispin's "statements and interview" did not discuss the positions of the chain slings as he witnessed him, and the important fact that he heard the chain sling contacting the conveyor when it was being raised. Furthermore, the statement and interview of Mr. Crispin did not discuss crane signal or verbal commands. Mr. Herrmann Accuride reported information was equally inaccurate.

Mr. Herrmann testified that he too was never asked to write a statement. (Herrmann Dep. 111-113) Mr. Herrmann testified that he did not recall seeing the notes written by Mr. Maleski or verify them for accuracy. He noted that he played no role in preparing post incident documents but did not disagree with its contents. (Herrmann Dep. 117) (Exhibit 7) However, the "interview and statement" said that on the day of the incident, Mr. Herrmann raised the chains above the conveyor and the chains were hanging above the conveyor when the conveyor began to tip. This was not accurate as Mr. Herrmann testified that they had not cleared the conveyor when the incident occurred. (Herrmann Dep. 125, 126) Mr. Herrmann testified that the he did not see the hooks clear the conveyor. (Herrmann Dep. 126) Mr. Herrmann testified that he assumed the hook got caught as the hoist was being raised. (Herrmann Dep. 100) This in addition, was left out of the statement and interview prepared by Mr. Maleski.

Critical testimony was when Mr. Herrmann testified that if he were removing the sling hooks, he would control them while they were being raised. He testified that if he was the

one that was unhooking the chains before the crane was raised, he would make sure all the chains were together and at least in one area so you could see all the hooks. He testified though that did not know him that well and only met him that day. Unfortunately, he never asked the driver to do that before he raised the crane hoist as he assumed he knew. (Herrmann Dep. 83, 85) This incident was not caused by an unstable load. It was caused by Mr. Herrmann raising the four-legged sling in an unsafe manner as it was contacting the conveyor. Prior to raising the hoist, Mr. Herrmann testified that he could not see the location of the chain sling hooks. He could only see a portion of the chains. (Herrmann Dep 82) He testified that he raised the hoist and chain sling and saw the conveyor shimmy as he was on the south side. (Herrmann Dep. 81-82, 86) Mr. Herrmann noted in his deposition that he had personally seen hooks and chains get caught previously causing the load to wobble. (Herrmann Dep. 100-102)

Further critical evidence was that fact that both Mr. Hermann and Mr. Natcher were consistent in advising the OSHA compliance safety and health officer during interviews that that the hook may have caught on the conveyor or become snagged as it the sling was being raised by Mr. Herrmann.

In retrospect, Mr. Herrmann testified said that he should have personally observed the position of all hooks before raising the hoist. (Herrmann Dep. 100) He was correct and if he had done so, the incident would not have occurred.

Mr. Natcher testified that Mr. Herrmann should have moved the crane in a southerly direction to stop the chains from touching the conveyor as the chains were being hoisted, but he did not do so. (Natcher Dep. 174) The crane operator should have stopped the lift hoist or moved the trolley south to prevent the chains from making contact with the conveyor but did not do so.  (Natcher Dep. 192) Had Mr. Herrmann don as Mr. Natcher opined, the incident would have able been prevented.

Although cribbing had no contribution to the incident occurrence, Mr. Herrmann testified that did not have any discussion about the placement of the cribbing with Mr. Natcher. He noted that he had concerns about the use of the cribbing as it could make the load unstable. Nevertheless, he did not make those concerns known to Mr. Natcher at any point. Mr. Herrmann testified that he was always told that it was the driver's responsibility to set the load, as they desired which he disagreed with. (Herrmann Dep. 54, 71-75)

Mr. Natcher did not assume the risk of the task of loading a conveyor on the flatbed trailer. Nor, did any negligence on the part of Mr. Natcher contribute to the fall of the conveyor from the trailer.

Finally, Mr. Herrmann testified that he was responsible for the lift. However, he further testified that he was not responsible when the driver was satisfied that the hooks were to be released.  (Herrmann Dep. 71) Unfortunately, he was inaccurate in his understanding of what constituted a lift. From this Expert's perspective, a lift included all crane operations including lifting the hoist and chain slings was after the load was set. To further underscore that Accuride was responsible was the fact that because of the incident,

Accuride implemented a rule requiring loads to be secured by the driver before sling hooks were removed from the load. (Herrmann Dep. 118-119, 125) Had Accuride implemented this rule prior to the incident, the load would not have tipped by the unsafe actions of Mr. Hermann.

Respectfully submitted,

Samuel J. Gualardo C.S.P.

Date:  12/21/17