IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID W. NATCHER, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:16-cv-219-BJR |
| | ) | |
| ACCURIDE CORPORATION, | ) | |
| Defendant | ) | ELECTRONICALLY FILED |

**DEFENDANT'S REPLY BRIEF IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

Defendant Accuride Corporation, by its attorneys, MacDonald, Illig, Jones & Britton LLP,

files this Reply Brief in Support of Motion for Summary Judgment, and states as follows:

**I.      Arguments In Reply**

**A.      Plaintiff Should Not Be Permitted To Manufacture A Factual Dispute By
Disavowing His Own Testimony Regarding The Accident**

Throughout his Brief, Mr. Natcher argues that, because he and Mr. Herrmann testified

differently regarding certain events immediately preceding the accident, genuine issues of fact

exist precluding summary judgment.  In effect, Mr. Natcher is picking and choosing testimony,

including testimony that contradicts his own, to assemble a more favorable version of events which

he then argues creates questions of fact for a jury.  This tactic should not be allowed.

In considering a motion for summary judgment, it is well established that the court must

accept the non-movant's version of the facts as true.  *See, e.g., Conley v. Ethex Corp.*, 2012 U.S.

Dist. LEXIS 1497, at *6 (W.D. Pa. Jan. 2, 2012) (citing *Matsushita Elec. Indus. Co. Ltd. v. Zenith

Radio Corp.*, 475 U.S. 574, 587 (1986) and *Big Apple BMW, Inc. v. BMW of North America, Inc.*,

974 F.2d 1358, 1363 (3d Cir. 1992)).  The issue presented here is whether Mr. Natcher should be permitted to ignore or reject his own testimony regarding events immediately preceding the accident and rely upon potentially contradictory testimony of other witnesses (primarily Mr. Herrmann) in an effort to manufacture factual disputes to avoid summary judgment..

The Eleventh Circuit decisively holds that, when rendering a decision on summary judgment, the court should accept the non-movant's version of the events.  *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005).  Specifically, the Eleventh Circuit has stated:

> When the nonmovant has testified to events [the court] does not (as urged by Plaintiffs' counsel) pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that [the court] deem[s] most helpful to the nonmovant.  Instead, when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version*.  [The court's] duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part:  the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided.

*Id.* (emphasis in original).  Similarly, the Eighth Circuit has held that a plaintiff may not avoid summary judgment by proffering testimony from another person that contradicts the plaintiff's own testimony.  *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995).  District Courts outside this jurisdiction agree, writing,"when a plaintiff stakes himself to a version of the facts in his sworn deposition testimony, he cannot create a genuine issue of material fact by pointing to other evidence that contradicts his testimony, effectively asking the district court to disregard his own version of the facts." *Main v. Rio Tinto Alcan, Inc.*, 2016 U.S. Dist. LEXIS 20280, at *17-18 (W.D. Ky. Feb. 19, 2016) (internal citations omitted); *see also Vigor v. City of Saraland*, 2008 U.S. Dist. LEXIS 100602, *2 n. 8 (S.D. Ala. Dec. 11, 2008) ("[A] plaintiff cannot avoid summary judgment by stitching together a narrative account that rejects his own testimony in favor of some other

contradictory bit of evidence."); *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 346 (S.D.N.Y. 2005) (quoting *Evans*).

In full candor, the Middle District of Pennsylvania declined to follow *Evans* and *Prosser*. *Velazquez v. ES3 York, LLC*, 2015 U.S. Dist. LEXIS 149141, at *40 (M.D. Pa. Nov. 4, 2015). However, *Velazquez* is distinguishable from *Evans, Prosser* and the present case. In *Velazquez*, the testimony from another witness supplemented but did not contradict the plaintiff's own testimony. *See Id.* at *40-41. Specifically, the plaintiff could only recall three ways in which the defendant allegedly mistreated him whereas another witness added additional comments that reflected a discriminatory animus. *Id.* at *39-40. In the present case, Mr. Natcher does not look to Mr. Herrmann to supplement his testimony but to contradict it.

Counsel has been unable to locate any Third Circuit decision accepting or rejecting this reasoning. However, in *Fennell v. Hale*, Magistrate Judge Pesto of the Western District of Pennsylvania rejected the plaintiff's effort to "tailor his story," citing *Prosser* favorably for the proposition that the Court is not required to "prune a witness's testimony so as to create a triable issue when the witness flatly contradicts himself in other parts of his testimony." *Fennell v. Hale*, 2016 U.S. Dist. LEXIS 78246, at *8-9 (W.D. Pa. June 14, 2016) (holding plaintiff's explanation of his claims evolved over a three year period and finding the alleged factual issue in dispute a "sham").

Accordingly, Accuride urges the Court to adopt the reasoning of the Eighth and Eleventh Circuits, which is consistent with the Third Circuit's summary judgment standard of crediting the non-movant's version of the events. Mr. Natcher should not be able to avoid summary judgment by disavowing his own, sworn deposition testimony which mandates that result.

