IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

DAVID W. NATCHER,            )
   Plaintiff                 )
                                    )
     v.                       )    Civil Action No. 1:16-cv-219-BJR
                                      )
ACCURIDE CORPORATION,        )
   Defendant                 )    ELECTRONICALLY FILED

**DEFENDANT'S RESPONSE TO
PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS**

Defendant Accuride Corporation, by its attorneys, MacDonald, Illig, Jones & Britton LLP,

files this Defendant's Response to Plaintiff's Counter-Statement of Material Facts:

152.    When Mr. Herrmann was hired by Accuride, he was asked if he had "experience"

in using an overhead crane but he was not asked for specifics of how he had used a crane in the

past. They just discussed his "previous job."  (Herrmann Depo., p. 22.)

> **RESPONSE:** **Denied as stated.  Mr. Herrmann's testimony reveals that his prior experience with crane operation was discussed when he was interviewed by Accuride:**
>
> > **Q.  During part of your interview process with Accuride, did there occur any type of discussion about what your job responsibilities would be as a millwright?**
> >
> > **A.  Yes.**
> >
> > **Q.  Were the job responsibilities during the interview process as discussed to you indicated to include use of an overhead crane?**
> >
> > **A.  Occasionally.**
> >
> > **Q.  So during the interview process, they said that you would occasionally have to use an overhead crane.**

**A. Depending on the job.**

**(Herrmann Depo., p. 21-23).**

153.    Mr. Herrmann did not receive any training from Accuride when he first started relative to the use of the overhead crane.  He was told the weight limits, showed where the chains were located, and told to "make sure the safety latch always works." (Herrmann Depo., pp. 23-24.)

> **RESPONSE: Denied as stated.  Mr. Herrmann's testimony in this regard is as follows:**
>
> > **Q. When you were first hired by Accuride, when you actually first start your position, did you receive any specific training from Accuride at the time you started on the use of the overhead crane?**
> >
> > **A. No.**
> >
> > **Q. Prior to using a crane for the first time when you started at Accuride, were you giving any type of training or instruction on the use of the crane?**
> >
> > **A. I was just trained on how that -- this crane, because there were two cranes I had used, how this crane operates, which at that time it was pendant control.  It had a long cord come down to the ground.  And the other one was remote control.**
> >
> > **It was just explained, you know, their weight limits, you know, they were 20 tons.  One's a 15 and one's a 20.  Their weight limits.  They showed us the chains that we use, you know, make the safety -- safety latch on the chains, make sure the safety latch always works.  And, you know, from there it come back to my original training that -- because, you know, I had already done it for nine years or 10 years.**
> >
> > **Q. Okay.  So as far as your initial orientation to the crane at Accuride, it was essentially just an introduction of this particular crane, here's how the pendant operates, here's where things are located.**
> >
> > **A. Right.**

> **Q.** **At that point in time, were you given any safety training regarding the use of the crane by Accuride?**
>
> **A.** **No.**
>
> **MR. MCCULLOUGH:**  **Well, I'll object to the form because his prior answer indicated that it included some safety regarding making sure the latches are working and -- so.**

**(Herrmann Depo., p. 23-24).**

154.    Mr. Herrmann was relying on his "original training" prior to working at Accuride because he had nine or ten years of prior experience, the specifics of which had not been inquired into by Accuride at the time of his hire. (Herrmann Depo., pp. 22-24).

> **<u>RESPONSE</u>: Denied as stated.  Mr. Herrmann's testimony in this regard is as follows:**
>
> > **Q.** **When you were first hired by Accuride, when you actually first start your position, did you receive any specific training from Accuride at the time you started on the use of the overhead crane?**
> >
> > **A.** **No.**
> >
> > **Q.** **Prior to using a crane for the first time when you started at Accuride, were you giving any type of training or instruction on the use of the crane?**
> >
> > **A.** **I was just trained on how that -- this crane, because there were two cranes I had used, how this crane operates, which at that time it was pendant control.  It had a long cord come down to the ground.  And the other one was remote control.**
> >
> > **It was just explained, you know, their weight limits, you know, they were 20 tons.  One's a 15 and one's a 20.  Their weight limits.  They showed us the chains that we use, you know, make the safety -- safety latch on the chains, make sure the safety latch always works.  And, you know, from there it come back to my original training that -- because, you know, I had already done it for nine years or 10 years.**
> >
> > **Q.** **Okay.  So as far as your initial orientation to the crane at Accuride, it was essentially just an introduction of**

> **this particular crane, here's how the pendant operates, here's where things are located.**
>
> **A.  Right.**
>
> **Q.  At that point in time, were you given any safety training regarding the use of the crane by Accuride?**
>
> **A.  No.**
>
> **MR. MCCULLOUGH:  Well, I'll object to the form because his prior answer indicated that it included some safety regarding making sure the latches are working and -- so.**

**(Herrmann Depo., p. 23-24).**

155.    Mr. Herrmann did not believe that he received any training the he would classify as "safety training" from Accuride regarding the use of the crane.  (Herrmann Depo., pp. 24.)

