IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

DAVID W. NATCHER,                           )
    Plaintiff                           )
                                            )
        v.                          )   Civil Action No. 1:16-cv-219-BJR
                                            )
ACCURIDE CORPORATION,                       )
    Defendant                           )   ELECTRONICALLY FILED

**DEFENDANT'S SUPPLEMENTAL CONCISE STATEMENT OF FACTS**

Defendant Accuride Corporation, by its attorneys, MacDonald, Illig, Jones & Britton LLP, files this Supplemental Concise Statement of Facts, and states as follows:

202.    Herrmann has been employed in an industrial/manufacturing setting since the mid-1980s.  (Herrmann Depo., p. 12-13; Def. Supp. Appx. Ex. N).

203.    Herrmann worked as an "outside machinist" or maintenance employee at Erie Shipyard Metro Machine, where he operated an overhead crane "all the time," from late 1996 to March 2005 when he was laid off.  (Herrmann Depo., p. 14; Def. Supp. Appx. Ex. N).

204.    While at Metro Machine, Herrmann's use of an overhead crane "was my job duties, but I was the crane inspector also.  So it was a combination of not only using the crane to make lifts and plant loads, it was also to inspect to make sure the cranes were safe for use."  (Herrmann Depo., p. 14).

205.    Herrmann testified concerning the extent of his use of the four overhead cranes while employed by Metro Machine:

        Q.    So that would be four overhead cranes?

        A.    Yeah.

> Q.    Did your job duties require you to interact with one of these cranes on a daily basis?
>
> A.    Something I had to do on them, yeah, whether it was picking something up or -- there was always something that I did do. Very rarely did I not.

(Herrmann Depo. p. 16-17).

206.    During his two interviews prior to becoming employed by Accuride, Herrmann's job duties as millwright were discussed, including that he would occasionally have to use an overhead crane and his experience operating overhead cranes. (Herrmann Depo., p. 21-23).

207.    While at Accuride, Herrmann attended a crane safety training in July 2008 conducted by an outside trainer, specifically including hooks, "about your safety devices and stuff that are intact when you are using a crane, making sure your chains are in good shape, and . . . making sure that the wires [on the wire rope] weren't broke on it." (Herrmann Depo., p. 25-28; Herrmann Depo. Ex. 4).

208.    At his deposition, Herrmann was shown a document titled 2011 Monthly Safety Training Tracker which tracked monthly training meetings by who attended and the topic. Although he did not specifically recall the October 2011 safety meeting, the Tracker indicates that Herrmann and four other individuals did attend a crane safety meeting in October 2011. (Herrmann Depo., p. 28-29; Herrmann Depo. Ex. 5).

209.    Herrmann also attends weekly "tool box talks" conducted by his foreman regarding a range of safety-related topics including crane, forklift, rigging and cribbing. These toolbox talks are in addition to monthly safety meetings. (Herrmann Depo., p. 29-33).

210.    In addition to the July 2008 crane safety training, the monthly safety meetings and the weekly toolbox talks, Herrmann described additional safety training involving rigging:

> Q.    Aside from the crane safety training that according to this sheet you received in October of 2011, do you recall any other monthly

safety meetings where you discussed crane safety or usage of the overhead crane?

A.  The only meetings that we really have on a regular basis about the crane is about our rigging, which is our stuff to pick a load up. And that is, we had a fella come in and he went over how to determine whether the -- the chains, the straps were good enough for your pick or not good enough.

There's way to determine whether the wire is broke. There's a blue line in a strap. If it's broke. Most of our training and our -- most of our repetitive training is making sure that our straps and everything are good. We actually even have a company -- we have to take all our straps and turn them in once a year, and we have a company that comes in and inspects them all.

Q.  So when you says the repetitive training that you have, is that the toolbox talk?

A.  No. We have -- occasionally, we have a guy come in from an outside company that will explain to us about our lifting devices. I guess that's the best word to put it, because there's a variety like I explained. Most incidents that I've been explained are from people not knowing that their lifting devices are proper or improper.

Q.  When you say somebody from an outside company comes in, do you recall any of these individuals that have come in to provide that training?

A.  No. I don't know any of the names or nothing.

Q.  And this is in addition to or separate from the training that you received from Russ Myers.

A.  Yeah.

Q.  When these individuals from outside companies come in to train, is there any type of a sign-in sheet or documentation that the training occurred?