**B.      Even If Plaintiff Is Permitted To Ignore His Own Testimony, Summary Judgment Still Is Warranted Under Either Version Of The Accident**

As stated, Mr. Natcher should not be permitted to cobble together a version of the accident by rejecting his own testimony in favor of what he believes to be more favorable testimony of Mr. Herrmann.   However, even if this tactic is permitted, there remain critical, material facts (particularly concerning Mr. Natcher's awareness of risks) over which there is no genuine dispute that compel the grant of summary judgment in favor of Accuride when these undisputed facts are applied to the legal determination that Accuride owed no duty to Mr. Natcher under the circumstances.

**1.      Undisputed Events Prior To Accident**

The following material facts prior to the incident are undisputed, or at least are not genuinely in dispute:

- Mr. Natcher has extensive experience as a local or over-the-road truck driver for many years and, immediately prior to the accident, as primarily a local truck driver for Birkmire Trucking.  (Pl. Resp. to DSMF No. 12-16).

- Mr. Natcher has extensive on-the-job experience working with crane operators, rigging cargo to be loaded or unloaded, and has worked with overhead crane operators at locations other than Accuride.  (Pl. Resp. to DSMF No. 19-21).

- Whether Mr. Natcher and Mr. Herrmann were able to communicate verbally or only by shouting or hand signals, neither gentleman testified that they were unable to communicate.  (Pl. Resp. to DSMF No. 56-57, 89, 90).

- Upon his arrival at Accuride on the morning of the accident, Mr. Natcher assisted Mr. Herrmann with rigging the conveyor to be loaded, in other words attaching the crane chains and hooks to the attachment points on the conveyor.  (Pl. Resp. DSMF No. 52-55).

- According to Mr. Natcher's own testimony, loading the conveyor on the trailer is "second nature," he and Mr. Herrmann know what each other is going to do, and

loading the conveyor on the trailer required teamwork.  (Pl. Resp. DSMF No. 58-59).

- Although his expert will disagree, both Mr. Natcher and Mr. Herrmann understood on the day of the accident that Mr. Herrmann's primary responsibility was to operate the controls of the crane and lift and place the load.  (Pl. Resp. DSMF No. 60; Natcher Depo., p. 110-111; Herrmann Depo., p. 71).

- Although his expert will disagree, as an experienced truck driver, Mr. Natcher understood that he was responsible for securing the conveyor for transport, including where to position the conveyor on the trailer, and how it would be strapped down for transport.  (Pl. Resp. DSMF No. 62-63).

- Mr. Natcher climbed onto the trailer as the conveyor was being lifted.  (Pl. Resp. DSMF No. 67-68).

- Although his expert will disagree, Mr. Natcher's own testimony is that he is not critical of Accuride that he was allowed to climb on the trailer, it is "just a daily routine of loading or unloading trailers," and he personally did not consider it to be dangerous to be up on the trailer while cargo is being moved by a crane.  (Pl. Resp. DSMF No. 67-70).

- Mr. Natcher determined whether the legs or the belly of the conveyor would be toward the front of the trailer when loaded, and it was his decision alone to set the conveyor on wooden cribbing supplied by Birkmire rather than directly on the trailer deck.  (Pl. Resp. DSMF No. 71-72, 75-76).

- Although plaintiff's expert disagrees that Mr. Natcher should have been on the trailer, Mr. Natcher placed cribbing where he wanted it and directed and guided Mr. Herrmann as he operated the crane to set the conveyor on the cribbing, and Mr. Herrmann followed Mr. Natcher's instructions because, as Mr. Natcher testified, "he has to."  (Pl. Resp. DSMF No. 83-84; Natcher Depo., p. 140).

- Once the conveyor was set on the cribbing to Mr. Natcher's satisfaction, Mr. Natcher directed Mr. Herrmann to lower the chains enough to give some slack so that Mr. Natcher could unhook the chains.  (Pl. Resp. DSMF No. 86).

- After the conveyor was set on the trailer, Mr. Natcher detached each of the four hooks from the conveyor.  (Pl. Resp. DSMF No. 92-93).

- Mr. Natcher, not Mr. Herrmann, decided where Mr. Natcher would place each chain and hook as it was detached.  (Pl. Resp. DSMF No. 96).

- After all four hooks were detached, Mr. Natcher communicated to Mr. Herrmann to take up (raise) the chains.  (Pl. Resp. DSMF No. 98, 103).

- Mr. Herrmann did not begin to raise the chains unexpectedly, before Mr. Natcher was ready, or before Mr. Natcher had communicated to Mr. Herrmann that he should do so.  (Pl. Resp. DSMF No. 103-104).