> **RESPONSE:  Denied as stated.  The testimony at Page 24 of Mr. Herrmann's deposition transcript dealt specifically with his initial orientation at the time he was hired by Accuride.  (Herrmann Depo., p. 24).  Mr. Herrmann did testify concerning safety training after becoming employed by Accuride up to the present time.  (See Hermann Depo., p. 25-33, 35-37; Def. Supp. S.M.F. No. 207-210).**

156.    Mr. Herrmann was never given any type of safety manual for the crane, including the safety manual from the manufacturer of the crane.  (Herrmann Depo., pp. 24-25.)

> **RESPONSE:  Admitted as to the representation of Mr. Herrmann's testimony.**

157.    Mr. Herrmann was never given a copy of the instruction manual for the crane and is not sure if one even exists.  (Herrmann Depo., p. 25.)

**RESPONSE: Admitted as to the representation of Mr. Herrmann's testimony.**

158.   The training Mr. Herrmann received through Accuride in July 2008 regarding the overhead crane did not include any information  regarding procedures  for loading or unloading flatbed trailers.  (Herrmann Depo., p. 28.)

**RESPONSE: Admitted as to the representation of Mr. Herrmann's testimony.**

159.   Accuride is in possession of only three documents evidencing any training as to crane usage provided  to Donald Herrmann prior  to the date of the incident in question.  (Accuride's Response to Plaintiffs Request for Production No. 1, produced as Exhibit 3.)

**RESPONSE: Admitted.  However, in addition to his extensive experience and training prior to becoming employed by Accuride, Mr. Herrmann testified that he received additional training regarding crane usage, crane operations and crane safety throughout his employment by Accuride which is not reflected by the documentation Accuride possesses and produced to plaintiff.  (Herrmann Depo., p. 25-33, 35-37; Def. Supp. S.M.F. No. 207-210).**

160.   Accuride is in possession of only three documents evidencing any training as to crane operations provided to Donald Herrmann prior to the date of the incident in question.  (Accuride's Response to Plaintiffs Request for Production No.3, produced as Exhibit 3.)

**RESPONSE: Admitted.  However, in addition to his extensive experience and training prior to becoming employed by Accuride, Mr. Herrmann testified that he received additional training**

**regarding crane usage, crane operations and crane safety throughout his employment by Accuride which is not reflected by the documentation Accuride possesses and produced to plaintiff. (Herrmann Depo., p. 25-33, 35-37; Def. Supp. S.M.F. No. 207-210).**

161.    Accuride is in possession of only three documents evidencing any training of Donald Herrmann as a crane rigger, spotter, or signaler, prior to the date of the incident in question. (Accuride's Response to Plaintiffs Request for Production No.5, produced as Exhibit 3.)

> **RESPONSE: Admitted.  However, in addition to his extensive experience and training prior to becoming employed by Accuride, Mr. Herrmann testified that he received additional training regarding crane usage, crane operations and crane safety throughout his employment by Accuride which is not reflected by the documentation Accuride possesses and produced to plaintiff. (Herrmann Depo., p. 25-33, 35-37; Def. Supp. S.M.F. No. 207-210).**

162.    Accuride is in possession of only three documents evidencing any training provided to any crane rigger, spotter, or signal person prior to the date of the incident in question. (Accuride's Response to Plaintiffs Request for Production Nos. 6-8, produced as Exhibit 3.)

> **RESPONSE: Admitted.  However, in addition to his extensive experience and training prior to becoming employed by Accuride, Mr. Herrmann testified that he received additional training regarding crane usage, crane operations and crane safety throughout his employment by Accuride which is not reflected by the documentation Accuride possesses and produced to plaintiff. (Herrmann Depo., p. 25-33, 35-37; Def. Supp. S.M.F. No. 207-210).**

163.    The three documents referenced in ¶ 159-162 are sign in sheets and contain no substance as to the training provided. (Documents 161-163, Exhibit 4.)

>    **RESPONSE: Denied as stated.  Both sign in sheets refer to "Crane Safety" or "Crane Safety Training."**

164.    At the time of the incident, Accuride did not have any rules, policies, or procedures in effect regarding crane use, rigging, spotting, or signaling.   (Accuride's Response to Plaintiffs Request for Production No. 10, produced as Exhibit 3.)

>    **RESPONSE: Denied as stated.   Plaintiff's Request for Production No. 10 requested documents, to which Accuride responded that it had no responsive documents.**

165.    At the time of the incident, Accuride did not have any rules, policies, or procedures in effect regarding driver access to trailers while crane operations were occurring.   (Accuride's Response to Plaintiffs Request for Production No. 10, produced as Exhibit 3.)