A.  Occasionally, the -- a lot of it is when we turn in our straps once a year, we'll be explained how important it is to turn them in by the company. I don't know what company inspects them. But the people who inspect them, same as our safety harnesses, the biggest thing that they explain is how important it is to make sure that these are proper for use instead of just saying, well, that's a glass.

So they -- they show us what we should be aware of.

Q.    Is the training that you're discussing when you said it happens occasionally, is that something once a year or how frequently does that occur?

A.    I really couldn't answer that question truthfully.

Q.    During the course of time you've been employed at Accuride, what training have you received regarding cribbing or rigging?

A.    The rigging was more or less check the straps, watching pinch points, which is pinch points everywhere.  When you're on a -- when you're working with a crane and you're lifting a load, pinch points are more important.

Cribbing, that's just something that I've learned from doing it for 20 years.

(Herrmann Depo., p. 35-37).

211.    Herrmann testified that prior to operating an overhead crane, he inspects to make sure the hook safety latches work property, usually checks the brake, that the hoist runs up and down, and inspects the safety latch on the crane.  (Herrmann Depo, p. 40-43, 89-90).

212.    Except for crane safety inspection or checks prior to operating a crane, Herrmann is not the crane inspector at Accuride.  This function is performed by outside companies. (Herrmann Depo., p. 35-36, 39-41;  Def. Supp. Appx. Ex. O, P, Q, R, S, T).

213.    During discovery, Natcher's counsel served a First Request for Production of Documents Directed to Defendant requesting, *inter alia*, the following:

- All crane inspection documentation for the **one (1) year period** prior to the incident in question;

- All crane sling inspection documentation for the **one (1) year period** prior to the incident in question; and

- All preventative maintenance and repair records for the crane, sling, hooks and other lifting devices for the **one (1) year period** prior to the incident in question.

(Def. Supp. Appx. Ex. U).

214.    In response to Natcher's document request, Accuride produced the following documents:

- 2015 (5/13/15) and 2016 (5/4/16) Annual Inspection Reports (Def. Supp. Appx. Ex. O, P)

- 2016 Monthly Crane inspection Reports (Def. Supp. Appx. Ex. Q)

- Konecranes Service Report and Invoice from February 2016 (Def. Supp. Appx. Ex. R)

- Dailey Supply, Inc. Sling Inspection Reports dated November 17, 2015 and December 19, 2016 (Def. Supp. Appx. Ex. S, T)

215.    The Konecranes Service Report and Invoice from February 2016 indicate that on February 5, 2016, Konecranes service technicians responded to a report that the hoist on the overhead crane in question was drifting, and the crane was taken out of service while parts were ordered.  On February 7, 2016, Konecranes technicians returned to Accuride, replaced the hoist brake, hub, coil, cooling fan and rectifier on the 20-ton KCI hoist, performed a function test with 11,000 pounds and returned the unit to service.  (Def. Supp. Appx. Ex. R).

216.    When the conveyor was attached to the crane and lifted six to ten inches off the ground, Herrmann and Natcher spun the conveyor 180 degrees so that when it was loaded on the trailer the legs of the conveyor are toward the front and the belly is toward the rear of the trailer. This was done because Natcher wanted the conveyor loaded in that position.  (Herrmann Depo., p. 76).

Respectfully submitted,


s/Matthew W. McCullough

Matthew W. McCullough
Pa. I.D. No. 46950
MacDONALD, ILLIG, JONES & BRITTON LLP
100 State Street, Suite 700
Erie, Pennsylvania 16507-1459
(814) 870-7602
FAX (814) 454-4647
mmccullough@mijb.com

Attorneys for Defendant
  Accuride Corporation

1577301

- 6 -

**CERTIFICATE OF SERVICE**

I certify that on July 23, 2018, the foregoing Defendant's Supplemental Concise Statement of Facts was filed electronically with the Clerk of Court, using the CM/ECF system.  Notice of this filing will be sent to all parties who have appeared of record by operation of the Court's ECF system and constitutes service of this filing under Rule 5(b)(2)(E) of the Federal Rules of Civil Procedure.  Those parties may access this filing through the Court's ECF system.

s/ Matthew W. McCullough
Matthew W. McCullough, Esq.