### 2.    Different Recollections Of Events Immediately Preceding Accident

The differing recollections of Mr. Natcher and Mr. Herrmann begin with Mr. Natcher directing Mr. Herrmann to take up the chains, what Mr. Natcher did with the chains as he detached them and what occurred after all four hooks had been detached.  The different recollections, however, do not impact Mr. Natcher's awareness or state of mind, nor do these differences create a duty on the part of Accuride to Mr. Natcher under the principles of a landowner's duty to an invitee or to an independent contractor, as discussed in Accuride's Main Brief and subsequently in this Reply Brief.  The different recollections are summarized as follows:[1]

Mr. Natcher:  He unhooked each chain one by one and placed them on top of the conveyor deck beneath the crane hoist.  While standing on the north side beside where he had piled the chains, Mr. Natcher communicated to Mr. Herrmann to take up the chains, which he began to do. Mr. Herrmann did not begin to lift the chains before Mr. Natcher was ready or before Mr. Natcher told him to.  Mr. Natcher then walked to the front of the trailer to the spot marked "N-3" on Natcher Deposition Exhibit 4.  While standing at N-3, Mr. Natcher observed all four chains and hooks slide off the conveyor deck on the south side, and he heard them strike the aluminum trailer deck.  At that point, Mr. Natcher did not communicate to Mr. Herrmann to stop raising the chains; instead, he returned to N-4 across from where the chains had fallen off the deck intending to push the

---

[1] Plaintiff also points to differing testimony concerning the noise level in the loading area and the parties' ability to communicate.  Mr. Natcher testified that he and Mr. Herrmann could communicate verbally.  Mr. Herrmann testified that it was noisy and any verbal communication would require shouting, so he and Mr. Natcher communicated by hand signals or a combination of hand signals and verbal commands.  Either way, this difference is not material, because neither individual testified that there was a failure of communication. (Pl. Resp. DSMF No. 56-57, 103-104).

chains away from the side of the conveyor.  Before he could reach across to the chains, the conveyor shook.  He yelled, "whoa, whoa, whoa" for Mr. Herrmann to stop raising the chains, and tried to hold or steady the conveyor, but he was unable and the conveyor tipped over toward the north, in Mr. Natcher's direction.  Mr. Natcher does not know one way or another whether Mr. Herrmann stopped raising the chains immediately upon Mr. Natcher's shouting "who, who, who."

Mr. Herrmann:  As Mr. Natcher unhooked each chain, he put them on the north side of the conveyor.  Once all four chains were detached, Mr. Natcher communicated to Mr. Herrmann to raise the chains.  At this point, Mr. Natcher was standing on the north side of the conveyor where the chains were hanging down from the hoist, and Mr. Natcher may have had one hook in his hand.  Upon receiving the signal to raise the chain, Mr. Herrmann toggled the control once or twice to raise the chains.  As he did, Mr. Herrmann saw the conveyor shimmy.  He immediately stopped raising the chains and yelled to Mr. Natcher to get out of the way, but the conveyor tipped to the north toward Mr. Natcher.

### 3.    Mr. Natcher's Testimony Regarding The Actions And Subjective Awareness

In his Brief, Mr. Natcher correctly points out that he and Mr. Herrmann have different recollections of their observations and actions in the moments immediately preceding the accident.  But only Mr. Natcher is able to testify concerning what he knew, why he did what he claims to have done, and his state of mind regarding the dangers and risks associated with his actions.  Neither Mr. Herrmann nor Mr. Crispin can dispute or contradict Mr. Natcher's testimony on these issues.

Mr. Natcher gave the following testimony -- which is not disputed by Mr. Herrmann or any other witness -- concerning his state of mind at the time of the accident:

- Mr. Natcher moved from N-4 to N-3 after directing Mr. Herrmann to raise the chains because it was "the safe spot to stand." (Pl. Resp. DSMF No. 101-102; Natcher Depo., p. 157-157; Natcher Depo. Ex. 4).

- In his own words and without any prompting by defense counsel, Mr. Natcher described the location toward the front of the trailer by the curtain which he labeled in his handwriting "N-3" on Deposition Exhibit 4 as "the safe spot to stand." (Pl. Resp. DSMF No. 101-102; Natcher Depo., p. 155-157; Natcher Depo. Ex. 4).

  > Q:    Why did you move to N-3?
  >
  > A:    Because that was the safe spot to stand.  That's just what you do in -- with an overhead crane.  You just -- as far as safety goes.  And, you know, you're out of the way of the hoist and stuff like that.  You stand off to the side.

- The location Mr. Natcher labeled on Exhibit 4 as N-3 and which he described as a "safe spot" is at the front of the trailer at the edge of the curtain.  (Natcher Depo., p. 154-157; Natcher Depo. Ex. 4).

- According to Exhibit 4 drawn by Mr. Natcher, had he been standing at N-3 at the time the conveyor tipped over as it did, Mr. Natcher would have been out of the way.  (Natcher Depo., p. 154-157).

- According to Mr. Natcher, while standing at N-3 he observed the chains slide off the conveyor deck to the south.  He left the safe spot N-3 to "try and get the chains away from the side of the machine, because they were dragging up the side of the machine."  (Pl. Resp. DSMF No. 105-106, 111; Natcher Depo. p. 159-160).