>    **RESPONSE: Denied as stated.   Plaintiff's Request for Production No. 10 requested documents, to which Accuride responded that it had no responsive documents.**

166.    At the time of the incident, Accuride did not have any rules, policies, or procedures in effect regarding a truck driver removing loading hooks. (Accuride's Response to Plaintiffs Request for Production No. 10, produced as Exhibit 3.)

>    **RESPONSE: Denied as stated.   Plaintiff's Request for Production No. 10 requested documents, to which Accuride responded that it had no responsive documents.**

167.    Mr. Herrmann arrived at work on the morning of the incident without any knowledge that he would be tasked to load the puck conveyor onto a flatbed trailer. (Herrmann Depo., pp. 47-48.)

> **RESPONSE: Admitted as to the representation of Mr. Herrmann's testimony.**

168.    Mr. Herrmann testified that the truck arrived "unexpectedly" and he was the only person available at the moment to deal with the conveyor.  (Herrmann Depo., p. 48.)

> **RESPONSE: Denied as stated.  Mr. Herrmann testified that the "truck rolled in the building unexpectedly.  We weren't sure when it was coming." Clearly it was known that the puck conveyor would be picked up for transport, as arrangements had been made with Birkmire Trucking through Rockfarm brokerage, and the conveyor had been moved to the loading bay during the second or third shift prior to Herrmann's first shift.  The conveyor had been washed and was ready to go.  (Herrmann Depo., p. 50). When the truck arrived, Mr. Herrmann was the only qualified Accuride employee available to operate the crane to load the conveyor.  (Herrmann Depo., p. 47-48).**

169.    Mr. Herrmann and his co-workers were surprised that the truck was there, and Mr. Herrmann was instructed by his foreman over the radio to go up and load the conveyor onto the truck.  (Herrmann Depo., pp. 50-51.)

> **RESPONSE: Admitted as to the representation of Mr. Herrmann's testimony.**

170.    At the time Plaintiff arrived at Accuride, the conveyor was perpendicular to the bed of the trailer and located in an area called the "wash bay."  It was on a low trailer that was used to transport the conveyor within the facility to wash bay. (Herrmann Depo., pp.46-47.)

> **RESPONSE:** **Admitted as to the representation of Mr. Herrmann's testimony.**

171.    Accuride did not have a designated "rigger" or "spotter" or anyone else present to assist Mr. Herrmann with this operation-Mr. Herrmann was on his own. (Natcher Depo., pp. 105-106; Herrmann Depo., p. 69.)

> **RESPONSE:** **Denied as stated.  Although it is admitted that no other Accuride employee was present to assist with the loading operation, Mr. Herrmann was not "on his own."  To the contrary, plaintiff Natcher assisted Mr. Herrmann during the loading operation. Mr. Natcher did so as a matter of custom, and he did so voluntarily and without question, discussion, debate or request for assistance of additional Accuride employees.**

172.    According to Mr. Herrmann, "(n]o one was assisting with the actual loading of the - of the trailer ... there was nobody but me and the driver to place that load." (Herrmann Depo., pp. 94-95.)

> **RESPONSE:** **Denied as stated.  Although it is admitted that no other Accuride employee was present to assist with the loading operation, Mr. Herrmann was not "on his own."  To the contrary, plaintiff Natcher assisted Mr. Herrmann during the loading operation. Mr. Natcher did so as a matter of custom, and he did so voluntarily and without question, discussion, debate or request for assistance of additional Accuride employees.**

173.    Mr. Herrmann's initial lift of the conveyor -off of the low transport trailer -was only high enough to move the conveyor off of the low trailer and toward Plaintiffs flatbed trailer. (Herrmann Depo., pp. 68-69.)

> **RESPONSE: Admitted as to the representation of Mr. Herrmann's testimony. Further, Mr. Herrmann testified that "I never take a load any higher than, yea-far, to be -- before I'm -- 6 to 10 inches before I'm satisfied with it." (Herrmann Depo., p. 61).**

174.    The first lift revealed that the conveyor was off balance and tipping in such a manner that it could not be lifted on the trailer in that position. (Herrmann Depo., pp. 66-67.)

> **RESPONSE: Admitted as to the representation of Mr. Herrmann's testimony. See also Herrmann Depo., p. 60-61.**

175.    Mr. Herrmann testified that he had forgotten which set of eyes on the conveyor were supposed to be used because "it had been a while since I[Herrmann] had loaded a trailer." (Herrmann Depo., p. 61.)

> **RESPONSE: Admitted as to the representation of Mr. Herrmann's testimony. In context, Mr. Herrmann was referencing the fact that it had been a while since he had loaded a conveyor and thus had forgotten which set of attachment points on the conveyor to use.**

176.    The only thing Plaintiff did to assist Mr. Herrmann with rigging the conveyor was to change the positioning of one of the three crane slings from its original location to the location designated by Mr. Herrmann. (Herrmann Depo., pp. 60; 68.)