- Mr. Natcher testified that "I knew it was not a good thing for [the chains] to be dragging up the side of the machine."  (Pl. Resp. DSMF No. 109; Natcher Depo., p. 161).

- Mr. Natcher's testimony is unequivocal that the reason he knew it was "not a good thing" for the chains to drag up the side of the machine was that a chain or hook could get caught on the conveyor and tip it over:

  > Q:    And so your effort was going to be to --
  >
  > A:    Push --
  >
  > Q.    -- reach over --
  >
  > A.    And push the chains away from the machine, because I knew it was not a good thing for them to be dragging up the side of the machine.
  >
  > Q.    Why did you know it was not a good thing for them to be dragging up the side of the machine?

A.    Just it shouldn't be -- they shouldn't be dragging up the side of the machine.

Q.    Well, were you concerned that if they dragged up the side of the machine, they could tip the machine over?

A.    I was -- that was in the back of my mind, but that's -- I was just trying to get them away from the machine.

Q.    But one of the things that would make it improper or not desirable for the chains to be dragging up the side of the machine, they might scratch the machine.  They might get caught on something.  Right?

A.    Yes.

Q.    Okay.

A.    I don't think I was so worried about them scratching the machine, but --

Q.    You were worried about them maybe getting caught or --

A.    Getting caught and flipping the machine --

Q.    Sure.

A.    -- off the trailer.

(Pl. Resp. DSMF No. 110; Natcher Depo., p. 161-162).

- According to his own testimony, Mr. Natcher was "worried" [defense counsel's word] about the chains "getting caught and flipping the machine -- off the trailer." (Pl. Resp. DSMF No. 110; Natcher Depo., p. 161-162).

- Mr. Natcher agreed with defense counsel's statement that he left a "zone of safety" (N-3) into "an area where you were now in danger:"

Q.    They were being dragged up the south side.

A.    Okay.

Q.    But you went to the north side.

A.    Yes.

Q.    If the chains were being lifted and caught on something, wouldn't it stand to reason that the unit would tip to the north?

A.    Yes.

Q.    Yet you left N-3 and went to N-4, which is the north side, in the direction that the conveyor could have tipped if the chains got caught.

A.     Yes.

Q.     So you were in a zone of safety?  Didn't you call it something like that --

A.     Yes.

Q.     -- at N-3?  And then you saw the problem.  I.e., the chains slipping off. Right?

A.     Yes.

Q.     You left that zone of safety into an area where you were now in danger. Is that a fair statement?

A.     Yes.

(Pl. Resp. DSMF No. 114; Natcher Depo., p. 162-163).

Based upon this testimony, there is no genuine issue of fact that Mr. Natcher understood that:  (1) chains and/or hooks coming in contact with the side of the conveyor as they were being lifted created a risk that a chain or hook could catch on the conveyor and flip it; (2) a location at the front of the trailer by the curtain, which Mr. Natcher designated N-3, was what he described as a "safe spot;" (3) Mr. Natcher walked to the safe spot because he wanted to be away from the crane when the hoist was lifting the chains; (4) Mr. Natcher moved from the "safe spot" to N-4 because he was "worried" that the chains or hooks could catch and tip the conveyor; and (5) Mr. Natcher was subjectively aware that in terms of his location on the trailer as the chains were being raised, there was a "safe spot" or "zone of safety" and there was "an area where [he was] now in danger."  Thus, although it is disingenuous for Mr. Natcher to suggest that his own testimony regarding his actions should be disregarded, even if reasonable minds could differ on what he did or did not do, reasonable minds cannot differ on what Mr. Natcher testified was his state of mind and his awareness of risks.

- 10 -

**C.    To State A Cause Of Action In Negligence, Plaintiff First Must Establish That He Was Owed A Duty**

**1.    Existence Of Duty Is A Question Of Law**

"Generally, to state a cause of action for negligence, a plaintiff must allege facts which establish the breach of a legally recognized duty or obligation of the defendant that is causally connected to actual damages suffered by the plaintiff." *Morello v. Kenco Toyota Lift,* 142 F.Supp. 3d 378, 382 (E.D.Pa. 2015). The threshold question in this and any other negligence action is whether the defendant owed a duty of care to Mr. Natcher under the circumstances. *R.W. v. Manzek*, 888 A.2d 740, 746 (Pa. 2005). A duty may arise from common law, statute or contract. *Morello*, 142 F.Supp. 3d at 382. "The existence of a duty is a question of law for the court to decide." *Manzek*, 888 A.2d at 746.