**RESPONSE:** **Denied as stated. There were four (4) crane slings. After both Herrmann and Natcher were dissatisfied with the first lift (Herrmann Depo., p. 61), Natcher reattached one of the hooks to a different set of pad eyes. (Herrmann Depo., 68-69; Natcher Depo., p. 97, 99-104). Natcher also assisted by guiding the conveyor to make sure it was not spinning when lifted. (Herrmann Depo., p. 65).**

177.   When both men were satisfied with the "rigging," Mr. Herrmann asked Plaintiff where on the trailer he wanted the conveyor to be placed. (Herrmann Depo., p. 54.)

**RESPONSE:** **Admitted as to the representation of Mr. Herrmann's testimony, with the clarification that Mr. Herrmann asked Mr. Natcher where and how Natcher wanted the conveyor placed on the trailer. (Herrmann Depo., p. 53-54).**

178.    This was Mr. Herrmann's custom - to always ask the driver where to place the load. (Herrmann Depo., p. 54.)

**RESPONSE:** **Admitted. In further response, Mr. Natcher testified that he, as the truck driver, is responsible for securing the load on the trailer for transport, which includes decisions such as where the load is placed on the trailer and whether to use cribbing. (Natcher Depo., p. 61, 64, 111, 119, 133-134).**

179.   When the conveyor was set down on the cribbing on the trailer, Plaintiff walked the entire way around the conveyor, which was on the cribbing on the trailer, and was satisfied with its positioning. (Natcher Depo., pp. 127-128, 142-143).

**RESPONSE: Admitted.**

180.    During this time while Plaintiff was walking around the conveyor, there was slack in the crane slings and the full weight of the conveyor was resting on the cribbing on the trailer. (Herrmann Depo., pp. 80-82, 120-121 ).

> **RESPONSE**: **Admitted that Mr. Herrmann testified that the full weight of the conveyor was resting on the cribbing at this time.  Denied that Mr. Herrmann testified that there was "slack" in the chains at this time.**

181.    While Plaintiff walked around the conveyor to unhook all four hooks from the lifting eyes, the crane was not supporting any portion of the weight of the conveyor.  (Herrmann Depo., p. 120.)

> **RESPONSE**: **Admitted as to the representation of Mr. Herrmann's testimony.**

182.    The conveyor did not shift, wiggle, shimmy, or move in any manner while Plaintiff was walking about the conveyor to unhook all four of the chains from the lifting eyes. (Herrmann Depo., p. 121.)

> **RESPONSE**: **Denied as stated.  Mr. Herrmann testified that he did not "see" the conveyor "shift, wiggle, shimmy" or move as Mr. Natcher walked around the conveyor.**

183.    The conveyor did not move in any manner until Mr. Herrmann started to operate the crane. (Herrmann Depo., pp. 81-82.)

**RESPONSE:** **Admitted as to the representation of Mr. Herrmann's testimony, with the clarification that both Mr. Herrmann and Mr. Natcher testified that, after Mr. Natcher had removed all four hooks from the conveyor, Mr. Herrmann did not begin to lift the chains until Mr. Natcher communicated to Mr. Herrmann to begin.  (Herrmann Depo., p. 81-82; Natcher Depo., p. 157, 171-172).**

184.    Mr. Herrmann never testified that he observed Plaintiff leave the area adjacent to the conveyor and return to the front of the trailer, and then approach the conveyor again before it tipped.  Mr. Herrmann's observation was that Plaintiff was near the chains of the crane, alternatively holding one hook in his hand, and that the conveyor tipped in the "blink of an eye" when he started to operate the crane.  (Herrmann Depo., pp. 81-82.)

**RESPONSE:** **Admitted in part and denied in part.  It is admitted that Mr. Herrmann did not testify that "he observed Plaintiff leave the area adjacent to the conveyor and return to the front of the trailer, and then approach the conveyor again before it tipped."  The characterization of Mr. Herrmann's testimony at pages 81-82 regarding his observation is denied as stated and is incomplete.  To the contrary, Mr. Hermann testified as follows:**

**Q.  Okay.  From that point, what does the driver do?**

**A.  He unhooks the hook, he signals me to go up with the chains, so I commenced to do as I'm told.  And at that moment -- and I don't know what moment, blink of the eye, I see the thing shimmy.  Just a little.  What I seen from the south side was just a little.  And the driver grabbed ahold of the trailer -- or the conveyor.**

**I only lifted the hooks because he said that, you know, it was okay.  I would have left the hooks hanging there until, you know, 5:30 if he didn't want them raised up.**

**\* \* \* \* \***

**Q.  Okay.  Were all -- when you started to lift the -- lift the crane, were all four chains, the portions that you could see, together in the same area of the conveyor?  Or were they still spread out it in different areas?**

A. They were all together, like, as you see them like that. If that's what you're explaining, the perpendicular? Yeah.

Q. Did the driver -- after the driver unhooked the -- as the driver was unhooking the hooks, did he move the hooks together or did they just all come together by virtue of the fact that they had been unhooked?