**2.    Plaintiff Cannot Rely Upon Expert Testimony To Establish Duty**

Mr. Natcher devotes a substantial portion of his Brief to the testimony and opinions of his expert witness, Samuel Gualardo. (Pl. Brief, p. 28-36). In particular, he refers to Mr. Gualardo's testimony concerning OSHA guidelines, general safety principles, safety training, safety best practices, safety culture and "essentially all aspects of safety in the workplace." (Pl. Brief, p. 31). Mr. Natcher then includes a summary of Gualardo's deposition testimony spanning three and one-half pages "as to what should have occurred at Accuride at a corporate level" in an effort to establish that Accuride owed a duty to Mr. Natcher at the corporate or institutional level to provide a safe workplace where Mr. Natcher "would not encounter the risk of harm that he faced on the day of the incident." (Pl. Brief, p. 30, 32-35)

It is well-settled that, while OSHA regulations and other industry standards may be relevant evidence of the standard of care the violation of which may be evidence of negligence, industry standards are not evidence of the existence of a duty.

> Although industry standards are admissible evidence in negligence cases, they do not have a bearing on the issue of whether a duty was owed; rather, industry standards are admissible on the issue of the standard of care. *Norton v. Ry. Exp. Agency, Inc.*, 412 F.2d 112, 114 (3d Cir. 1969). *Industry standards cannot be used to create a duty when none would otherwise be owed.* [citation omitted].

*Morello*, 142 F.Supp. 3d at 383 (Emphasis in original).

Further, it is clear that an expert witness cannot testify as to the governing law of the case or otherwise render an opinion on a question of law. *Nertavich*, 100 A.2d at 243 (holding that experts improperly opined on the primary question as to whether or not the defendant owed a duty to plaintiff). *See also, Dyvex Industries, Inc. v. Agilex Flavors & Fragrances, Inc.*, 2018 U.S. Dist. LEXIS 32752 *19, 24 (No. 12-cv-0979, M.D.Pa. Feb. 28, 2018).  Thus, it is not appropriate for an expert witness to utilize industry standards to opine that a defendant owed a duty to the plaintiff.  *See Nertavich v. PPL Elec. Utilities*, 100 A.3d 221, 243 (Pa.Super. 2014), *aff'd* 124 A.3d 734 (Pa. 2015).

### D.    Accuride Owed No Duty To Mr. Natcher As An Independent Contractor Or As A Business Invitee

In Pennsylvania, employees of independent contractors working on, or in control of, premises owned by another are considered business invitees. *LeFlar v. Gulf Creek Industrial Park No. 2*, 515 A.2d 875, 880 (Pa. 1986); *Warnick v. Home Depot U.S.A., Inc.*, 516 F.Supp. 2d 459, 466 (E.D.Pa. 2007).  Because the legal principles governing a landowner's duty toward a business

invitee and an independent contractor are similar, the discussion here will focus on Accuride's

obligations toward Mr. Natcher in his capacity as a business invitee.[2]

### 1.    Assumption Of Risk As Counterpart To Accuride's Lack Of Duty To Protect Against Risk

In Pennsylvania, "a possessor of land is not liable to his invitees for physical harm caused

to them by any activity or condition on the land whose danger is known or obvious to them, unless

---

[2] A landowner owes no duty to a contractor if the contractor is in the same position as the landowner to discover the dangerous condition. *Warnick v. The Home Depot U.S.A., Inc.*, 516 F. Supp. 2d 459, 466 (E.D.Pa. 2007) (citing *Colloi v. Phila. Elec. Co.*, 481 A.2d 616, 620 (Pa. Super. 1984)). In *Warnick*, the court declined to find a duty owed to plaintiff as a business invitee since the condition that caused plaintiff's injury, an unsecured board on the ceiling, was at least as obvious to plaintiff as it was to defendant's employees. *Id.*

Landowners have no duty to warn independent contractors or its employees of dangers that are at least as obvious to the contractor and its employees as they are to the landowner. *Figured v. Carrizo (Marcellus), LLC*, 2017 U.S. Dist. LEXIS 202254, *15 (M.D. Pa. Dec. 8, 2017) citing *Beil v. Telesis Construction, Inc.*, 11 A.3d 456, 460 (Pa. 2011). In fact, the Supreme Court of Pennsylvania has found in favor of landowners in situations where both the landowner and the contractor had roughly equal knowledge of the relevant danger or risk. *Farabaugh v. Pa. Tpk. Comm'n*, 911 A.2d 1254, 1273 (Pa. 2006); *see also Figured*, 2017 U.S. Dist. LEXIS 202254 at *15. Therefore, a landowner is only under a duty to warn an independent contractor or its employees of a danger not reasonably known to the contractor. *Farabaugh*, 911 A.2d at 1273.