A. I didn't see him do what I do. Okay? So I'm going to say no to that. If it was me being the guy, those chains don't go up until they're in my arm. Not grabbed, just -- and then they'll go up like this (indicating). This you have control of the chain. Did I see the driver do that? No.

Q. Okay. What did you see the driver do with the chains before you start to lift the crane?

A. I seen him unhook it. It looked like he had thrown them to the north side of the conveyor. Now, mind you, he's standing on the -- on the north side of the truck. It looked like as he went through, he threw all the hooks over to the other side of the conveyor. And then when he unhooked the last hook, let it go. To me it looked like they were all free of the conveyor from what -- my ground level.

Q. Okay. So when you -- when you're looking at the chains knowing that you can't see the hooks from ground level before you lift the crane, you're standing on the south side of the trailer. Is that correct?

A. Correct.

Q. And from what you could see and observe, it looked like all of the chains and the hooks were on the north side of --

A. Clear of the trailer.

Q. -- of the conveyor.

A. Correct

(Herrmann Depo., p. 81-84). Mr. Herrmann also testified that Natcher had one hook in his hand when Mr. Natcher directed Mr. Herrmann to raise the chains:

Q. And then here when you look at the third item here, it says, "Driver held hook and told me to take it up." Get back to that page again.

A. The driver had the hook. He unhooked the hook, and he told me to take it up. Did he have all four hooks? No. He had one hook in his hand, the one he had just

- 14 -

**done and he was holding that one instead of letting it go down and drop. And when he told me to go up, I did as he told me but I went up very slowly.**

**Q. Okay. So when -- when the driver tells you to take it up and you say you basically toggle the switch, you know, up slowly so the crane is basically moving and then stopping, moving and stopping, moving and stopping.**

**A. Very slowly. It's probably slower than what you just moved your hand.**

**Q. Okay. So what -- do you recall how many times you would have depressed the toggle switch to take the crane up before you saw the shimmy?**

**A. Probably twice, if that.**

**Q. So the -- it was on the first time or the second time that you hit the switch that you see the shimmy start.**

**A. Right.**

**(Herrmann Depo., p. 99-100).**

185.   Mr. Herrmann testified repeatedly that he was critical of the use of cribbing for the load (which will be the subject of a credibility determination  by the jury), but admitted that at no time did he communicate  any concern to Plaintiff regarding the cribbing and continued with the loading process. (Herrmann Depo., pp. 73-74, 120-121.)

> **RESPONSE: Admitted in part and denied in part. It is admitted that Mr. Herrmann was critical of Mr. Natcher's decision to set the conveyor on cribbing rather than directly on the trailer deck, but that he did not convey his criticism or concern to Mr. Natcher. It is denied that Mr. Herrmann's testimony in this regard raises a credibility determination to be resolved by a jury.**

- 15 -

186.    Mr. Herrmann stated that he "would have left the hooks hanging there until, you know, 5:30 if he didn't want them raised up." (Herrmann Depo., p. 82.)

> **RESPONSE: Admitted, with the clarification that Mr. Herrmann did not raise and would not have raised the chains unless and until Mr. Natcher directed him to do so.**

187.    When Mr. Herrmann started to lift the crane, Mr. Herrmann testified that he was unable to see the full length of chain comprising the four slings of the crane and specifically could not see the four hooks at the end of the slings from where he was standing. (Herrmann Depo., p. 82, 100). He estimated he could not see the bottom "10 inches or so." (Herrmann Depo., p. 82.)

> **RESPONSE: Admitted as to the representation that Mr. Herrmann could not see the full length or the bottom "10 inches or so" of all four chains, particularly the hooks. However, Mr. Herrmann also testified that he could see that Mr. Natcher had one of the hooks in his hand, and that from what Mr. Herrmann could see it looked like all of the chains and the hooks were on the north side clear of the conveyor, at the time Mr. Natcher directed Mr. Herrmann to raise the chains. (Herrmann Depo., p. 84, 99).**

188.    Mr. Herrmann did not see Plaintiff do what he himself does with the crane slings after they are unhooked from a load- which is gather them in his arms loosely to control the chains as they raise. (Herrmann Depo., pp.83-84.) It is Mr. Herrmann's practice to actually remain in contact with the crane slings while the crane is in operation. (Herrmann Depo., pp. 83-85.)