Mr. Natcher argues that Accuride is liable under the retained control exception. *Beil,* 11 A.3d at 460, 466-467. While Accuride owned and ultimately maintained control of its facility -- including the crane, Accuride did not control Mr. Natcher in such a way that he was not entirely free do to the work in his own way. In fact, the record reflects the opposite. As the truck driver, Mr. Natcher's responsibility was to secure the load and determine *how* to secure it for transport. In doing so, Mr. Natcher decided to put the conveyor on cribbing rather than directly on the aluminum deck. Mr. Herrmann followed Mr. Natcher's instructions as the conveyor was positioned on the cribbing because "he has to." During this process, Mr. Natcher elected to climb aboard the trailer, and he determined his own movements about the trailer as he directed the positioning of the conveyor and as he detached the chains. Mr. Natcher elected not to temporarily brace or secure the conveyor before detaching it from the crane. Under both Mr. Natcher's and Mr. Herrmann's version, Mr. Natcher unhooked the chains and decided where to put them -- whether on top of the conveyor deck or draped over the north side. Under both versions of events, it was Mr. Natcher who communicated to Mr. Herrmann when to raise the chains. Under both versions, it was Mr. Natcher's decision where to stand as Mr. Herrmann raised the chains. Under Mr. Natcher's recollection of events, when the chains slid off the conveyor, it was Mr. Natcher who voluntarily left his safe spot to push the chains away from the conveyor to protect against the possibility that the chains could cause the conveyor to tip.

The facts that Mr. Natcher cites refer only to the operation of the premises generally, whereas the aforesaid facts show that Mr. Natcher was primarily in control of the loading operation, including to secure the conveyor for transport before and during the time his injury occurred. Simply put, Accuride contracted Birkmire to transport the conveyor, and Mr. Natcher directed the loading and securement of the conveyor *in his own way*. There is no evidence that Accuride retained or exercised any control over the manner of the loading or the operational details of the loading, which was the proximate cause of Mr. Natcher's injuries. Therefore, Accuride cannot be liable under the retained control exception.

the possessor should anticipate the harm despite such knowledge or obviousness." *Restatement (Second) of Torts* §343A.  Specifically, a possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he (a) knows or by the exercise of reasonable care would discover the condition and should realize that it involves an unreasonable risk of harm to such invitees, (b) should expect that the invitees will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger.  *See Carrender v. Fitterer*, 469 A.2d 120, 123 (Pa. 1983) (adopting *Rest*. § 343).  Additionally, "a possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness." *Id*. (quoting *Rest*. § 343A).

The Pennsylvania Supreme Court has ruled that an assumption of risk analysis is simply a counterpart to a duty analysis.  *See Carrender v. Fitterer,* 469 A.2d 120, 124 (Pa. 1983)(assumption of the risk operates merely as a corollary of the absence of a duty).  As the *Carrender* Court explained:

> Appellee misperceives the relationship between the assumption-of-risk doctrine and the rule that a possessor of land is not liable to his invitees for obvious dangers.  When an invitee enters business premises, discovers dangerous conditions which are both obvious and avoidable, and nevertheless proceeds voluntarily to encounter them, the doctrine of assumption of risk operates merely as a counterpart to the possessor's lack of duty to protect the invitee from those risks.  By voluntarily proceeding to encounter a known or obvious danger, the invitee is deemed to have agreed to accept the risk and to undertake to look out for himself.  It is precisely because the invitee assumes the risk of injury from obvious and avoidable dangers that the possessor owes the invitee no duty to take measures to alleviate those dangers.  *Thus, to say that the invitee assumed the risk of injury from a known and avoidable danger is simply another way of expressing the lack of any duty on the part of the possessor to protect the invitee against such dangers.*

*Carrender*, 469 A.2d at 125 (emphasis added); *see also Montagazzi v. Crisci*, 994 A.2d 626, 635 (Pa. Super. 2010) (a finding that plaintiff knowingly and voluntarily encountered an obvious and dangerous risk relieves those "who may have otherwise had a duty" to protect against the danger because the plaintiff "implicitly agree[d] to take care of himself"). In other words, a determination that a plaintiff assumed the risk is "in effect . . . [a] determin[ation] that the plaintiff relieved the defendant of the duty to guard him from a risk of harm regardless of the source from which the duty derived." *Montagazzi*, 994 A.2d at 636.

"A danger is deemed to be 'obvious' when 'both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising normal perception, intelligence, and judgment.'" *Carrender*, 469 A.2d at 123-24 (quoting *Restatement Second of Torts* § 343A, comment b). For a danger to be "known," it must "not only be known to exist, but ... *also be recognized that it is dangerous* and the probability and gravity of the threatened harm must be appreciated." *Id.* at 124 (emphasis added).

Finally, "[a]lthough the question of whether a danger was known or obvious is usually a question of fact for the jury, the question may be decided by the court where reasonable minds could not differ as to the conclusion." *Id.* (citing REST. § 328B, comments c and d); *see also Kabo v. UAL, Inc.*, 762 F. Supp. 1190, 1195 (E.D. Pa. 1991) (holding the risk of heart attack to 65-yr-old from lifting heavy luggage to be known and obvious as a matter of law). Courts have not hesitated to make such determinations where there is no question that the dangers surrounding the activities or conditions were "unchanging, obvious, and known by the plaintiffs." *See e.g. Malinder v. Jenkins Elevator & Mach Co.*, 538 A.2d 509, 514 (Pa. Super. 1988) (assumption of risk barred recovery where the plaintiff stuck his head in an elevator shaft and testified that he was aware of risk of getting struck by the elevator); *Banks v. Trustees of the University of Pennsylvania*, 666

A.2d 329, 332 (Pa. Super. 1995) (trial court did not err in finding that the defendant owed no duty to the plaintiff because the "danger associated with jumping from a four-foot wall was both obvious and known to the appellant" as evidenced by the appellant's own deposition testimony).