> **RESPONSE: Admitted, with the clarification that this is Mr. Herrmann's practice "when [he] would be the person that was doing the loading, not the crane operator." If Mr. Herrmann was the one**

**that was unhooking the chains before the crane was raised, he would make sure all the chains were together and at least in one area so he could see all the hooks. (Herrmann Depo., p. 85).**

189.    Mr. Herrmann had never met Plaintiff prior to the incident and never asked him to do anything particular with the chains, but rather "assumed he knowed." (Herrmann Depo., p. 85.)

**RESPONSE**: **Admitted.**

190.    Mr. Herrmann admitted that he could not see the hooks before lifting the crane and "should have ran around to the other side of the trailer instead of taking trust in the driver." (Herrmann Depo., p. 100.)

**RESPONSE**: **Denied as stated and as incomplete and not in context. Mr. Herrmann agreed that he could not see each of the four hooks at the time he began raising the chains after Mr. Natcher directed him to do so. (Herrmann Depo., p. 82). He could see that Mr. Natcher had one hook in his hand. (Herrmann Depo., p. 99). Mr. Herrmann further testified at page 100 of his deposition:**

> **Q. So the -- it was on the first time or the second time that you hit the switch that you see the shimmy start.**
>
> **A. Right.**
>
> **Q. Now, where the rest of that it says, "Hook may have caught up." Do you see where that's written? You're a page too far. The page before.**
>
> **A. Oh.**
>
> **Q. So you see where that's written?**
>
> **A. Yeah. Do you read the word? This is the exact words, because I was on the floor. Here again, I can't see those hooks.**

> **There's no way -- I guess I should have ran around to the other side of the trailer instead of taking the trust in the driver. Okay? But . . .**
>
> Q. **I'm just -- and I'm asking. So you don't know if the hook caught up or not for sure. You said may.**
>
> A. **I don't. It's just my assumption. Yeah.**
>
> Q. **Okay.**
>
> A. **I don't know.**

**(Herrmann Depo., p. 100).**

191.    Mr. Herrmann testified that Ron Celeski, the Union representative, told the OSHA investigator that Accuride used to use two employees for flatbed loading. (Herrmann Depo., p. 97.)

> **RESPONSE: Denied as stated. The following is Mr. Herrmann's testimony:**
>
> Q. **Okay. Maintenance millwright. And in part of the -- so the OSHA -- the handwritten notes from the OSHA inspector, it says at the very last thing, "Accuride used to use two EEs," which means employees, "for flatbed loading."**
>
> **Do you see where it says that? Do you recall having a conversation with the OSHA person about the fact that Accuride used to use two employees for flatbed loading?**
>
> A. **To be honest with you, I can tell you this here came from probably 25 years ago when it was still Kaiser Aluminum, they were doing this, but they shipped different things. They did a lot more shipping, a lot more stuff.**
>
> **So as of a year ago, only if we needed it. The driver -- in my time, the driver has always been the one to do the spotting and the help loading, unless, of course, it's too big of an object to where you need an extra person.**
>
> Q. **Okay. So when you say -- when this says, "Accuride used to use two employees for flatbed loading," do you recall that being something told to the OSHA --**

A. I didn't tell her that. I think that was the Union guy.

Q. Who's the Union guy?

A. Ron Celeski.

Q. Was Mr. Celeski present when you talked to the OSHA investigator?

A. Oh, yeah,

Q. Was he there for the entire conversation?

A. Yes. He was.

**(Herrmann Depo., p. 97-98).**

192.    At the time of the incident, Accuride only used two employees to load trucks "if we [Accuride] needed it." In Mr. Herrmann's time at Accuride, "the driver has always been the one to do the spotting and help loading, unless, of course, it's too big of an object to where you need an extra person." (Herrmann Depo., p. 97.)

**RESPONSE:  Denied as stated.  The following is Mr. Herrmann's testimony:**

Q. Okay.  Maintenance millwright.  And in part of the -- so the OSHA -- the handwritten notes from the OSHA inspector, it says at the very last thing, "Accuride used to use two EEs," which means employees, "for flatbed loading."

Do you see where it says that?  Do you recall having a conversation with the OSHA person about the fact that Accuride used to use two employees for flatbed loading?

A. To be honest with you, I can tell you this here came from probably 25 years ago when it was still Kaiser Aluminum, they were doing this, but they shipped different things.  They did a lot more shipping, a lot more stuff.

So as of a year ago, only if we needed it.  The driver -- in my time, the driver has always been the one to do the spotting and the help loading, unless, of course, it's too big of an object to where you need an extra person.

Q. Okay. So when you say -- when this says, "Accuride used to use two employees for flatbed loading," do you recall that being something told to the OSHA --

A. I didn't tell her that. I think that was the Union guy.

Q. Who's the Union guy?

A. Ron Celeski.

Q. Was Mr. Celeski present when you talked to the OSHA investigator?

A. Oh, yeah,

Q. Was he there for the entire conversation?

A. Yes. He was.

**(Herrmann Depo., p. 97-98).**

193.    In relationship to placing and positioning the load properly on the flatbed, Mr. Herrmann testified that he "can't do nothing because I'm on the ground." (Herrmann Depo., p.80.)