Mr. Natcher's principal argument against application of *Carrender's* "no duty" and "assumption of risk" formulations is that his decision to move next to the conveyor was a last minute decision made at a time when he did not believe that the conveyer might tip over or pose a risk of injury. (Pl. Brief, p. 23-24). This argument is not supported by any version of the facts.[3]

Under his own version, Mr. Natcher stood on the north side of the conveyor next to where he had piled the chains and directed Mr. Herrmann to raise the chains. Tellingly, Mr. Natcher then moved to the front of the trailer because, in his own words, "that was the safe spot to stand." This admission, coupled with his later admission that he moved from a zone of safety to a spot where he was now in danger (See Natcher Depo., p. 163), confirms that Mr. Natcher was keenly aware that standing beside the conveyor while the chains were being raised posed a risk or danger.

Even more revealing is Mr. Natcher's testimony concerning why he reacted as he did when the chains slid off the conveyor deck. Having just retreated to the "safe spot to stand," Mr. Natcher deliberately returned to a location next to the conveyor opposite where the chains had slid off and now were dragging up the side. He did so because, in his own words, "I knew it was not a good thing for them to be dragging up the side of the machine." (Natcher Depo., p. 161). Mr. Natcher

---

[3] Mr. Natcher's reliance upon *Staub, Barrett* and *Handschuh* is misplaced. In *Staub*, the plaintiff was aware of open holes in the roof on which he was laying insulation, but at the time of the accident he was walking backward rapidly placing insulation boards as they were handed to him, and while doing so tripped and fell backward into a hole that he did not at the time realize was directly behind him. *Staub*, 749 A.2d at 524-525. In *Barrett*, the plaintiff was looking upward as he worked and testified that he did not see the piece of vinyl siding insulation on which he slipped. *Barrett*, 685 A.2d at 131. In *Handschuh*, the plaintiff decedent was generally aware that a cave-in was one of the risks inherent in excavation and pipe laying, but awareness of general dangers associated with performing a job is in and of itself insufficient to establish voluntary assumption of risk as a matter of law. *Handschuh*, 574 A.2d at 694-696.

acknowledged that in the "back of [his] mind" he was concerned that the chains could tip the conveyor over (Natcher Depo., p. 161) and that he was worried about the chains "getting caught and flipping the machine . . . off the trailer." (Natcher Depo., p. 161-162).

In his Brief, Mr. Natcher writes that his thought at the time he approached the conveyor "was to push the chains away from the conveyor, not that this conveyor might tip over or pose a risk of injury." (Pl. Brief, p. 24). This statement simply is not true based upon Mr. Natcher's testimony concerning why he did what he says he did. Although the conveyor did not begin to shake until he had returned beside the conveyor, the very reason he left the safe spot in the first place was because he knew the chains dragging up the side could catch or snag and flip the conveyor. Thus, Mr. Natcher appreciated the very danger that came to fruition while he was in a safe position, then with full awareness of that danger deliberately left the safe position and encountered that danger.

The fact that Mr. Herrmann observed certain physical facts differently does not alter the result. Mr. Herrmann can only contradict facts concerning Mr. Natcher's movements and/or the exact location of the chains when the conveyor tipped. Mr. Herrmann cannot, and does not, contradict what Mr. Natcher testified was his state of mind and awareness of danger. If Mr. Herrmann's testimony is credited, Mr. Natcher remained at all times next to the conveyor at a location he knew posed a danger if a chain or hook caught on the conveyor while being raised. He did not move to a "safe spot" while the chains were moving upward. If Mr. Herrmann's recollection is accepted, then instead of leaving then returning to a dangerous position, Mr. Natcher at all times remained in a position he knew was dangerous. *See, Greenburg v. General Electric Co.*, 1993 U.S. Dist. LEXIS 8975, *27 (C.A. No. 92-1923, E.D. Pa. June 23, 1993) ("Where a danger is obvious and plaintiff clearly appreciates the nature of the danger,

assumption of the risk may be found as a matter of law even though plaintiff asserts that he did not anticipate the precise manner in which the danger ripened into an injury producing event.").

Mr. Natcher also states that courts have been reluctant to apply assumption of risk in cases involving employees who encounter a risk during the course of their employment, citing *Staub v. Toy Factory, Inc.,* 749 A.2d 522, 530 (Pa.Super. 2000).  (Pl. Brief, p. 19).  In *Staub,* the panel reacted to and rejected "outright the trial court's conclusion that [the plaintiff] was required to quit his job rather than proceed in the face of an obvious danger."  *Staub*, 749 A.2d at 532.  The facts in *Staub*, however, differ from our case.[4]

In *Staub*, the plaintiff was laying insulation on a roof in which numerous unprotected openings had been cut.  While walking backward performing his task, plaintiff tripped and fell into one of the holes behind him.  The defendants argued that because the holes were open and obvious, and because plaintiff had demonstrated his awareness by periodically looking over his shoulder, the plaintiff had assumed the risk of falling through by continuing to work on the roof despite the presence of the holes.  Thus, unlike our case, in *Staub* the plaintiff was not subjectively aware of the specific risks which brought about his harm and he did not knowingly proceed to encounter it.