**RESPONSE**: **Denied as stated. The quotation must be read in context as follows:**

Q. Where was the driver on the flatbed as you were moving the conveyor onto the cribbing?

A. He was on the -- on the flatbed guiding the conveyor to where he wanted it. He had his hands on it, so it could -- when I come down with the hook, it could be placed where he wanted it to be. So he was kind of like all over the trailer, you know, at different -- different points to make sure he was satisfied with the way it was sitting.

Q. Okay. During the process of lowering the conveyor onto the cribbing on the flatbed, where were you standing?

A. I started on the north. I went to the south. Then I went over -- I started on the north, went to the west, and then went over to the south side of the trailer.

I was standing there with the remote, because he was on the north side of the trailer. And another rule of thumb, you want to see your person. You know, you don't want to stand behind them. So the

Q. **south side, being he was on the north side, I was looking at him.**

Q. **So when the driver is on the -- is on the flatbed and the conveyor is being loaded, did the driver stay on the north side of the trailer or did he go the entire way around?**

A. **After we actually set it, he went around to make sure it was -- he was satisfied with it and started unhooking the hooks.**

Q. **Okay.  So after -- as it's being lowered, before it's set, where was the driver standing?  Was it on the north side of the trailer?**

A. **As it's being lowered?**

Q. **As it's being lowered.**

A. **He -- like I said, he started on the north at the beginning of it, and I started on the north.  And then we both -- we both move around to make sure -- I can't do nothing because I'm on the ground.  So, yeah, he was on the north.  He was actually on the south at one time and he was on the west at one time.**

   **So there was no particular time where he was at the north for a long period of time, other than when it was time to say, okay, he was on his last hook.  You know, he unhooked the left -- the south side hooks, walked around and unhooked the north side hooks.**

**(Herrmann Depo., p. 79-80).**

194.    Mr. Herrmann had a radio at all times during the loading process in order to be contact his foreman, Scott Biggie, who was "authority." (Herrmann Depo., pp. 107-108).

> **RESPONSE:  Denied as stated.  In context, Mr. Herrmann testified as to the following after the accident had happened:**
>
> Q. **Okay.  When you first get over to the driver after the incident, what happens?**
>
> A. **I look over, I ran around the corner right away.  I look under the trailer, I seen the driver there.  I got on my radio because we all have radios in maintenance.  And I really, really -- I mean, was yelling for my foreman.**

> Finally he answered and he came right down immediately.
>
> First thing I would do in any case, but this case was worse, contact somebody to give me help, somebody that is authority that's going to come down there and give me help.
>
> Q. Who was that, Scott?
>
> A. Scott Biggie. Yeah.
>
> Q. Okay. So you contact Scott. Did you have a cell phone or anything aside from your radio?
>
> A. Just a two-way radio. He was way up at the farther end of the plant. He was nowhere around it.

**(Herrmann Depo., p. 107-108).**

195.    Mr. Herrmann's supervisor was "clear  on the other side of the building" when  the incident  occurred. (Herrmann Depo., p. 116.)

> **RESPONSE: Admitted as to the representation of Mr. Herrmann's testimony.**

196.     Mr. Herrmann  believes that the "shimmy" he observed contemporaneously with the start of the crane operation  "caused like a tumble." (Herrmann Depo., p. 104.)

> **RESPONSE: Denied as stated.  In context, Mr. Herrmann testified as follows:**
>
> Q. So when you see the conveyor start to shimmy, was that as you started to lift the hooks?
>
> A. Yes.
>
> \* \* \* \* \*
>
> Q. Okay.  So when -- when the driver tells you to take it up and you say you basically toggle the switch, you know, up slowly so the crane is basically moving and then stopping, moving and stopping, moving and stopping.

A. Very slowly.  It's probably slower than what you just moved your hand.

Q. Okay.  So what -- do you recall how many times you would have depressed the toggle switch to take the crane up before you saw the shimmy?

A. Probably twice, if that.

Q. So the -- it was on the first time or the second time that you hit the switch that you see the shimmy start.

A. Right.

**(Herrmann Depo., p. 82, 99-100).**

\* \* \* \* \*

Q. All right.  So from the time you see the shimmy until the conveyor actually falls, did you see anything from that point, between those two things, about the movement of the conveyor, did you see, you know, how it fell, if it tipped, if it flipped off the flatbed from the time you see the shimmy until it gets on the ground?

A. What it looked like to me was it did a slide.  Like the shimmy caused it to -- because it's so top heavy, caused like a tumble.  That's what it looked like from my end as -- that's the south side.