In the present case, Accuride does not assert that it owed no duty to Mr. Natcher because of his general awareness that loading equipment on a trailer utilizing an overhead crane entails dangers which Mr. Natcher assumed merely by working as a truck driver or participating in the loading of the conveyor.  Rather, Accuride owed no duty to Mr. Natcher because he knowingly

---

[4] *Staub* also cited *Jara v. Rexworks, Inc.*, 718 A.2d 788 (Pa.Super. 1998).  *Jara* stands for the proposition that in a strict liability case, "where an employee, in doing a job, is required to use equipment as furnished by the employer, this defense [of assumption of risk] is unavailable."  *Jara*, 718 A.2d at 795.  The Third Circuit has recognized that the *Jara* rule only applies when the employee used the equipment in question as directed by his employer."  *D'Angelo v. Ads Machinery Corp.*, 128 Fed. Appx. 253, 256 (3d Cir. 2005).

and voluntarily encountered a specific risk and changed his position from safety to danger to encounter the risk, despite available alternatives. There is absolutely no evidence that Mr. Natcher was in any way coerced to do so simply because he was within the scope of his employment by Birkmire Trucking at the time.

### 2. *Carrender* Applies Even If Accuride Negligently Created The Risk

According to the *Restatement (Second) of Torts*, Section 496A, "a plaintiff who voluntarily assumes as risk of harm arising from the negligent or reckless conduct of the defendant cannot recover for such harm." In *McGarry v. Philly Rock Corp.*, 2015 Pa. Super. Unpub. LEXIS 3767 (Pa. Super. 2015), the plaintiff sustained ankle injuries while "bouldering" at a rock climbing facility. The defendant, Philly Rock Corp., successfully argued that plaintiff had assumed the risk of her injuries. In analyzing the facts under the assumption of risk doctrine, the court noted that the doctrine has been compared to estoppel:

> It might be assumed, for purposes of an assumption of risk analysis, that the defendant(s) was negligent, and at least partly responsible for the injury sustained, nevertheless, given the circumstances in which the injury was sustained, the plaintiff is essentially "estopped" from pursuing an action against the defendant because it is fundamentally unfair to allow the plaintiff to shift responsibility for the injury to the when the risk was known, appreciated and voluntarily assumed by the plaintiff.

*McGarry*, at *13-14, (citing *Bullman v. Giuntoli*, 761 A.2d 566, 570 (Pa. Super. Ct. 2000)). The court also analyzed the assumption of the risk doctrine in relation to duty:

> If the case is viewed from the perspective of a duty analysis, the evidence presented at trial establishes that [the plaintiff] voluntarily encountered a known risk, thereby obviating any duty which might otherwise have been owed him by [the defendant]. Under this analysis, the case is controlled by the assumption of risk principle that one who voluntarily undertakes a known risk thereby releases the defendant from any duty of care.

*McGarry,* at *14, (citing *Howell v. Clyde,* 620 A.2d 1107, 1110-11 (Pa. 1993)).

The Superior Court found that even if it accepted plaintiff's expert's testimony that Philly Rock Corp. was negligent in failing to provide instruction on bouldering and mat placement and that signs around the facility were in adequate to instruct plaintiff on how to avoid injury, plaintiff testified that she knew the risk of injury in bouldering, and that she proceeded despite that risk. *McGarry*, at \*18-19.  As part of its assumption of the risk analysis, the court presumed that the defendant was negligent and partly responsible for plaintiff's injuries.  *Id.*

## II.    Conclusion

WHEREFORE, defendant Accuride Corporation respectfully requests this Honorable Court to grant summary judgment in its favor and against plaintiff David W. Natcher on all claims and causes of action in the Complaint, and to enter judgment accordingly.

Respectfully submitted,

s/Matthew W. McCullough
Matthew W. McCullough
Pa. I.D. No. 46950
MacDONALD, ILLIG, JONES & BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7602
FAX (814) 454-4647
mmccullough@mijb.com

Attorneys for Defendant
  Accuride Corporation

1577181

- 20 -

## CERTIFICATE OF SERVICE

I certify that on July 23, 2018, the foregoing Defendant's Reply Brief in Support of Motion for Summary Judgment was filed electronically with the Clerk of Court, using the CM/ECF system. Notice of this filing will be sent to all parties who have appeared of record by operation of the Court's ECF system and constitutes service of this filing under Rule 5(b)(2)(E) of the Federal Rules of Civil Procedure. Those parties may access this filing through the Court's ECF system.

s/ Matthew W. McCullough
Matthew W. McCullough, Esq.