Q. When the -- the conveyor actually hits the ground, how far from the trailer was it when it came to its final rest?

A. Maybe 6 to 8 feet.  It's a curved conveyor so part of it could have been a little bit more.

**(Herrmann Depo., p. 104).**

197.    When the conveyor fell, Mr. Herrmann was standing  in the area where the conveyor would have landed  had it fallen to the passenger  side  rather  than the driver's side of the flatbed. (Herrmann  Depo, p. 117-118.) Mr. Herrmann  is unsure whether he would have been able to get out of the way of the conveyor had it tipped south.   (Herrmann Depo., p. 118.)

**RESPONSE**: **Admitted as to the representation of Mr. Herrmann's testimony.**

198.    After this incident, Accuride  implemented a rule that the crane is not to be unhooked from the load until the load is completely fastened down and secured  to the truck, whether the truck is an Accuride  truck or an outside  truck.  (Herrmann Depo., pp. 118-119.)

> **RESPONSE**: **Admitted, subject to objection pursuant to Rule 407 of the Federal Rules of Evidence.**

199.    According to Mr. Herrmann, Accuride "decided to take full control  from the driver because it's our facility, it's our crane.  The driver now has to kind of do things the way that we want because ...."  (Herrmann Depo., pp. 124-125.)

> **RESPONSE**: **Admitted that Mr. Herrmann's testimony is accurately quoted in part.  In full context, and subject to objection pursuant to Rule 407 of the Federal Rules of Evidence, Mr. Herrmann testified:**
>
> > **Q.  I just have a couple of things to clarify here.**
> >
> > **You were asked about a policy that went in to place at Accuride after the incident where the -- basically the load stays hooked until it's strapped.  Is that --**
> >
> > **A.  Regardless.**
> >
> > **Q.  Okay.  Do you have an understanding of whether that policy was put -- was put in place because of this accident?**
> >
> > **A.  I believe it was.  We decided to take full control from the driver because it's our facility, it's our crane.  The**

- 24 -

> driver now has to kind of do things the way that we want because . . .
>
> Q. All right. But you think the triggering point was the accident, itself.
>
> A. Yeah.

**(Herrmann Depo., p. 124-125).**

200.    After the incident, Mr. Herrmann  learned that a truck driver tried to tell an Accuride crane operator  to unhook  the crane prior to the load being secure, and the Accuride crane operator refused  because of the new rule.  (Herrmann Depo., p. 119.)

> **RESPONSE: Admitted that Mr. Herrmann's testimony is accurately quoted in part. In full context, and subject to objection pursuant to Rule 407 of the Federal Rules of Evidence, Mr. Herrmann testified:**
>
> > **Q. I just have a couple of things to clarify here.**
> >
> > **You were asked about a policy that went in to place at Accuride after the incident where the -- basically the load stays hooked until it's strapped. Is that --**
> >
> > **A. Regardless.**
> >
> > **Q. Okay. Do you have an understanding of whether that policy was put -- was put in place because of this accident?**
> >
> > **A. I believe it was. We decided to take full control from the driver because it's our facility, it's our crane. The driver now has to kind of do things the way that we want because . . .**
> >
> > **Q. All right. But you think the triggering point was the accident, itself.**
> >
> > **A. Yeah.**

**(Herrmann Depo., p. 124-125).**

201.    Mr. Herrmann did not interact with Plaintiff after the incident other than observe his condition and call for help and has had no contact with Plaintiff since the day of the incident. (Herrmann Depo., pp. 108-110, 123.)

> **RESPONSE**: **Admitted as to the representation of Mr. Herrmann's testimony.**

202.    Plaintiff testified that the cribbing he used on the trailer deck did not roll or become displaced during the incident and that it was in "fairly the same place" in the post-incident to where he placed it on the trailer. (Natcher Depo., pp. 193-194).

> **RESPONSE**: **Admitted, except that it is Mr. Natcher's belief that the cribbing did not roll or become displaced during the incident, which he concluded from his observation of photographs. (Natcher Depo., p. 193-194).**

Respectfully submitted,

s/Matthew W. McCullough
Matthew W. McCullough
Pa. I.D. No. 46950
MacDONALD, ILLIG, JONES & BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7602
FAX (814) 454-4647
mmccullough@mijb.com

Attorneys for Defendant
    Accuride Corporation

1576642

- 26 -

## CERTIFICATE OF SERVICE

I certify that on July 23, 2018, the foregoing Defendant's Response to Plaintiff's Counter-Statement of Material Facts was filed electronically with the Clerk of Court, using the CM/ECF system. Notice of this filing will be sent to all parties who have appeared of record by operation of the Court's ECF system and constitutes service of this filing under Rule 5(b)(2)(E) of the Federal Rules of Civil Procedure. Those parties may access this filing through the Court's ECF system.

s/ Matthew W. McCullough
Matthew W. McCullough, Esq.